**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

|  |  |
|---|---|
| MAX MINDS, LLC, | |
| Plaintiff, | CAUSE NO. 1:24-cv-00779-MPB-MKK |
| v. | JURY TRIAL DEMANDED |
| TRIANGLE EXPERIENCE GROUP, INC., ROBERT CLARE, JEFFREY MASE, KEVIN MULLICAN, and JOHN DOES 1-10, | **FILED UNDER SEAL PURSUANT TO** 18 U.S.C. § 1836(b)(2) |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND SEIZURE ORDER

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK

**TABLE OF CONTENTS**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

II.  STATEMENT OF FACTS ............................................................................................ 2

    A.   PLAINTIFF'S INTELLECTUAL PROPERTY RIGHTS........................................ 2

        1.   MAX's Copyrights in the Haptic Software ................................................. 3

        2.   MAX's Trade Secrets in Haptic ................................................................. 4

        3.   Defendants' Use of MAX's Intellectual Property ....................................... 5

    B.   DEFENDANTS' UNLAWFUL CONDUCT ........................................................ 8

        1.   TEG'S PUBLIC DISCLOSURE OF THE HAPTIC FEDERAL SOURCE CODE. 8

        2.   TEG'S COPYRIGHT INFRINGEMENT, CIRCUMVENTION AND CMI
REMOVAL/FALSIFICATION VIOLATIONS....................................................... 9

        3.   TEG's REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION......... 10

    C.   THE IRREPARABLE HARM TO PLAINTIFF ............................................... 10

III. ARGUMENT ............................................................................................................ 11

    A.   Standard for Preliminary Injunction and Seizure Order. ........................................ 11

        1.   Plaintiff's Trade Secrets Claims.............................................................. 12

          a)   Requirements for Claims of Trade Secrets Misappropriation under the DTSA and
IUTSA ...................................................................................................... 12

          b)   Plaintiff Will Likely Succeed on the Merits of its Trade Secrets Claims ......... 13

        2.   Plaintiff's Copyright Claims .................................................................. 14

          a)   Plaintiff Will Likely Succeed on its Copyright Infringement Claims. ................ 14

          b)   Plaintiff Will Likely Succeed on the Merits of its Circumvention Claims. ....... 14

          c)   Plaintiff Will Likely Succeed on the Merits of its CMI Removal/Falsification
Claims ...................................................................................................... 16

        3.   Plaintiff's Lanham Act Claims................................................................ 17

          a)   Plaintiff Will Likely Succeed on the Merits of its False Designation of Origin
Claim ....................................................................................................... 17

        4.   Plaintiff is Suffering Irreparable Injury and There is No Adequate Remedy at Law.
.................................................................................................................... 18

          a)   Trade Secrets Claims ........................................................................... 18

          b)   Copyright Claims ................................................................................ 19

          c)   Lanham Act Claim ............................................................................... 20

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK

5.  The Balance of Hardship Tips Sharply in Plaintiff's Favor. .................................. 21

6.  An Injunction Is in the Public Interest. .................................................. 21

IV.  A BOND SHOULD SECURE THE INJUNCTION ........................................... 22

V.  AN ORDER REQUIRING THE SEIZURE OF MAX'S CONFIDENTIAL SOURCE CODE IS APPROPRIATE ................................................................... 23

1.  Relief Pursuant to Rule 65 Would be Inadequate ..................................... 23

2.  Immediate and Irreparable Injury Would Occur without the Seizure .................... 24

3.  The Harm MAX Outweighs any Harm to Defendants or Third Parties ................. 24

4.  MAX is Likely to Succeed on its Trade Secrets Claim ................................ 24

5.  Defendants have Actual Possession of MAX's Trade Secrets ........................... 25

6.  The TEG servers are Described with Particularity ................................... 25

7.  Seizure is Necessary to Preserve Evidence and Minimize Harm ...................... 25

8.  MAX has not publicized the requested seizure ...................................... 25

VI.  CONCLUSION ................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page**

*321 Studios v. MGM Studios, Inc.*,
  307 F. Supp. 2d 1085 (N.D. Cal. 2004) ................................................................. 16

*Actuate Corp. v. IBM*,
  2010 U.S. Dist. LEXIS 33095, 2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) ....................... 15

*Aon PLC v. Infinite Equity, Inc.*,
  No. 19 C 7504, 2021 U.S. Dist. LEXIS 175378 (N.D. Ill. Sep. 15, 2021) ............................ 20

*Aon Risk Servs. Companies, Inc. v. Alliant Ins. Servs.*,
  Inc., 415 F.Supp.3d 843 (N.D. Ill. 2019) ........................................................... 12, 13

*Apple Comput., Inc. v. Franklin Comput. Corp.*,
  714 F.2d 1240 (3d Cir. 1983) ........................................................................... 22

*Ballas v. Tedesco*,
  41 F. Supp. 2d 531 (D.N.J. 1999) ...................................................................... 19

*Burroughs Payment Sys. v. Symco Group, Inc.*,
  2012 U.S. Dist. LEXIS 67198, 2012 WL 1670163 ................................................ 16

*CBS Broad.* v. *Echostar Commc'ns Corp.*,
  265 F.3d 1193 (11th Cir. 2001) ........................................................................ 22

*Cooper v. Salazar*,
  196 F.3d 809 (7th Cir. 1999) ........................................................................... 12

*Dermsource, Inc. v. Citymedrx, L.L.C.*,
  No. 23-CV-281(JS)(JMW), 2023 U.S. Dist. LEXIS 8652 (E.D.N.Y. Jan. 18, 2023) ........... 24

*Diamond Sawblades Mfrs. Coal. v. Diamond Tools Tech.*,
  504 F. Supp. 3d 927 (S.D. Ind. 2020) .................................................................. 18

DMCA." *Synopsys, Inc. v. Innogrit, Corp.*,
  No. 19-CV-02082-LHK, 2019 U.S. Dist. LEXIS 171487 (N.D. Cal. Oct. 1, 2019) ............. 15

*Elevance Health, Inc. v. Mohan*,
  No. 1:23-cv-01497-SEB-MJD, 2023 U.S. Dist. LEXIS 164105 (S.D. Ind. Sept. 15, 2023) . 13

*Eli Lilly & Co. v. Natural Answers, Inc.*,
  233 F.3d 456 (7th Cir. 2000) ........................................................................... 12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ...................................................................................... 14

*Friedman v. Live Nation Merch., Inc.*,
   833 F.3d 1180 (9th Cir. 2016) ........................................................ 17

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
   174 F.3d 411 (4th Cir. 1999) .......................................................... 23

*Howmedica Osteonics Corp. v. DJO Glob., Inc.*,
   No. 1:17-cv-00938-SEB-TAB, 2018 U.S. Dist. LEXIS 227687, 2018 WL 3130969 .......... 13

