DO NOT UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MAX MINDS, LLC, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) CAUSE NO. _____ ) ) JURY TRIAL DEMANDED |
| TRIANGLE EXPERIENCE GROUP, INC., ROBERT CLARE, JEFFREY MASE, KEVIN MULLICAN, and JOHN DOES 1-10, | ) ) FILED UNDER SEAL PURSUANT TO 18 ) U.S.C. § 1836(b)(2) ) ) |
| Defendants. | |

## DECLARATION OF BRANDON FISCHER IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND SEIZURE ORDER

### TABLE OF CONTENTS

MAX'S COPYRIGHTS IN HAPTIC ................................................................................... 4

MAX'S COPY PROTECTION AND COPYRIGHT MANAGEMENT INFORMATION IN HAPTIC ................................................................................................................................. 4

MAX'S TRADE SECRETS IN HAPTIC .............................................................................. 5

MAX'S END USER LICENSING AGREEMENT FOR HAPTIC ....................................... 6

MAX'S RELATIONSHIP WITH TEG ................................................................................. 7

THE HAPTIC FEDERAL SOURCE CODE LICENSE AGREEMENT ............................. 10

THE CERTIFICATION AGREEMENT .............................................................................. 12

MAX'S URGENT NEED FOR ENTRY OF A PRELIMINARY INJUNCTION AND SEIZURE ORDER AGAINST TEG TO PROTECT MAX'S INTELLECTUAL PROPERTY AND TO PROTECT NATIONAL SECURITY ................................................................................ 13

REASON NUMBER ONE: TEG'S PUBLIC INTERNET DISCLOSURE OF THE SOURCE CODE FOR HAPTIC FEDERAL ....................................................................................... 13

REASON NUMBER TWO: TEG'S CIRCUMVENTION AND COPYRIGHT INFRINGEMENT VIOLATIONS ....................................................................................... 15

REASON NUMBER THREE: TEG'S CMI REMOVAL VIOLATIONS ........................... 17

REASON NUMBER FOUR: TEG'S LANHAM ACT VIOLATIONS ............................... 17

CONCLUSION ..................................................................................................................... 18

I, Brandon Fischer, declare and say:

1. I am the Chief Executive Officer of Max Minds, LLC ("MAX"). I make this declaration based on my personal knowledge in support of MAX's motion for preliminary injunction and seizure order.

2. MAX is an Indiana limited liability company, with its principal place of business of 12400 North Meridian Street, Suite 175, Carmel, Indiana 46032. I am the sole member of MAX.

3. I have a 25-year background in developing software-based solutions beginning in 2005 when I founded Anacore. While leading Anacore, we created a cutting-edge digital signage and interactive kiosk platform known as MediaStation and the first multi-site interactive collaboration platform, Synthesis. My work led to Anacore's acquisition by Silicon Valley-based Prysm Inc. in 2014.

4. I actively support local Indiana organizations such as Techpoint and Powderkeg; I serve as an Advisory Board Member and Capstone Advisor of Indiana University Human-Computer Interaction; I have often been invited to speak on my work in designing and developing interactive software-based solutions for web, mobile, desktop, and large-scale video wall systems, most recently at the World Artificial Intelligence Cannes Festival, where I presented on improving student engagement, connectedness, and learning equity through AI-enhanced teaching and learning systems.

5. In 2019, I founded MAX. MAX's principal product is Alleo, an interactive digital collaboration, presentation, and productivity solution for integrated teams worldwide. Alleo was nominated for the Mira "Innovator of the Year" award by TechPoint, and under my leadership,

the Alleo team received nominations for "Best in Tech," "Product Innovation of the Year," "Product Launch of the Year," and "Disruptor of the Year."

6. Initially designed as a high-level solution for hybrid collaboration called Haptic, MAX's developers evolved the Alleo system to address the changing needs of users and their preferred work models. Max's software is used in briefing centers, experience centers, innovation centers and command and control centers. MAX's customers include Fortune 100 companies in consulting, telecommunications, IT, pharma, and manufacturing.

7. Alleo was originally called Haptic. Haptic was recently rebranded as Alleo for commercial users. The Haptic name remains in use for government users.

8. Alleo is typically licensed to customers as a software as a service (SAAS) system residing on a server on the internet (a "cloud" server) and customers access the software using an internet browser.

9. Government customers—especially customers in the military services sector—require more security for their systems than a SAAS software offering can provide. Therefore, Government customers typically install MAX's Haptic software "on premise" on their own servers to provide users with secure access that mission critical applications require.

