**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

**CASE NO.: 1:24-cv-00779-JPH-MKK**

MAX MINDS, LLC,

                    Plaintiff,

v.

TRIANGLE EXPERIENCE GROUP, INC.,
ROBERT EDWARD CLARE, JEFFREY
MASE, KEVIN G MULLICAN AND JOHN
DOES 1-10,

                    Defendants.

_____

## <u>MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS</u>

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................2

II.     ALLEGATIONS OF THE COMPLAINT AGAINST TEG ...................................3

    A.   The Complaint is Extensive, Detailed and Sufficiently and Plausibly States Claims for Misappropriation of Trade Secrets, Trademark Violations, Copyright Infringement and Copyright Violations against TEG and individuals Clare, Mace, Mullican and unidentifed TEG employees named as John Does. ....................................................................3

        1.   Plaintiff's Intellectual Property Rights ..........................................................4

        2.   MAX's Copyrights in the Haptic Software ....................................................4

        3.   MAX's Trade Secrets in Haptic ....................................................................5

        4.   Defendants' Use, Misuse, and Misappropriation of MAX's Intellectual Property ........6

III.    ARGUMENT ...................................................................................................11

    A.   Legal Standard ...........................................................................................11

    B.   The Complaint Sufficiently and Plausibly States Claims for Violation of the Defend Trade Secrets Act and Indiana Uniform Trade Secrets Act ...................................12

    C.   The Complaint Sufficiently and Plausibly States Claims for Copyright Infringement against TEG ...............................................................................................14

    D.   The Complaint Sufficiently and Plausibly States Claims for Circumvention against TEG in Violation of 17 U.S.C. § 1201. ...............................................................17

    E.   The Complaint Sufficiently and Plausibly States Claims for Removal or Falsification of Copyright Management information against TEG in Violation of 17 U.S.C. § 1202. ............20

    F.   The Complaint Sufficiently and Plausibly States a Claim for Reverse Passing Off against TEG in violation of 15 U.S.C. § 1125(a) ...............................................................21

    G.   The John Doe Defendants are TEG Employees Who Have Not Been Identified and Who Are Individually Liable for Infringement of Max's Intellectual Property Rights and When they are Identified they Will be Named and Served ....................................................23

    H.   Neither Rule 13 nor the JVA Provide a Basis to Stay these Proceedings Against TEG for Violations of Max's Intellectual Property Rights .................................................25

IV.     CONCLUSION ...............................................................................................26

## TABLE OF AUTHORITES

**Cases**                                                                                           **Page(s)**

*Hostway Corp. v. JPMorgan Chase Bank* ............................................................... 25
  *2009 U.S. Dist. LEXIS 75049 (N.D. Ill. Aug. 24, 2009)*

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
  598 U.S. 508 (2023) ......................................................................................... 17

*Archibald & Kendall, Inc.*,
  573 F.2d 429 (7th Cir. 1978) ......................................................................... 11

*Arista Records Ltd. Liab. Co. v. Doe*,
  604 F.3d 110 (2d Cir. 2010) ......................................................................... 23

*Chamberlain Group v. Skylink Technologies, Inc.*,
  381 F.3d 1178 (Fed. Cir. 2004) ..................................................................... 18

*Cushing v. City of Chicago*,
  3 F.3d 1156 (7th Cir. 1993) ........................................................................... 11

*Dangler v. Imperial Mach. Co.*,
  11 F.2d 945 (7th Cir. 1926) ........................................................................... 24

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003) ......................................................................................... 22

*Design Basics v. Van Prooyen Builders, Inc., No. 2:19CV100-PPS/SLC*,
  2021 U.S. Dist. LEXIS 41425 (N.D. Ind. Mar. 5, 2021) .................................... 20

*Diamond Sawblades Mfrs. Coal. v. Diamond Tools Tech.*,
  504 F. Supp. 3d 927 (S.D. Ind. 2020) ............................................................. 21

*Energy Intelligence Grp. v. Exelon Generation Co., No. 20-cv-3983*,
  2021 U.S. Dist. LEXIS 76688 (N.D. Ill. Apr. 21, 2021) ............................... 11,12

*Euromarket Designs, Inc. v. Crate & Barrel Ltd.*,
  96 F. Supp. 2d 824 (N.D. Ill. 2000) ............................................................... 23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ....................................................................................... 14

*Haggerty Enterprises, Inc. v. Lipan Indus. Co., No. 00 C 766*,
  2001 WL 968592 (N.D. Ill. Aug. 23, 2001) ..................................................... 23

*Hotels Meridien v. LaSalle Hotel Operating Partnership, LP*,
  380 F.3d 126 (2d Cir. 2004) ......................................................................... 22

*Hull v. Bd.of Trs. of Univ. of Ill. at Chi., No. 98 C 6199*,
  2001 U.S. Dist. LEXIS 9905 (N.D. Ill. July 16, 2001) ..................................... 11

*I.A.E., Inc. v. Shaver*,

74 F.3d 768 (7th Cir. 1996) ................................................................................................... 16

*JCW Invs., Inc. v. Novelty, Inc.*,
    482 F.3d 910 (7th Cir. 2007) ........................................................................................ 14

*Kay Bros. Enters. v. Parente, No. 16 C 387*,
    2018 U.S. Dist. LEXIS 128191 (N.D. Ill. July 31, 2018) .................................... 11

*Leo Feist v. Young*,
    138 F.2d 972, 59 USPQ 450 (7th Cir. 1943) ........................................................ 23

*Lovellette v. Southern R. Co.*,
    898 F.2d 1286 (7th Cir. 1990) ..................................................................................... 11

*M. Arthur Gensler Jr. & Assocs. v. Strabala*,
    764 F.3d 735 (7th Cir. 2014) ........................................................................................ 22

*Med. Informatics Eng'g, Inc. v. Orthopaedics Ne., P.C.*,
    458 F. Supp. 2d 716 (N.D. Ind. 2006) ................................................................... 23

*Muhammad-Ali v. Final Call, Inc.*,
    832 F.3d 755 (7th Cir. 2016) ........................................................................................ 16

*Phoenix Entm't, LLC v. Rumsey*,
    829 F.3d 817 (7th Cir. 2016) ........................................................................................ 22

*Precision Universal Joint Corp. v. Republic Gear Co., No. 75 C 2942*,
    1976 U.S. Dist. LEXIS 15452 (N.D. Ill. Apr. 22, 1976) ................................... 23

