**COMPARISON OF MAX'S FACTUAL ALLEGATIONS**

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| **The "Haptic" Software** ||
| 19. MAX creates highly functional software platforms for commercial and governmental applications. | 2. MAX creates highly functional software platforms for commercial and governmental applications. . . . |
| 28. MAX began development of its software in or around March 2019.<br><br>29. Full-time development began in May 2019. | 19. In or around March 2019, MAX began development of a software product called "Haptic,"<br><br>with full-time development beginning in May 2019.<br><br>Haptic is an interactive content collaboration software and was originally designed for use in both the public and private sector. MAX created Haptic independently. |
| 25. MAX's software is used in briefing centers, experience centers, innovation centers and command and control centers. MAX's customers include Fortune 100 companies in consulting, telecommunications, IT, pharma, and manufacturing. | 20. Haptic enables teams to communicate seamlessly and in real-time. The platform's powerful tools help teams manage tasks, share files, and stay organized.<br><br>The software is capable of numerous functions such as creating: Briefing and experience centers; ideation and insight centers; customizable collaboration spaces; and dashboarding and operations centers. |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| 32. In June 2019, MAX demonstrated its software to industry partners and potential commercial customers at InfoComm. | 21. In June 2019, MAX demonstrated Haptic to industry partners and potential commercial customers at InfoComm. |
| 33. Also in July 2019, MAX conducted another demonstration of its software to industry partners and potential customers.<br><br><br><br>34. MAX's first customer for the government version of its software called Haptic Federal was an agency of the Department of Defense (DOD) that agreed to license Haptic Federal in August of 2019. | 22. In July 2019, MAX conducted another demonstration of the Haptic platform to industry partners and potential customers.<br><br>MAX demonstrated Haptic to at least a dozen individuals during that demonstration.<br><br>The demonstration resulted in the first license of Haptic to a government agency in August 2019 through MAX's first licensing partner. |
| 35. The agency of DOD is still a client and user of Haptic Federal through its prime contractor Peraton. The agency of DOD continues to use Haptic Federal on premise to manage command and control processes within the agency. | |
| 36. On or about October 1, 2019, MAX posted a video demonstration of its software showing a highly functional product. The video demonstration can be viewed at this URL: https://vimeo.com/363671367/409066cb0e | 23. On or about October 1, 2019, MAX published a video demonstration of Haptic showing a highly functional product. The video demonstration can be viewed at this URL: https://vimeo.com/363671367/409066cb0e |

| **SECOND FILED ACTION**<br><br>**Max's Complaint (1:24-cv-00779)** | **FIRST FILED ACTION**<br><br>**Max's Counterclaims (1:24-cv-00650)** |
|---|---|
| 37. In or about November 2019, Haptic Federal was installed on-premise for the aforementioned DOD agency. | 24. In or about November 2019, Mr. Fischer installed Haptic for the first licensee, a U.S. government agency.<br><br>Max had a fully functioning version of Haptic at this time. |
| **Max and TEG Meet** | |
| 69. MAX's CEO Brandon Fischer first met representatives of TEG in 2016 when TEG was a licensed distributor of software sold by Fischer's prior employer. | 37. Mr. Fischer met TEG in 2016 in connection with TEG operating as a licensed distributor of Prysm's Synthesis software. |
| 70. In February 2019, Fischer invited representatives of TEG to a demonstration of MAX's Haptic software.<br><br>TEG's representatives declined but invited Fischer to demonstrate Haptic the next day at the U.S. Government Joint Staff Lab in Norfolk, Virginia. | 40. A few months after the expiration of the Non-Compete Agreement in February 2019, Mr. Fischer invited TEG to the above-referenced July 2019 demonstration of Haptic.<br><br>TEG declined the invitation and instead invited MAX to demonstrate Haptic the next day at the U.S. Government Joint Staff Lab in Norfolk, Virginia. |
| 71. Prior to the demonstration, MAX and TEG entered into the mutual Non-Disclosure Agreement ("NDA"), attached herewith as Exhibit 7. | 41. The purpose of the meeting at the Joint Staff Lab was for MAX to demonstrate the Haptic platform to TEG and leaders within the Joint Staff Lab, *i.e.* potential customers.<br><br>Prior to this demonstration, MAX and TEG entered into a mutual Non-Disclosure Agreement ("NDA"), attached herewith as Exhibit 4. |

