**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

**CASE NO.: 1:24-cv-00779-JPH-MG**

MAX MINDS, LLC,

        Plaintiff,

v.

TRIANGLE EXPERIENCE GROUP, INC.,
ROBERT EDWARD CLARE, JEFFREY
MASE, KEVIN G MULLICAN AND JOHN
DOES 1-10,

        Defendants.

**DECLARATION OF BRANDON FISCHER**

I, Brandon Fischer, declare and say:

    1.    I am the Chief Executive Officer of Max Minds, LLC ("MAX"). I make this declaration based on my personal knowledge in support of MAX's motion for preliminary injunction and seizure order.

    2.    MAX is an Indiana limited liability company, with its principal place of business of 12400 North Meridian Street, Suite 175, Carmel, Indiana 46032. I am the sole member of MAX.

    3.    I have a 27-year background in developing software-based solutions, In 2005, I founded a software company called Anacore. While leading Anacore, we created a cutting-edge digital signage and interactive kiosk platform known as MediaStation and the first multi-site interactive collaboration platform, Synthesis. My work led to Anacore's acquisition by Silicon Valley-based Prysm Inc. in 2014.

4. While employed with Prysm, I was VP of Research and Development and the General Manager of Prysm's Indianapolis office.

5. I actively support local Indiana organizations such as Techpoint and Powderkeg; I serve as an Advisory Board Member and Capstone Advisor of Indiana University Human-Computer Interaction; I have often been invited to speak on my work in designing and developing interactive software-based solutions for web, mobile, desktop, and large-scale video wall systems, most recently at the World Artificial Intelligence Cannes Festival, where I presented on improving student engagement, connectedness, and learning equity through AI-enhanced teaching and learning systems.

6. In 2018, I founded MAX. MAX's principal product is Alleo, an interactive digital collaboration, presentation, and productivity solution for integrated teams worldwide. Alleo was nominated for the Mira "Innovator of the Year" award by TechPoint, and under my leadership, the Alleo team received nominations for "Best in Tech," "Product Innovation of the Year," "Product Launch of the Year," and "Disruptor of the Year."

7. In preparation for making this declaration I read the Court's Orders entered at ECF 74 and ECF 81 in this case. I also read the Declaration of Robert Simon filed in this case at ECF 76-2. Mr Simon is a Senior Software Engineer for Max. Mr. Simon is involved in the development of MAX's Alleo, Haptic, and Haptic Federal software programs. I also read the Declaration of Robert Clare filed at ECF 83-3, the Declaration of Nick Ferrara filed at ECF 83-2, the sealed version of the Declaration of Nick Ferrara, and the Motion for Reconsideration filed by TEG at ECF 83.

8. I am familiar with the Haptic Federal source code. I agree with Mr. Simon's statements in his declaration at ECF 76-2.  His statements are not unsupported, but rather they

are from his personal knowledge. The chart attached to Mr. Simon's declaration listing the ninety-one (91) different source code repositories for Max's software also far exceeds my initial estimate.

9. I also agree that the Haptic Federal software at issue in this case was split or "branched" off effective December 21, 2021. The branches since the split contain significant new development, updates and an independent product feature set that do not exist in Haptic Federal.

10. I also agree with these points made by Mr. Simon in his declaration:

   a) The only relevant source code repositories listed in the chart are the four repositories that are numbered 5, 6, 7, and 23.

   b) TEG would only need to review the code in repositories number 5 ("haptic-admin"), 6 ("haptic-backend"), and 7 ("haptic-client"), a portion of the repository containing just the revision history of the Haptic Federal main branch, and separately a portion of the repository containing just the revision history of the 3.1.21.9 JWICS PoC v2 branch.

   c) The Haptic Federal main branch contains the history of all code changes up to the branching point in time of December 21, 2021.

11. Disclosure of the complete native source code repositories with all branches of these four (4) repositories would be devastating to Max. The only way that Max can be sure that its trade secrets and confidential source code would be protected would be under circumstances where the disclosure was performed in a highly controlled environment on a computer unconnected to the internet and disconnected from a printer or any a means copying code, and where the ability to view the code on a monitor was limited to a third-party expert with no relationship to TEG who had signed the undertaking in the protective order in this case and agreed not to disclose any information concerning the source code except to counsel under penalty of court sanction. Disclosure of the source code in part of in full under any other

3

circumstances would be extremely harmful to the company because it would disclose trade-secrets and development work for products other than Haptic Federal.

