UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MAX MINDS, LLC, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No.: 1:24-cv-00779-JPH-MG |
| | ) |
| TRIANGLE EXPERIENCE GROUP, INC., *et al*, | ) |
| | ) |
| *Defendants*. | ) |

**TRIANGLE EXPERIENCE GROUP, INC.'S REPLY BRIEF
IN FURTHER SUPPORT OF ITS MOTION FOR RECONSIDERATION**

As previously ordered by the Court on August 19, Triangle Experience Group, Inc. ("TEG") needs a full response to its Document Request No. 6:

*Native copies of all source code repositories containing source code of the Software, organized from earliest to latest version.*

Plaintiff Max Minds, LLC ("Max") seeks to modify that order, alleging that not all repositories are relevant to TEG's defenses and their production subjects Max to burden and potential harm. (Dkt. 76 at 2-6; Dkt. 89 at 4-10.) Although the Court granted Max's original motion and ordered that Max need only produce four repositories using a different protocol from the one detailed in the Amended Stipulated Protective Order ("Protective Order"), (Dkt. 81 at 2-3; Dkt.. 75), the Court has requested further briefing. TEG respectfully submits this reply brief in further support of its motion for reconsideration.

TEG needs to review all the Haptic-related repositories to support its claims and defenses. Neither Max's original motion nor its response brief establish sufficient harm and lack of relevance to avoid responding to Document Request No. 6 in full.

TEG is willing to agree, for purposes of this motion only, that repositories containing only "Alleo"-related source code do not have to be produced at this time.[1] By TEG's count, that leaves roughly 80 remaining repositories related to Haptic Federal. Based on Max's descriptions alone,[2] the 80 remaining repositories contain versions of the Haptic Federal computer program, drafts of parts of the Haptic Federal computer program, widgets where drafts of code may be stored, dependent programs needed to run Haptic Federal, and other relevant information.

These repositories, together, are needed to piece together the story of the development of Haptic Federal. These repositories, in full, are needed to identify what parts of the alleged trade secret and copyright TEG authored. These repositories are needed to identify what is not protectable subject matter and what aspects came from TEG's own prior software, leading to a conclusion of no infringement. The legal relevance of all such repositories is significant. Without all the identified repositories (produced in accordance with the Protective Order's "Attorneys' Eyes Only" and other protections), TEG's software expert will be unable to install and run Haptic Federal at the expert's location or use the necessary analysis tools to formulate his expert opinions and prepare his report. Max fails to identify any real harm or disclosure risk that outweighs TEG's need to have sufficient evidence to defend against Max's claims. Production of all 80 remaining repositories is appropriate and just.

## ARGUMENT

All repositories of the Haptic Federal source code are relevant and discoverable for three reasons. First, the repositories are relevant to showing that TEG is a co-owner of the alleged trade secrets. Second, the collection of repositories will show that TEG did not infringe any of Max's

---

[1] For purposes of this motion only, TEG does not request production of the repositories that are directed to Alleo, namely Repository Nos. 1, 2, 3, 4, 19, 40, 84, 85, 87-91.

[2] TEG should have the right to test the veracity of these descriptions and reserves the right to do so.

alleged copyrights. Third, TEG's expert will be unlikely to operate Haptic Federal in a remote environment without all copies of the source code repositories. Max's unsupported allegations of burden do not outweigh this showing of the Haptic Federal source code's relevance and importance to TEG's defenses.

## I. All Repositories that Touch or Consist of Haptic Federal Code Are Relevant to this Dispute.

Max challenges the relevancy of the Haptic Federal computer program. (Dkt. 89 at 4-8.) But this is a case about the Haptic Federal computer program—who owns it, who created it, and who has the right to use it. All versions, drafts of code, the tools used to create Haptic Federal, and all dependencies[3] needed to run it, are relevant. The entirety of that list is legally relevant to prove Max's claims are baseless.

### A. The Repositories are Relevant to Count Max's Trade Secret Claim because the Evidence will Show that TEG is a Co-Owner of the Identified Trade Secret.