*Inventus Power, Inc. v. Shenzhen Ace Battery Co.*,
   No. 20-cv-3375, 2020 U.S. Dist. LEXIS 122347 (N.D. Ill. July 13, 2020) .................. 13, 21

*JCW Invs., Inc. v. Novelty, Inc.*,
   482 F.3d 910 (7th Cir. 2007) .......................................................... 14

*Kraft Foods Grp. Brands L.L.C. v. Cracker Barrel Old Country Store, Inc.*,
   735 F.3d 735 (7th Cir. 2013) .......................................................... 18

*Krause Int'l, Inc. v. Reed Elsevier, Inc.*,
   866 F. Supp. 585 (D.D.C. 1994) ...................................................... 21

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
   342 F.3d 714 (7th Cir. 2003) .......................................................... 13

*Life Spine, Inc. v. Aegis Spine, Inc.*,
   8 F.4th 531 (7th Cir. 2021) ........................................................... 19

*Ligtel Communs. v. Baicells Techs.*,
   455 F. Supp. 3d 792 (N.D. Ind. 2020) ................................................ 12

*MGM Studios, Inc. v. Grokster, Ltd.*,
   518 F. Supp. 2d 1197 (C.D. Cal. 2007) .............................................. 20

*Microsoft Corp. v. EEE Bus., Inc.*,
   555 F. Supp. 2d 1051 (N.D. Cal. 2008) ............................................ 15-16

*Motorola, Inc. v. Lemko Corp.*,
   2012 U.S. Dist. LEXIS 2718, 2012 WL 74319 ...................................... 13

*Promatek Indus., LTD v. Equitrac Corp.*,
   300 F.3d 808 (7th Cir. 2002) ........................................................ 18, 20

*Rathmann Grp. v. Tanenbaum*,
   889 F.2d 787 (8th Cir. 1989) .......................................................... 23

*Rosati v.*
   *Rosati*, No. 20-cv-07762, 2021 U.S. Dist. LEXIS 155794 (N.D. Ill. Aug. 18, 2021) ........... 21

*Spinmaster, Ltd. v. Overbreak L.L.C.*,
   404 F. Supp. 2d 1097 (N.D. Ill. 2005) ................................................ 19

*Stahly, Inc. v. M.H. Jacobs Co.*,
    183 F.2d 914 (7th Cir. 1950) ........................................................................... 22

*Synopsys, Inc. v. AzurEngine Techs., Inc.*,
    401 F. Supp. 3d 1068 (S.D. Cal. 2019) ........................................................... 20

*Ty, Inc. v. Jones Grp. Inc.*,
    237 F.3d 891 (7th Cir. 2001) ........................................................... 11, 12, 18, 21

*Virtual Studios, Inc. v. Beaulieu Grp., L.L.C.*,
    987 F. Supp. 2d 769 (E.D. Tenn. 2013) .......................................................... 22

*Warner Bros. Ent., Inc. v. WTV Sys.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ..................................................... 20, 21

## Statutes

15 U.S.C. § 1125 ................................................................................................ 18
17 U.S.C. § 502 ................................................................................................. 19
17 U.S.C. § 1201 ............................................................................................... 15
17 U.S.C. § 1202 .......................................................................................... 16, 17
17 U.S.C. § 1203 ............................................................................................... 17
18 U.S.C. § 1836 ....................................................................................... i, 3, 23
18 U.S.C. § 1839 ......................................................................................... 13, 14

## Rules

Fed. R. Civ. P. 65 .............................................................................................. 23

## Other

Section 226 of the Consolidated Appropriations Act of 2021 ..................................... 21

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

This case is related to *Triangle Experience Group, Inc. v. Max Minds, LLC*, Case No. 1:24-cv-00650-JPH-MG pending in this district. The related case was originally filed in the Eastern District of Virginia and transferred to this district by order dated April 12, 2024. In the related case, Triangle Experience Group, Inc. (TEG) alleges that MAX Minds, LLC (MAX) breached certain written contracts between the parties related to subcontracting the licensing of MAX's software to agencies within the Department of Defense (DOD).

Since the related case was filed, and even prior to its filing, MAX was conducting an investigation of TEG's nefarious actions concerning plaintiff's software source code. MAX was concerned because MAX is a subcontractor of software licenses (unrelated to TEG) to a DOD agency. **MAX's investigation led to the recent discovery that TEG exposed the source code for MAX's Haptic Federal software product in three places on the public internet.** The initial discovery occurred in the past two months well after the motion to transfer the related case was fully briefed in the Eastern District of Virginia. Since the discovery, MAX has investigated the issue further and concluded that the actions of defendants could have serious consequences for MAX and national security.

Source code is normally highly confidential. Since plaintiff's software is used within the government, the exposure of plaintiff's source code is of extra concern. Good cybersecurity practices and protocols are inconsistent with the defendants' actions alleged herein. The actions of defendants are a cybersecurity incident waiting to happen. As a government contractor with a commitment to protect government information and infrastructure TEG and its executives know better.

The defendants' exposure of MAX's source code online can give clues to malicious hackers seeking ways to compromise classified information contained in MAX's software. The agreements between the parties prohibit what defendants have done. The exposure of MAX's

1

source code misappropriates plaintiff's trade secrets. The actions of defendants infringe on plaintiff's copyrights, and circumvented technical measures designed to protect MAX's software. TEG also removed and falsified copyright management information in MAX's software. Defendants removed the Haptic name from plaintiff's software to pass off the software as a product of TEG in violation of the Lanham Act.

This case was filed under seal because filing this case in the public record could alert individuals who seek to damage our national security of the existence of plaintiff's source code online. Once the threat is neutralized, either voluntarily by defendants or via compliance with this Court's orders, the case can be unsealed immediately. Until then, the defendants' actions pose an imminent threat to MAX's intellectual property, to MAX's relationships with customers, and to the national security of this country.

## II.       STATEMENT OF FACTS
### A.       PLAINTIFF'S INTELLECTUAL PROPERTY RIGHTS

MAX is an Indiana custom software development company. MAX's products are Alleo and Haptic Federal. Alleo and Haptic Federal are interactive, digital collaboration presentation, and productivity solutions for integrated teams worldwide. (Fischer Decl. ¶ 5).

Initially designed as a high-level solution for hybrid collaboration called Haptic, MAX's developers evolved the Alleo system to address the changing needs of users and their preferred work models. MAX's software is used in briefing centers, experience centers, and innovation centers by the government, and by Fortune 100 companies in consulting, telecommunications, IT, pharma, and manufacturing. (Fischer Decl. ¶ 6). Originally called Haptic, the software was recently rebranded as "Alleo" for commercial users; the Haptic name remains for government users. (Fischer Decl. ¶ 7).