10. Alleo/Haptic is a server-based collaborative workspace that utilizes a browser interface, enabling users to collaborate in real-time. It also features screen sharing capabilities that permit users to select and share the display window of individual programs from their workstations to the Alleo/Haptic workspace. Alleo/Haptic is an infinite canvas of screen real estate that operates synchronously for all members in real-time. Alleo/Haptic is both the front-end operating system and underlying source code that is responsible for delivering these capabilities.

## MAX'S COPYRIGHTS IN HAPTIC

11. MAX began development of its software in or around March 2019. Full-time development began in May 2019.

12. Alleo/Haptic is an original, creative software program written in several different programming languages.

13. Haptic Version 1.2.21.1 was registered as an unpublished work with the Copyright Office effective April 19, 2024, Registration No. TXu 2-425-362. A true and correct copy of the registration certificate is attached to the Complaint as **Exhibit 1**.

14. Haptic Version 1.2.125 was registered as an unpublished work with the Copyright Office effective April 2, 2024, Registration No. TXu 2-412-490. A true and correct copy of the registration certificate is attached to the Complaint as **Exhibit 2**.

15. Haptic Federal Version 3.1.21.4 was registered as an unpublished work with the Copyright Office effective March 21, 2024, Registration No. TXu 2-419-714. A true and correct copy of the registration certificate is attached to the Complaint as **Exhibit 3**.

16. Haptic Federal Version 3.1.21.8 was registered as an unpublished work with the Copyright Office effective March 21, 2024, Registration No. TXu 2-419-718. A true and correct copy of the registration certificate is attached to the Complaint as **Exhibit 4**.

## MAX'S COPY PROTECTION AND COPYRIGHT MANAGEMENT INFORMATION IN HAPTIC

17. All Haptic Federal software is protected by technological measures that effectively control access to the software in that in the ordinary course of the software's operation, these measures require the application of information, or a process or a treatment, with the authority of MAX, to gain access to the work.

18. One technological measure that MAX uses to protect Haptic Federal is a license key that is required to install the software.

19. MAX applied copyright management information (CMI) to the Haptic Federal software.

20. The copyright management information MAX applied to the Haptic Federal Software consisted of the Haptic name which is title, author and identifying information for the title and author of Haptic Federal, MAX.

## MAX'S TRADE SECRETS IN HAPTIC

21. The Haptic Federal software source code was written in several different programming languages by MAX employees and developers under contract to MAX. All employees and developers working for MAX are contractually bound to maintain the confidentiality of the software they develop for the company.

22. The source code for the Haptic Federal software is a compilation, program, and code, which derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

23. The Haptic Federal source code is never distributed to end users in source code format. Instead, the source code is compiled into executable, binary or web format executable code in such a fashion as to obscure the underlying trade secrets contained within the code.

24. The Haptic Federal source code is a compilation, program, and code, which derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its

disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Haptic Federal source code is a trade secret of MAX.

## MAX'S END USER LICENSING AGREEMENT FOR HAPTIC

25.     When Haptic Federal is licensed to end users it is always pursuant to restrictions contained in an End User License Agreement (EULA).

26.     Pursuant to the EULA, users of the Haptic Federal software are granted a limited "non-exclusive, non-transferable, non-sublicensed" license for a limited time.

27.     Pursuant to the EULA, users of the Haptic Federal software agree not to "directly or indirectly (i) sell, rent out, lease, license, distribute, market, exploit the Product or any of its parts commercially, (ii) reverse engineer, decompile, disassemble, adapt, reproduce, or create derivative works of this Product," "(iii) create, use and/or distribute "auto", "trainer", "script" or "macro" computer programs or other "cheat" or "hack" programs or software applications for this Product (whether over the internet or in local area network); (iv) remove, alter, disable or circumvent any copyright and trademark indications or other authorship and origin information, notices or labels contained on or within this Product and (v) export or re-export this Product or any copy of adaptation in violation of any applicable laws or regulations."

28.     Pursuant to the EULA, users of the Haptic Federal software agree that MAX retains and owns all intellectual property rights in the Haptic Federal software.

29.     Pursuant to the EULA, users of the Haptic Federal software agree to comply with all applicable laws, rules and regulations applicable to the software.