*Propertythree Tech. Grp. v. Apartment Hunters, No. 1:07-cv-356-RLY-JMS*,
    2008 U.S. Dist. LEXIS 136027 (S.D. Ind. May 19, 2008) ............................... 20

*Rodriguez v. Plymouth Ambulance Service*,
    577 F.3d 816 (7th Cir. 2009) ........................................................................................ 23

*Roth v. Walsh Co., No. 18-CV-1431*,
    2019 U.S. Dist. LEXIS 11439 (E.D. Wis. Jan. 24, 2019) .................................. 21

*Sadowski v. Miss. Valley Broads., LLC, No. 18-cv-946-jdp*,
    2019 U.S. Dist. LEXIS 37920 (W.D. Wis. Jan. 11, 2019) ................................ 21

**Statutes**

15 U.S.C. § 1125(a) ................................................................................................... 21,22

17 U.S.C. § 106 .......................................................................................................... 18, 22

17 U.S.C. § 201(a) ..................................................................................................... 15,16

17 U.S.C. § 204(a). .......................................................................................................... 16

17 U.S.C. § 1201 ............................................................................................................... 18

17 U.S.C. § 1202 ................................................................................................. 20, 22, 24

17 U.S.C. §1202(b)(1) ..................................................................................................... 20

17 U.S.C. §1202(b)(3) ................................................................................................ 20

18 U.S.C. § 1836 ...................................................................................................... 14

18 U.S.C. § 1839(5) .................................................................................................. 13

18 U.S.C. §1839(5)(B)(ii)(II). ................................................................................. 13

**Rules**

Rule 8 ......................................................................................................................... 16

Rule 12(b)(6) ............................................................................................................. 11

**SRIPLAW**

Cᴀʟɪꜰᴏʀɴɪᴀ ◆ Gᴇᴏʀɢɪᴀ ◆ Fʟᴏʀɪᴅᴀ ◆ Iɴᴅɪᴀɴᴀ ◆ Tᴇɴɴᴇssᴇᴇ ◆ Tᴇxᴀs ◆ Nᴇᴡ Yᴏʀᴋ

## <u>MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS</u>

Plaintiff MAX MINDS, LLC by and through its undersigned counsel, and for its

Memorandum of Law in opposition to the Motion to Dismiss Plaintiff Max Minds, LLC's

Complaint or in the alternative to Stay (ECF 52), states as follows:

### I.       INTRODUCTION

The motion to dismiss is premised on a demonstrably false claim: that TEG has some sort

of master license to Max's software or some type of ownership interest in Max's software. There

is no support for this false claim. The complaint makes clear that TEG has no such rights. TEG's

attempt to argue that it can do whatever it wants with Max's software including use and disclose

the software to anyone, rewrite the software, sell the software without accounting to Max,

commit copyright infringement, hack into the software, rename the software, pass the software

off as TEG's own creation instead of Max's HAPTIC software, etc. is false and unsupportable.

TEG's reliance on the "joint venture agreement" (referring to the JVA attached to the

complaint in this case) is futile. The statutory prohibitions on trade secret theft, copyright

infringement and trademark infringement all contradict TEG's fantastical theory of license. The

JVA gives TEG no rights whatsoever to copy, distribute, or create derivative works of Max's

copyrighted software. The JVA gives TEG no rights to Max's trade secret source code, or Max's

trademark HAPTIC. The JVA is not a license for Max's software or source code. The word

"license" appears only twice in the JVA; in neither place where the word "license" is used does

TEG receive a license to any of Max's software. There is no license grant in the JVA at all. The

JVA is an agreement to agree on a list of things that might happen in the future if the parties agreed to them and if certain things occurred, but those things never happened.[1]

The claims in the complaint in this copyright dispute are pled sufficiently, plausibly and extensively. The complaint is nearly 200 paragraphs long supported by eleven exhibits. The motion to dismiss is really an invitation for this court to buy into TEG's alternate narrative lock-stock-and-barrel. But the facts are not at issue on this motion. The pleading is and it is sufficient. Max will prove its facts are the correct narrative in discovery. TEG's motion should be denied.

## II.    ALLEGATIONS OF THE COMPLAINT AGAINST TEG

**A.    The Complaint is Extensive, Detailed and Sufficiently and Plausibly States Claims for Misappropriation of Trade Secrets, Trademark Violations, Copyright Infringement and Copyright Violations against TEG and individuals Clare, Mace, Mullican and unidentified TEG employees named as John Does.**

The recitation of the facts in TEG's motion is skewed. TEG argues over and over that the terms of the parties' JVA somehow trumps all of Max's intellectual property rights in its software. TEG seems not to understand that the IP rights TEG violated are Max's property rights created by statute and not derived from a contract.

---

[1] As explained below, there is a one sentence section called "Intellectual Property" in the JVA that TEG appears to hang its hat on. Under that provision, *if* TEG paid for "custom software development" (which it never did), and *if* that custom development created a new copyrightable work (which it did not), and *if* that new copyrightable work was determined by the parties under the JVA to be a joint work (which never happened), then TEG *might* own some intellectual property. But, again, this is all fantasy. None of those things ever happened.

There is also a provision in the JVA that makes TEG "the exclusive distributor/reseller of the Haptic Federal product into the federal market." But that statement alone is not a license. In fact, the JVA contemplates that Max—not TEG—would issue the licenses for Haptic. We know this because the JVA refers to "license based revenue targets" that TEG was required to meet. In other words, TEG would need to sell licenses and meet those targets. That is very different from TEG being an exclusive licensee—which they were not—with a right to do whatever they wanted to the software—which is what TEG wants this Court to believe. Don't believe it. It's false.

## 1.      Plaintiff's Intellectual Property Rights

MAX is an Indiana custom software development company. (ECF 1 ¶ 11). MAX's products are Alleo and Haptic Federal. (ECF 1 ¶ 20). Alleo and Haptic Federal are interactive, digital collaboration presentation, and productivity solutions for integrated teams worldwide. (ECF 1 ¶¶ 20-22). MAX's software is used in briefing centers, experience centers, and innovation centers by the government, and by Fortune 100 companies in consulting, telecommunications, IT, pharma, and manufacturing. (ECF 1 ¶ 25). Originally called Haptic, the software was recently rebranded as "Alleo" for commercial users; the Haptic name remains for government users. (ECF 1 ¶ 24). Alleo/Haptic is a server-based collaborative workspace that utilizes a browser interface. The software resides on a server on the internet (a "cloud" server) and customers access the software using an internet browser. (ECF 1 ¶ 26).