| SECOND FILED ACTION | FIRST FILED ACTION |
|---|---|
| Max's Complaint (1:24-cv-00779) | Max's Counterclaims (1:24-cv-00650) |
| 72. Fischer later discovered that the demonstration fulfilled an obligation of TEG under a pre-existing $49.5 million sole-source government contract awarded to TEG. | 42. Unbeknownst to MAX, the demonstration at the Joint Staff Lab fulfilled an obligation of TEG under a pre-existing $49.5 million sole-source government contract and TEG used the demonstration to pitch the government for an additional contract award. |
| 73. On July 25, 2019, a week after the demonstration, TEG received an additional $16.6 million contract award described as "Cross Domain Solutions- Comprehensive, Collaborative, Command and Control Mission Application Platform Service (C4MAP)." | On July 25, 2019, a week after the demonstration, TEG received a $16.6 million contract award. The contract award is described as "Cross Domain Solutions- Comprehensive, Collaborative, Command and Control Mission Application Platform Service" which is longhand for C4MAP. |
| 74. Fischer had no prior knowledge of the C4MAP contract award. | TEG did not disclose the existence of either the sole-source contract or the contract award to MAX.<br><br>59. Unbeknown to MAX, after TEG and MAX signed the JVA in January 2020, TEG used the Haptic Federal software to fulfill commitments that TEG had previously made to the U.S. Government. Said commitments arose out of a $49.5 million sole source contract, awarded to TEG in 2016 and ending in October 2021. |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| 79. Impressed with Haptic Federal's capabilities, Clare contacted Fischer on November 3, 2019 to discuss how TEG could become an authorized reseller of Haptic Federal to the U.S. Government. | 45. Impressed with Haptic's capabilities, Rob Clare contacted Mr. Fischer on November 3, 2019, to discuss how TEG could become an authorized reseller of the Haptic software to the U.S. Government. TEG requested a meeting and Mr. Fischer met with TEG later that month. |
| 80. Fischer and Clare met in January 2020. | TEG then requested that MAX visit TEG in January 2020, and offered to pay for MAX's entire trip including expenses, which MAX accepted. |
| **The Joint Venture Agreement ("JVA")** ||
| 81. On January 23, 2020, MAX and TEG signed the Joint Venture Agreement (JVA) attached hereto as Exhibit 9. | 46. . . . [O]n January 23, 2020, MAX and TEG entered into the JVA, which related to a Haptic spin-off product specifically for TEG customers in the federal government market. |
| 82. Pursuant to the JVA, TEG agreed to create a distribution channel to license Haptic Federal to customers in the federal government. | 2. . . . . MAX and TEG engaged in a business relationship whereby TEG agreed to create a distribution channel to license one of MAX's products, "Haptic Federal," to customers in the federal government. . . . |
| 84. The JVA provided that TEG would be the exclusive distributor of MAX's federal government product, Haptic Federal, so long as TEG hit certain licensing goals and shared half the revenue with MAX. | 3. The JVA provided that TEG would be the exclusive distributor of MAX's federal government product, Haptic Federal, so long as TEG hit certain licensing goals and shared half the revenue with MAX. |

| **SECOND FILED ACTION**<br><br>**Max's Complaint (1:24-cv-00779)** | **FIRST FILED ACTION**<br><br>**Max's Counterclaims (1:24-cv-00650)** |
|---|---|
| 85. The JVA granted TEG the right to be "the exclusive distributor/reseller of the Haptic Federal product into the federal market," so long as TEG hit certain "license-based revenue targets, paid to MAX[.]"<br><br>94. The JVA applied to the Haptic Federal product only. | 47. . . . The JVA granted TEG the right to be "the exclusive distributor/reseller of the Haptic Federal product into the federal market," so long as TEG hit certain "license-based revenue targets, paid to MAX[.]" *Id*. at 2.<br><br>The JVA pertains to the Haptic Federal product only. |
| 86. Under the JVA, TEG was required to "maintain a web presence for marketing material of the Haptic Federal product [and] deliver, deploy, sustain, and develop customer requirements."<br><br>87. Under the JVA, TEG was required to "establish and manage all federal channel sales partnerships." | 51. Under the JVA, TEG was required to "maintain a web presence for marketing material of the Haptic Federal product [and] deliver, deploy, sustain, and develop customer requirements." *Id*. at 1.<br><br>TEG was required to "establish and manage all federal channel sales partnerships." *Id*. at 3. |
| 88. The JVA required "TEG and Max [ ] to establish and share an electronic files system."<br><br>Specifically, "TEG and MAX agree[d] to work collaboratively on the preparation and delivery of: Proposals, Marketing materials, [and] Activity reporting to government customers[.]"<br><br>"TEG and MAX agree[d] to conduct routine project and program management review discussions." | 52. Although TEG was to manage the federal distribution channel, the JVA required "TEG and Max [ ] to establish and share an electronic files system." *Id*. at 2.<br>Specifically, "TEG and MAX agree[d] to work collaboratively on the preparation and delivery of: Proposals, Marketing materials, [and] Activity reporting to government customers[.]" *Id*.<br><br>"TEG and MAX agree[d] to conduct routine project and program management review discussions." *Id*. |