12. The software at issue in this case is Haptic Federal. Max employees or independent contractors wrote the source code in Haptic Federal originally and did not copy the source code from anyone. The source code was not copied from my prior company Prysm. The source code was not copied from TEG. No TEG employee or independent contractor ever wrote any of the source code in Max's possession contained in any of the 91 source code repositories listed in the exhibit to Mr. Simon's declaration. I know this from personal knowledge to be true.

13. Mr. Ferrara makes the allegation in paragraph eleven of his declaration based on information from counsel for TEG that "Plaintiff may have misappropriated source code from a former employer to create early versions of the software at issue in this case." I categorically deny that allegation. Once again, all of Max's software is original to Max and none of it was copied from my former employer.

14. Mr. Ferrara makes the following statements in his declaration:

> 9. To the extent that there is evidence that Defendant contributed to the development of Plaintiff's software, e.g., in identifying requirements, planning designs, directing defects to be fixed, etc., commit messages in Plaintiff's repositories could provide evidence of these activities.
>
> 10. Further, I understand from counsel that Defendant contends that they provided Plaintiff with initial ideas and design as to how the software at issue in this case should be designed and operated. Production of Plaintiff's source code repositories would enable this assertion to be tested, as source code repositories allow any specific version to be extracted for analysis.

These assertions do not make sense to me. My layman's understanding of copyright is that it protects original works of authorship. The entire Haptic Federal source code was written originally by Max employees or independent contractors. All the authorship of Haptic Federal is owned by Max. No one working for TEG ever wrote any of the Haptic Federal source code.

Therefore, I do not understand why Mr. Ferrara's concerns about "identifying requirements, planning designs, directing defects to be fixed" or providing Max "with initial ideas and design" are relevant. It simply does not make sense to me as a software developer.

15. I also do not understand why Mr. Ferrara needs to engage in the activities he outlines in his sealed declaration. For example, he says he wants to engage in "system testing, in which a running version of the software is stood up and examined." As a software developer this does not make sense to me since Max is asserting a copyright in its source code for Haptic Federal. Standing up the software in order to determine whether Max is entitled to a preliminary injunction does not make sense to me as a layman or as a software developer.

16. Concerning Mr. Clare's declaration, it contains many inaccuracies and several false statements. Mr. Clare has no personal knowledge of my background and experience with my former companies. The following statements are not true:

   a. **Paragraph 8**: TEG did not contract with "Prysm to provide and develop software related to the ACES program." TEG simply became a reseller of Prysm's Synthesis software.

   b. **Paragraph 9**: I was not "chief software engineer" for Prysm. I was not "in charge . . of software development" for Prysm. I was the Vice President of Research and Development for Prysm. I oversaw the research and development team that was focused on future concepts and products for the company. I did not direct the software development team on Prysm's Synthesis product. My team at Prysm was not involved in its core product, and instead focused on future concepts and products that had yet to reach the market.

c. **Paragraph 10**: I did not "develop[] and provide[] software [for Prysm] known as Synthesis." In fact, I did not write a single line of code that was ever used in the Synthesis product while at Anacore or at Prysm.

d. **Paragraph 11**: TEG did not "work[]with Prysm in further developing the software." TEG had no involvement with software development at Prysm. Again, the statement that I was the "chief engineer and main technical point of contact at Prysm" is false.

e. **Paragraphs 11-12**: I had no discussions with TEG before I left Prysm. TEG reached out to me after I left Prysm.

f. **Paragraph 13**: The purpose for my visit was not to "review the application of C4MAP, which was using Synthesis." The purpose was for me to demonstrate the Haptic software to TEG and their customer.

g. **Paragraph 14**: I did not and never had access to Prysm's Synthesis source code. My initial employees and contractors did not have any relationship with Prysm or access to the Synthesis source code.

h. **Paragraph 15**: Haptic was not developed with the "collaboration and instruction of TEG." This is false. Haptic was independently developed by my company.

i. **Paragraph 16**: Max did not use "the Synthesis software to create the foundation for Haptic." This is false. It cannot be true because Max never had access to the Synthesis source code.

17. The remainder of Mr. Clare's declaration is pure speculation.

I declare under perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 1, 2024.

_____
BRANDON FISCHER