Max's brief is silent as to the relevancy of the Haptic Federal computer program repositories to Max's trade secret misappropriation claim. In its Complaint, Max defines its trade secret as follows:

> The Haptic Federal Source Code is a trade secret of MAX consisting of scientific, technical or engineering information, including patterns, plans, compilations, program devices, formulas, designs, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing.

(Dkt. 1 at ¶¶ 19, 20, 146, 155.) This definition tracks the statutory language in 18 U.S.C. § 1836(b)(1), which is not limited to "creative expression." In the software context, trade secrets

---

[3] A "dependency" in the software context is source code for components necessary to run a software program. Dependencies include such things as widgets, libraries, plugins, or user interface components. Various versions of the software and those dependencies are needed to run the software, understand the various versions, and prevent errors. (Ex. B, Ferrara Decl. ¶¶ 15-16.)

3

include providing ideas regarding design and architecture, technical requirements, specifications, drawings, sketches, mock-ups, and the like. *See, e.g., Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 921 (E.D. Ill. 2016) (recognizing sufficiency of trade secret claim encompassing these concepts on a motion to dismiss).

Here, the evidence will show that TEG provided such information for the Haptic Federal Source Code. (Ex. A, Clare Decl. ¶¶ 5-16.) Starting in 2017, TEG provided Max with ideas as to the overall design and architecture of Haptic Federal. (*Id.* ¶¶ 5-6.) TEG provided Max with technical requirements, detailed written specifications, architecture drawings, story board mockups, and other design documentation and videos. (*Id.* ¶¶ 7, 9, 11, 13.) TEG told Max to how to design and code the modules, including how the various modules in Haptic Federal interact with each other and the client's existing infrastructure. (*Id.* ¶ 12.) All versions of the code and related repositories are relevant to prove TEG is the owner of the alleged trade secret, or at the very least a co-owner.

### B. The Repositories are Relevant to Prove TEG Did Not Infringe Max's Alleged Copyrights.

The repositories are also independently relevant to Max's copyright infringement claim. To establish copyright infringement, a plaintiff must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Max argues that the repositories are not relevant to Max's copyright claims because TEG cannot legally be a co-author. That argument is both wrong and incomplete. First, Max is wrong on the law regarding co-authorship. Under the correct law, TEG will show it is a co-author. Second, a comparison of the Haptic Federal computer program to TEG's pre-2019 technology will show Haptic Federal is a derivative work of (and infringes) the same.

1.  **TEG Will Prove it is a Co-Author of the Haptic Federal Computer Program.**

All the repositories are important evidence to prove TEG is a co-author of Haptic Federal. The standard for co-authorship in the Seventh Circuit has two prongs: (1) intent to create a joint work, and (2) the contribution of independently copyrightable material. *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009).

Here, there was a mutual intent to be co-authors. The intent to create a joint work does not necessarily mean that the collaborators overtly recognize each other as co-authors. Instead, the relevant question is whether the parties intended to work together to create a single product. Evidence of such intent can include written agreements or payments. *Id.* TEG and Max signed an NDA in July of 2019 to document their intent to work together on Haptic Federal. (Compl., Dkt. 1 at 11 ¶ 71; Compl. Ex. 7, Dkt. 1-7.) Six months and numerous technical discussions later, in January of 2020, the parties signed a joint venture agreement to further document their commitment to jointly develop Haptic Federal. (Compl., Dkt. 1 at 12 ¶ 81; Compl. Ex. 9, Dkt. 1-9.) The parties met weekly, sometimes daily, on the development of Haptic Federal. (Ex. A ¶ 11.) TEG paid Max approximately $4.6 million, with over $2.5 million of those funds specifically designated for development work. (*Id.* ¶ 15.) The parties intended to co-author the work.