Alleo/Haptic is a server-based collaborative workspace that utilizes a browser interface, enabling users to collaborate in real-time. It also features screen sharing capabilities that permit

users to select and share the display window of individual programs from their workstations to the Alleo/Haptic workspace. Alleo/Haptic is an infinite canvas of screen real estate that operates synchronously for all members in real-time. Alleo/Haptic is both the front-end operating system and underlying source code responsible for delivering these capabilities. (Fischer Decl. ¶ 10).

### 1.   MAX's Copyrights in the Haptic Software

Alleo/Haptic is an original, creative software program written in several different programming languages. MAX registered four versions of Haptic with the Copyright office and obtained registration certificates for each version. The following table details MAX's copyright registrations for Haptic:

| Title of Work | Registration Number | Effective Date | Certificate of Registration |
|---|---|---|---|
| Haptic Version 1.2.21.1 | TXu 2-425-362 | April 19, 2024 | Complaint, Ex. 1 |
| Haptic Version 1.2.125 | TXu 2-421-490 | April 2, 2024 | Complaint, Ex. 2 |
| Haptic Version 3.1.21.4 | TXu 2-419-714 | March 21, 2024 | Complaint, Ex. 3 |
| Haptic Version 3.1.21.8 | TXu 2-419-718 | March 21, 2024 | Complaint, Ex. 4 |

All Haptic Federal software is protected by technological measures that effectively control access to the software in that in the ordinary course of the software's operation; the measures require the application of information, or a process or a treatment, with the authority of MAX, to gain access to the Work. (Fischer Decl. ¶ 17.)

One technological measure that MAX uses to protect Haptic Federal is a license key that is required to install the software. (Fischer Decl. ¶ 18). Encoded into each license key is the customer's name and location as well as the date range when the key can be installed, after which, the key will no longer work. (*Id.*).

Max also applied copyright management information ("CMI") to the Haptic Federal software. (Fischer Decl. ¶ 19). The copyright management information MAX applied to the Haptic Federal Software consisted of the Haptic name, which is title, author and identifying information

for the title and author of Haptic Federal, MAX. (Fischer Decl. ¶ 20).

## 2. MAX's Trade Secrets in Haptic

The Haptic Federal software source code was written by MAX employees and developers under contract to MAX. All employees and developers working for MAX are contractually bound to maintain the confidentiality of the software they develop for the company. (Fischer Decl. ¶ 21).

The source code for the Haptic Federal software is a compilation, program, and code, which derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. (Fischer Decl. ¶ 22).

The Haptic Federal source code is never distributed to end users in source code format. Instead, the source code is compiled into executable, binary or web format executable code in such a fashion as to obscure the underlying trade secrets contained within the code. (Fischer Decl. ¶ 23).

When Haptic Federal is licensed to end users it is always pursuant to restrictions contained in an End User License Agreement (EULA). (Fischer Decl. ¶ 25). Pursuant to the EULA, users of the Haptic Federal software agree not to "directly or indirectly (i) sell, rent out, lease, license, distribute, market, exploit the Product or any of its parts commercially, (ii) reverse engineer, decompile, disassemble, adapt, reproduce, or create derivative works of this Product," "(iii) create, use and/or distribute "auto", "trainer", "script" or "macro" computer programs or other "cheat" or "hack" programs or software applications for this Product (whether over the internet or in local area network); (iv) remove, alter, disable or circumvent any copyright and trademark indications or other authorship and origin information, notices or labels contained on or within this Product and (v) export or re-export this Product or any copy of adaptation in violation of any

applicable laws or regulations." (Fischer Decl. ¶ 27).

Pursuant to the EULA, users of the Haptic Federal software agree:

(1)  that MAX retains and owns all intellectual property rights in the Haptic Federal software;

(2) to comply with all applicable laws, rules and regulations applicable to the software;

(3) not to "create, use, share and/or publish by any means in relation to the Product any material (text, words, images, sounds, videos, etc.) which would breach a duty of confidentiality, infringe any intellectual property right or an individual's right to privacy or which would incite the committing of an unlawful act (in particular, piracy, cracking or circulation of counterfeit software)";

(4) not to "create, supply or use alternative methods of using the Products, for example server emulators"; and

(5) not to "modify, distort, block, abnormally burden, disrupt, slow down and/or hinder the normal functioning of all or part of the Product, or their accessibility to other users, or the functioning of the partner networks of the Product, or attempt to do any of the above."

(Fischer Decl. ¶¶ 28-32; Complaint, Ex. 5).

### 3.  Defendants' Use of MAX's Intellectual Property

MAX first demonstrated the Haptic software to TEG in July of 2019 at the U.S. Government Joint Staff Lab in Norfolk Virginia. (Fischer Decl. ¶ 35). Before the demonstration MAX and TEG entered into a mutual Non-Disclosure Agreement. (Fischer Decl. ¶ 36; Complaint, Ex. 7).

Following the demonstration, MAX and TEG began working together. MAX provided

TEG's CEO Rob Clare and COO Jeff Mase with Haptic Federal user accounts. (Fischer Decl. ¶ 40). Before signing-in to their user accounts, Clare and Mase agreed to the Haptic Privacy Policy. (Fischer Decl. ¶ 41; Complaint, Ex. 8). To use the Haptic Federal software, Clare and Mase agreed to the Haptic EULA. (Fischer Decl. ¶ 43). These user accounts allowed TEG to access and demonstrate the capabilities of Haptic Federal to TEG customers. (Fischer Decl. ¶ 42).

Impressed with Haptic Federal's capabilities, TEG contacted MAX inquiring whether TEG could become an authorized reseller of Haptic Federal to the US government. The parties came to an agreement whereby TEG would create a distribution channel to license Haptic Federal to customers in the federal government. (Fischer Decl. ¶ 47).

Thereafter, the parties entered into a Joint Venture Agreement (JVA), pursuant to which MAX would create and maintain a branch of the Haptic source code for exclusive use by the US government. (Fischer Decl. ¶ 48; Complaint, Ex. 9). TEG would be the exclusive distributor of Haptic Federal to the US government. (Fischer Decl. ¶ 49). The JVA applied to the Haptic Federal product only and nothing in the JVA granted TEG ownership rights in the Haptic Federal software. (Fischer Decl. ¶¶ 58-59).

Pursuant to the JVA, beginning in June 2020 MAX made the source code securely available to TEG over a dozen times to allow their government customer(s) to scan for vulnerabilities and security issues. (Fischer Decl. ¶ 68). All source code transfers by MAX to TEG were pursuant to significant restrictions contained in a Source Code License Agreement dated March 30, 2021 ("SCLA"). (Fischer Decl. ¶¶ 60, 62; Complaint, Ex. 6). The SCLA contains an extensive confidentiality agreement in which TEG acknowledged and agreed that Haptic Federal Source Code and the Documentation for the Haptic Federal Source Code was "confidential intellectual property (including trade secrets)" of MAX and that TEG would maintain and not disclose any Confidential Information. (Fischer Decl. ¶ 67).