30.     Pursuant to the EULA, users of the Haptic Federal software agree not to "create, use, share and/or publish by any means in relation to the Product any material (text, words, images, sounds, videos, etc.) which would breach of a duty of confidentiality, infringe any intellectual property right or an individual's right to privacy or which would incite the

6

committing of an unlawful act (in particular, piracy, cracking or circulation of counterfeit software)."

31. Pursuant to the EULA, users of the Haptic Federal software agree not to "create, supply or use alternative methods of using the Products, for example server emulators."

32. Pursuant to the EULA, users of the Haptic Federal software agree not to "modify, distort, block, abnormally burden, disrupt, slow down and/or hinder the normal functioning of all or part of the Product, or their accessibility to other users, or the functioning of the partner networks of the Product, or attempt to do any of the above."

33. A true and correct copy of the EULA users of Haptic are required to accept and agree to in order to install and use Haptic is attached to the Complaint in this case as Exhibit 5.

## MAX'S RELATIONSHIP WITH TEG

34. I first met representatives of TEG in 2016 when TEG was a licensed distributor of Synthesis, the software I developed at my prior company.

35. In February 2019, I invited representatives of TEG to a demonstration of MAX's Haptic software. TEG's representatives declined but invited me to demonstrate Haptic the next day at the U.S. Government Joint Staff Lab in Norfolk, Virginia.

36. Prior to the demonstration, MAX and TEG entered into a mutual Non-Disclosure Agreement ("NDA"). A true and correct copy of the NDA is attached to the Complaint as Exhibit 7.

37. I later discovered that the demonstration fulfilled an obligation of TEG under a pre-existing $49.5 million sole-source government contract awarded to TEG.

38. On July 25, 2019, a week after the demonstration, TEG received an additional $16.6 million contract award described as "Cross Domain Solutions- Comprehensive, Collaborative, Command and Control Mission Application Platform Service (C4MAP)."

39. I had no prior knowledge of the C4MAP contract award.

40. On October 2, 2019, I provided TEG's CEO Rob Clare and COO Jeff Mase with Haptic Federal user accounts.

41. Before signing-in to their user accounts, Clare and Mase agreed to the Haptic Privacy Policy, attached to the Complaint as Exhibit 8.

42. The user accounts permitted Clare and Mase access to and the ability to demonstrate Haptic Federal to TEG's customers.

43. In order to use the Haptic Federal software, Clare and Mase agreed to the Haptic EULA.

44. Impressed with Haptic Federal's capabilities, Clare contacted me on November 3, 2019 to discuss how TEG could become an authorized reseller of Haptic Federal to the U.S. Government.

45. I met with Clare in January 2020.

46. On January 23, 2020, MAX and TEG signed the Joint Venture Agreement (JVA) attached to the Complaint as Exhibit 9.

47. Pursuant to the JVA, TEG agreed to create a distribution channel to license Haptic Federal to customers in the federal government.

48. The JVA stated that MAX would "[c]reate and maintain a branch of the Haptic source code, called Haptic Federal" that would be "for exclusive use by the US government."

49. The JVA provided that TEG would be the exclusive distributor of MAX's federal government product, Haptic Federal, so long as TEG hit certain licensing goals and shared half the revenue with MAX.

50. The JVA granted TEG the right to be "the exclusive distributor/reseller of the Haptic Federal product into the federal market," so long as TEG hit certain "license-based revenue targets, paid to MAX[.]"

51. Under the JVA, TEG was required to "maintain a web presence for marketing material of the Haptic Federal product [and] deliver, deploy, sustain, and develop customer requirements."

52. Under the JVA, TEG was required to "establish and manage all federal channel sales partnerships" for Haptic Federal.

53. The JVA required "TEG and Max [ ] to establish and share an electronic files system." Specifically, "TEG and MAX agree[d] to work collaboratively on the preparation and delivery of: Proposals, Marketing materials, [and] Activity reporting to government customers[.]" "TEG and MAX agree[d] to conduct routine project and program management review discussions."

54. The JVA provided that in the first year, TEG would make retainer payments to MAX that would be credited toward revenue targets. MAX would use the retainer payments to create and maintain Haptic Federal, install and support two installations with TEG for testing and demonstration purposes, and provide TEG with a software update at least once every three months.

55. With respect to sales revenue, MAX and TEG agreed to equally share revenue from "total sale of Haptic Federal product and user license sales[.]". However, TEG agreed that "[a]ny channel discount will be negotiated using TEG's portion of the TEG/MAX shared revenue."