## 2.      MAX's Copyrights in the Haptic Software

Alleo/Haptic is an original, creative software program written in several different programming languages. (ECF 1 ¶ 30). MAX registered four versions of Haptic with the Copyright office and obtained registration certificates for each version. The following table details MAX's copyright registrations for Haptic. (ECF 1 ¶¶ 39-42).

| Title of Work | Registration Number | Effective Date | Certificate of Registration |
|---|---|---|---|
| Haptic Version 1.2.21.1 | TXu 2-425-362 | April 19, 2024 | Complaint, Ex. 1 |
| Haptic Version 1.2.125 | TXu 2-421-490 | April 2, 2024 | Complaint, Ex. 2 |
| Haptic Version 3.1.21.4 | TXu 2-419-714 | March 21, 2024 | Complaint, Ex. 3 |
| Haptic Version 3.1.21.8 | TXu 2-419-718 | March 21, 2024 | Complaint, Ex. 4 |

All Haptic Federal software is protected by technological measures that effectively control access to the software.  In the ordinary course of the software's operation, the measures require the application of information, or a process or a treatment, with the authority of MAX, to

gain access to the Work. (ECF 1 ¶ 43). One technological measure that MAX uses to protect

Haptic Federal is a license key that is required to install the software. (ECF 1 ¶ 44).

Max also applied copyright management information ("CMI") to the Haptic Federal

software. (ECF 1 ¶ 45). The copyright management information MAX applied to the Haptic

Federal Software consisted of the Haptic name, which is title, author and identifying information

for the title and author of Haptic Federal, MAX. (ECF 1 ¶ 46).

### 3.    MAX's Trade Secrets in Haptic

The Haptic Federal software source code was written by MAX employees and developers

under contract to MAX. (ECF 1 ¶ 47). All employees and developers working for MAX are

contractually bound to maintain the confidentiality of the software they develop for the company.

*(Id.)*.

The source code for the Haptic Federal software is a compilation, program, and code,

which derives independent economic value from not being generally known to, and not being

readily ascertainable by proper means by, other persons who can obtain economic value from its

disclosure or use and is the subject of efforts that are reasonable under the circumstances to

maintain its secrecy. (ECF 1 ¶ 48). The Haptic Federal source code is never distributed to end

users in source code format. Instead, the source code is compiled into executable, binary or web

format executable code in such a fashion as to obscure the underlying trade secrets contained

within the code. (ECF 1 ¶ 49).

When Haptic Federal is licensed to end users it is always pursuant to restrictions

contained in an End User License Agreement (EULA). (ECF 1 ¶ 50).  Pursuant to the EULA,

users of the Haptic Federal software agree not to "directly or indirectly (i) sell, rent out, lease,

license, distribute, market, exploit the Product or any of its parts commercially, (ii) reverse

engineer, decompile, disassemble, adapt, reproduce, or create derivative works of this Product,"

"(iii) create, use and/or distribute "auto", "trainer", "script" or "macro" computer programs or other "cheat" or "hack" programs or software applications for this Product (whether over the internet or in local area network); (iv) remove, alter, disable or circumvent any copyright and trademark indications or other authorship and origin information, notices or labels contained on or within this Product and (v) export or re-export this Product or any copy of adaptation in violation of any applicable laws or regulations." (ECF 1 ¶ 52).

Pursuant to the EULA, users of the Haptic Federal software also agree: (1) that MAX retains and owns all intellectual property rights in the Haptic Federal software; (2) to comply with all applicable laws, rules and regulations applicable to the software; (3) not to "create, use, share and/or publish by any means in relation to the Product any material (text, words, images, sounds, videos, etc.) which would breach a duty of confidentiality, infringe any intellectual property right or an individual's right to privacy or which would incite the committing of an unlawful act (in particular, piracy, cracking or circulation of counterfeit software)"; (4) not to "create, supply or use alternative methods of using the Products, for example server emulators"; and (5) not to "modify, distort, block, abnormally burden, disrupt, slow down and/or hinder the normal functioning of all or part of the Product, or their accessibility to other users, or the functioning of the partner networks of the Product, or attempt to do any of the above." (ECF 1 ¶¶ 53-57; EULA, ECF 1-5).

### 4.      Defendants' Use, Misuse, and Misappropriation of MAX's Intellectual Property

MAX first demonstrated the Haptic software to TEG in July of 2019 at the U.S. Government Joint Staff Lab in Norfolk Virginia. (ECF 1 ¶ 70). Before the demonstration MAX and TEG entered into a mutual Non-Disclosure Agreement. (ECF 1 ¶ 71; ECF 1-7).

Following the demonstration, MAX and TEG began working together. (ECF 1 ¶ 75).

MAX provided TEG's CEO Rob Clare and COO Jeff Mase with Haptic Federal user accounts. (*Id.*). To use the Haptic Federal software, Clare and Mase agreed to the Haptic EULA. (ECF 1 ¶ 78). These user accounts allowed TEG to access and demonstrate the capabilities of Haptic Federal to TEG customers. (ECF 1 ¶ 77).

Impressed with Haptic Federal's capabilities, TEG contacted MAX inquiring whether TEG could become an authorized reseller of Haptic Federal to the US government. (ECF 1 ¶ 79). The parties discussed that TEG would create a distribution channel to license Haptic Federal to customers in the federal government. (ECF 1 ¶ 82).  Thereafter, the parties entered into the JVA attached to the complaint. (ECF 1-9). The JVA provides that MAX (not TEG) would create and maintain a branch of the Haptic source code for exclusive use by the US government, and that TEG would be the exclusive distributor of Haptic Federal to the US government so long as TEG hit certain licensing goals and shared half the revenue with MAX." (ECF 1 ¶¶ 83-84; ECF 1-9). The JVA did not license any of Max's software to TEG, nor did it give TEG ownership rights in the Haptic Federal software.

Pursuant to the JVA, beginning in June 2020 MAX made the source code securely available to TEG over a dozen times to allow their government customer(s) to scan for vulnerabilities and security issues. so long as TEG hit certain licensing goals and shared half the revenue with MAX. (ECF 1 ¶ 96). However, the source code was not released to TEG at that time. Instead, first the parties agreed to the significant restrictions contained in a Source Code License Agreement dated March 30, 2021 ("SCLA"). (ECF 1 ¶ 62; ECF 1-6). The SCLA contains an extensive confidentiality agreement in which TEG acknowledged and agreed that Haptic Federal Source Code and the Documentation for the Haptic Federal Source Code was "confidential intellectual property (including trade secrets)" of MAX and that TEG would

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

maintain and not disclose any Confidential Information. (ECF 1 ¶ 67).