| **SECOND FILED ACTION**<br><br>**Max's Complaint (1:24-cv-00779)** | **FIRST FILED ACTION**<br><br>**Max's Counterclaims (1:24-cv-00650)** |
|---|---|
| 89. The JVA provided that in the first year, TEG would make retainer payments to MAX that would be credited toward revenue targets. MAX would use the retainer payments to create and maintain Haptic Federal, install and support two installations with TEG for testing and demonstration purposes, and provide TEG with a software update at least once every three months.<br><br>93. Nothing in the JVA granted TEG ownership rights in the Haptic Federal software. | 53. Additionally, the JVA provided that in the first year, TEG would make retainer payments to MAX that would be credited toward revenue targets. *Id*. at 1. MAX would use the retainer payments to create and maintain Haptic Federal, install and support two installations with TEG for testing and demonstration purposes, and provide TEG with a software update at least once every three months. *Id*.<br><br>Nothing in the JVA granted TEG ownership rights in the Haptic Federal software. |
| 90. With respect to sales revenue, MAX and TEG agreed to equally share revenue from "total sale of Haptic Federal product and user license sales[.]". However, TEG agreed that "[a]ny channel discount will be negotiated using TEG's portion of the TEG/MAX shared revenue." | 54. With respect to sales revenue, MAX and TEG agreed to equally share revenue from "total sale of Haptic Federal product and user license sales[.]" *Id*. at 3. However, TEG agreed that "[a]ny channel discount will be negotiated using TEG's portion of the TEG/MAX shared revenue." |
| 91. Notably, the JVA does not entitle TEG to share revenue earned by MAX through sale of products other than Haptic Federal. And the JVA does not state that TEG is the exclusive distributor of all of MAX's software. | 55. Notably, the JVA does not entitle TEG to share revenue earned by MAX through sale of products other than Haptic Federal. And the JVA does not state that TEG is the exclusive distributor of all of MAX's software. |
| 92. MAX and TEG also agreed to equally share revenue from "total sale in non-federal opportunities, when using co-owned [intellectual property]." However, co-owned intellectual property would only exist in the event that TEG paid MAX for "custom software development," which never occurred. | 56. MAX and TEG also agreed to equally share revenue from "total sale in non-federal opportunities, when using co-owned [intellectual property]." *Id*. However, co-owned intellectual property would only exist in the event that TEG paid MAX for "custom software development," which never occurred. *Id*. at 2. |

| **SECOND FILED ACTION**<br><br>**Max's Complaint (1:24-cv-00779)** | **FIRST FILED ACTION**<br><br>**Max's Counterclaims (1:24-cv-00650)** |
|---|---|
| **The Other Agreements** ||
| 95. After the JVA was entered into, TEG also entered into the SCLA attached as Exhibit 6, and the EULA attached as Exhibit 5. | 4. In addition to the JVA, the parties entered into an End User License Agreement (the "EULA"), attached herewith as Exhibit 2, and a Source Code License Agreement (the "SCLA"), attached herewith as Exhibit 3. The EULA and SCLA agreements provide that MAX is the sole owner of the Haptic Federal software. |
| **The End User License Agreement ("EULA")** ||
| 49. The Alleo/Haptic source code is never distributed to end users in source code format. Instead, the source code is compiled into executable, binary or web format executable code in such a fashion as to obscure the underlying trade secrets contained within the code. | |
| 50. When Haptic Federal is licensed to end users it is always pursuant to restrictions contained in an End User License Agreement (EULA) such as the EULA attached hereto as Exhibit 5. | 25. Prior to installing the Haptic software on any licensee systems, licensees must accept the terms provided in an End User License Agreement (the "EULA"). |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| | 26. The EULA uses the term "Product" defined as "the Haptic application, software, their associated upgrades, patches, and updates and related services (the "Product") currently provided or which will be provided by Max Minds, LLC dba Haptic, or any one of its subsidiaries or affiliated companies (collectively referred to as 'HAPTIC')." Ex. 2, at 1. |
| 51. Pursuant to the EULA, users of the Haptic Federal software are granted a limited "non-exclusive, non-transferable, non-sublicensed" license for a limited time. | 27. Section 1 of the EULA ("Grant of License") states, in part: "HAPTIC (or its licensors) grants You a non-exclusive, non-transferable, non-sublicensed, non-commercial and personal license to install and/or use the Product . . . for such time until either You or HAPTIC terminates this EULA. . . . THIS PRODUCT IS LICENSED TO YOU, NOT SOLD." Ex. 2, § 1.1. |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| 52. Pursuant to the EULA, users of the Haptic Federal software agree not to "directly or indirectly (i) sell, rent out, lease, license, distribute, market, exploit the Product or any of its parts commercially, (ii) reverse engineer, decompile, disassemble, adapt, reproduce, or create derivative works of this Product," "(iii) create, use and/or distribute "auto", "trainer", "script" or "macro" computer programs or other "cheat" or "hack" programs or software applications for this Product (whether over the internet or in local area network); (iv) remove, alter, disable or circumvent any copyright and trademark indications or other authorship and origin information, notices or labels contained on or within this Product and (v) export or re-export this Product or any copy of adaptation in violation of any applicable laws or regulations." | 28. Section 1 of the EULA goes on to specify: "You shall not, directly or indirectly (i) sell, rent out, lease, license, distribute, market, exploit the Product or any of its parts commercially, (ii) reverse engineer, decompile, disassemble, adapt, reproduce, or create derivative works of this Product (except if the Product enables You through a specific feature to create, generate or submit User Generated Content and for which You will need to create an Account and comply Terms of Use), in whole or in part; (iii) create, use and/or distribute 'auto', 'trainer', 'script' or 'macro' computer programs or other 'cheat' or 'hack' programs or software applications for this Product (whether over the internet or in local area network); (iv) remove, alter, disable or circumvent any copyright and trademark indications or other authorship and origin information, notices or labels contained on or within this Product and (v) export or re-export this Product or any copy of adaptation in violation of any applicable laws or regulations." Ex. 2, § 1.2. |
| 53. Pursuant to the EULA, users of the Haptic Federal software agree that MAX retains and owns all intellectual property rights in the Haptic Federal software. | 29. Section 2 of the EULA ("Ownership") states: "All title, ownership rights and intellectual property rights in and to the Product [ ] and any and all copies thereof are owned by HAPTIC or its licensors. . . . This License confers no title or ownership in the Product and should not be construed as a sale of any rights in the Product." Ex. 2, § 2. |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| 54. Pursuant to the EULA, users of the Haptic Federal software agree to comply with all applicable laws, rules and regulations applicable to the software. | |
| 55. Pursuant to the EULA, users of the Haptic Federal software agree not to "create, use, share and/or publish by any means in relation to the Product any material (text, words, images, sounds, videos, etc.) which would breach of a duty of confidentiality, infringe any intellectual property right or an individual's right to privacy or which would incite the committing of an unlawful act (in particular, piracy, cracking or circulation of counterfeit software)." | |
| 56. Pursuant to the EULA, users of the Haptic Federal software agree not to "create, supply or use alternative methods of using the Products, for example server emulators." | |
| 57. Pursuant to the EULA, users of the Haptic Federal software agree not to "modify, distort, block, abnormally burden, disrupt, slow down and/or hinder the normal functioning of all or part of the Product, or their accessibility to other users, or the functioning of the partner networks of the Product, or attempt to do any of the above." | |