Turning to the second element, the evidence will show that TEG contributed copyrightable expression to the Haptic Federal computer program. Independent copyrightable contributions in the software context include more than merely writing the code. Copyright protection extends beyond the literal code to a software program's structure, sequence and organization. *Whelan Assocs., Inc. v. Jaslow Dental Lab'y, Inc.*, 797 F.2d 1222, 1248 (3rd Cir. 1986) (creative expression includes expression of operation); *see also Computer Assocs. Int'l. v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004) (similarity in techniques, fundamental rules and certain

functions in plaintiff and defendant's software resulted in substantial similarity of protected expression); *CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F. Supp. 337, 354-56 (M.D. Ga. 1992) (sequence, structure, organization, file formats, screens, reports and transaction codes protectable expression). Creative expression includes "the manner in which the program operates, controls and regulates the computer in receiving, assembling, calculating, retaining, correlating and producing useful information." *Whelan Assocs.*, 797 F.2d at 1239.

Here, the evidence will ultimately show that TEG not only developed the overarching ideas for Haptic Federal but went one step further and told Max how to express those ideas in code. As early as July 2019, Max did not have nor did it contemplate certain critical functions of the source which would make the software salable in the government. (Ex. A ¶¶ 9, 12.) The evidence will show that TEG created the list of functional features embodied in the program and told Max how to achieve those features with software code. (*Id.* ¶ 13. ) TEG developed the structure of the code, both overall and within each sub-section. (*Id.* ¶ 12.) TEG developed the sequence of the code and the organization, in part based on TEG's already existing platform at the time. (*Id.* ¶¶ 6, 7, 14. ) Finally, TEG gave Max various code sequences for various features and functionality and provided error fixes to code sequences. (*Id.* ¶ 14.)

The Haptic Federal repositories are relevant to identify what parts came from TEG. The assertion that TEG is not a co-author because TEG did not perform the keystrokes to write the code for Haptic Federal is both legally wrong and factually disputed.

### 2. The Haptic Federal Computer Program is Necessary to Prove it is Derivative (and Infringing) of TEG's Preexisting Technology.

Finally, the repositories are relevant to prove the Haptic Federal computer program is a derivative work of (and infringes) TEG's own preexisting technology. A second software program based on a prior program can be a derivative work of the prior program (and create co-authorship

6

rights in the new program). *See, e.g., Berryhill v. Minarik,* No. 05-810-AA, 2006 U.S. Dist. LEXIS 14724, at *7-9 (D. Or. Mar. 14, 2006) ("Minarik made a substantial contribution by providing the actual framework for Berryhill's code adaptation, not just ideas[, based on the previous version of the program]."). Here, prior to and during development of Haptic Federal, TEG gave Mr. Fischer and Max unfettered access to all the existing workflow requirements, as well as all conceptual or pseudo code, that TEG utilized since approximately 2018. (Ex. A ¶¶ 6-14.) The evidence will ultimately show that TEG's prior technology formed the base for Haptic Federal. The repositories are needed to connect the versions of Haptic Federal to TEG's preexisting technology to demonstrate that Haptic Federal is a derivative work and, therefore, TEG did not engage in copyright infringement.

### 3. Max's Cases are Inapposite.

Plaintiff cites several cases for the proposition that "other district courts faced with similar requests for production of "all source code" have refused to order "all source code" produced and instead limited production of source code to only that which is relevant and proportional to the needs of the case." (Dkt. 76 at 4-5; Dkt. 89 at 7-8.)[4] However, none of these cases involved copyright claims or claims disputing authorship of the software code. The courts in these cases found the source code to be irrelevant where the requesting party would not be able to use the requested code in proving its claims or defenses. Here, this lawsuit is a trade secret and copyright infringement case and does involve a genuine dispute as to authorship, ownership and infringement. The requested software code will be used by TEG to defend against these claims.