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK

Security measures were required to be followed every time source code was transferred by Max to TEG. (Fischer Decl. ¶ 69). One security measure required in connection with source code transfer was that TEG was required to provide MAX with a "chain of custody" document with signatures from everyone who accessed the source code stating that each person witnessed destruction of the source code after the scan. (Fischer Decl. ¶ 75.  One reason why security measures were required is because prior to MAX's agreement to the JVA with TEG, MAX's first customer for Haptic Federal was a Department of Defense (DOD) agency that agreed to license Haptic Federal in August of 2019. (Fischer Decl. ¶ 70).

In the Summer of 2023, TEG failed to provide chain of custody documentation multiple times as required in order to protect MAX's trade secret source code from unauthorized disclosure. (Fischer Decl. ¶ 77). As a result, on August 17, 2023, MAX and TEG entered into a Certification Agreement. The agreement was intended to formalize confidentiality safeguards for Haptic Federal. (Fischer Decl. ¶ 78; Complaint, Ex. 10). The Certification Agreement recites that "the Parties wish to maintain the source code for Haptic Federal software platform ("Source Code") confidential and to preserve its value as a trade secret, and therefore wish to limit disclosure of the Source Code." (Fischer Decl. ¶ 78). TEG further acknowledged in the Certification that TEG was under a duty to maintain as confidential the Haptic Federal source code and that the Haptic Federal source code was to be used only by the customer to complete required security scans, which were to be accompanied by a chain of custody form. (Fischer Decl. ¶ 80).

After the parties entered into the Certification Agreement, MAX discovered TEG in violation of the Certification Agreement numerous times. On September 13, 2023 and September 22, 2023, MAX engaged in source code transfers (versions 3.1.21.8 and 3.1.21.9) to TEG. With respect to each transfer, TEG (1) retained the source code; (2) withheld the government scan re-

port; (3) withheld Chain of Custody documents; and (4) failed to obtain signatures from everyone who touched the Haptic Federal source code. MAX asked TEG at least twenty times to remedy these issues, but TEG stalled and eventually stopped responding to MAX in December 2023. TEG's Certification Agreement violations willfully endangered the Haptic Federal source code, resulting in damage to MAX. (Fischer Decl. ¶ 91-95).

## B.    DEFENDANTS' UNLAWFUL CONDUCT

### 1.    TEG'S PUBLIC DISCLOSURE OF THE HAPTIC FEDERAL SOURCE CODE.

From the time MAX transferred software source code for Haptic Federal to TEG, MAX had concerns about whether TEG was complying with its agreements and maintaining the necessary security of the Haptic Federal Source Code. (Fischer Decl. ¶ 81).

In February 2024 while searching the internet MAX discovered that the defendants installed Haptic Federal on internet facing servers accessible on at least three (3) uniform resource locators (URL). The specifics of this discovery is explained in detail in the Declaration of Robert Simon of MAX submitted in connection with the motion for preliminary injunction and seizure order. (Fischer Decl. ¶ 82). In each instance discovered by MAX, TEG removed the Haptic CMI from the Haptic Federal software and replaced the Haptic CMI with false CMI indicating that the software was TEG's software by using the terms "VJOC" and "C4MAP." (Fischer Decl. ¶ 83).

At each URL the servers hosting the Haptic Federal software exposed source code maps and source code to the public. (Simon Decl. ¶ 5). MAX documented where TEG exposed the Haptic Federal source code online and how it can be found, reviewed and captured. (Simon Decl. ¶ 3, Ex. 1). The exposure of MAX's Haptic Federal source code is a serious issue of concern for MAX since it exposes MAX's trade secrets to the public. (Fischer Decl. ¶ 85; Simon Decl. ¶ 6).

Not only is TEG's disclosure of MAX's source code a concern for MAX, but it is a serious issue of concern for our country's national security. The exposure of the Haptic Federal

source code by TEG online makes the program vulnerable to attacks or exploits that could be carried out against the government. (Fischer Decl. ¶ 86-87).

There is good reason to believe that individuals within TEG are aware of the potential exposure. (Fischer Decl. ¶ 88-89). Pursuant to the Certification Agreement and the SCLA, TEG is under a continuing obligation to maintain the confidentiality of the Haptic Federal Software and the Haptic Federal Source Code. (Fischer Decl. ¶ 90).

## 2. TEG'S COPYRIGHT INFRINGEMENT, CIRCUMVENTION AND CMI REMOVAL/FALSIFICATION VIOLATIONS.

TEG circumvented the technological measures in the Haptic Federal source code. (Fischer Decl. ¶ 96). TEG made at least $2.5 million of undisclosed software/service sales of Haptic Federal or trials in Haptic Federal in 2023. (Fischer Decl. ¶ 97). In each case of a sale, TEG required a license key to install Haptic Federal; MAX never provided license keys for these sales. (Fischer Decl. ¶¶ 98-99). To get around the licensing key requirement, TEG modified the Haptic Federal source code by stripping out or modifying the licensing logic from the source code to circumvent the licensing key requirement. (Fischer Decl. ¶ 100). TEG also back-dated computers to circumvent MAX's licensing policy for Haptic Federal. (Fischer Decl. ¶ 109). TEG did not request or receive permission or authority to strip out or modify the licensing logic from the source code or back-date computers to circumvent the licensing key technological measure. (Fisher Decl. ¶ 101).

In 2020 and 2021, MAX discovered that TEG exceeded software licenses by providing "free" extended trials. (Fischer Decl. ¶ 102). MAX was required to authorize each free trial of Haptic Federal software that TEG provided to a customer in advance of installation. (Fischer Decl. ¶ 103). In mid-2021, MAX discovered at least a dozen trials that TEG had extended to customers without MAX's authorization. (Fischer Decl. ¶ 104). In response, TEG told MAX these were free trials; TEG's claim of free trials is false because TEG was paid to install and support

the trial installations of Haptic Federal. (Fischer Decl. ¶ 105).

TEG provided unauthorized trials to customers by exceeding the scope of the two software licenses granted to TEG pursuant to the JVA. TEG made unauthorized copies and distributed those unauthorized copies of Haptic Federal to third parties for live events and live exercises for which TEG received compensation. TEG exceeded the scope of software licenses purchased from MAX by copying and distributing Haptic Federal numerous times without MAX's authorization. (Fischer Decl. ¶¶ 106-108).