56. The JVA does not entitle TEG to share revenue earned by MAX through sale of products other than Haptic Federal. And the JVA does not state that TEG is the exclusive distributor of all of MAX's software.

57. MAX and TEG also agreed to equally share revenue from "total sale in non-federal opportunities, when using co-owned [intellectual property]." However, co-owned intellectual property would only exist in the event that TEG paid MAX for "custom software development," which never occurred.

58. Nothing in the JVA granted TEG ownership rights in the Haptic Federal software.

59. The JVA applied to the Haptic Federal product only.

## THE HAPTIC FEDERAL SOURCE CODE LICENSE AGREEMENT

60. The Haptic Federal source code has only been distributed in limited circumstances pursuant to significant restrictions contained in a Source Code License Agreement ("SCLA").

61. The source code for the Alleo version of MAX's software has never been distributed to users or exposed in any way to the public.

62. MAX agreed to provide the Haptic Federal source code to TEG pursuant to a Source Code License Agreement dated March 30, 2021 (SCLA). A true and correct copy of the SCLA is attached to the Complaint as Exhibit 6.

63. Subject to and conditioned on TEG's payment of fees owed pursuant to the SCLA and TEG's compliance with all the terms and conditions of the SCLA, MAX granted TEG "a non-exclusive, non-sublicensable, and non-transferable (except in compliance with Section 12(g) of the SCLA), a license during the SCLA's term to (i) use the Source Code for the [Haptic Federal] system for [TEG's] Internal business purposes; and (ii) use and make a reasonable

number of copies of the Documentation [for the Haptic Federal software] solely for [TEG's] internal business purposes in connection with [TEG's] use of the Source Code."

64. The SCLA further restricted the use of the Haptic Federal source code to "Authorized Users." An "Authorized User" is defined as "an employee or other end user of [TEG] who [TEG] permits to access and use the Source Code for the software and/or Documentation pursuant to [TEG's] license."

65. The SCLA restricted TEG's use of the Haptic Federal source code further. The section entitled "Use Restrictions" provides:

> Use Restrictions. Licensee shall not use the Source Code or Documentation for any purposes beyond the scope of the license granted in this Agreement. Without limiting the foregoing and except as otherwise expressly set forth in this Agreement, Licensee shall not at any time, directly or indirectly: (i) copy, modify, or create derivative works of the Source Code or the Documentation, in whole or in part, ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Source Code or the Documentation to any third party: (iii) remove any proprietary notices from the source Code or the Documentation; or (iv) use the Source Code in any manner or for any purpose that infringes, misappropriates. or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law.

66. Pursuant to the SCLA, TEG "acknowledges that, as between [MAX and TEG, MAX] owns all rights, title, and interests, including all intellectual property rights in and to the Source Code and Documentation."

67. The SCLA contains an extensive confidentiality agreement in which TEG acknowledged and agreed that the Haptic Federal Source Code and the Documentation for the Haptic Federal Source Code was "confidential intellectual property (including trade secrets)" of MAX and that TEG would maintain all Confidential Information provided to TEG by MAX as confidential and to not disclose such information.

11

## THE CERTIFICATION AGREEMENT

68. Beginning in June 2020, MAX made the source code securely availably to TEG over a dozen times to allow their government customer(s) to scan for vulnerabilities and security issues.

69. Security measures were required to be followed every time source code was transferred by MAX to TEG.

70. One reason why security measures were required is because prior to MAX's agreement to the JVA with TEG, MAX first customer for Haptic was the National Reconnaissance Office (NRO), a Department of Defense (DOD) agency, that agreed to license Haptic in August of 2019.

71. NRO is still a client and user of Haptic, now Alleo, through prime contractor Peraton. NRO continues to use Haptic on premise to conduct top secret briefings within NRO.

72. In or about November 2019, Haptic was installed on-premise for NRO.

73. As a government subcontractor to Peraton and a vendor to DOD agency NRO, MAX is subject to significant industrial security obligations under its government contract to supply Haptic to NRO.

74. MAX's agreements for the provision of Haptic to NRO are extensive.

75. One security measure required in connection with source code transfer was that TEG was required to provide MAX with a "chain of custody" document with signatures from everyone who accessed the source code stating that each person witnessed destruction of the source code after the scan.

76. TEG failed to provide the required chain of custody documentation to MAX on numerous occasions.

77. In the Summer of 2023, TEG failed to provide chain of custody documentation multiple times as MAX required in order to protect its trade secret source code from unauthorized disclosure.