Pursuant to the SCLA, security measures were required to be followed every time source code was transferred by Max to TEG. (ECF 1-6). One security measure was that TEG was required to provide MAX with a "chain of custody" document with signatures from everyone who accessed the source code stating that each person witnessed destruction of the source code after the scan. (ECF 1 ¶ 97). In the Summer of 2023, TEG failed to provide chain of custody documentation multiple times as required in order to protect MAX's trade secret source code from unauthorized disclosure. (ECF 1 ¶ 99). As a result, on August 17, 2023, MAX and TEG entered into a Certification Agreement ("CA"). (ECF 1 ¶ 100; ECF 1-10). The agreement was intended to formalize confidentiality safeguards for Haptic Federal. (*Id.*).

The Certification Agreement recites that "the Parties wish to maintain the source code for Haptic Federal software platform ("Source Code") confidential and to preserve its value as a trade secret, and therefore wish to limit disclosure of the Source Code." (ECF 1 ¶ 101). TEG acknowledged in the Certification that TEG was under a duty to maintain as confidential the Haptic Federal source code and that the Haptic Federal source code was to be used only by the customer to complete required security scans, which were to be accompanied by a chain of custody form. (ECF 1 ¶ 102).

After the parties entered into the Certification Agreement, MAX discovered TEG in violation of the Certification Agreement numerous times. On September 13, 2023 and September 22, 2023, MAX engaged in source code transfers (versions 3.1.21.8 and 3.1.21.9) to TEG. (ECF 1 ¶ 111). With respect to each transfer, TEG (1) retained the source code; (2) withheld the government scan report; (3) withheld Chain of Custody documents; and (4) failed to obtain signatures from everyone who touched the Haptic Federal source code. (ECF 1 ¶ 112). MAX

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

asked TEG at least twenty times to remedy these issues, but TEG stalled and eventually stopped responding to MAX in December 2023. (ECF 1 ¶ 113).

In February 2024 while searching the internet MAX discovered that the defendants installed Haptic Federal on internet facing servers accessible on at least three (3) uniform resource locators (URL). (ECF 1 ¶ 103). In each instance discovered by MAX, TEG removed the Haptic CMI from the Haptic Federal software and replaced the Haptic CMI with false CMI indicating that the software was TEG's software by using the terms "VJOC" and "C4MAP." (ECF 1 ¶ 104). At each URL the servers hosting the Haptic Federal software exposed source code maps and source code to the public. (ECF 1 ¶ 105). The exposure of MAX's Haptic Federal source code exposed MAX's trade secrets to the public. (ECF 1 ¶ 106).

TEG circumvented the technological measures in the Haptic Federal source code. (ECF 1 ¶ 115). TEG made at least $5 million of undisclosed software/service sales of Haptic Federal or trials in Haptic Federal in 2023. (ECF 1 ¶ 116). In each case of a sale, TEG required a license key to install Haptic Federal; MAX never provided license keys for these sales. (ECF 1 ¶¶ 117-118). To get around the licensing key requirement, TEG modified the Haptic Federal source code by stripping out or modifying the licensing logic from the source code to circumvent the licensing key requirement. (ECF 1 ¶ 119). TEG also back-dated computers to circumvent MAX's licensing policy for Haptic Federal. (ECF 1 ¶ 177). TEG did not request or receive permission or authority to strip out or modify the licensing logic from the source code or back-date computers to circumvent the licensing key technological measure. (ECF 1 ¶ 120).

In 2020 and 2021, MAX discovered that TEG exceeded software licenses by providing "free" extended trials. (ECF 1 ¶ 121). MAX was required to authorize each free trial of Haptic Federal software that TEG provided to a customer in advance of installation. (ECF 1 ¶ 122). In

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

mid-2021, MAX discovered at least a dozen trials that TEG had extended to customers without MAX's authorization. (ECF 1 ¶ 123). In response, TEG told MAX these were free trials; TEG's claim of free trials is false because TEG was paid to install and support the trial installations of Haptic Federal. (ECF 1 ¶ 124).

TEG provided unauthorized trials to customers by exceeding the scope of the two software licenses granted to TEG pursuant to the JVA. (ECF 1 ¶ 125). TEG made unauthorized copies and distributed those unauthorized copies of Haptic Federal to third parties for live events and live exercises for which TEG received compensation. (ECF 1 ¶ 126). TEG exceeded the scope of software licenses purchased from MAX by copying and distributing Haptic Federal numerous times without MAX's authorization. (ECF 1 ¶ 127).

Without notice to MAX or permission from MAX, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "C4MAP" when it demonstrated Haptic Federal to certain government customers. (ECF 1 ¶ 129).  Similarly, without notice to MAX or permission from MAX, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "VJOC," an abbreviation for Virtual Joint Operations Center, to other government customers. (ECF 1 ¶ 130). TEG removed the Haptic name from the Haptic Federal software without MAX's knowledge, agreement or authorization. (ECF 1 ¶ 131). TEG committed such acts knowing removing the Haptic name would conceal the true facts concerning ownership of the Haptic Federal software from others, including TEG's government customers. (ECF 1 ¶ 186). TEG and the individual defendants intended to conceal the true facts concerning ownership of the Haptic Federal software from others, including TEG's government customers. (ECF 1 ¶ 180).

### III.     ARGUMENT

#### A.     Legal Standard

The motion recites the legal standard for a motion to dismiss under Rule 12(b)(6) correctly. However, the standard for dismissal based on an affirmative defense—such as the affirmative defense of license which pervades the motion—is not nearly as low a standard as TEG would have this court believe.

The burden of proving the existence of a license rests with the accused infringer. *Kay Bros. Enters. v. Parente*, No. 16 C 387, 2018 U.S. Dist. LEXIS 128191 (N.D. Ill. July 31, 2018). To successfully employ an affirmative defense, a defendant must establish "the elements of the defense by a preponderance of the evidence." *Hull v. Bd.of Trs. of Univ. of Ill. at Chi.*, No. 98 C 6199, 2001 U.S. Dist. LEXIS 9905 (N.D. Ill. July 16, 2001).