| SECOND FILED ACTION | FIRST FILED ACTION |
|---|---|
| Max's Complaint (1:24-cv-00779) | Max's Counterclaims (1:24-cv-00650) |
| 58. Pursuant to the EULA, "the laws of the United States and the State of Indiana" apply to the EULA.<br><br>59. Pursuant to the EULA, "any action at law or in equity arising under this EULA shall be finally adjudicated or determined in any court or courts of the State of Indiana, or of the United States of America, in Hamilton County, Indiana." | 30. The EULA is governed "in accordance with the laws of the United States and the State of Indiana." Ex. 2, § 9.4.1.<br><br>The EULA contains a forum/venue selection clause stating "any action at law or in equity arising under this EULA shall be finally adjudicated or determined in any court or courts of the State of Indiana, or of the United States of America, in Hamilton County, Indiana[.]" Ex. 2, § 9.4.2. |
| 78. In order to use the Haptic Federal software, Clare and Mase agreed to the Haptic Federal EULA. | 31. TEG has agreed to the applicable EULA numerous times prior to installations of Haptic or Haptic branch products. Additionally, TEG's CEO Rob Clare acknowledged acceptance of the terms EULA in an email dated August 10, 2020. |
| 75. On October 2, 2019, Fischer provided TEG's CEO Rob Clare and COO Jeff Mase with Haptic Federal user accounts.<br><br>77. The user accounts permitted Clare and Mase access to and the ability to demonstrate Haptic Federal to TEG's customers.<br><br>76. Before signing-in to their user accounts, Clare and Mase agreed to the Haptic Privacy Policy, attached herewith as Exhibit 8. | 44. On October 2, 2019, Mr. Fischer provided TEG's CEO Rob Clare and COO Jeff Mase with Haptic user accounts.<br><br>This allowed TEG to access and demonstrate the Haptic platform live to their customers.<br><br>Before signing-in, all users (which includes TEG) were required by the Haptic software to read, acknowledge, and assent to the terms of the Haptic Privacy Policy, attached herewith as Exhibit 5. Additionally, in or around August 2020 the Haptic software required users signing-in to agree to the EULA described above. |

| SECOND FILED ACTION | FIRST FILED ACTION |
|---|---|
| Max's Complaint (1:24-cv-00779) | Max's Counterclaims (1:24-cv-00650) |
| **The Source Code License Agreement ("SCLA")** ||
| 60. The Haptic Federal source code has only been distributed in limited circumstances pursuant to significant restrictions contained in a Source Code License Agreement ("SCLA"). <br><br> 61. The source code for MAX's software has never been distributed to users. <br><br> 62. One limited circumstance where MAX agreed to provide restricted access to the Haptic Federal source code was to TEG pursuant to a Source Code License Agreement dated March 30, 2021 (SCLA) attached hereto as Exhibit 6. | 71. On March 30, 2021, MAX and TEG entered into a Source Code License Agreement (the "SCLA"). Ex. 3. |
| 63. Subject to and conditioned on TEG's payment of fees owed pursuant to the SCLA and TEG's compliance with all the terms and conditions of the SCLA, MAX grated [sic] TEG "a non-exclusive, non-sublicensable, and non-transferable (except in compliance with Section 12(g) of the SCLA), a license during the SCLA's term to (i) use the Source Code for the [Haptic Federal] system for [TEG's] Internal business purposes; and (ii) use and make a reasonable number of copies of the Documentation [for the Haptic Federal software] solely for [TEG's] internal business purposes in connection with [TEG's] use of the Source Code." | 72. In the SCLA, MAX granted TEG "a non-exclusive, non-sublicensable, and nontransferable [ ] license" for Haptic Federal. Ex. 3, § 2(a). The license was "[s]ubject to and conditioned on [TEG's] payment of Fees and compliance with all the terms and conditions of [the SCLA]." *Id*. Moreover, the SCLA "supersede[d] all prior and contemporaneous [agreements] with respect to [the subject matter of the SCLA.]" *Id*. at § 12(a). |