---

[4] Max's response brief cites *Uniloc USA, Inc. v. Apple Inc.,* No. *18-cv-00362-PJH (LB)*, 2018 U.S. Dist. LEXIS 72464 (N.D. Cal. Apr. 30, 2018); *ACI Worldwide Corp. v. Mastercard Techs., LLC,* No. 8:14CV31, 2016 U.S. Dist. LEXIS 149037 (D. Neb. Oct. 27, 2016); *LoganTree LP v. Garmin Int'l, Inc.,* 339 F.R.D. 171 (D. Kan. 2021); *OCR Sols. v. Charactell, Inc.,* No. 6:17-cv-709-Orl-28DCI, 2018 U.S. Dist. LEXIS 245700 (M.D. Fla. July 19, 2018).

7

Further, TEG has not requested the entirety of Max's source code throughout its business—just the Haptic Federal computer program and all ancillary and dependent materials required to operate and run the program.

## II. All Repositories are Necessary to Stand Up and Operate Haptic Federal in a Remote Environment.

The Court limited Max's production to four static repositories: #5 Haptic-Admin, #6 Haptic-backend, #7 Haptic-client, and #21 Haptic-demo. (Dkt. 81 at 2.) This limited production, however, is not usable. Max identified 80 repositories that are related in some way to the Haptic Federal program (and not the Alleo computer program). Each of these repositories is thus needed to test and understand the full scope of Max's alleged intellectual property. For example, the descriptions of these repositories suggest they are widgets, libraries, plugins, and user interface components. (Ex. B, Ferrara Decl. ¶¶ 15, 17.) Many of these repositories are likely necessary to install and operate older versions of Haptic Federal (e.g., #11, #12) or contain code that was ultimately placed into Haptic Federal (e.g., #24, #25). (*Id.* ¶ 17.) Without these ancillary repositories, it is unknown whether TEG will be able to install and operate Haptic Federal or fully understand the code development timeline. (*Id.* ¶ 18.) TEG's software expert will be unable to see the full picture of how the software is supposed to function. (*Id.*) The source code, and all related repositories, is needed to defend against Max's trade secret claim and copyright infringement claims.

## III. Max Has Shown No Burden or Injury that Outweighs the Source Code's Relevance.

Max's allegations of burden or injury neither outweigh the source code's relevance nor render the Court's August 19 discovery ruling (Dkt. 74 at 5) "clearly erroneous" or a "manifest error of law or fact."

### A. Max's Allegations of Burden are Manufactured.

In support of its alleged burden, Max has come forward with nothing more than its unsupported, self-serving assertion that it faces a "massive" burden. (Dkt. 76 at 2; Dkt. 89 at 2.) Max fails to articulate any actual burden Max would suffer from producing the source code repositories. TEG's expert, however, has explained that producing the repositories should take no more than one day of effort by a typical developer. (Ex. B ¶¶ 7-11.)

Max's assertion that it faces injury from disclosure of its trade secrets by TEG is also without support. Discovery in this case is protected by the Protective Order, which includes a "Highly Confidential – Attorneys' Eyes Only" designation and the ability to send an encrypted hard drive directly to an expert. (Dkt. 75 at 5.) Nevertheless, Max asserts it cannot produce the source code repositories—even under the Protective Order—because TEG is a competitor, and its counsel will violate the Protective Order.[5] There is simply no basis for Max's contentions.

When litigants are competitors in the same industry, courts in this District and elsewhere have routinely recognized that an "Attorneys' Eyes Only designation strikes the appropriate balance between a litigant's right to relevant discoverable information and the legitimate concerns surrounding disclosure of highly confidential and sensitive information to a direct competitor." *U.S. ex rel. Daugherty v. Bostwick Lab'ys*, No. 1:08-CV-354, 2013 U.S. Dist. LEXIS 89683, at *31 (S.D. Ohio June 26, 2013) (*cited in Rodo Inc. v. Guimaraes*, 2022 U.S. Dist. LEXIS 233192, at *3-4 (S.D.N.Y. Dec. 27, 2022)). As such, protective orders with Attorneys' Eyes Only designations are regularly employed in trade secret cases. *Berkeley v. Teradata Operations, Inc.*, No. 17 C 7472, 2020 U.S. Dist. LEXIS 160208, at *4-5 (N.D. Ill. Sept. 2, 2020).