### 3. TEG's REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION.

Without notice to MAX or permission from MAX, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "C4MAP" when it demonstrated Haptic Federal to certain government customers. (Fischer Decl. ¶ 110). Similarly, without notice to MAX or permission from MAX, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "VJOC," an abbreviation for Virtual Joint Operations Center, to other government customers. (Fischer Decl. ¶ 111).

TEG removed the Haptic name from the Haptic Federal software without MAX's knowledge, agreement or authorization. (Fischer Decl. ¶ 112). TEG committed such acts knowing removing the Haptic name would conceal the true facts concerning ownership of the Haptic Federal software from others, including TEG's government customers. (Fischer Decl. ¶ 113). TEG and the individual defendants intended to conceal the true facts concerning ownership of the Haptic Federal software from others, including TEG's government customers.

### C. THE IRREPARABLE HARM TO PLAINTIFF

The defendants' conduct deprives Plaintiff of the ability to control its chief asset, its software. Despite being under a duty to maintain the confidentiality of MAX's Haptic Federal Source Code, TEG has made MAX's proprietary Haptic Federal source code accessible to the

general public. (Fischer Decl. ¶ 85).

TEG extended unauthorized trials and licenses of MAX's software without MAX's authorization or knowledge such that MAX does not know the extent to which its software is being used or by whom it is being used. (Fischer Decl. ¶¶ 101-108). Despite MAX's requests for TEG to remedy this issue, TEG continued to misuse MAX's software. (Fischer Decl. ¶ 94).

Not only are defendants misusing and misappropriating MAX's proprietary software, but they are rebranding it as their own, misleading purchasers of the software as to its true owner, and concealing MAX's ownership of the software. (Fischer Decl. ¶¶ 110-127).

The defendants' actions pose an imminent threat to MAX's intellectual property, to MAX's relationships with customers, and to the national security of this country.

### III.    ARGUMENT

#### A.    Standard for Preliminary Injunction and Seizure Order.

To obtain a preliminary injunction, a party must establish (1) that its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that it will suffer irreparable harm if the injunction is not granted. *Ty, Inc. v. Jones Grp. Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

If the Court is satisfied that these three conditions have been met, then it must consider the harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Id.* Finally, the Court must consider the potential effect on the public interest (non-parties) in denying or granting the injunction. *Id.* The Court then weighs all of these factors, "sitting as would a chancellor in equity," when it decides whether to grant the injunction. *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992)).

The process of weighing the factors requires the court to engage in an analysis—the sliding scale approach–to determine the likelihood of plaintiff succeeding on the merits weighed

**SRIPLAW**

Cᴀʟɪꜰᴏʀɴɪᴀ ◆ Gᴇᴏʀɢɪᴀ ◆ Fʟᴏʀɪᴅᴀ ◆ Iɴᴅɪᴀɴᴀ ◆ Tᴇɴɴᴇssᴇᴇ ◆ Nᴇᴡ Yᴏʀᴋ

against the balance of harms. *Id.* The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Id.* at 895-896. The greater the movant's likelihood of succeeding on the merits, the less the balancing of harms need be in his favor. *See Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir. 2000). To demonstrate a likelihood of success on the merits a plaintiff "need only demonstrate a better than negligible chance of succeeding." *Cooper v. Salazar,* 196 F.3d 809, 813 (7th Cir. 1999).

### 1.  Plaintiff's Trade Secrets Claims.

#### a)  Requirements for Claims of Trade Secrets Misappropriation under the DTSA and IUTSA

A trade secret misappropriations claim requires a showing that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner. *Aon Risk Servs. Companies, Inc. v. Alliant Ins. Servs., Inc.*, 415 F.Supp.3d 843, 848 (N.D. Ill. 2019). The complaint alleges violations of both the Defend Trade Secrets Act (DTSA) and the Indian Uniform Trade Secrets Act (IUTSA); the elements of misappropriation claims under the DTSA and IUTSA are similar, *Ligtel Communs. v. Baicells Techs.*, 455 F. Supp. 3d 792, 806-07 (N.D. Ind. 2020).

Information qualifies as a "trade secret" if (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Indiana's definition is the same. *Elevance Health, Inc. v. Mohan*, No. 1:23-cv-01497-SEB-MJD, 2023 U.S. Dist. LEXIS 164105, at *18 (S.D. Ind. Sept. 15, 2023).

Once a party demonstrates the existence of a trade secret, it then must show

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK

misappropriation, that is, either the "acquisition of a trade secret of another . . . by improper means" or the "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(A)-(B); *Howmedica Osteonics Corp. v. DJO Glob., Inc.*, No. 1:17-cv-00938-SEB-TAB, 2018 U.S. Dist. LEXIS 227687, 2018 WL 3130969, at *7 (S.D. Ind. Mar. 15, 2018). Under both statutes, whether information qualifies as a trade secret is a question of fact that "requires an ad hoc evaluation of all the surrounding circumstances." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003).

> b)      **Plaintiff Will Likely Succeed on the Merits of its Trade Secrets Claims**

Plaintiff alleges that the defendants misappropriated the Haptic Federal source code by disclosure of the source code without MAX's consent under circumstances where the defendants had a duty to maintain the secrecy of the source code. (Complaint ¶¶ 146-151, 155-161).

The Haptic Federal source code qualifies as a trade secret. *See Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20-cv-3375, 2020 U.S. Dist. LEXIS 122347, at *26-28 (N.D. Ill. July 13, 2020) (Approximately 100,000 confidential technical documents and source code constituted trade secrets); *Aon Risk Servs. Cos. v. Alliant Ins. Servs.,* 415 F. Supp. 3d 843, 848 (N.D. Ill. 2019) (recognizing that "data compilations, proprietary tools, client information [and] client lists" may constitute trade secrets); *Motorola, Inc. v. Lemko Corp*., 2012 U.S. Dist. LEXIS 2718, 2012 WL 74319, at *16-17 (N.D. Ill. Jan. 10, 2012) (product source code and documentation, product roadmaps, and testing tools found to be protectable trade secrets).

The facts demonstrate that MAX took all necessary precautions to maintain the trade secrets in its Haptic Federal source code. MAX did not release the source code to the defendants except under secure conditions pursuant to agreements with onerous requirements on the defendants to maintain the secrecy of that code.

The facts also demonstrate misappropriation by defendants. Misappropriation means the

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK

"disclosure or use of a trade secret of another without express or implied consent by a person who … at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was … acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II).

Misappropriation is shown here. The defendants knew that MAX's Haptic Federal source code was acquired under circumstances requiring the defendants to maintain the secrecy of the code and limit its use. Despite this knowledge, defendants disclosed the code online. Plaintiff will likely succeed on this claim.

### 2.  Plaintiff's Copyright Claims

#### a)  Plaintiff Will Likely Succeed on its Copyright Infringement Claims.

The elements of a copyright infringement claim are (1) ownership of a valid copyright, and (2) actionable copying by the defendant. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007).