78. As a result, on August 17, 2023, MAX and TEG entered into a Certification Agreement. The agreement was intended to formalize confidentiality safeguards for Haptic Federal. The Certification Agreement is attached to the Complaint as Exhibit 10.

79. The Certification Agreement recites that "the Parties wish to maintain the source code for the Haptic Federal software platform ("Source Code") confidential and to preserve its value as a trade secret, and therefore wish to limit disclosure of the Source Code."

80. Pursuant to the Certification Agreement, TEG "acknowledge[d] and agree[d] that it shall be responsible for implementing procedures to ensure that:

   a. Haptic Federal Source Code is at all times maintained as confidential, not disclosed except to customer personnel having a need to receive the Haptic Federal source code, and

   b. Haptic Federal source code is used only by the customer to complete required security scans. TEG shall secure from the customer in each instance a chain of custody form reasonably acceptable to Max Minds (similar to the DA 4137)."

**MAX'S URGENT NEED FOR ENTRY OF A PRELIMINARY INJUNCTION AND SEIZURE ORDER AGAINST TEG TO PROTECT MAX'S INTELLECTUAL PROPERTY AND TO PROTECT NATIONAL SECURITY**

**REASON NUMBER ONE: TEG'S PUBLIC INTERNET DISCLOSURE OF THE SOURCE CODE FOR HAPTIC FEDERAL**

81. Beginning from the first date when MAX transferred software source code for Haptic Federal to TEG, MAX had concerns about whether TEG was complying with its agreements and maintaining the necessary security of the Haptic Federal Source Code.

82. In February 2024, MAX discovered while searching the internet that TEG installed Haptic Federal on internet facing servers accessible on at least three uniform resource locators (URL). The specifics of this discovery is explained in detail in the Declaration of Robert Simon of MAX submitted in connection with the motion for preliminary injunction and seizure order.

83. In each instance discovered by MAX, TEG removed the Haptic CMI from the Haptic Federal software and replaced the Haptic CMI with false CMI indicating that the software was TEG's software by using the terms "VJOC" and "C4MAP."

84. At each URL the servers hosting the Haptic Federal software exposed source code maps and source code to the public internet.

85. The exposure of MAX's Haptic Federal source code is a serious issue of concern for MAX since it exposes MAX's trade secrets to the public that TEG is required to maintain as secret.

86. I am informed by MAX's cybersecurity contractor that the exposure of MAX's Haptic Federal source code online presents a significant security risk.

87. The exposure of MAX's Haptic Federal source code is a serious issue of concern for our country's national security because the NRO is a licensee and user of Haptic software and the exposure of the source code by TEG online makes the program vulnerable to attacks or exploits that could be carried out against NRO.

88. Based upon my knowledge of the operations of TEG, I believe that defendants Robert Clare, Jeffrey Mase, and Kevin Mullican are aware of, know about, and are complicit in the exposure of MAX's Haptic Federal source code online.

89. Based upon my dealings with TEG over the course of the last four years, I believe that Defendants Robert Clare, Jeffrey Mase, and Kevin Mullican know that MAX's Haptic Federal source code is a trade secret of MAX.

90. Pursuant to the Certification Agreement and the SCLA, TEG is under a continuing obligation to maintain the confidentiality of the Haptic Federal Software and the Haptic Federal Source Code.

91. After the parties entered into the Certification Agreement, MAX discovered TEG in violation of the Certification Agreement numerous times.

92. On September 13, 2023 and September 22, 2023, MAX engaged in source code transfers (versions 3.1.21.8 and 3.1.21.9) to TEG.

93. With respect to each transfer, TEG (1) retained the source code; (2) withheld the government scan report; (3) withheld Chain of Custody documents; and (4) failed to obtain signatures from everyone who touched the Haptic Federal source code.

94. MAX asked TEG at least twenty times to remedy these issues, but TEG stalled and eventually stopped responding to MAX in December 2023.

95. TEG's Certification Agreement violations willfully endangered the Haptic Federal source code, resulting in damage to MAX.

### REASON NUMBER TWO: TEG'S CIRCUMVENTION AND COPYRIGHT INFRINGEMENT VIOLATIONS

96. TEG circumvented the technological measures in the Haptic Federal source code.

97. TEG made at least $2.5 million of undisclosed software/service sales of Haptic Federal or trials in Haptic Federal in 2023.