TEG filed a motion to dismiss under Rule 12(b)(6). "Where the pleadings raise a contested issue of material fact, a Rule 12(b)(6) motion must be denied." *Mitchell v, Archibald & Kendall, Inc*., 573 F.2d 429, 432 (7th Cir. 1978); *Cushing v. City of Chicago*, 3 F.3d 1156, 1163 (7th Cir. 1993) (holding that resolving issues of fact are "inappropriate for resolution in a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6)."); *Lovellette v. Southern R. Co.,* 898 F.2d 1286, 1291 (7th Cir. 1990) (holding that determining issues of fact is "inappropriate for resolution in a FED. R. CIV. P. 12(b)(6) motion to dismiss the pleadings.").

Neither of the two cases TEG cited (ECF 52 at 6) are intellectual property infringement cases. Both are employment or civil rights cases. Neither case dealt with the affirmative defense of license. Where courts are presented with a dispute over whether a license provides a valid affirmative defense at the pleading stage to support dismissal they routinely demur because the issue whether the putative licensee had a valid license or exceeded the scope of the license is an intensive factual dispute unsuited for dismissal on the pleadings. See e.g. *Energy Intelligence*

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

*Grp. v. Exelon Generation Co.*, No. 20-cv-3983, 2021 U.S. Dist. LEXIS 76688 (N.D. Ill. Apr.

21, 2021) (motion to dismiss denied where the putative licensee's "argument regarding the

license was not clear," and the construction of the purported license "could be a question of

fact," so therefore "the determination of whether a license exists and its scope can involve factual

disputes that are not appropriate for resolution on a motion to dismiss.")

### B.   The Complaint Sufficiently and Plausibly States Claims for Violation of the Defend Trade Secrets Act and Indiana Uniform Trade Secrets Act

TEG does not make the argument that the source code for Haptic Federal is not a trade

secret. It obviously is and TEG wisely concedes this point. Instead, TEG argues TEG's use or

possession of Max's source code was with Max's consent. (See ECF 52 at 7, "Max's Complaint

does not allege—and cannot allege—that TEG acquired the Software by improper means

because TEG obtained access to the Software as Max's joint venturer under the JVA." And

"Max's misappropriation claims thus hinge on whether Max has adequately alleged TEG's actual

or threatened disclosure or use of its trade secrets without its consent.") TEG is wrong.

The term "misappropriation" in the DTSA means:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5).

The complaint alleges that at the time the defendants disclosed MAX's source code and "[a]t the time of disclosure, Defendants knew or had reason to know that the Haptic Federal Source Code was a trade secret of MAX because TEG acquired the Haptic Federal Source Code under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." (ECF 1 ¶ 159). The allegation in Count I is consistent with the prohibition contained in §1839(5)(B)(ii)(II). The allegation is plausible because (1) Max refused to release its trade secret source code to TEG before the parties entered into the SCLA with its very significant restrictions; (2) the SCLA required TEG to follow extensive security measures every time Max made a source code transfer to TEG, including "chain of custody" documents with signatures from everyone who accessed the source code stating that each person witnessed destruction of the source code after the scan; (3) TEG failed to provide chain of custody documentation multiple times starting in the summer of 2023; (4) as a result of TEG's failures MAX and TEG entered into the CA to formalize confidentiality safeguards for Max's software and to preserve its value as a trade secret; and (5) even after entering into the SCLA and the CA, MAX discovered TEG committed numerous violations of the CA in September of 2023 when MAX engaged in source code transfers with TEG.

TEG's failure to limit the use or disclosure of MAX's trade secrets is the focus of MAX's claims. TEG's contrary arguments miss the point. TEG says that "[u]nder the terms of the JVA, Max has not alleged and cannot allege facts sufficient to draw a reasonable inference that TEG acquired the Software by improper means or disclosed a trade secret without Max's express or

implied consent." (ECF 52 at 9). But the JVA does not cover what happens when TEG misappropriates Max's trade secret source code. The Economic Espionage Act of 1996 as amended by the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"), and the IUTSA are the operative statutes that prohibit TEG's misappropriation. TEG's argument that its use of Max's source code was "consensual" might offer TEG a defense, but the mere existence of the JVA does not *ipso facto* make TEG's alleged conduct consensual.

TEG argues that Max's copyright infringement claim "fails under the plain terms of the JVA because, even accepting as true Max's characterization of TEG as a mere licensee, Max has not and cannot allege that TEG's alleged conduct was in breach of a condition precedent to the JVA." (ECF 52 at 11). Again, TEG's attempts to frame this case as a contract dispute—which it is not and no claims of the complaint allege breach of contract—is simply wrong. The JVA is attached to the complaint and a part thereof. The court can plainly see that the JVA does not grant TEG a license to any Max software.

The JVA does not save TEG from its violations of its duties under the statute. The complaint adequately alleges claims for DTSA and IUTSA violations against TEG.

### C.      The Complaint Sufficiently and Plausibly States Claims for Copyright Infringement against TEG

The elements of a copyright infringement claim are (1) ownership of a valid copyright, and (2) actionable copying by the defendant. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007). TEG does not dispute the first element. Rather, it argues that Max's "factual allegations in support of its copyright infringement claim are scant, conclusory, and difficult to discern." (ECF 52 at 9). But the allegations are there in the complaint plain as day.

These are just a few examples: Max alleged that "[i]n 2020 and 2021. . . TEG exceeded

software licenses by providing 'free' extended trials." (ECF 1 ¶ 121). "In mid-2021, MAX discovered at least a dozen trials that TEG had extended to customers without MAX's authorization." (ECF 1 ¶ 123). TEG provided unauthorized trials to customers by exceeding the scope of the two software licenses granted to TEG pursuant to the JVA. (ECF 1 ¶ 125). TEG made unauthorized copies and distributed those unauthorized copies of Haptic Federal to third parties for live events and live exercises for which TEG received compensation. (ECF 1 ¶ 126). TEG exceeded the scope of software licenses purchased from MAX by copying and distributing Haptic Federal numerous times without MAX's authorization. (ECF 1 ¶ 127).

TEG next argues that they were licensed to do what they did. "Under the plain terms of the JVA, TEG is authorized to distribute and sell the Software" and "that its authorization springs from TEG's status as a joint owner of the Software." (ECF 52 at 9-10). TEG's assertion that it is a "joint owner of the Software" or that they are "authorized to distribute and sell the Software" is false. TEG has not sought a declaratory judgment from this or any court that it is a "joint owner" of any copyright in any of Max's software, nor could it do so. The JVA does not support such a claim. There is nothing in the JVA that gives TEG copyright rights in Max's software.

TEG appears to be relying on the "Intellectual Property" paragraph in the JVA that says:

Any Intellectual Property ("IP") resulting from custom software development that is paid for by TEG will be co-owned by TEG and MAX, except any plug-in features paid for by the government that are contractual deliverables to the govt. customer.