| **SECOND FILED ACTION**<br><br>**Max's Complaint (1:24-cv-00779)** | **FIRST FILED ACTION**<br><br>**Max's Counterclaims (1:24-cv-00650)** |
|---|---|
| 64. The SCLA further restricted the use of the Haptic Federal source code to "Authorized Users." An "Authorized User" is defined as "an employee or other end user of [TEG] who [TEG] permits to access and use the Source Code for the software and/or Documentation pursuant to [TEG's] license." | |
| 65. The SCLA restricted TEG's use of the Haptic Federal source code further. The section entitled "Use Restrictions" provides: <u>Use Restrictions</u>. Licensee shall not use the Source Code or Documentation for any purposes beyond the scope of the license granted in this Agreement. Without limiting the foregoing and except as otherwise expressly set forth in this Agreement, Licensee shall not at any time, directly or indirectly: (i) copy, modify, or create derivative works of the Source Code or the Documentation, in whole or in part, ii)rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Source Code or the Documentation to any third party: (iii) remove any proprietary notices from the Source Code or the Documentation; or (iv) use the Source Code in any manner or for any purpose that infringes, misappropriates. or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law. | 73. The SCLA lays out multiple "Use Restrictions" on TEG's license: [TEG] "shall not at any time, directly or indirectly: (i) copy, modify, or create derivative works of the Source Code or the Documentation, in whole or in part; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Source Code or the Documentation to any third party; (iii) remove any proprietary notices from the Source Code or the Documentation; or (iv) use the Source Code in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law." *Id*. at § 2(b). |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| 66. Pursuant to the SCLA, TEG "acknowledges that, as between [MAX and TEG, MAX] owns all rights, title, and interests, including all intellectual property rights in and to the Source Code and Documentation. | 74. With respect to intellectual property ownership, the SCLA provides that "as between [TEG] and [MAX], [MAX] owns all rights, title, and interests, including all intellectual property rights, in and to the Software, Source Code and Documentation." *Id*. at § 7(a). |
| 67. The SCLA contains an extensive confidentiality agreement in which TEG acknowledged and agreed that the Haptic Federal Source Code and the Documentation for the Haptic Federal Source Code was "confidential intellectual property (including trade secrets)" of MAX and that TEG would maintain all Confidential Information provided to TEG by MAX as confidential and to not disclose such information. | |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| **The Certification Agreement** ||
| 96. Beginning in June 2020, MAX made the source code securely availably to TEG over a dozen times to allow their government customer(s) to scan for vulnerabilities and security issues.<br><br>97. TEG was required to provide MAX with a "chain of custody" document with signatures from everyone who accessed the source code stating that each person witnessed destruction of the source code after the scan.<br><br>98. TEG failed to provide the required chain of custody documentation to MAX on numerous occasions.<br><br>99. In the Summer of 2023, TEG failed to provide chain of custody documentation multiple times as MAX required in order to protect its trade secret source code from unauthorized disclosure. | 117. TEG also failed to protect the Haptic Federal Source Code. Beginning in June 2020, MAX made the source code securely availably to TEG over a dozen times to allow their government customer(s) to scan for vulnerabilities and security issues.<br><br>In most cases, TEG provided MAX with a "chain of custody" document that should have signatures from everyone who accessed the source code stating that each person witnessed destruction of the source code after the scan.<br><br><br><br>In the summer of 2023, TEG failed to provide chain of custody documentation multiple times. |
| 100. As a result, on August 17, 2023, MAX and TEG entered into a Certification Agreement. The agreement was intended to formalize confidentiality safeguards for Haptic Federal. The Certification Agreement is attached as Exhibit 10. | 118. As a result, on August 17, 2023, MAX and TEG entered into a Certification Agreement. The Certification Agreement is attached as Exhibit 6. The agreement was intended to formalize confidentiality safeguards for Haptic Federal. |