---

[5] Max has apparently dropped its prior arguments and unfounded allegations regarding an unrelated prior litigation.

Indeed, it is error to deny a defendant access to a plaintiff's proprietary, competitive, or trade secret information when it is relevant to defendant's claims and defenses. *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (*cited in Berkeley*, 2020 U.S. Dist. LEXIS 160208, at \*5). The proper action is the issuance of a protective order with the ability to limit access to attorneys' eyes only. *Id*. Of course, such a protective order is already in place here, and TEG's expert has already agreed to abide by the terms of that Protective Order. (Ex. B ¶¶ 19-22.)

### B. Max's Unilateral Modification of the Protective Order Protocols is Improper.

The only real burden here will be the burden TEG will face if its expert's review of the source code is constricted to the "highly controlled environment" requested by Max and adopted by the Court. (Dkt. 76 at 3-4; Dkt. 89 at 4; Dkt. 81 at 2.) This new review methodology is incongruent with the Protective Order, which already allows for review via encrypted hard drive by an expert bound to abide by the Protective Order including its Attorneys' Eyes Only designations. (Dkt. 75 at 5.) Without providing any reasons why the protective protocols of the current Protective Order are insufficient, Max seeks to limit TEG's expert's review to a highly controlled environment that is unconnected to the internet, disconnected from a printer, and located on a standalone monitor made available in some unknown location to which TEG's expert presumably must travel. (Dkt. 76 at 3-4; Dkt. 89 at 4; Dkt. 81 at 2.) These restrictions are impractical and prejudicial to TEG.

As explained by TEG's software expert, most modern software development tools require an internet connection to download required third-party components on demand when a developer attempts to build the software. (Ex. B ¶ 23.) TEG's expert will thus be unable to operate the software and fully analyze TEG's defenses to Max's trade secret and copyright infringement claims. (*Id*. ¶¶ 23-24.) Max's unilateral modification of the Protective Order is not only unjustified and atypical, but it will substantially inhibit TEG's expert review and analysis. (*Id*. ¶¶ 20, 23-24.)

10

## CONCLUSION

For all the foregoing reasons, and for the reasons set forth in TEG's initial motion for reconsideration, TEG respectfully requests that the Court order Max to produce all source code repositories listed by Max (except for those relating solely to "Alleo") in accordance with the "attorneys' eyes only" and other protective measures detailed in the Amended Stipulated Protective Order.

Dated: October 8, 2024

Respectfully submitted,

/s/ Richard D. Kelley

| | |
|---|---|
| Alexander P. Orlowski, Atty. No. 30794-29<br>Amanda Jane Gallagher, Atty. No. 32662-79<br>**BARNES & THORNBURG LLP**<br>11 South Meridian Street<br>Indianapolis, IN 46204<br>Tel: (317) 566-1110<br>Fax: (317) 636-1507<br>alexander.orlowski@btlaw.com<br>amanda.gallagher@btlaw.com | Richard D. Kelley, *admitted pro hac vice*<br>Raighne C. Delaney, *admitted pro hac vice*<br>Stephen D. Caruso, *admitted pro hac vice*<br>Samuel J. Banks, *admitted pro hac vice*<br>Kandis M. Koustenis, *admitted pro hac vice*<br>**BEAN KINNEY & KORMAN, PC**<br>2311 Wilson Boulevard, Suite 500<br>Arlington, VA 22201<br>Tel: (703) 525-4000<br>Fax: (703) 525-2207<br>rkelley@beankinney.com<br>rdelaney@beankinney.com<br>scaruso@beankinney.com<br>sbanks@beankinney.com<br>kkoustenis@beankinney.com<br><br>Heather J. Kliebenstein, *admitted pro hac vice*<br>**MERCHANT & GOULD**<br>150 South Fifth Street, Suite 2200<br>Minneapolis, MN 55402<br>Tel: (612) 332-5300<br>Fax: (612) 332-9081<br>hkliebenstein@merchantgould.com<br><br>*Counsel for Triangle Experience Group, Inc.* |