Plaintiff alleges that it owns a valid copyright in the Haptic Federal source code. Plaintiff registered the Haptic Federal source code and attached certificates of registration to its complaint. (Complaint Ex. 1-4). The defendants had access to the source code to copy it through their relationship with MAX, and defendants copied the code and distributed unauthorized copies of Haptic Federal to third parties and online without MAX's authorization. (Fischer Decl. ¶¶ 106-108; Simon Decl.). TEG provided a dozen or more unauthorized trials of MAX's Haptic software and allowed trials to extend beyond the period allowed under their agreement. (Fischer Decl. ¶ 102-105). TEG made derivatives of MAX's Haptic software by modifying the source code without authorization. (Fischer Decl. ¶ 100-101).

Plaintiff has demonstrated likelihood of success on its copyright infringement claims.

#### b)  Plaintiff Will Likely Succeed on the Merits of its Circumvention Claims.

17 U.S.C. § 1201(a)(1)(A) provides that "no person shall circumvent a technological measure that effectively controls access to a work protected under this title." "[T]o 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). "A technological measure 'effectively controls access to a work if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id*. License key systems are "technological measures that effectively control access to a copyrighted work for the purposes of the DMCA." Synopsys, Inc. v. Innogrit, Corp., No. 19-CV-02082-LHK, 2019 U.S. Dist. LEXIS 171487, at *20 (N.D. Cal. Oct. 1, 2019).

Defendants have engaged in circumvention. Defendants removed or modified the licensing logic from the Haptic Federal source code to circumvent the licensing key technological measure. Defendants also back-dated computers to circumvent the date restrictions in the licensing key system and install Haptic Federal.

Courts have found violations of 17 U.S.C. § 1201(a)(1) in far less egregious circumstances than the ones presented in this case. *See Actuate Corp. v. IBM*, 2010 U.S. Dist. LEXIS 33095, 2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) (Spero, M.J.) ("[U]nauthorized distribution of passwords and usernames avoids and bypasses a technological measure in violation of sections 1201(a)(2) and (b)(1)."); *Microsoft Corp. v. EEE Bus., Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008) (White, J.) ("By distributing a VLK without authorization, [defendant] effectively circumvented [plaintiff's] technological measure to control access to a copyrighted work in violation of the DCMA."); *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1098 (N.D. Cal. 2004) ("However, while [defendant's] software does use the authorized

key to access the DVD, it does not have authority to use this key, as licensed DVD players do, and it therefore avoids and bypasses [the technological measure].”); *Burroughs Payment Sys. v. Symco Group, Inc.*, 2012 U.S. Dist. LEXIS 67198, 2012 WL 1670163, at *4 (N.D. Cal. May 14, 2012) (“unauthorized use of a valid password 'circumvents' technology measures”)

Courts have granted preliminary injunctive relief under factually similar circumstances to the case here. *CSC Holdings, Inc. v. Greenleaf Elecs.*, No. 99 C 7249, 2000 U.S. Dist. LEXIS 7675 (N.D. Ill. June 1, 2000) (preliminary injunction granted on circumvention of technological measures which are designed to control access to a copyrighted work under 17 U.S.C. § 1201). Plaintiff has demonstrated likelihood of success on its circumvention claims.

### c)      Plaintiff Will Likely Succeed on the Merits of its CMI Removal/Falsification Claims

Copyright Management Information is defined as any of the following information “conveyed in connection with copies . . . or displays of a work”:

> The title and other information identifying the work, including the information set forth on a notice of copyright[, and t]he name of, and other identifying information about, the author of a work . . . [or] the copyright owner of the work, including the information set forth in a notice of copyright.

17 U.S.C. § 1202(c)(1)-(3). The CMI falsification provision provides:

> No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—provide [ ] or distribute or import for distribution copyright management information that is false.

17 U.S.C. § 1202(a)(1)-(2). The CMI removal provision provides:

> No person shall, without the authority of the copyright owner or the law—intentionally remove or alter any copyright management information, distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or distribute [or] import for distribution … works [or] copies of works [ ] knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b)(1)-(3).

**SRIPLAW**
Cᴀʟɪꜰᴏʀɴɪᴀ ◆ Gᴇᴏʀɢɪᴀ ◆ Fʟᴏʀɪᴅᴀ ◆ Iɴᴅɪᴀɴᴀ ◆ Tᴇɴɴᴇssᴇᴇ ◆ Nᴇᴡ Yᴏʀᴋ

Liability is not contingent on a defendant itself removing or altering any CMI; the defendant's knowledge that CMI was removed or altered before the defendant distributed the image suffices. *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1187 (9th Cir. 2016).

In this case, plaintiff asserts that the defendants "without permission or authority of MAX or the law, removed MAX's copyright management information and distributed copyright management information knowing that it was false without authority of MAX" when they "removed 'Haptic' from the main page of Haptic Federal and changed the name of Haptic Federal to either "C4MAP" or "VJOC" when defendants demonstrated Haptic Federal to certain government customers." (Complaint ¶¶ 129-131, 184-186). The facts set forth in the declarations supporting this motion demonstrate that the defendants removed HAPTIC, defendants substituted C4MAP or VJOC for HAPTIC in order so defendants could claim HAPTIC was their software, and that they did so for purposes of enabling, facilitating or concealing infringement of the MAX's rights in the Haptic Federal computer program.

Plaintiff has demonstrated likelihood of success on its copyright management information removal or falsification claims.

### 3. Plaintiff's Lanham Act Claims

#### a) Plaintiff Will Likely Succeed on the Merits of its False Designation of Origin Claim

The complaint alleges that the "Haptic" mark is a trademark of MAX for software that is inherently distinctive or suggestive, and that the defendants removed the Haptic mark on the Haptic Federal software and replaced it with C4MAP and JVOC when the software was displayed, advertised, and marketed to TEG's clients in violation of 15 U.S.C. § 1125(a). (Complaint ¶¶ 132-144).

"This section of the Lanham Act requires that customers likely be, in other words, tricked into thinking that products are affiliated with or approved by another party." *Diamond Sawblades*

*Mfrs. Coal. v. Diamond Tools Tech.*, 504 F. Supp. 3d 927, 942 (S.D. Ind. 2020). In order to prevail under the Lanham Act, 15 U.S.C. § 1125(a), plaintiff must establish that it has a protectable trademark and that the defendants' use of the term is likely to cause confusion among consumers. See *Ty, Inc.*, 237 F.3d at 897. In assessing the likelihood of consumer confusion, we consider: (1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's. *Promatek Indus., LTD v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002).