98. In each case of a sale, TEG required a license key to install Haptic Federal.

99. MAX never provided license keys for these sales to TEG.

100. Instead, to get around the licensing key requirement, TEG modified the Haptic Federal source code by stripping out or modifying the licensing logic from the source code to circumvent the licensing key technological measure.

101. At no time did the defendants ever request or receive permission or authority to strip out or modify the licensing logic from the source code to circumvent the licensing key technological measure.

102. In 2020-2021, MAX discovered that TEG misused software licenses by providing free extended trials.

103. MAX was required to authorize each free trial of Haptic Federal software that TEG provided to a customer in advance of installation.

104. In mid-2021, MAX discovered at least a dozen trials that TEG had extended to customers without MAX's authorization.

105. In response, TEG told MAX these were free trials. However, this was false. TEG was paid to install and support the trial installations of Haptic Federal.

106. TEG also provided unauthorized trials to customers by exceeding the scope of the two software licenses granted to TEG pursuant to the JVA.

107. TEG made unauthorized copies and distributed those unauthorized copies of Haptic Federal to third parties for live events and live exercises for which TEG received compensation.

108. TEG exceeded the scope of software licenses purchased from MAX by copying and distributing Haptic Federal numerous times without MAX's authorization.

109. On May 16, 2023, TEG admitted to back-dating computers to circumvent MAX's licensing policy for Haptic Federal.

### REASON NUMBER THREE: TEG'S CMI REMOVAL VIOLATIONS

110.   Without notice to MAX or permission from MAX, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "C4MAP" when it demonstrated Haptic Federal to certain government customers.

111.   Without notice to MAX or permission from MAX, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "VJOC," an abbreviation for Virtual Joint Operations Center, to other government customers.

112.   TEG removed the Haptic name from the Haptic Federal software without MAX's knowledge, agreement or authorization.

113.   TEG and the individual defendants knew removing the Haptic name would conceal the true facts concerning ownership of the Haptic Federal software from others, including TEG's government customers.

114.   TEG and the individual defendants intended to conceal the true facts concerning ownership of the Haptic Federal software from others, including TEG's government customers.

### REASON NUMBER FOUR: TEG'S LANHAM ACT VIOLATIONS

115.   TEG engaged in a campaign of unauthorized rebranding of Haptic Federal under TEG's brand names.

116.   TEG rebranded the Haptic Federal software as "C4MAP 3.0" or "VJOC."

117.   Calling the Haptic Federal software "C4MAP 3.0" or "VJOC" allowed TEG to misrepresent Haptic Federal to industry partners and customers as TEG's own creation.

118.   TEG replaced product trademarks in the Haptic Federal software with TEG's own VJOC logo.

119.   TEG marketed Haptic Federal as C4MAP on the e-marketplace CHESS where the U.S. Army shops for commercial information technology ("IT") software and services.

120. TEG marketed Haptic Federal as "C4MAP (VJOC)" on the military IT solutions website SupplyCore.

121. TEG promoted C4MAP without mentioning Haptic Federal or MAX on the websites www.digitaltwinconsortium.org and www.opencommons.org.

122. TEG marketed MAX's intellectual property as its own in various bid proposals submitted to the Government.

123. TEG either did not disclose its bid proposals to MAX or did not disclose full and accurate versions of the proposals.

124. MAX learned about TEG's actions and confronted TEG in March 2020.

125. In response, TEG agreed that it would always call the product "C4MAP powered by Haptic."

126. Despite TEG's agreement to the contrary, TEG later reverted to leaving out any reference to Haptic or MAX when marketing Haptic Federal.

127. TEG's rebranding has deprived end customers of their ability to make informed procurement decisions and caused financial harm to both MAX and the end customers.

## CONCLUSION

128. MAX's recent discovery of TEG's exposure of MAX's source code online made this action necessary. It is my belief that court intervention compelling MAX to comply with its obligations and respect MAX's intellectual property rights is necessary and the only course of action that will be effective as all attempts short of this action have been tried and failed. The preliminary injunction and seizure order requested should be entered.

129. Specifically, MAX believes that seizure of all copies of MAX's software and all derivative works of that software in the possession of TEG is necessary to protect MAX. In addition, TEG's executives should be required to provide sworn assurances that all of MAX's

software and all derivative works of that software have been removed from MAX's computers and all backups purged from TEG's systems. The copies of MAX's software should be maintained and preserved by a third-party software escrow service during the pendency of this case to preserve the status quo pending the determination of this action.

    I declare under perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 6, 2024.

_____
BRANDON FISCHER