(ECF 1-9). This provision of the JVA could, in theory, become relevant if TEG paid for "custom software development," and if that custom development created a new copyrightable work, and if that new copyrightable work was determined by the parties under the JVA to be a joint work. See 17 U.S.C. § 201(a) ("Copyright in a work protected under this title vests initially in the

author or authors of the work. The authors of a joint work are co-owners of copyright in the work.")

TEG might also be relying on the statement in the JVA that "TEG is the exclusive distributor/reseller of the Haptic Federal product into the federal market." But that statement alone is not a license. For copyright licenses to be valid they must meet specific requirements. For an exclusive license—which is considered the equivalent of a transfer of ownership—such a transfer must be made in writing. 17 U.S.C. § 204(a). Any transfer of copyright ownership that is not in writing is invalid. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774-75 (7th Cir. 1996).

The complaint does not allege that Max is suing TEG for infringement of software or source code that the parties co-developed. The complaint alleges that TEG infringed Max's existing works that it owns copyright in alone. The complaint does not allege infringement of some unknown work to be developed in the future. The complaint references and attaches four copyright registrations for different versions of the Haptic software that Max registered and only Max owns. Those are the works that TEG infringed by the acts alleged in the complaint, not some future potential work.

TEG's arguments that they were authorized to do what they did also betray a fundamental flaw: "a plaintiff is *not* required to prove that the defendant's copying was unauthorized in order to state a *prima facie* case of copyright infringement." *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 760 (7th Cir. 2016) (emphasis in original). TEG's argument that they had a license or were authorized is an affirmative defense, not a pleading defect. *Id*. at 761 ("As Rule 8 indicates, 'the existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement.")  Simply stated, the complaint makes clear that TEG's actions were all unlicensed.

Max is not alleging breach of contract either. The JVA is not a license. The JVA does not grant TEG a license to anything, including Max's software. Furthermore, the complaint alleges TEG violated several licenses including the SCLA and the EULA. Those violations are infringement because even if TEG was a licensee of Max's software—which it is not—TEG's use of Max's software beyond the scope of any license alleged in the complaint gives rise to a claim for copyright infringement against TEG. See *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) (use of Lynn Goldsmith's photograph of Prince exceeded the scope of the license to Warhol and therefore infringed copyright; fair use defense rejected).

The fact is that TEG has no current, active license to any of Max's software. None of TEG's customers have any license to any of Max's software either. All those licenses were terminated. Yet, as the complaint alleges, TEG and the individual defendants are still copying, distributing, and making derivative works of Max's software and source code.

### D.      The Complaint Sufficiently and Plausibly States Claims for Circumvention against TEG in Violation of 17 U.S.C. § 1201.

Max's complaint alleges that TEG circumvented the licensing key technological measures in the Haptic software in order to make millions of dollars of undisclosed software sales of the Haptic software, sales of service for the Haptic software, or trials of the Haptic software. (ECF 1 ¶ 116). In each case of a sale, TEG required a license key to install Haptic, but MAX never provided license keys to TEG so to get around the licensing key requirement, TEG modified the Haptic source code by stripping out or modifying the licensing logic from the source code to circumvent the licensing key requirement. (ECF 1 ¶¶ 117-119). TEG also back-dated computers to circumvent MAX's licensing policy for Haptic Federal. (ECF 1 ¶ 177).

These allegations fit squarely into the requirements of the statute that reads "No person shall circumvent a technological measure that effectively controls access to a work protected

under this title." 17 U.S.C. § 1201(a)(l)(A). These allegations also comply with the requirements

of *Chamberlain Group v. Skylink Technologies, Inc.*, 381 F.3d 1178 (Fed. Cir. 2004) which

found that a plaintiff alleging a violation of § 1201(a) must prove the following:

> (1) ownership of a valid copyright on a work, (2) effectively controlled by a
> technological measure, which has been circumvented, (3) that third parties can
> now access (4) without authorization, in a manner that (5) infringes or facilitates
> infringing a right protected by the Copyright Act, because of a product that (6) the
> defendant either (I) designed or produced primarily for circumvention; (ii) made
> available despite only limited commercial significance other than circumvention;
> or (iii) marketed for use in circumvention of the controlling technological
> measure. A plaintiff incapable of establishing any one of elements (1) through (5)
> will have failed to prove a prima facie case. A plaintiff capable of proving
> elements (1) through (5) need prove only one of (6)(I), (ii), or (iii) to shift the
> burden back to the defendant. At that point, the various affirmative defenses
> enumerated throughout § 1201 become relevant.

*Chamberlain*, 381 F.3d at 1203.

Yet TEG maintains that "[f]atally missing from Max's circumvention allegations are

facts sufficient to draw a reasonable inference that TEG's alleged circumvention—the removal

of the license key—constitutes copyright infringement or facilitates copyright infringement."

(ECF 52 at 15). But the infringement is right there in black and white: TEG circumvented the

licensing key technological measures in the Haptic software in order to make millions of dollars

of undisclosed software sales of the Haptic software, sales of service for the Haptic software, or

trials of the Haptic software.

The exclusive rights in the copyright author include the rights "(1) to reproduce the

copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the

copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public

by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106. When

TEG circumvented the licensing key technological measures in the Haptic software it did so in

order to copy and distribute Max's copyrighted Haptic software in violation of Max's exclusive

rights. When TEG modified the Haptic source code by stripping out or modifying the licensing logic from the source code to circumvent the licensing key requirement, TEG created a derivative work of Max's software and then copied and distributed the modified software in violation of Max's exclusive rights under copyright.

TEG next argues that "TEG is not facilitating copyright infringement. The only third parties accessing the Software are TEG's Government customers, who are licensed customers under the terms of the JVA." (ECF 52 at 15). As noted above, the JVA does not grant TEG a license to anything. In fact, the subsequently executed EULAs and SCLA all prohibit TEG from doing what they did to circumvent and prohibit TEG from distributing Max's software to anyone. Moreover, the source code for the software was only licensed pursuant to SCLA which limited use the use of the source code to TEG's internal business purposes. Modifying the source code to remove the licensing logic and distributing modified versions of the source code exceeded the scope of the SCLA and undeniably was copyright infringement.