| **SECOND FILED ACTION**<br><br>**Max's Complaint (1:24-cv-00779)** | **FIRST FILED ACTION**<br><br>**Max's Counterclaims (1:24-cv-00650)** |
|---|---|
| 101. The Certification Agreement recites that "the Parties wish to maintain the source code for the Haptic Federal software platform ("Source Code") confidential and to preserve its value as a trade secret, and therefore wish to limit disclosure of the Source Code." | |
| 102. Pursuant to the Certification Agreement, TEG "acknowledge[d] and agree[d] that it shall be responsible for implementing procedures to ensure that: a. Haptic Federal Source Code is at all times maintained as confidential, not disclosed except to customer personnel having a need to receive the Haptic Federal source code, and b. Haptic Federal source code is used only by the customer to complete required security scans. TEG shall secure from the customer in each instance a chain of custody form reasonably acceptable to Max Minds (similar to the DA 4137)." | 119. The Certification Agreement mandates that "all copies of the Source Code that have been provided to TEG and/or to a TEG customer have been destroyed, and have not been retained by any entity." Ex. 6, ¶ 2. Further, the Certification Agreement mandates that "TEG shall secure from the customer in each instance a chain of custody form reasonably acceptable to Max Minds (similar to the DA 4137)." *Id.*, at ¶ 3. |

| SECOND FILED ACTION | FIRST FILED ACTION |
|---|---|
| Max's Complaint (1:24-cv-00779) | Max's Counterclaims (1:24-cv-00650) |
| 110. After the parties entered into the Certification Agreement, MAX discovered TEG violated the Certification Agreement in ways that infringed upon MAX's intellectual property rights numerous times. | 120. TEG has repeatedly violated the terms of the Certification Agreement. |
| 111. On September 13, 2023 and September 22, 2023, MAX engaged in source code transfers (versions 3.1.21.8 and 3.1.21.9) to TEG. | For the two most recent source code transfers (3.1.21.8 and 3.1.21.9) on September 13 and September 22, 2023, respectively, |
| 112. With respect to each transfer, TEG (1) retained the source code; (2) withheld the government scan report; (3) withheld Chain of Custody documents; and (4) failed to obtain signatures from everyone who touched the Haptic Federal source code. | TEG has (1) retained the source code; (2) withheld the government scan report; (3) withheld Chain of Custody documents; and (4) failed to obtain signatures from everyone who touched the Haptic Federal source code. |
| 113. MAX asked TEG at least twenty times to remedy these issues, but TEG stalled and eventually stopped responding to MAX in December 2023. | 121. MAX asked TEG at least twenty times to remedy these issues, but TEG stalled and eventually stopped responding to MAX in December 2023. |
| 114. TEG's Certification Agreement violations willfully endangered the Haptic Federal source code, resulting in damage to MAX. | TEG has willfully endangered the Haptic Federal source code, resulting in damage to MAX. |

| **SECOND FILED ACTION**<br><br>**Max's Complaint (1:24-cv-00779)** | **FIRST FILED ACTION**<br><br>**Max's Counterclaims (1:24-cv-00650)** |
|---|---|
| **The Alleged "Rebranding"** ||
| 129. Without notice to MAX or permission from MAX, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "C4MAP" when it demonstrated Haptic Federal to certain government customers.<br><br>130. Without notice to MAX or permission from MAX, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "VJOC," an abbreviation for Virtual Joint Operations Center, to other government customers.<br><br>131. TEG removed the Haptic name from the Haptic Federal software without MAX's knowledge, agreement or authorization.<br><br>132. TEG engaged in a campaign of unauthorized rebranding of Haptic Federal under TEG's brand names. | 33. TEG improperly rebrands the third-party software it licenses to the government under "C4MAP" which is an acronym for "Comprehensive Collaborative Command and Control Mission Application Platform."<br><br>TEG also uses "VJOC," an abbreviation for Virtual Joint Operations Center, when supplying third-party software to the government. |
| | 34. By using the "C4MAP" brand, TEG can switch out the underlying software platform without notifying customers, including the U.S. government, simply by adjusting the version number. Further, the brand name obfuscates the fact that the partner company actually creates and develops the software. |

| **SECOND FILED ACTION**<br><br>**Max's Complaint (1:24-cv-00779)** | **FIRST FILED ACTION**<br><br>**Max's Counterclaims (1:24-cv-00650)** |
|---|---|
|  | 35. TEG also uses the "C4MAP" brand to negotiate more favorable deals with the U.S. government by presenting itself as the sole provider of C4MAP in order to obtain sole-source contracts with premium prices due to the absence of alternative providers. |
| 133. TEG rebranded the Haptic Federal software as "C4MAP 3.0" or "VJOC."<br><br>134. Calling the Haptic Federal software "C4MAP 3.0" or "VJOC" allowed TEG to misrepresent Haptic Federal to industry partners and customers as TEG's own creation. | 62. Part of TEG's overall scheme to position itself as the sole source of the product was to engage in a campaign of unauthorized rebranding of Haptic Federal under TEG's brand names.<br><br>TEG rebranded the Haptic Federal software as "C4MAP 3.0" or "VJOC," removing the Haptic trademark.<br><br>This made it easier for TEG to misrepresent Haptic Federal to industry partners and customers as its own creation. |