In this case all the factors weigh in favor of confusion. The defendants substituted the HAPTIC mark for marks of their choosing on the same exact product under circumstances showing that they intended to misrepresent plaintiff's Haptic Federal product as defendants' own product. Defendants in fact intended to palm off Haptic Federal as its own product. Under these circumstances, plaintiff will likely succeed on its false designation of origin claims.

### 4. Plaintiff is Suffering Irreparable Injury and There is No Adequate Remedy at Law.

Irreparable harm is harm that is "not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction or both) in the plaintiff's favor." *Kraft Foods Grp. Brands L.L.C. v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013).

### a) Trade Secrets Claims

There is no presumption of irreparable harm upon for trade secrets misappropriation. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). Evidence of lost customers, lost market share, and lost business generally is unquantifiable making injury irreparable. *Id.*

That is the case here. Plaintiff demonstrated that the defendants used their access to plaintiff's trade secret source code to obtain customers and business in ways that violated the parties' agreements. These losses are unquantifiable. The harm to plaintiff is therefore irreparable by damages.

### b) Copyright Claims

Where a copyright owner has expended significant resources promoting products embodying its copyrights, losses resulting from infringement of such copyrights constitutes irreparable harm. *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1173 (7th Cir. 1997). These harms are notoriously difficult to quantify, and accordingly are considered irreparable which is why the Copyright Act expressly provides for injunctive relief to address infringement. See 17 U.S.C. § 502; *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010) (loss of sales due to infringement is "notoriously difficult" to prove; violation of copyright owner's "right to exclude" renders monetary remedies inadequate in a wide range of circumstances).

A copyright owner's "invest[ment] of substantial time, effort and money into creating the [copyright protected work]" coupled with the likely inability to realize the return on such investment due to infringement of the copyright, supports a finding of irreparable harm. *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 542 (D.N.J. 1999). The sort of irreparable harm resulting from copyright infringement includes damage to the copyright owner's business reputation and right of exclusivity. *Spinmaster, Ltd. v. Overbreak L.L.C.*, 404 F. Supp. 2d 1097, 1111 (N.D. Ill. 2005).

The same is true for circumvention and copyright management information claims. *See Aon PLC v. Infinite Equity, Inc.,* No. 19 C 7504, 2021 U.S. Dist. LEXIS 175378, at *91 (N.D. Ill. Sep. 15, 2021). "In the DMCA context, irreparable harm may be established by evidence that circumvention is undermining the copyright owner's negotiating position, damaging goodwill

with licensees, threatening the copyright owner's business model, risking the copyright owner's market share, causing reputational harm to the copyright owner or its works, and/or enabling third parties to infringe the owner's copyrights." *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1074 (S.D. Cal. 2019).

Defendants' infringing conduct deprives Plaintiff of the ability to control its chief asset, its software. This is an irreparable harm for which monetary compensation is inadequate and warrants equitable relief. *See Promatek Industries, Ltd. v. Equitrac Corp*., 300 F.3d 808, 813 (7th Cir. 2002) (finding that damage to plaintiff's goodwill was irreparable harm for which plaintiff had no adequate remedy at law); *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1219 (C.D. Cal. 2007) ("In sum, Plaintiffs have offered two independently sufficient grounds for a finding of irreparable harm. Plaintiff will suffer irreparable harm because of StreamCast's likely inability to pay for the past and/or future infringements that it has induced. Additionally, StreamCast's inducement has and will continue to irreparably harm Plaintiff's ability to enforce its exclusive rights."); *Warner Bros. Ent., Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1013-14 (C.D. Cal. 2011) (recognizing that the perception of the ability to infringe copyright protected work undermines the ability to develop and conduct business); *CSC Holdings*, 2000 U.S. Dist. Lexis at *26 (finding no adequate remedy at law where "any adequate remedy for [p]laintiff would necessarily have to include equitable relief that would prevent [d]efendant from continuing to circumvent plaintiff's technological measures to protect its copyright).

### c)   Lanham Act Claim

Section 226 of the Consolidated Appropriations Act of 2021 restored the presumption of irreparable harm to a plaintiff who seeks an injunction in a Lanham Act. *See Rosati v. Rosati*, No. 20-cv-07762, 2021 U.S. Dist. LEXIS 155794, at *34 (N.D. Ill. Aug. 18, 2021) (referring to the amendment of 15 U.S.C. § 1116(a) providing that a plaintiff "shall be entitled to a rebuttable

presumption of irreparable harm upon a . . . finding of likelihood of success on the merits.")

Even without the presumption, plaintiff's showing of irreparable harm for the other claims discussed above applies equally to plaintiff's Lanham Act claims.

### 5.  The Balance of Hardship Tips Sharply in Plaintiff's Favor.

If the Court is satisfied that Plaintiff has demonstrated (1) a likelihood of success on the merits, (2) no adequate remedy at law, and (3) the threat of irreparable harm if preliminary relief is not granted, then it must next consider the harm that Defendants will suffer if preliminary relief is granted, balancing such harm against the irreparable harm Plaintiff will suffer if relief is denied. *Ty, Inc.*, 237 F.3d at 895.

"Defendant's product uses Plaintiff's trade secrets [and copyrighted source code], Defendant has no right to use them, and any harm it suffered as a result of the injunction 'would be a consequence of [its] own conduct.'" *Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20-cv-3375, 2020 U.S. Dist. LEXIS 122347, at *46 (N.D. Ill. July 13, 2020) (quoting *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1146 (N.D. Ill. 2019)).

As willful infringers, Defendants are entitled to little equitable consideration. "When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l, Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994). Defendants "cannot complain" of being forced to cease their infringement. *Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1014-15 (C.D. Cal. 2011). Further, the threat of continued copyright infringement without issuance of an injunction as well as the copyright owner's loss of exclusivity occasioned by copyright infringement support a finding that the balance of hardships weighs in favor of awarding injunctive relief. *Virtual Studios, Inc. v. Beaulieu Grp., L.L.C.*, 987 F. Supp. 2d 769, 781 (E.D. Tenn. 2013).

### 6.  An Injunction Is in the Public Interest.

"[I]t is virtually axiomatic that the public interest can only be served by upholding

copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983); *see also CBS Broad. v. Echostar Commc'ns Corp.*, 265 F.3d 1193, 1198 (11th Cir. 2001) (the public interest lies with protecting the rights of copyright owners). This is especially true here since protecting the plaintiff's software protects its integrity.

Furthermore, the public interest favors entry of a preliminary injunction to protect the consumer from being defrauded and misled by infringing goods. *See Stahly, Inc. v. M.H. Jacobs Co.*, 183 F.2d 914, 917 (7th Cir. 1950) (noting that trademark laws "are concerned not alone with the protection of a property right existing in an individual, but also with the protection of the public from fraud and deceit."). The public needs to be protected from being defrauded and buying defendants' infringing software.