TEG's argument also defies logic and common sense. If Max had truly licensed the Haptic software to TEG as TEG claims in order to allow TEG to distribute the software to "TEG's Government customers," then why would TEG have needed to circumvent the licensing keys in the software in order to facilitate the distribution of the software. If TEG was an authorized distributor to any government customer—which they emphatically were not—then TEG would have been provided with the license keys to the software so that they could license or sublicense the software legally and correctly, not surreptitiously by hacking the source code to remove licensing key logic or backdating computers to defeat the licensing key's normal operation.

**E.     The Complaint Sufficiently and Plausibly States Claims for Removal or Falsification of Copyright Management information against TEG in Violation of 17 U.S.C. § 1202.**

The complaint alleges that TEG removed the Haptic CMI from the Haptic Federal software and replaced the Haptic CMI with false CMI indicating that the software was TEG's software by using the terms "VJOC" and "C4MAP." TEG removed Max's name HAPTIC and renamed the software C4MAP or C4MAP (VJOC) or VJOC in order to deceive the DOD into believing that the software belongs to TEG. The complaint alleges that the defendants committed these acts knowing that they did not have the authority of Max, knowing that the CMI was false and knowing or having reasonable grounds to know that they will induce, enable, facilitate or conceal infringement of the MAX's rights in the Haptic Federal Source Code protected under the Copyright Act. (ECF 1 ¶¶ 184-186).

These allegations adequately state claims for the removal of CMI under §1202(b)(1) and the distribution of copies of works with the CMI removed under §1202(b)(3). *Design Basics v. Van Prooyen Builders, Inc.*, No. 2:19CV100-PPS/SLC, 2021 U.S. Dist. LEXIS 41425, at *7-8 (N.D. Ind. Mar. 5, 2021)("accepting the truth of Design Basics' allegations and drawing all inferences in the light most favorable to it, the complaint states facially plausible claims for relief under the DMCA.") A broad reading of the requirements of the statute at the pleading stage is the appropriate standard of review for these claims. *Propertythree Tech. Grp. v. Apartment Hunters*, No. 1:07-cv-356-RLY-JMS, 2008 U.S. Dist. LEXIS 136027, at *19-20 (S.D. Ind. May 19, 2008) ("how Plaintiff inserted its copyright information onto its online forms or how Defendants allegedly removed such information" is not necessary detail to satisfy federal notice pleading standards for claims under § 1202 at the motion to dismiss stage).

Sadowski is not required to prove his case in his pleading; he must only allege a plausible claim for relief. Sadowski alleges some critical facts "on information and belief," but that form of pleading is appropriate for matters within the

20
**SRIPLAW**

purview of the defendant, such as defendant's knowledge or intent. Of course, at some point, Sadowski will need to adduce evidence to support his allegations, and he should not maintain his DMCA claim after he realizes that he has no support for it.

*Sadowski v. Miss. Valley Broads., LLC*, No. 18-cv-946-jdp, 2019 U.S. Dist. LEXIS 37920, at *3-4 (W.D. Wis. Jan. 11, 2019). See also, *Roth v. Walsh Co.*, No. 18-CV-1431, 2019 U.S. Dist. LEXIS 11439, at *9 (E.D. Wis. Jan. 24, 2019).

The complaint adequately pleads the requirements of § 1202. The motion should be denied.

### F.    The Complaint Sufficiently and Plausibly States a Claim for Reverse Passing Off against TEG in violation of 15 U.S.C. § 1125(a)

The complaint alleges that the "Haptic" mark is a trademark of MAX for software that is inherently distinctive or suggestive, and that the defendants removed the Haptic mark on the Haptic Federal software and replaced it with C4MAP and JVOC when the software was displayed, advertised, and marketed to TEG's clients in violation of 15 U.S.C. § 1125(a). (ECF 1 ¶¶ 132-144).

"This section of the Lanham Act requires that customers likely be, in other words, tricked into thinking that products are affiliated with or approved by another party." *Diamond Sawblades Mfrs. Coal. v. Diamond Tools Tech.*, 504 F. Supp. 3d 927, 942 (S.D. Ind. 2020). Max's complaint is simple: the HAPTIC trademark and software belongs to Max. TEG removed the HAPTIC trademark and rebranded Max's software with TEG's marks "VJOC" and "C4MAP" to deceive TEG's customers into believing that TEG created the software which it did not. Calling the software "VJOC" and "C4MAP" is false and misleading and likely to cause confusion among customers who are interested in purchasing the software and are confronted with the same software being marketed by Max as HAPTIC and by TEG as "VJOC" and "C4MAP." Which is the real product? Consumers will not know because TEG created the confusion by rebranding the

software and calling it something other than HAPTIC which is the name the software goes by in the federal market for software.

Max's trademark claim is not foreclosed by *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). That case held that "origin of goods," as used in § 1125(a) did not connote the person or entity which originated the ideas contained in the video, and instead referred only to the producer's tangible video product. In other words, "the law of trademark cannot be invoked to assert what in fact is really a claim of copyright infringement." *Phoenix Entm't, LLC v. Rumsey*, 829 F.3d 817, 826 (7th Cir. 2016).

The decision in *M. Arthur Gensler Jr. & Assocs. v. Strabala*, 764 F.3d 735 (7th Cir. 2014), a dispute between architects, is instructive. One architect accused the other of violating § 1125(a) by making a false or misleading representation of fact concerning the architect's role in designing five buildings that was likely to deceive as to the connection or association of the defendant architect with the plaintiff, and to deceive clients about the origin of the defendant architect's designs. The Seventh Circuit held that "[n]othing in *Dastar* forecloses such a claim." *Id.*, 764 F.3d at 737, citing *Societe des Hotels Meridien v. LaSalle Hotel Operating Partnership, LP*, 380 F.3d 126 (2d Cir. 2004). The court also observed that "a false claim of authorship, without the making of copies (or some other act covered by 17 U.S.C. §106), is outside the scope of copyright law.[2] Gensler's only plausible federal claim rests on §43(a)." *Id*.

---

[2] Judge Easterbrook appears to have overlooked that a false claim of copyright authorship with the necessary scienter can be a violation of 17 U.S.C. § 1202 as plaintiff alleges in the complaint here.

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

**G.     The John Doe Defendants are TEG Employees Who Have Not Been Identified and Who Are Individually Liable for Infringement of Max's Intellectual Property Rights and When they are Identified they Will be Named and Served**

In the Seventh Circuit, plaintiffs are entitled to conduct discovery to identify John Doe defendants. See *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 821 (7th Cir. 2009) (permitting pro se plaintiff whose complaint contained specific allegations describing the conduct of unknown prison officers to conduct discovery to ascertain the identity of the defendants). Plaintiffs in intellectual property cases have similarly been permitted this latitude to conduct discovery to identify John Doe defendants who committed infringement. See *Arista Records Ltd. Liab. Co. v. Doe*, 604 F.3d 110 (2d Cir. 2010) (where the "identification of alleged infringers was indispensable for the vindication of the plaintiffs' copyright rights" the plaintiff was allowed discovery to identify the individuals to enforce the plaintiff's rights against those individuals).