| **SECOND FILED ACTION**<br><br>**Max's Complaint (1:24-cv-00779)** | **FIRST FILED ACTION**<br><br>**Max's Counterclaims (1:24-cv-00650)** |
|---|---|
| 135. TEG replaced product trademarks in the Haptic Federal software with TEG's own VJOC logo.<br><br>136. TEG marketed Haptic Federal as C4MAP on the e-marketplace CHESS where the U.S. Army shops for commercial information technology ("IT") software and services.<br><br>137. TEG marketed Haptic Federal as "C4MAP (VJOC)" on the military IT solutions website SupplyCore.<br><br>138. TEG promoted C4MAP without mentioning Haptic Federal or MAX on the websites www.digitaltwinconsortium.org and www.opencommons.org. | 63. For example, TEG replaced product trademarks on the platform with TEG's own VJOC logo.<br><br>TEG marketed Haptic Federal as C4MAP on the e-marketplace CHESS where the U.S. Army shops for commercial information technology ("IT") software and services.<br><br>Similarly, TEG marketed Haptic Federal as "C4MAP (VJOC)" on the military IT solutions website SupplyCore.<br><br>TEG also promoted C4MAP without mentioning Haptic Federal or MAX on the websites www.digitaltwinconsortium.org and www.opencommons.org. |
| 139. TEG marketed MAX's intellectual property as its own in various bid proposals submitted to the Government.<br><br>140. TEG either did not disclose its bid proposals to MAX or did not disclose full and accurate versions of the proposals. | 64. Additionally, TEG improperly marketed MAX's intellectual property as its own in various bid proposals submitted to the Government.<br><br>TEG either did not disclose its bid proposals to MAX or did not disclose full and accurate versions of the proposals. |

| SECOND FILED ACTION | FIRST FILED ACTION |
|---|---|
| Max's Complaint (1:24-cv-00779) | Max's Counterclaims (1:24-cv-00650) |
| 141. MAX learned about TEG's actions and confronted TEG in March 2020.<br><br>142. In response, TEG agreed that it would always call the product "C4MAP powered by Haptic."<br><br>143. Despite TEG's agreement to the contrary, TEG later reverted to leaving out any reference to Haptic or MAX when marketing Haptic Federal. | 65. It was not until MAX confronted TEG in March 2020,<br><br>that TEG agreed that it would always call the product "C4MAP powered by Haptic."<br><br>Despite this agreement, TEG later reverted to leaving out any reference to Haptic or MAX when marketing the product. |
| | 79. Despite MAX already having compromised and allowing TEG to market Haptic Federal as "C4MAP powered by Haptic," TEG continued with its unauthorized rebranding campaign. MAX again confronted TEG about the issue on May 26, 2021, via email. |
| | 80. Due to TEG's false and misleading statements to potential customers, MAX felt it had to remind TEG that "TEG is not the exclusive provider, licensor or distributor of the Haptic (source code). MAX has provided TEG with a temporary license to the source code for a limited time[.]" Further, MAX made it clear that TEG should not be selling or offering to sell perpetual licenses of the product. Finally, MAX pointed out "numerous instances where C4MAP or VJOC are mentioned without the phrase 'Powered by Haptic.'" |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| 144. TEG's rebranding has deprived end customers of their ability to make informed procurement decisions and caused financial harm to both MAX and the end customers. | 82. TEG's rebranding of Haptic Federal in their marketing and license sale materials has deprived end customers of their ability to make informed procurement decisions and caused financial harm to both MAX and the end customers. |
| **The Software – Copyright and Licenses** ||
| 38. Max's Haptic Federal software is an original creative work of authorship entitled to copyright protection. | 48. Both Haptic and Haptic Federal continued to evolve independently in parallel.<br><br>MAX is the sole owner of the copyrights in the Haptic and Haptic Federal software, including all versions of both Haptic and Haptic Federal. |
|  | 5. TEG repeatedly breached the JVA, EULA and SCLA contracts and infringed on MAX's intellectual property rights by, among things, copying MAX's software, making derivative copies of that software, rebranding that software and claiming it as TEG's own creation. TEG, moreover, generated tens of millions of dollars in revenue, much of which was not properly disclosed to (let alone shared with) MAX. |