In this case, the injury to the public is significant, and the injunctive relief that plaintiff seeks is specifically intended to remedy that injury by dispelling the public confusion created by defendants' actions. The public has the right not to be confused and defrauded as to the source of the software offered by defendants or as to the identity of the owner of the intellectual property used in connection that software. Unless defendants' unauthorized use of plaintiff's software is enjoined, the government purchaser will continue to be confused and misled by defendants' conduct.

## IV.   A BOND SHOULD SECURE THE INJUNCTION

The posting of security upon issuance of a temporary or preliminary injunction is vested in the Court's sound discretion. *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999); Fed. R. Civ. P. 65(c). Because of the strong and unequivocal nature of Plaintiff's evidence of

infringement, Plaintiff respectfully requests this Court require Plaintiff to post a bond of no more than ten thousand dollars ($10,000.00).

## V.   AN ORDER REQUIRING THE SEIZURE OF MAX'S CONFIDENTIAL SOURCE CODE IS APPROPRIATE

Under the DTSA, a plaintiff may move for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action. 18 U.S.C. § 1836(b)(2). "Prior to issuing an *ex parte* seizure order, the Court must find that it clearly appears from the specific facts that:

1) an order issued pursuant to Rule 65 of the Federal Rules of Civil Procedure or another form of equitable relief would be inadequate because the party to which the order would be issued would evade, avoid, or otherwise not comply with such an order;

2) an immediate and irreparable injury will occur if such seizure is not ordered;

3) the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application and substantially outweighs the harm to any third parties who may be harmed by such seizure;

4) the applicant is likely to succeed in showing that the information at issue is a trade secret and the defendant misappropriated the trade secret by inappropriate means or conspired to do so;

5) the person against whom seizure would be ordered has actual possession of the trade secret, and any property to be seized;

6) the property application describes with reasonable particularity the matter to be seized and, to the extent reasonable under the circumstances, the location where the matter is to be seized;

7) if the applicant were to provide notice, the person against whom seizure would be ordered would destroy, move, hide, or otherwise make such matter inaccessible to the court; and

8) the applicant has not publicized the requested seizure.

*Dermsource, Inc. v. Citymedrx, L.L.C.*, No. 23-CV-281(JS)(JMW), 2023 U.S. Dist. LEXIS 8652, at *11-12 (E.D.N.Y. Jan. 18, 2023) (citing 18 U.S.C. § 1836(b)(2)).

### 1.   Relief Pursuant to Rule 65 Would be Inadequate

MAX assumes that TEG will resist the entry of an injunction because defendants have

refused to comply with the numerous agreements restricting their conduct forcing MAX to file

this action to protect its property rights in its intellectual property. TEG's willful disregard for its

contractual obligations creates significant doubt whether injunctive relief will be sufficient.

 The defendants' access to plaintiff's software must be restricted. Injunctive relief re-

quires cooperation. If defendants agree to cooperate and engage in full disclosure with the Court

then seizure might not be necessary. However, a seizure order will be necessary if defendants re-

sist compliance. Defendants have refused to comply with the terms of their agreements with

MAX to date. There is no indication that will change.

### 2.   Immediate and Irreparable Injury Would Occur without the Seizure

Absent an order requiring the seizure of TEG's servers, MAX's trade secrets will con-

tinue to be viewable and accessible by the general public and this country's national security will

continue to be threatened.

The exposure of MAX's Haptic Federal source code is a serious issue of concern for our

country's national security. Plaintiff's DOD agency licensee could be vulnerable to attacks or ex-

ploits as a result. (Fischer Decl. ¶ 87).

### 3.   The Harm MAX Outweighs any Harm to Defendants or Third Parties

The harm to MAX, as outlined above, outweighs any harm to defendants. An order re-

quiring the seizure of TEG's servers will merely require defendants to comply with the laws of

the United States and the contracts they entered into.

### 4.   MAX is Likely to Succeed on its Trade Secrets Claim

MAX is likely to succeed on its trade secrets claim. MAX's Haptic Federal source code is

a trade secret. The Haptic Federal source code is a compilation, program, and code, which de-

rives independent economic value from not being generally known to, and not being readily as-

certainable by proper means by, other persons who can obtain economic value from its disclo-

sure or use and is the subject of efforts that are reasonable under the circumstances to maintain

its secrecy. (Fischer Decl. ¶ 24). TEG has acknowledged that the Haptic Federal source code is a trade secret. (Fischer Decl. ¶ 79).

TEG is misappropriating MAX's trade secret. TEG is exposing MAX's source code maps and source code to the public on the internet. (Simon Decl. ¶ 6; Fischer Decl. ¶ 85).

### 5.  Defendants have Actual Possession of MAX's Trade Secrets

There is no question that TEG has actual possession of MAX's trade secrets. TEG was given the source code under strict terms of confidentiality provided in the SCLA and the Certification Agreement. (*See e.g.,* Fischer Decl. ¶ 62).

### 6.  The TEG servers are Described with Particularity

The servers operated by TEG which display to the public MAX's Haptic Federal source code are identified in the declaration of Robert Simon and Exhibit 1 attached thereto.

### 7.  Seizure is Necessary to Preserve Evidence and Minimize Harm

Seizure is crucial to preserve evidence of TEG's wrongdoing and minimize harm to MAX, third parties, and the United States Government. (Rothman Declaration for Sealing ¶ 8-10; Fischer Decl. ¶ 85-87; Simon Decl. ¶ 6).

### 8.  MAX has not publicized the requested seizure

Max filed this case under seal and has not publicized the requested seizure.

## VI.    CONCLUSION

In view of the foregoing, Plaintiff respectfully requests this Court enter a Preliminary Injunction as to Defendants and the seizure order requested.

DATED: May 8, 2024                    Respectfully submitted,

                                      */s/ J. Campbell Miller*
                                      J. CAMPBELL MILLER
                                      Indiana Bar Number: 38279-49
                                      campbell.miller@sriplaw.com

                                      **SRIPLAW, P.A.**
                                      231 S. Rangeline Road

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK

Suite H
Carmel, IN 46032
561.404.4350 – Telephone
561.404.4353 – Facsimile

and

JOEL B. ROTHMAN
*(pro hac vice forthcoming)*
joel.rothman@sriplaw.com

**SRIPLAW, P.A.**
21301 Powerline Road
Suite 100
Boca Raton, FL 33433
561.404.4335 – Telephone
561.404.4353 – Facsimile

and

*/s/ Philip D. Sever*
PHILIP D. SEVER
Indiana Bar No.:  25384-49
phil@landownerattorneys.com

**SEVER, STORY, WALKER**
742 South Rangeline Road
Carmel, IN 46032
317.961.1202 – Telephone

*Counsel for Plaintiff Max Minds, LLC*