The infringement of intellectual property rights is considered an intentional tort. *Precision Universal Joint Corp. v. Republic Gear Co*., No. 75 C 2942, 1976 U.S. Dist. LEXIS 15452, at *6 (N.D. Ill. Apr. 22, 1976). "Copyright infringement is unquestionably a tort…" *Leo Feist v. Young*, 138 F.2d 972, 975, 59 USPQ 450, 453 (7th Cir. 1943)). Intentional torts create personal liability for the individuals who commit them. *Haggerty Enterprises, Inc. v. Lipan Indus. Co*., No. 00 C 766, 2001 WL 968592, at *2 (N.D. Ill. Aug. 23, 2001); *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 835 (N.D. Ill. 2000).

A corporate officer is personally liable for the torts in which she has participated or which she has authorized or directed. *Med. Informatics Eng'g, Inc. v. Orthopaedics Ne., P.C.,* 458 F. Supp. 2d 716, 729-30 (N.D. Ind. 2006). Moreover, an individual—even if acting on behalf of a corporation—is personally liable for infringement if they (1) act willfully and knowingly, (2) personally participate in the infringing activities, or (3) use the corporation to

carry out their own deliberate infringement. *Dangler v. Imperial Mach. Co.,* 11 F.2d 945, 947 (7th Cir. 1926) (personal liability attaches in situations where the officer uses the corporation as an instrument to avoid personal liability or knowingly uses a corporation for the purpose of avoiding responsibility for the damages resulting from infringement).

Here the complaint alleges that "John Does 1-10 are employees of TEG whose true names and identities are not yet known but who will be identified in discovery in this case." (ECF 1 ¶ 18). The counts for trade secret misappropriation each allege that "Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN personally disclosed and/or *caused, directed and authorized employees of TEG* to disclose MAX's trade secret Haptic Federal Source Code without permission or authority of MAX." (ECF 1 ¶¶151, 161). The count for copyright infringement alleges that "Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN *caused, directed and authorized employees of TEG* to copy, distribute or make derivative works of the Haptic Federal source code without permission or authority of MAX." (ECF 1 ¶¶ 172). The Count for circumvention alleges that "Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN *caused, directed and authorized employees of TEG* to circumvent MAX's technological measures without permission or authority of MAX." (ECF 1 ¶ 179). The count for violation of 17 U.S.C. § 1202 alleges that "Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN *caused, directed and authorized employees of TEG* to distribute copyright management information without permission or authority of MAX." (ECF 1 ¶¶ 185). The count for reverse passing off alleges that "Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN *caused, directed and authorized employees of TEG* to remove the Haptic mark without permission or authority of MAX." (ECF 1 ¶¶ 196).

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

Plaintiff is entitled to identify the John Doe defendants and then name them personally for the infringement they committed. That is a proper purpose and their designation in the complaint should remain so that after an initial period of discovery they can be identified and named as defendants.

**H.      Neither Rule 13 nor the JVA Provide a Basis to Stay these Proceedings Against TEG for Violations of Max's Intellectual Property Rights**

It has already been extensively argued that the JVA gives TEG no intellectual property rights whatsoever. Since the JVA gives TEG no IP rights, the JVA cannot be an impediment to this case proceeding. To stay this case because the JVA provided TEG with some expectation that it could have rights in the future would vitiate those rights altogether. Why have a Copyright Act, a Trade Secret Act, or a Trademark Act if the vague and brief language of a "joint venture agreement" could make those rights disappear at the mere request of TEG? The notion appears to do violence to the idea that intellectual property is protectable at all. Surely that is not true nor can it serve as a basis to stay a sufficient complaint that satisfies all the statutory requirements from proceeding.

The two cases here do not contain "identical facts, law, and evidence" as the claims in *Hostway Corp. v. JPMorgan Chase Bank*, that Defendant cites. 2009 U.S. Dist. LEXIS 75049, at *8 (N.D. Ill. Aug. 24, 2009). The parallel litigation in that case involved two separately filed cases in two different courts (Southern District of New York and Northern District of Illinois) both involving breach of the exact same agreement. *Id.*

Here, the two cases are different. This case involves claims under federal law for infringement of intellectual property rights. The other solely relates to breach of contract, an issue of state law. These cases are also in the same United States District Court and plaintiff gave notice that the cases were related.

Staying the instant proceeding (including the motion for preliminary injunction) would allow TEG to continue its illegal activities selling, modifying and distributing Max's software without its consent.

## IV.     CONCLUSION

WHEREFORE, Plaintiff MAX MINDS, LLC respectfully requests that the Motion to Dismiss be Denied in its entirety.

Dated: July 26, 2024                                Respectfully submitted,


                                                    /s/ J. Campbell Miller
                                                    J. CAMPBELL MILLER
                                                    Bar Number: 38279-49
                                                    campbell.miller@sriplaw.com

                                                    **SRIPLAW, P. A.**
                                                    231 South Rangeline Road
                                                    Suite H
                                                    Carmel, Indiana 46032
                                                    332.600.5599 – Telephone
                                                    561.404.4353 – Facsimile

                                                    -and-

                                                    JOSEPH A. DUNNE (*Pro Hac Vice*)
                                                    joseph.dunne@sriplaw.com

                                                    **SRIPLAW, P. A.**
                                                    175 Pearl Street
                                                    Third Floor
                                                    Brooklyn, Indiana 11201
                                                    929.200.8446 – Telephone
                                                    561.404.4353 – Facsimile

                                                    -and-

                                                    JOEL B. ROTHMAN (*Pro Hac Vice*)
                                                    joel.rothman@sriplaw.com

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ TEXAS ◆ NEW YORK

**SRIPLAW, P. A.**
21301 Powerline Road
Suite 100
Boca Raton, Indiana 33433
561.404.4335 – Telephone
561.404.4353 – Facsimile

-and-

PHILIP D SEVER
Bar Number: 25384-49
phil@landownerattorneys.com

**SEVER, STORY, WALKER**
742 South Rangeline Road
Carmel, IN  46032
317 9611202 - Telephone

*Counsel for Plaintiff Max Minds, LLC*