| SECOND FILED ACTION | FIRST FILED ACTION |
|---|---|
| Max's Complaint (1:24-cv-00779) | Max's Counterclaims (1:24-cv-00650) |
| 121. In 2020-2021, MAX discovered that TEG misused software licenses by providing free extended trials.<br><br>122. MAX was required to authorize each free trial of Haptic Federal software that TEG provided to a customer in advance of installation.<br><br>123. In mid-2021, MAX discovered at least a dozen trials that TEG had extended to customers without MAX's authorization.<br><br>124. In response, TEG told MAX these were free trials. However, this was false. TEG was paid to install and support the trail [sic] installations of Haptic Federal. | 83. In addition, in 2020-2021, TEG misused software licenses by providing supposedly free extended trials.<br><br>MAX had explained to TEG that "[e]ach 'Free Trial' must be authorized by Max/Haptic in-advance of installation."<br><br>Yet in mid-2021 MAX discovered a dozen trials that TEG had extended to customers without authorization.<br><br>While TEG told MAX these were free trials, it is highly likely TEG was being paid to install and support these trial installations. |
| 125. TEG also provided unauthorized trials to customers by exceeding the scope of the two software licenses granted to TEG pursuant to the JVA.<br><br>126. TEG made unauthorized copies and distributed those unauthorized copies of Haptic Federal to third parties for live events and live exercises for which TEG received compensation. | 84. Further, TEG provided unauthorized trials by misusing the two software licenses that were given to TEG under the JVA for demo and testing purposes.<br><br>TEG replicated the unauthorized licenses for live events and live exercises for which it received compensation. TEG also misused software licenses purchased from MAX by replicating the licenses numerous times for customers without MAX's authorization. |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| 128. On May 16, 2023, TEG admitted to back-dating computers to circumvent MAX's licensing policy for Haptic Federal | 85. During a call on May 16, 2023, TEG admitted to back-dating computers to circumvent MAX's licensing policy. These actions demonstrate a deliberate attempt to avoid compliance with the various agreements between MAX and TEG and have led to financial losses for MAX. |
| **The Source Code and CMI** | |
| 47. The Alleo/Haptic software source code was written in several different programming languages by MAX employees and developers under contract to MAX. All employees and developers working for MAX are contractually bound to maintain the confidentiality of the software they develop for the company. | |
| 48. The source code for the Alleo/Haptic software is a compilation, program, and code, which derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. | |

| **SECOND FILED ACTION**<br><br>**Max's Complaint (1:24-cv-00779)** | **FIRST FILED ACTION**<br><br>**Max's Counterclaims (1:24-cv-00650)** |
|---|---|
| 49. The Alleo/Haptic source code is never distributed to end users in source code format. Instead, the source code is compiled into executable, binary or web format executable code in such a fashion as to obscure the underlying trade secrets contained within the code. | |
| 68. The Haptic Federal source code is a compilation, program, and code, which derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Haptic Federal source code is a trade secret of MAX. | |
| 109. Pursuant to the Certification Agreement and the SCLA, TEG is under a continuing obligation to maintain the confidentiality of the Haptic Federal Software and the Haptic Federal Source Code. | |
| 96. Beginning in June 2020, MAX made the source code securely availably to TEG over a dozen times to allow their government customer(s) to scan for vulnerabilities and security issues. | 117. . . . Beginning in June 2020, MAX made the source code securely availably to TEG over a dozen times to allow their government customer(s) to scan for vulnerabilities and security issues. . . . . |
| 103. In February 2024, MAX discovered that TEG installed Haptic Federal on internet facing servers accessible on at least six uniform resource locators (URL). | |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| 104. In each instance, TEG removed the Haptic CMI from the Haptic Federal software and replaced the Haptic CMI with false CMI indicating that the software was TEG's software by using the terms "VJOC" and "C4MAP." | |
| 105. At each URL the servers hosting the Haptic Federal software exposed source code maps and source code to the public internet. | |
| 106. The exposure of MAX's Haptic Federal source code is a serious issue of concern for MAX since it exposes MAX's trade secrets to the public that TEG is required to maintain as a secret. | |
| 43. All Haptic Federal software is protected by technological measures that effectively control access to the software in that in the ordinary course of the software's operation, these measures require the application of information, or a process or a treatment, with the authority of MAX, to gain access to the work. | |
| 44. One technological measure that MAX uses to protect Haptic Federal is a license key that is required to install the software. | |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| 115. TEG circumvented the technological measures in the Haptic Federal source code. | 122. It is unsurprising that TEG failed to protect the source code from unauthorized distribution or tampering since TEG itself has tampered with the source code. |
| 116. TEG made at least $5 million of undisclosed software/service sales of Haptic Federal or trials in Haptic Federal in 2022 and 2023. | As discussed above, TEG made at least over $5 million of software/service sales using Haptic Federal in 2022 and 2023 that TEG never disclosed to MAX. |
| 117. In each case of a sale, TEG required a license key to install Haptic Federal. | In each case, TEG would need a license key to install the software. |
| 118. MAX never provided license keys for these sales to TEG. | |
| 119. Instead, to get around the licensing key requirement, TEG modified the Haptic Federal source code by stripping out or modifying the licensing logic from the source code to circumvent the licensing key technological measure. | To get around this requirement, TEG has backdated computers to circumvent the licensing logic and/or retained and modified the Haptic Federal source code by stripping or modifying the licensing logic to provide the software to those new customers. |
| 120. At no time did the defendants ever request or receive permission or authority to strip out or modify the licensing logic from the source code to circumvent the licensing key technological measure. | |
| 45. MAX applied copyright management information (CMI) to the Haptic Federal software. | |

| SECOND FILED ACTION<br><br>Max's Complaint (1:24-cv-00779) | FIRST FILED ACTION<br><br>Max's Counterclaims (1:24-cv-00650) |
|---|---|
| 46. The copyright management information MAX applied to the Haptic Federal Software consisted of the Haptic name which is title, author and identifying information for the title and author of Haptic Federal, MAX. | |