# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| MAX MINDS, LLC, | |
| Plaintiff, | |
| v. | CAUSE NO. 1:24-cv-00779-MPB-MKK |
| | JURY TRIAL DEMANDED |
| TRIANGLE EXPERIENCE GROUP, INC., ROBERT CLARE, JEFFREY MASE, KEVIN MULLICAN, and JOHN DOES 1-10, | |
| Defendants. | |

## **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF AMENDED MOTION FOR PRELIMINARY INJUNCTION**

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................... 7

    A.   Plaintiff's Intellectual Property Rights ...................................................... 7

        1.   Max's Copyrights in the Haptic Software ........................................... 8

        2.   Max's Trade Secrets in Haptic ............................................................ 9

        3.   Defendants' Access to and Use of Max's Intellectual Property ........... 10

    B.   Defendants' Unlawful Conduct .................................................................. 13

        1.   TEG's Copyright Infringement .......................................................... 13

        2.   TEG's Public Disclosure of The Haptic Federal Source Code. ........... 14

    C.   TEG's Circumvention and CMI Removal/Falsification Violations ............ 15

    D.   TEG's Removal of Copyright Management Information. ............................ 16

    E.   The Irreparable Harm to Plaintiff .............................................................. 17

III. ARGUMENT ...................................................................................................... 17

    A.   Standard for Preliminary Injunction and Seizure Order. ............................ 17

        1.   Plaintiff's Copyright Claims .............................................................. 18

            a)   Plaintiff Will Likely Succeed on its Copyright Infringement Claims. ............... 18
            b)   Plaintiff Will Likely Succeed on the Merits of its Circumvention Claims ....... 19
            c)   Plaintiff Will Likely Succeed on the Merits of its CMI Removal/Falsification Claims .......................................................................... 21

        2.   Plaintiff's Trade Secrets Claims ........................................................ 22

            a)   Requirements for Claims of Trade Secrets Misappropriation under the DTSA and IUTSA .................................................................................. 22
            b)   Plaintiff Will Likely Succeed on the Merits of its Trade Secrets Claims ......... 23

        3.   Plaintiff's Lanham Act Claims .......................................................... 24

            a)   Plaintiff Will Likely Succeed on the Merits of its False Designation of Origin Claim ................................................................................................ 24

        4.   Plaintiff is Suffering Irreparable Injury and There is No Adequate Remedy at Law. ................................................................................ 25

            a)   Trade Secrets Claims ................................................................... 25
            b)   Copyright Claims ........................................................................ 26
            c)   Lanham Act Claim ...................................................................... 27

        5.   The Balance of Hardship Tips Sharply in Plaintiff's Favor. ................ 28

        6.   An Injunction Is in the Public Interest. ............................................... 28

IV.  A BOND SHOULD SECURE THE INJUNCTION ........................................... 29

V.   CONCLUSION .................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*321 Studios v. MGM Studios, Inc.*,
  307 F. Supp. 2d 1085 (N.D. Cal. 2004) ................................................................. 20

*Actuate Corp. v. IBM*,
  2010 U.S. Dist. LEXIS 33095, 2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) ...................... 20

*Aon PLC v. Infinite Equity, Inc.*,
  No. 19 C 7504, 2021 U.S. Dist. LEXIS 175378 (N.D. Ill. Sep. 15, 2021) ............................ 26

*Aon Risk Servs. Companies, Inc. v. Alliant Ins. Servs.*,
  Inc., 415 F.Supp.3d 843 (N.D. Ill. 2019) ........................................................ 22, 23

*Apple Comput., Inc. v. Franklin Comput. Corp.*,
  714 F.2d 1240 (3d Cir. 1983) .............................................................................. 28

*Ballas v. Tedesco*,
  41 F. Supp. 2d 531 (D.N.J. 1999) ......................................................................... 26

*Burroughs Payment Sys. v. Symco Group, Inc.*,
  2012 U.S. Dist. LEXIS 67198, 2012 WL 1670163 ................................................... 20

*CBS Broad. v. Echostar Commc'ns Corp.*,
  265 F.3d 1193 (11th Cir. 2001) .......................................................................... 28

*Cooper v. Salazar*,
  196 F.3d 809 (7th Cir. 1999) .............................................................................. 18

*CSC Holdings, Inc. v. Greenleaf Elecs.*,
  No. 99 C 7249, 2000 U.S. Dist. LEXIS 7675 (N.D. Ill. June 1, 2000) ........................... 20-21

*Diamond Sawblades Mfrs. Coal. v. Diamond Tools Tech.*,
  504 F. Supp. 3d 927 (S.D. Ind. 2020) .................................................................. 24

DMCA." *Synopsys, Inc. v. Innogrit, Corp.*,
  No. 19-CV-02082-LHK, 2019 U.S. Dist. LEXIS 171487 (N.D. Cal. Oct. 1, 2019) ............. 20

*Elevance Health, Inc. v. Mohan*,
  No. 1:23-cv-01497-SEB-MJD, 2023 U.S. Dist. LEXIS 164105 (S.D. Ind. Sept. 15, 2023) . 22

*Eli Lilly & Co. v. Natural Answers, Inc.*,
  233 F.3d 456 (7th Cir. 2000) .............................................................................. 18

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ......................................................................................... 18

*Friedman v. Live Nation Merch., Inc.*,
  833 F.3d 1180 (9th Cir. 2016) ............................................................................ 21

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

174 F.3d 411 (4th Cir. 1999) ................................................ 29

*Howmedica Osteonics Corp. v. DJO Glob., Inc.*,
No. 1:17-cv-00938-SEB-TAB, 2018 U.S. Dist. LEXIS 227687, 2018 WL 3130969 .......... 23

*Inventus Power, Inc. v.Shenzhen Acetery Co.*,

No. 20-cv-3375, 2020 U.S. Dist. LEXIS 122347, (N.D. Ill. July 13, 2020) ...................... 23, 28

*JCW Invs., Inc. v. Novelty, Inc.*,
482 F.3d 910 (7th Cir. 2007) ................................................ 18, 19

*Kraft Foods Grp. Brands L.L.C. v. Cracker Barrel Old Country Store, Inc.*,
735F.3d 735, (7th Cir. 2013) ................................................ 25

*Krause Int'l, Inc. v. Reed Elsevier, Inc.*,
866 F. Supp. 585 (D.D.C. 1994) ................................................ 28

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
342 F.3d 714 (7th Cir. 2003) ................................................ 23

*Life Spine, Inc. v. Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir. 2021) ................................................ 25

*Ligtel Communs. v. Baicells Techs.*,
455 F. Supp. 3d 792 (N.D. Ind. 2020) ................................................ 22

*MGM Studios, Inc. v. Grokster, Ltd.*,
518 F. Supp. 2d 1197 (C.D. Cal. 2007) ................................................ 27

*Microsoft Corp. v. EEE Bus., Inc.*,
555 F. Supp. 2d 1051 (N.D. Cal. 2008) ................................................ 20

*Motorola, Inc. v. Lemko Corp.*,
2012 U.S. Dist. LEXIS 2718, 2012 WL 74319 ................................................ 23

*Promatek Indus., LTD v. Equitrac Corp.*,
300 F.3d 808 (7th Cir. 2002) ................................................ 25, 26-27

*Rathmann Grp. v. Tanenbaum*,
889 F.2d 787 (8th Cir. 1989) ................................................ 29

*Ri v. Rosi*
No. 20-cv-07762, 2021 U.S. Dist. LEXIS 155794, (N.D. Ill. Aug. 18, 2021) ...................... 27

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) ................................................ 26

*Spinmaster, Ltd. v. Overbreak L.L.C.*,
404 F. Supp. 2d 1097 (N.D. Ill. 2005) ................................................ 26

*Stahly, Inc. v. M.H. Jacobs Co.*,
183 F.2d 914 (7th Cir. 1950) ................................................ 28-29

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

*Synopsys, Inc. v. AzurEngine Techs., Inc.*,
    401 F. Supp. 3d 1068 (S.D. Cal. 2019) ................................................................. 26

*Ty, Inc. v. GMA Accessories, Inc.*,
    132 F.3d 1167 (7th Cir. 1997) ............................................................................. 26

*Ty, Inc. v. Jones Grp. Inc.*,
    237 F.3d 891 (7th Cir. 2001) ................................................................. 17, 24, 28

*Virtual Studios, Inc. v. Beaulieu Grp., L.L.C.*,
    987 F. Supp. 2d 769 (E.D. Tenn. 2013) ............................................................. 28

*Warner Bros. Ent., Inc. v. WTV Sys.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ......................................................... 27, 28

**Statutes**

15 U.S.C. § 1125 ................................................................................................ 24

17 U.S.C. § 502 ................................................................................................. 26

17 U.S.C. § 1201 .......................................................................................... 19, 20

17 U.S.C. § 1202 ................................................................................................ 21

18 U.S.C. § 1839 ..................................................................................... 22, 23, 24

**Rules**

Fed. R. Civ. P. 65 ............................................................................................... 29

**TABLE OF EXHIBITS**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| Exhibit 1 | Declaration of Brandon Fischer (Fischer Decl.) |
| Fischer Decl., Exhibit 1 | Copyright Registration No. TXu 2-425-362 |
| Fischer Decl., Exhibit 2 | Copyright Registration No. TXu 2-412-490 |
| Fischer Decl., Exhibit 3 | Copyright Registration No. TXu 2-419-714 |
| Fischer Decl., Exhibit 4 | Copyright Registration No. TXu 2-419-718 |
| Fischer Decl., Exhibit 5 | End User License Agreement (EULA) |
| Fischer Decl., Exhibit 6 | Mutual Non-Disclosure Agreement (DNA) |
| Fischer Decl., Exhibit 7 | Haptic Privacy Policy (Privacy Policy) |
| Fischer Decl., Exhibit 8 | Joint Venture Agreement (JVA) |
| Fischer Decl., Exhibit 9 | Source Code License Agreement (SCLA) |
| Fischer Decl., Exhibit 10 | Certification Agreement (CA) |
| Exhibit 2 | Declaration of Jay Campbell Miller |
| Miller Decl., Ex. 1 | Transcript Excerpts, Deposition of Robert Clare |
| Miller Decl., Ex. 2 | Transcript Excerpts, Deposition of Kevin Mullican. |
| Miller Decl., Ex. 3 | Clare Deposition Transcript, Ex. 1 |
| Miller Decl., Ex.4 | Clare Deposition Transcript, Ex. 11 |
| Miller Decl., Ex.5 | Clare Deposition Transcript, Ex. 29 |
| Miller Decl., Ex.6 | Clare Deposition Transcript, Ex. 30 |
| Miller Decl., Ex.7 | Clare Deposition Transcript, Ex. 31 |
| Miller Decl., Ex. 8 | Clare Deposition Transcript, Ex. 32 |
| Miller Decl., Ex. 9 | Clare Deposition Transcript, Ex. 34 |
| Miller Decl., Ex. 10 | Clare Deposition Transcript, Ex. 35 |
| Miller Decl., Ex. 11 | Clare Deposition Transcript, Ex. 36 |
| Miller Decl., Ex. 12 | Clare Deposition Transcript, Ex. 37 |
| Miller Decl., Ex. 13 | Clare Deposition Transcript, Ex. 38 |
| Miller Decl., Ex. 14 | Clare Deposition Transcript, Ex. 39 |
| Miller Decl., Ex. 15 | Clare Deposition Transcript, Ex. 40 |
| Miller Decl., Ex. 16 | Triangle Experience, Inc.'s Second Amended Verified Answers and Objections to Max's Interrogatories in this case. |
| Miller Decl., Ex. 17 | Max Minds, LLC's First Amended Verified Answers and Objections to TEG's Interrogatories |
| Exhibit 3 | Declaration of Robert Simon |
| Simon Decl., Ex. 1 | Memorandum Concerning TEG's Source Code Exposure on the Public Internet |
|  |  |
|  |  |

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

## I.    INTRODUCTION

Max makes interactive content collaboration software. For the government market relevant here, Max's software is called "Haptic." Haptic enables teams to communicate seamlessly and in real-time manage tasks, share files, and stay organized in briefing and experience centers, ideation and insight centers, in customizable collaboration spaces, and in operations centers. (Fischer Decl. ¶ 7, 10).

In June of 2019, Max demonstrated Haptic at InfoComm. Further demonstrations the following month resulted in the first license of Haptic to a government agency—the National Reconnaissance Office—in August of 2019. The installation for NRO in November of 2019 followed. (Fischer Decl. ¶ 11).

TEG is not a software company. TEG is owned and staffed by former members of "Delta Force," a highly secretive unit of the miliary on which the Department of Defense tightly controls information and usually refuses to comment publicly on the secretive unit and its activities. (Discovery Conference Tr. 35:15-20, August 8, 2024); https://en.wikipedia.org/wiki/Delta_Force citing Haney, Eric L. (2002), "Inside Delta Force," New York: Delacorte Press. TEG's operations are classified; TEG employees have security clearances that Max's employees lack.

TEG's overtures to Brandon Fischer, Max's CEO, began in March of 2018, less than 3 weeks after Fischer left his prior company Prysm and while Fischer was under an NDA regarding Prysm's Synthesis source code. TEG was previously a customer of Prysm and asked Fischer if he could make modifications to the Synthesis source code for TEG. Fischer told TEG he had an NDA, and a source code license and permission from Prysm would be necessary. (Mullican Tr. 34:1-13; Miller Decl., Ex. 3).

Fischer waited for his NDA to expire. Thereafter, Fischer created Max and developed Haptic. TEG invited Fischer to present a demonstration of Haptic in July 2019 at the U.S. Government Joint Staff Lab in Norfolk, Virginia. Before the demonstration, Max and TEG entered into a mutual NDA. (Fischer Decl., Ex. 6).

At the time, unbeknownst to Fischer and Max, the Joint Staff Lab demonstration was part of a $49.5 million sole-source government contract TEG won. A week after the demonstration, TEG received a $16.6 million contract award based on Fischer's presentation. Fischer knew none of this and TEG disclosed neither the existence of the contract or the contract award.

On October 2, 2019, Max gave TEG's CEO Rob Clare and COO Jeff Mase user accounts to log into Haptic Federal so that TEG could demonstrate the software live. Logging in required Clare and Mase to agree to the Haptic Privacy Policy. Then in August of 2020, agreement to the Haptic End User License Agreement (EULA) was required to use the software and both Clare and Mase agreed to the EULA.

Negotiations to resell Haptic Federal to the DOD began November of 2019. Negotiations continued in January 2020 when TEG paid for Fischer to travel to Virginia for more meetings between the two companies. On January 23, 2020, Clare for TEG and Fischer for Max signed a Joint Venture Agreement (JVA)—which reads more like a letter of intent than a binding contract—under which TEG would manage a distribution channel to the federal government for Haptic Federal.

Critically important, the parties never signed a joint development agreement. (Mullican Tr. 37:21-38:5). In fact, the JVA stated the opposite: Max—not TEG or the parties—would "[c]reate and maintain a branch of the Haptic source code, called Haptic Federal" that would be "for exclusive use by the US government." (Fischer Decl., Ex. 8, p. 2). TEG's role was "the exclusive distributor/reseller of the Haptic Federal product into the federal market," so long as TEG

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

hit certain "license-based revenue targets, paid to Max[.]" (*Id*. at p. 3). Nothing in the JVA granted TEG ownership rights in the Haptic Federal software. Furthermore, co-owned intellectual property could only come about if TEG paid for "custom software development" (*Id*. at p. 1), but that never occurred.

To resell Haptic Federal under the JVA, source code needed to be scanned by government agencies to detect potential vulnerabilities. So the parties signed a Source Code License Agreement (SCLA) on March 30, 2021. (Fischer Decl., Ex. 9). The SCLA—totally inconsistent with TEG's claim of "joint ownership"—proclaims that TEG "shall not at any time, directly or indirectly: (i) copy, modify, or create derivative works of the Source Code or the Documentation, in whole or in part; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Source Code or the Documentation to any third party; (iii) remove any proprietary notices from the Source Code or the Documentation; or (iv) use the Source Code in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law." Id. at § 2(b). The SCLA also provides that "as between [TEG] and [Max], [Max] owns all rights, title, and interests, including all intellectual property rights, in and to the Software, Source Code and Documentation." Id. at § 7(a). And the SCLA provides that Max is the sole owner of any and all "Feedback" (i.e., "comments, questions, suggestions") that TEG or any other user may provide. Id. at § 7(b).

Throughout the parties' relationship, Max was suspicious of TEG. TEG withheld information from Max. TEG made demands on Max to fix issues and develop features outside Max's normal development process or priorities. TEG claimed Max's software did not work but kept distributing it more and more widely. TEG gave out trials without consulting or paying Max.

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

TEG exceeded license restrictions set by Max. TEG back-dated computers to circumvent licensing restrictions built into Haptic Federal. TEG kept Max in the dark, and despite Max's demands for information and disclosure, TEG refused time and again.

Then, on December 28, 2023, TEG peremptorily filed its Complaint against Max in the companion case—Case No. 1:24-CV-00650 (the '650 Case)—in the Eastern District of Virginia. ('650 Case ECF 1). Max moved to dismiss or transfer venue. ('650 Case ECF 12). After a hearing on April 12, 2024, the EDVA transferred venue to this court. ('650 Case ECF 18 & 19).

It is now apparent that the peremptory '650 case was filed so TEG could "get the upper hand" because—as TEG has since conceded—TEG appropriated Max's software and source code without Max's knowledge or consent in violation of the parties' agreements and distributed Max's software widely within different commands in the Department of Defense.

TEG obviously believed it would fare better on the offense than on the defense. TEG had been on the defense once before when it engaged in the same type of illegal behavior with a prior software company.[1] See Complaint, *Hadron Industries, Inc., et al. v. Triangle Experience Group, Inc., et. al.*, 1:19-cv-00035-LO-MSN (E.D. Va. January 9, 2019) (ECF 76, Ex. 1).

This case was filed on May 7, 2024, after Max's investigation discovered that TEG retained—and did not destroy as agreed—Max's source code after performing security scans required by the Government to expose software vulnerabilities. TEG then exposed the source code for Max's Haptic Federal software product in three places on the public internet. (Simon Decl. ¶¶ 3-4). Source code is highly confidential and proprietary; TEG's exposure of Max's

---

[1] Review of the complaint in *Hadron v. TEG* and also in *Ex Rel Hadron Industries, Inc. v. Triangle Experience Group, Inc., et. al.*, 1:18-cv-1487 (E.D. Va., April 30, 2018), reveals that the allegations made by Hadron against TEG are eerily similar to those made by Max here. Furthermore, filing of the *Hadron* litigation coincides with TEG's approach to Max alleged in this case. In fact, in the *Hadron* case, like in this case, TEG obtained Hadron's source code for its software. According to counsel for Hadron, TEG still has Hadron's source code. And, since that source code was used by TEG for classified operations, and since Hadron lacked security clearances and access to the government agencies using the software and lacked intellectual property protection, there was effectively nothing that Hadron could do about it.

**SRIPLAW**
California ◆ Georgia ◆ Florida ◆ Indiana ◆ Tennessee ◆ New York ◆ Texas

source code was a violation of the parties' agreements and a cybersecurity incident waiting to happen.

Since this case was filed, Max learned so much more about TEG's nefarious activities through limited discovery to determine the scope and contours of a preliminary injunction needed to restrain TEG. The Court will see that TEG went way beyond merely retaining Max's software. TEG used self-help to obtain Max's source code under false pretenses of conducting security scans and instead of destroying the code retained the code to steal Max's software, violate Max's intellectual property rights, violate the parties' agreements, strip out Max's security and licensing protections, and distribute the software widely within classified national security DOD installations earning TEG hundreds of millions of dollars in government contracting payments now and in the foreseeable future.

In deposition, TEG's CEO testified:

Q.     Do you know if TEG ever received software for purposes of having it scanned to determine if it had the vulnerabilities and then retained the source code for some reason in order, for example, to do development on?

THE WITNESS: Possibly. I mean, it would not be out of practice for us to do that. I mean, the answer is yes, but I have to explain further. There would be no -- there would be no boundary for our folks to do that considering, again, the nature of the joint venture agreement to co-develop. Both parties completely were inter-active and collaborative in remediating these scan vulnerabilities. It can't be done by one person, especially an entity like Max. TEG would have had to participate in that remediation.

(Clare Tr. 99:15-100:7).

TEG defends its admitted infringement and other intellectual property violations based on the parties' JVA. However, the JVA governed the parties' "joint venture" not joint development. There is no joint development agreement between the parties. TEG was never a software developer; Max was the developer; the parties have no joint development agreements between them. Sure, TEG has software developers now, but it only hired those recently to violate Max's

intellectual property rights by developing illegal derivative works of Max's software.

The need for a preliminary injunction is plain as day. TEG's software piracy enabled TEG to widely sell its rebranded version of Haptic Federal—software TEG calls "VJOC" for "Virtual Joint Operations Center"—to numerous organizations within the Department of Defense. TEG did this by copying Max's Haptic Federal source code, modifying and creating derivative works of that code, circumventing the technical protections against duplicating the code and removing Max's Haptic copyright management information and branding, and distributing the modified Haptic Federal software throughout the Department of Defense. As of the second quarter of 2024, TEG's worldwide intellectual property violations look like this:



(Miller Decl., Ex. 14).

The Government believes that it is buying software licenses from TEG that TEG has the authority to sell to the Government. The Government is wrong. In fact, the Government has committed itself to millions of dollars of licensing and support fees for government contracts

with TEG based on the lie that TEG owns rights to the software it stole from Max. And TEG shows no signs of ceasing its blatant violations of Max's intellectual property rights. ███████

███████████████████████████████████████████████████████████████████████

███████████ (Clare Tr. 65:3-21).

All four factors for entry of a preliminary injunction are present in spades. Likelihood of success is conceded. The lack of a legal remedy and irreparable harm are undeniable. The public's interest favors stopping intellectual property theft. A low bond is required. The injunction should issue.

## II.      STATEMENT OF FACTS

### A.      Plaintiff's Intellectual Property Rights

1.      Max is an Indiana custom software development company. Max's products are Alleo and Alleo Federal. Max's Alleo product was formerly called "Haptic" and Max's Alleo Federal product was formerly called "Haptic Federal." Alleo and Alleo Federal are interactive, digital collaboration presentation, and productivity solutions for integrated teams worldwide. (Fischer Decl. ¶ 5, 7).

2.      Initially designed as a high-level solution for hybrid collaboration called Haptic, Max's developers evolved the Alleo system to address the changing needs of users and their pre-ferred work models. Max's software is used in briefing centers, experience centers, and innova-tion centers by the government, and by Fortune 100 companies in consulting, telecommunica-tions, IT, pharma, and manufacturing. (Fischer Decl. ¶ 6).

3.      Alleo/Haptic is a server-based collaborative workspace that utilizes a browser in-terface, enabling users to collaborate in real-time. It also features screen sharing capabilities that permit users to select and share the display window of individual programs from their work-stations to the Alleo/Haptic workspace. Alleo/Haptic is an infinite canvas of screen real estate

that operates synchronously for all members in real-time. Alleo/Haptic is both the front-end operating system and underlying source code responsible for delivering these capabilities. (Fischer Decl. ¶ 10).

### 1.    Max's Copyrights in the Haptic Software

4.    Alleo/Haptic is an original, creative software program written in several different programming languages. Max registered four versions of Haptic (the "Work") with the Copyright office and obtained registration certificates for each version. The following table details Max's copyright registrations for Haptic:

| Title of Work | Registration Number | Effective Date | Certificate of Registration |
|---|---|---|---|
| Haptic Version 1.2.21.1 | TXu 2-425-362 | April 19, 2024 | Fischer Decl., Ex. 1 |
| Haptic Version 1.2.125 | TXu 2-421-490 | April 2, 2024 | Fischer Decl., Ex. 2 |
| Haptic Version 3.1.21.4 | TXu 2-419-714 | March 21, 2024 | Fischer Decl., Ex. 3 |
| Haptic Version 3.1.21.8 | TXu 2-419-718 | March 21, 2024 | Fischer Decl., Ex. 4 |

5.    Max was solely responsible for the development of the Haptic Federal Source code and all Haptic Versions including the ones listed above. (Fischer Decl. ¶ 17). At no point in time did anyone outside of Max and Max's independent contractors write code that was used in the creation of any of the above software programs registered with the copyright office. (Fischer Decl. ¶ 18). Throughout the course of the parties relationship, TEG provided Max with ideas and features that the end user or government customer requested be included in the software. (Fischer Decl. ¶ 19). However, TEG merely conveyed these ideas to Max which then translated these ideas into code that could be used with the software. (*Id.*).

6.    All Haptic Federal software is protected by technological measures that effectively control access to the software in that in the ordinary course of the software's operation the measures require the application of information, or a process or a treatment, with the authority of Max, to gain access to the Work. (Fischer Decl. ¶ 20.)

7.      One technological measure that Max uses to protect Haptic Federal is a license key that is required to install the software. (Fischer Decl. ¶ 21). Encoded into each license key is the customer's name and location as well as the date range when the key can be installed, after which, the key will no longer work. (*Id.*).

8.      Max also applied copyright management information ("CMI") to the Haptic Federal software. (Fischer Decl. ¶ 22). The copyright management information Max applied to the Haptic Federal Software consisted of the identifying information for the title – Haptic – and author – Max. (Fischer Decl. ¶ 23).

## 2.      Max's Trade Secrets in Haptic

9.      The Haptic Federal software source code was written by Max employees and developers under contract to Max. All employees and developers working for Max are contractually bound to maintain the confidentiality of the software they develop for the company. (Fischer Decl. ¶ 24).

10.     The source code for the Haptic Federal software is a compilation, program, and code, which derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. (Fischer Decl. ¶ 25).

11.     The Haptic Federal source code is never distributed to end users in source code format. Instead, the source code is compiled into executable, binary or web format executable code in such a fashion as to obscure the underlying trade secrets contained within the code. (Fischer Decl. ¶ 26).

12.     When Haptic Federal is licensed to end users it is always pursuant to restrictions contained in an End User License Agreement (EULA). (Fischer Decl. ¶ 28). Pursuant to the EULA, users of the Haptic Federal software agree not to "directly or indirectly (i) sell, rent out,

9

lease, license, distribute, market, exploit the Product or any of its parts commercially, (ii) reverse engineer, decompile, disassemble, adapt, reproduce, or create derivative works of this Product," "(iii) create, use and/or distribute "auto", "trainer", "script" or "macro" computer programs or other "cheat" or "hack" programs or software applications for this Product (whether over the internet or in local area network); (iv) remove, alter, disable or circumvent any copyright and trademark indications or other authorship and origin information, notices or labels contained on or within this Product and (v) export or re-export this Product or any copy of adaptation in violation of any applicable laws or regulations." (Fischer Decl. ¶ 30).

13.     Pursuant to the EULA, users of the Haptic Federal software agree:

(1) that Max retains and owns all intellectual property rights in the Haptic Federal software;
(2) to comply with all applicable laws, rules and regulations applicable to the software;
(3) not to "create, use, share and/or publish by any means in relation to the Product any material (text, words, images, sounds, videos, etc.) which would breach a duty of confidentiality, infringe any intellectual property right or an individual's right to privacy or which would incite the committing of an unlawful act (in particular, piracy, cracking or circulation of counterfeit software)";
(4) not to "create, supply or use alternative methods of using the Products, for example server emulators"; and
(5) not to "modify, distort, block, abnormally burden, disrupt, slow down and/or hinder the normal functioning of all or part of the Product, or their accessibility to other users, or the functioning of the partner networks of the Product, or attempt to do any of the above."

(Fischer Decl. ¶¶ 31-36, Ex. 5).

### 3.     Defendants' Access to and Use of Max's Intellectual Property

14.     Max first demonstrated the Haptic software to TEG in July of 2019 at the U.S. Government Joint Staff Lab in Norfolk Virginia. (Fischer Decl. ¶ 38). Before the demonstration, the parties entered into a mutual Non-Disclosure Agreement. (Fischer Decl. ¶ 39, Ex. 6).

15.     Thereafter, Max and TEG began working together. Max provided TEG's CEO Rob Clare and COO Jeff Mase with Haptic Federal user accounts. (Fischer Decl. ¶ 43). Before

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

signing-in to their user accounts, Clare and Mase agreed to the Haptic Privacy Policy. (Fischer Decl. ¶ 44, Ex. 7). To use the Haptic Federal software, Clare and Mase agreed to the Haptic EULA. (Fischer Decl. ¶ 46). These user accounts allowed TEG to access and demonstrate the capabilities of Haptic Federal to TEG customers. (Fischer Decl. ¶ 45).

16.     Impressed with Haptic Federal's capabilities, TEG contacted Max inquiring whether TEG could become an authorized reseller of Haptic Federal to the US government. The parties came to an agreement whereby TEG would create a distribution channel to license Haptic Federal to customers in the federal government. (Fischer Decl. ¶ 47).

17.     Thereafter, the parties entered into a Joint Venture Agreement (JVA), pursuant to which Max would create and maintain a branch of the Haptic source code for exclusive use by the US government. (Fischer Decl. ¶ 49, 51, Ex. 8). TEG would be the exclusive distributor of Haptic Federal to the US government. (Fischer Decl. ¶ 52). The JVA applied to the Haptic Federal product only and nothing in the JVA granted TEG ownership rights in the Haptic Federal software. (Fischer Decl. ¶¶ 59-61).

18.     Pursuant to the JVA, beginning in June 2020 Max made the source code securely available to TEG to allow their government customer(s) to scan for vulnerabilities and security issues. (Fischer Decl. ¶ 71). The source code was never transferred to TEG for any purpose other than to scan the source code for vulnerabilities and security issues. (Fischer Decl. ¶ 73). All source code transfers by Max to TEG were pursuant to significant restrictions contained in the SCLA dated March 30, 2021. (Fischer Decl. ¶¶ 63-70, 72, 79, Ex. 9). TEG agreed in the SCLA that Haptic Federal Source Code and the Documentation for the Haptic Federal Source Code was "confidential intellectual property (including trade secrets)" of Max and that TEG would maintain and not disclose any Confidential Information. (Fischer Decl. ¶ 69).

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

19.    Security measures were required to be followed every time source code was transferred by Max to TEG. (Fischer Decl. ¶ 72). One security measure required in connection with source code transfer was that TEG was required to provide Max with a "chain of custody" document with signatures from everyone who accessed the source code stating that each person witnessed destruction of the source code after the scan. (Fischer Decl. ¶ 79).

20.    In the Summer of 2023, TEG failed to timely provide chain of custody documentation for multiple source code transfers as required in order to protect Max's trade secret source code from unauthorized disclosure. (Fischer Decl. ¶ 81). As a result, on August 17, 2023, Max and TEG entered into a Certification Agreement. The agreement was intended to formalize confidentiality safeguards for Haptic Federal. (Fischer Decl. ¶ 82, Ex. 10). The Certification Agreement recites that "the Parties wish to maintain the source code for Haptic Federal software platform ("Source Code") confidential and to preserve its value as a trade secret, and therefore wish to limit disclosure of the Source Code." (Fischer Decl. ¶ 83). TEG further acknowledged in the Certification that TEG was under a duty to maintain as confidential the Haptic Federal source code and that the Haptic Federal source code was to be used only by the customer to complete required security scans, which were to be accompanied by a chain of custody form. (Fischer Decl. ¶ 84).

21.    On September 13, 2023, Haptic Federal source code files for version 3.1.21.8 were provided to TEG, accompanied by Max's chain of custody form, for purposes of performing security and vulnerability scans of the source code. (Max's Amended Answers to Rogs, p. 10-11). On September 22, 2023, despite not having returned the chain of custody form for version 3.1.21.8, TEG demanded that Max send the next version of Haptic Federal source code for TEG to scan. (*Id.*) On September 25, 2023, Max gave into TEG's demands and transferred Hap-

tic Federal source code files for version 3.1.21.9 before receiving chain of custody documentation for the prior version as an "exception." (*Id.*). Max never received chain of custody documentation for either of the above reference source code transfers. This was the last time Max transferred any source code to TEG.

22.     With respect to each transfer, TEG (1) retained the source code; (2) withheld the government scan report; (3) withheld Chain of Custody documents; and (4) failed to obtain signatures from everyone who touched the Haptic Federal source code. Max asked TEG at least twenty times to remedy these issues, but TEG stalled and eventually stopped responding to Max in December 2023. TEG's Certification Agreement violations willfully endangered the Haptic Federal source code, resulting in damage to Max. (Fischer Decl. ¶ 95-99).

### B.     Defendants' Unlawful Conduct
### 1.     TEG's Copyright Infringement

23.     TEG retained the Haptic Federal source code to perform its own development of the source code. (Clare Tr. 62:20-63-14; 80:25-82:15). TEG began its own development of the Haptic Federal source code in August or September of 2023. (Clare Tr. 63:25-64:5). To this day TEG continues to modify and develop Max's Haptic Federal source code, which it is licensing to the government. (Clare Tr.  70:23-71:1). TEG never disclosed to Max that it retained Max's source code or began creating derivative versions of Max's source code. (Fischer Decl. ¶ 112).

24.     TEG has stored the source code in its own source code repositories. (TEG's Second Amended Answers to Interrogatories, p. 18-19). The source code is "[s]tored in the history of repositories located in the 'Triangle Experience Group-Development' organization in GitHub. (*Id.*). The source code is also stored in TEG's "Azure DevOps" ("ADO") repositories located in the 'TEG-Development-Workspace." (*Id.*).

25.     TEG uses the "Azure DevOps" repository to modify and develop the source code it stole from Max. (Mullican Tr. 27:20-29:5).

26.



(Clare Tr. 44:23-45:11).

(Clare Tr. 45:8-11; 87:24-88:11).

27.

(Clare Tr. 49:14-21). The "VJOC" software is being operated and deployed by an unknown number of users.

28.    TEG claims that during the months preceding its retention and modification of the source code, the software was not functioning properly. TEG further claims that it asked Max on a number of occasions to fix certain issues with the software, but the Max was not fixing the issues. TEG's CEO, Robert Clare stated that "then it morphed into the need to fix it [the software] for [Max], like if you [referring to Max] are not going to fix it, then we [referring to TEG] will." (Clare Tr. 81:25-83:24).

29.    Max never gave TEG permission to do any of the above with respect to the software. (Fischer Decl. ¶ 97, 105). Max only found out about TEG's actions in discovery. TEG's testimony confirms that Max lost control of its software.

### 2.    TEG's Public Disclosure of The Haptic Federal Source Code.

30.    In February 2024 while searching the internet Max discovered that the defendants installed Haptic Federal on internet facing servers accessible on at least three (3) uniform resource locators (URL). In each instance discovered by Max, TEG removed the Haptic CMI from the Haptic Federal software and replaced the Haptic CMI with false CMI indicating that the software was TEG's software by using the terms "VJOC" and "C4MAP." (Fischer Decl. ¶ 87).

31.    At each URL server TEG exposed source code maps and source code to the public. (Simon Decl. ¶ 4). Max documented where TEG exposed the Haptic Federal source code online and how it can be found, reviewed and captured. (ECF 14, Ex. 1).

14

32.     Accordingly, Max's expert performed a comparison of the source code made available by TEG and Max's Haptic federal source code. See generally Expert Report of Robert Zeidman ("Zeidman Report"). Max's expert concluded as follows:

> I found that the majority of the source code files (Angular template files and TypeScript files) exposed by the source maps and downloaded from the TEG site were identical or nearly identical to the source code files (Angular template files and TypeScript files) from Max Minds.

(Miller Decl., Ex. 18, Expert Report of Robert Zeidman Report ¶ 22).

33.     Employees of Max reviewed the source code exposed on the public internet by TEG. (Simon Decl. ¶ 6). This review confirmed TEG's unauthorized modification and development of Max's Haptic Federal software source code. (Simon Decl. ¶ 7). For one example, the source code as exposed by TEG, contained TEG's own developer notes within the code. (Simon Decl. ¶ 8). Max has never included developer notes in its source code. (*Id.*).

34.     On June 3, 2024, TEG certified "that public internet access to the software and the allegedly copyrighted and trade secret source code has been disabled/terminated and will remain disabled/terminated during the pendency of this lawsuit and/or until further order of this Court." (ECF 43 ¶ 1).

### C.     TEG's Circumvention and CMI Removal/Falsification Violations.

35.     TEG circumvented the technological measures in the Haptic Federal source code. (Fischer Decl. ¶ 102). TEG made millions of dollars of undisclosed software/service sales of Haptic Federal or trials in Haptic Federal in 2023 by circumventing the technical licensing measures. (Fischer Decl. ¶ 103).

36.     In each case of a sale, TEG required a license key to install Haptic Federal; Max never provided license keys for these sales. (Fischer Decl. ¶¶ 102-103). To get around the licensing key requirement, TEG modified the Haptic Federal source code by stripping out or modifying the licensing logic from the source code to circumvent the licensing key requirement.

(Fischer Decl. ¶ 106). This was confirmed by TEG's CTO who stated "[t]he very first thing we did when we began to make modifications to our software was to remove that security deficiency [referring to Max's license key protocol]." (Mullican Tr. 58:6-10). TEG also back-dated computers to circumvent Max's licensing policy for Haptic Federal. (Fischer Decl. ¶ 116). TEG did not request or receive permission or authority to strip out or modify the licensing logic from the source code or back-date computers to circumvent the licensing key technological measure. (Fisher Decl. ¶ 107).

37.    In 2020 and 2021, Max discovered that TEG exceeded software licenses by providing "free" extended trials. (Fischer Decl. ¶ 108). Max was required to authorize each free trial of Haptic Federal software that TEG provided to a customer in advance of installation. (Fischer Decl. ¶ 109). In mid-2021, Max discovered at least a dozen trials that TEG had extended to customers without Max's authorization. (Fischer Decl. ¶ 110). In response, TEG told Max these were free trials; TEG's claim of free trials is false because TEG was paid to install and support the trial installations of Haptic Federal. (Fischer Decl. ¶ 111).

38.    TEG provided unauthorized trials to customers by exceeding the scope of the two software licenses granted to TEG pursuant to the JVA. TEG made unauthorized copies and distributed those unauthorized copies of Haptic Federal to third parties for live events and live exercises for which TEG received compensation. TEG exceeded the scope of software licenses purchased from Max by copying and distributing Haptic Federal numerous times without Max's authorization. (Fischer Decl. ¶¶ 108-110).

### D.    TEG's Removal of Copyright Management Information.

39.    Without notice to Max or permission from Max, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "C4MAP" when it demonstrated Haptic Federal to certain government customers. (Fischer Decl. ¶ 117). Similarly, without notice to Max or permission from Max, TEG removed "Haptic" from the main page of

16

Haptic Federal and changed the name of Haptic Federal to "VJOC," an abbreviation for Virtual Joint Operations Center, to other government customers. (Fischer Decl. ¶ 118).

40. TEG removed the Haptic name from the Haptic Federal software without Max's knowledge, agreement or authorization. (Fischer Decl. ¶ 119). TEG committed such acts knowing removing the Haptic name would conceal the true facts concerning ownership of the Haptic Federal software from others, including TEG's government customers. (Fischer Decl. ¶ 120). TEG and the individual defendants intended to conceal the true facts concerning ownership of the Haptic Federal software from others, including TEG's government customers.

### E. The Irreparable Harm to Plaintiff

41. The defendants' conduct deprives Plaintiff of the ability to control its chief asset, its software. TEG has taken complete control of Max's Haptic Federal Software and Software source code and has ousted Max from any involvement in its development or sale to the United States Government. (Fischer Decl. ¶ 135).

42. Not only are defendants misusing and misappropriating Max's proprietary software, but they are rebranding it as their own, misleading purchasers of the software as to its true owner, and concealing Max's ownership of the software. (Fischer Decl. ¶¶ 117-134).

43. The defendants' actions pose an imminent threat to Max's intellectual property and to Max's relationships with customers.

44. Since the time this case was filed, TEG has been on notice that it does not have permission or authority to take the unlawful actions described above. Despite being on notice, TEG continues to modify, develop, distribute, and profit from the unauthorized use of Max's software. (Fischer Decl. ¶ 136). Max continues to be irreparably harmed. An injunction against TEG must enter to protect Max from further harm.

### III. ARGUMENT

### A. Standard for Preliminary Injunction and Seizure Order.

To obtain a preliminary injunction, a party must establish (1) that its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that it will suffer irreparable harm if the injunction is not granted. *Ty, Inc. v. Jones Grp. Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

If the Court is satisfied that these three conditions have been met, then it must consider the harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Id.* Finally, the Court must consider the potential effect on the public interest (non-parties) in denying or granting the injunction. *Id.* The Court then weighs all of these factors, "sitting as would a chancellor in equity," when it decides whether to grant the injunction. *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992)).

The process of weighing the factors requires the court to engage in an analysis—the sliding scale approach–to determine the likelihood of plaintiff succeeding on the merits weighed against the balance of harms. *Id.* The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Id.* at 895-896. The greater the movant's likelihood of succeeding on the merits, the less the balancing of harms need be in his favor. *See Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir. 2000). To demonstrate a likelihood of success on the merits a plaintiff "need only demonstrate a better than negligible chance of succeeding." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999).

### 1.     Plaintiff's Copyright Claims

#### a)     Plaintiff Will Likely Succeed on its Copyright Infringement Claims.

The elements of a copyright infringement claim are (1) ownership of a valid copyright, and (2) actionable copying by the defendant *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007).

**SRIPLAW**
Cᴀʟɪғᴏʀɴɪᴀ ◆ Gᴇᴏʀɢɪᴀ ◆ Fʟᴏʀɪᴅᴀ ◆ Iɴᴅɪᴀɴᴀ ◆ Tᴇɴɴᴇssᴇᴇ ◆ Nᴇᴡ Yᴏʀᴋ ◆ Tᴇxᴀs

Plaintiff alleges that it owns a valid copyright in the Haptic Federal source code. Plaintiff registered the Haptic Federal source code and attached certificates of registration to its complaint. (Fischer, Ex. 1-4). The defendants had access to the source code to copy it through their relationship with Max, and defendants copied the code and distributed unauthorized copies of Haptic Federal to organizations within the Department of Defense and online without Max's authorization. (Fischer Decl. ¶¶ 106-108; Simon Decl.). Defendants were never given the code for any purposes other than to scan the code for vulnerabilities. (Fischer Decl. ¶ 73). Defendants were required to destroy the code after the scans were completed. (*Id.*).

TEG has admitted that they retained Max's source code and have modified and created derivative works of that Software at issue. (Clare Tr. 62:10-71:4). TEG is currently storing the code at issue in this action in two separate source code repositories where TEG is actively modifying and developing the software. (Clare Tr. 13:2-17). 

(Clare Tr. 44:23-45:11).

(Clare Tr. 49:14-21).

Max never gave TEG permission to retain the source code. (Fischer Decl. ¶ 99). Max never gave TEG permission to modify or create derivative works of the software source code. (*Id.*). Max never gave TEG permission to distribute those unauthorized derivative versions of the software to anyone, including agencies within the Department of Defense. (*Id.*).

Despite being put on notice that it does not have the right to do any of the above, TEG continues to modify, distribute, and profit from Max's copyrighted software.

Plaintiff has demonstrated likelihood of success on its copyright infringement claims.

       **b)**    **Plaintiff Will Likely Succeed on the Merits of its Circumvention Claims.**

19

**SRIPLAW**

17 U.S.C. § 1201(a)(1)(A) provides that "no person shall circumvent a technological measure that effectively controls access to a work protected under this title." "[T]o 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). "A technological measure 'effectively controls access to a work if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id*. License key systems are "technological measures that effectively control access to a copyrighted work for the purposes of the DMCA." *Synopsys, Inc. v. Innogrit, Corp*., No. 19-CV-02082-LHK, 2019 U.S. Dist. LEXIS 171487, at *20 (N.D. Cal. Oct. 1, 2019).

Defendants have engaged in circumvention. Defendants removed or modified the licensing logic from the Haptic Federal source code to circumvent the licensing key technological measure. Defendants also back-dated computers to circumvent the date restrictions in the licensing key system and install Haptic Federal.

Courts have found violations of 17 U.S.C. § 1201(a)(1) in far less egregious circumstances than the ones presented in this case. *See Actuate Corp. v. IBM*, 2010 U.S. Dist. LEXIS 33095, 2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) (Spero, M.J.) ("[U]nauthorized distribution of passwords and usernames avoids and bypasses a technological measure in violation of sections 1201(a)(2) and (b)(1)."); *Microsoft Corp. v. EEE Bus., Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008) (White, J.) ("By distributing a VLK without authorization, [defendant] effectively circumvented [plaintiff's] technological measure to control access to a copyrighted work in violation of the DCMA."); *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1098 (N.D. Cal. 2004) ("However, while [defendant's] software does use the authorized

key to access the DVD, it does not have authority to use this key, as licensed DVD players do, and it therefore avoids and bypasses [the technological measure]."); *Burroughs Payment Sys. v. Symco Group, Inc.*, 2012 U.S. Dist. LEXIS 67198, 2012 WL 1670163, at *4 (N.D. Cal. May 14, 2012) ("unauthorized use of a valid password 'circumvents' technology measures")

Courts have granted preliminary injunctive relief under factually similar circumstances to the case here. *CSC Holdings, Inc. v. Greenleaf Elecs.*, No. 99 C 7249, 2000 U.S. Dist. LEXIS 7675 (N.D. Ill. June 1, 2000) (preliminary injunction granted on circumvention of technological measures which are designed to control access to a copyrighted work under 17 U.S.C. § 1201). Plaintiff has demonstrated likelihood of success on its circumvention claims.

### c)    Plaintiff Will Likely Succeed on the Merits of its CMI Removal/Falsification Claims

Copyright Management Information is defined as any of the following information "conveyed in connection with copies . . . or displays of a work":

> The title and other information identifying the work, including the information set forth on a notice of copyright[, and t]he name of, and other identifying information about, the author of a work . . . [or] the copyright owner of the work, including the information set forth in a notice of copyright.

17 U.S.C. § 1202(c)(1)-(3). The CMI falsification provision provides:

> No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—provide [ ] or distribute or import for distribution copyright management information that is false.

17 U.S.C. § 1202(a)(1)-(2). The CMI removal provision provides:

> No person shall, without the authority of the copyright owner or the law—intentionally remove or alter any copyright management information, distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or distribute [or] import for distribution … works [or] copies of works [ ] knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b)(1)-(3).

Liability is not contingent on a defendant itself removing or altering any CMI; the defendant's knowledge that CMI was removed or altered before the defendant distributed the image suffices. *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1187 (9th Cir. 2016).

In this case, plaintiff asserts that the defendants "without permission or authority of Max or the law, removed Max's copyright management information and distributed copyright management information knowing that it was false without authority of Max" when they "removed 'Haptic' from the main page of Haptic Federal and changed the name of Haptic Federal to either "C4MAP" or "VJOC" when defendants demonstrated Haptic Federal to certain government customers." (Complaint ¶¶ 129-131, 184-186). The facts set forth in the declarations supporting this motion demonstrate that the defendants removed HAPTIC, defendants substituted C4MAP or VJOC for HAPTIC in order so defendants could claim HAPTIC was their software, and that they did so for purposes of enabling, facilitating or concealing infringement of the Max's rights in the Haptic Federal computer program.

Plaintiff has demonstrated likelihood of success on its copyright management information removal or falsification claims.

### 2.    Plaintiff's Trade Secrets Claims.

#### a)    Requirements for Claims of Trade Secrets Misappropriation under the DTSA and IUTSA

A trade secret misappropriation claim requires a showing that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner. *Aon Risk Servs. Companies, Inc. v. Alliant Ins. Servs., Inc.*, 415 F.Supp.3d 843, 848 (N.D. Ill. 2019). The complaint alleges violations of both the Defend Trade Secrets Act (DTSA) and the Indian Uniform Trade Secrets Act (IUTSA); the elements of misappropriation claims under the DTSA and IUTSA are similar, *Ligtel Communs. v. Baicells Techs.*, 455 F. Supp. 3d 792, 806-07 (N.D. Ind. 2020).

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

Information qualifies as a "trade secret" if (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Indiana's definition is the same. *Elevance Health, Inc. v. Mohan*, No. 1:23-cv-01497-SEB-MJD, 2023 U.S. Dist. LEXIS 164105, at *18 (S.D. Ind. Sept. 15, 2023).

Once a party demonstrates the existence of a trade secret, it then must show misappropriation, that is, either the "acquisition of a trade secret of another . . . by improper means" or the "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(A)-(B); *Howmedica Osteonics Corp. v. DJO Glob., Inc.*, No. 1:17-cv-00938-SEB-TAB, 2018 U.S. Dist. LEXIS 227687, 2018 WL 3130969, at *7 (S.D. Ind. Mar. 15, 2018). Under both statutes, whether information qualifies as a trade secret is a question of fact that "requires an ad hoc evaluation of all the surrounding circumstances." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003).

   **b)**    **Plaintiff Will Likely Succeed on the Merits of its Trade Secrets Claims**

Plaintiff alleges that the defendants misappropriated the Haptic Federal source code by disclosure of the source code without Max's consent under circumstances where the defendants had a duty to maintain the secrecy of the source code. (Complaint ¶¶ 146-151, 155-161).

The Haptic Federal source code qualifies as a trade secret. *See Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20-cv-3375, 2020 U.S. Dist. LEXIS 122347, at *26-28 (N.D. Ill. July 13, 2020) (Approximately 100,000 confidential technical documents and source code constituted trade secrets); *Aon Risk Servs. Cos. v. Alliant Ins. Servs.*, 415 F. Supp. 3d 843, 848 (N.D. Ill. 2019) (recognizing that "data compilations, proprietary tools, client information [and] client lists" may constitute trade secrets); *Motorola, Inc. v. Lemko Corp.*, 2012 U.S. Dist. LEXIS

**SRIPLAW**
Cᴀʟɪғᴏʀɴɪᴀ ◆ Gᴇᴏʀɢɪᴀ ◆ Fʟᴏʀɪᴅᴀ ◆ Iɴᴅɪᴀɴᴀ ◆ Tᴇɴɴᴇssᴇᴇ ◆ Nᴇᴡ Yᴏʀᴋ ◆ Tᴇxᴀs

2718, 2012 WL 74319, at *16-17 (N.D. Ill. Jan. 10, 2012) (product source code and documentation, product roadmaps, and testing tools found to be protectable trade secrets).

The facts demonstrate that Max took all necessary precautions to maintain the trade secrets in its Haptic Federal source code. Max did not release the source code to the defendants except under secure conditions pursuant to agreements with onerous requirements on the defendants to maintain the secrecy of that code.

The facts also demonstrate misappropriation by defendants. Misappropriation means the "disclosure or use of a trade secret of another without express or implied consent by a person who … at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was … acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II).

Misappropriation is shown here. The defendants knew that Max's Haptic Federal source code was acquired under circumstances requiring the defendants to maintain the secrecy of the code and limit its use. Despite this knowledge, defendants disclosed the code online. Defendants are using Max's trade secret source code without consent from Max and know that it was acquired under circumstances giving rise to a duty to maintain it as secret. Plaintiff will likely succeed on this claim.

### 3.    Plaintiff's Lanham Act Claims

#### a)    Plaintiff Will Likely Succeed on the Merits of its False Designation of Origin Claim

The complaint alleges that the "Haptic" mark is a trademark of Max for software that is inherently distinctive or suggestive, and that the defendants removed the Haptic mark on the Haptic Federal software and replaced it with C4MAP and JVOC when the software was displayed, advertised, and marketed to TEG's clients in violation of 15 U.S.C. § 1125(a). (Complaint ¶¶ 132-144).

"This section of the Lanham Act requires that customers likely be, in other words, tricked into thinking that products are affiliated with or approved by another party." *Diamond Sawblades Mfrs. Coal. v. Diamond Tools Tech.*, 504 F. Supp. 3d 927, 942 (S.D. Ind. 2020). In order to prevail under the Lanham Act, 15 U.S.C. § 1125(a), plaintiff must establish that it has a protectable trademark and that the defendants' use of the term is likely to cause confusion among consumers. See *Ty, Inc.*, 237 F.3d at 897. In assessing the likelihood of consumer confusion, we consider: (1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's. *Promatek Indus., LTD v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002).

In this case all the factors weigh in favor of confusion. The defendants substituted the HAPTIC mark for marks of their choosing on the same exact product under circumstances showing that they intended to misrepresent plaintiff's Haptic Federal product as defendants' own product. Defendants in fact intended to palm off Haptic Federal as its own product. Under these circumstances, plaintiff will likely succeed on its false designation of origin claims.

**4.    Plaintiff is Suffering Irreparable Injury and There is No Adequate Remedy at Law.**

Irreparable harm is harm that is "not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction or both) in the plaintiff's favor." *Kraft Foods Grp. Brands L.L.C. v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013).

**a)    Trade Secrets Claims**

There is no presumption of irreparable harm upon for trade secrets misappropriation. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). Evidence of lost customers, lost market share, and lost business generally is unquantifiable making injury irreparable. *Id*.

That is the case here. Plaintiff demonstrated that the defendants used their access to plaintiff's trade secret source code to obtain customers and business in ways that violated the parties' agreements. These losses are unquantifiable. The harm to plaintiff is therefore irreparable by damages.

### b)      Copyright Claims

Where a copyright owner has expended significant resources promoting products embodying its copyrights, losses resulting from infringement of such copyrights constitutes irreparable harm. *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1173 (7th Cir. 1997). These harms are notoriously difficult to quantify, and accordingly are considered irreparable which is why the Copyright Act expressly provides for injunctive relief to address infringement. See 17 U.S.C. § 502; *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010) (loss of sales due to infringement is "notoriously difficult" to prove; violation of copyright owner's "right to exclude" renders monetary remedies inadequate in a wide range of circumstances).

A copyright owner's "invest[ment] of substantial time, effort and money into creating the [copyright protected work]" coupled with the likely inability to realize the return on such investment due to infringement of the copyright, supports a finding of irreparable harm. *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 542 (D.N.J. 1999). The sort of irreparable harm resulting from copyright infringement includes damage to the copyright owner's business reputation and right of exclusivity. *Spinmaster, Ltd. v. Overbreak L.L.C.*, 404 F. Supp. 2d 1097, 1111 (N.D. Ill. 2005).

The same is true for circumvention and copyright management information claims. *See Aon PLC v. Infinite Equity, Inc.*, No. 19 C 7504, 2021 U.S. Dist. LEXIS 175378, at *91 (N.D. Ill. Sep. 15, 2021). "In the DMCA context, irreparable harm may be established by evidence that circumvention is undermining the copyright owner's negotiating position, damaging goodwill with licensees, threatening the copyright owner's business model, risking the copyright owner's

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

market share, causing reputational harm to the copyright owner or its works, and/or enabling third parties to infringe the owner's copyrights." *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1074 (S.D. Cal. 2019).

Defendants' infringing conduct deprives Plaintiff of the ability to control its chief asset, its software. This is an irreparable harm for which monetary compensation is inadequate and warrants equitable relief. *See Promatek Industries, Ltd. v. Equitrac Corp*., 300 F.3d 808, 813 (7th Cir. 2002) (finding that damage to plaintiff's goodwill was irreparable harm for which plaintiff had no adequate remedy at law); *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1219 (C.D. Cal. 2007) ("In sum, Plaintiffs have offered two independently sufficient grounds for a finding of irreparable harm. Plaintiff will suffer irreparable harm because of StreamCast's likely inability to pay for the past and/or future infringements that it has induced. Additionally, StreamCast's inducement has and will continue to irreparably harm Plaintiff's ability to enforce its exclusive rights."); *Warner Bros. Ent., Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1013-14 (C.D. Cal. 2011) (recognizing that the perception of the ability to infringe copyright protected work undermines the ability to develop and conduct business); *CSC Holdings*, 2000 U.S. Dist. Lexis at *26 (finding no adequate remedy at law where "any adequate remedy for [p]laintiff would necessarily have to include equitable relief that would prevent [d]efendant from continuing to circumvent plaintiff's technological measures to protect its copyright).

### c)    Lanham Act Claim

Section 226 of the Consolidated Appropriations Act of 2021 restored the presumption of irreparable harm to a plaintiff who seeks an injunction in a Lanham Act. *See Rosati v. Rosati*, No. 20-cv-07762, 2021 U.S. Dist. LEXIS 155794, at *34 (N.D. Ill. Aug. 18, 2021) (referring to the amendment of 15 U.S.C. § 1116(a) providing that a plaintiff "shall be entitled to a rebuttable presumption of irreparable harm upon a . . . finding of likelihood of success on the merits.")

Even without the presumption, plaintiff's showing of irreparable harm for the other

27

claims discussed above applies equally to plaintiff's Lanham Act claims.

**5.     The Balance of Hardship Tips Sharply in Plaintiff's Favor.**

If the Court is satisfied that Plaintiff has demonstrated (1) a likelihood of success on the merits, (2) no adequate remedy at law, and (3) the threat of irreparable harm if preliminary relief is not granted, then it must next consider the harm that Defendants will suffer if preliminary relief is granted, balancing such harm against the irreparable harm Plaintiff will suffer if relief is denied. *Ty, Inc*., 237 F.3d at 895.

"Defendant's product uses Plaintiff's trade secrets [and copyrighted source code], Defendant has no right to use them, and any harm it suffered as a result of the injunction 'would be a consequence of [its] own conduct.'" *Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20-cv-3375, 2020 U.S. Dist. LEXIS 122347, at *46 (N.D. Ill. July 13, 2020) (quoting *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1146 (N.D. Ill. 2019)).

As willful infringers, Defendants are entitled to little equitable consideration. "When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l, Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994). Defendants "cannot complain" of being forced to cease their infringement. *Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1014-15 (C.D. Cal. 2011). Further, the threat of continued copyright infringement without issuance of an injunction as well as the copyright owner's loss of exclusivity occasioned by copyright infringement support a finding that the balance of hardships weighs in favor of awarding injunctive relief. *Virtual Studios, Inc. v. Beaulieu Grp., L.L.C.*, 987 F. Supp. 2d 769, 781 (E.D. Tenn. 2013).

**6.     An Injunction Is in the Public Interest.**

"[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *Apple Comput., Inc. v.*

*Franklin Comput. Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983); *see also CBS Broad. v. Echostar Commc'ns Corp.*, 265 F.3d 1193, 1198 (11th Cir. 2001) (the public interest lies with protecting the rights of copyright owners). This is especially true here since protecting the plaintiff's software protects its integrity.

Furthermore, the public interest favors entry of a preliminary injunction to protect the consumer from being defrauded and misled by infringing goods. *See Stahly, Inc. v. M.H. Jacobs Co.*, 183 F.2d 914, 917 (7th Cir. 1950) (noting that trademark laws "are concerned not alone with the protection of a property right existing in an individual, but also with the protection of the public from fraud and deceit."). The public needs to be protected from being defrauded and buying defendants' infringing software.

In this case, the injury to the public is significant, and the injunctive relief that plaintiff seeks is specifically intended to remedy that injury by dispelling the public confusion created by defendants' actions. The public has the right not to be confused and defrauded as to the source of the software offered by defendants or as to the identity of the owner of the intellectual property used in connection that software. Unless defendants' unauthorized use of plaintiff's software is enjoined, the government purchaser will continue to be confused and misled by defendants' conduct.

## IV.    A BOND SHOULD SECURE THE INJUNCTION

The posting of security upon issuance of a temporary or preliminary injunction is vested in the Court's sound discretion. *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999); Fed. R. Civ. P. 65(c). Because of the strong and unequivocal nature of Plaintiff's evidence of infringement, Plaintiff respectfully requests this Court require Plaintiff to post a bond of no more than ten thousand dollars ($10,000.00).

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

## V.  CONCLUSION

In view of the foregoing, Plaintiff respectfully requests this Court enter a Preliminary Injunction to enjoin defendants to protect Max's intellectual property rights as to the Haptic Federal software and source code:

(1) from copying and distributing plaintiff's copyrighted and trade secret protected software and source code;

(2) from creating derivative works of plaintiff's copyrighted and trade secret protected software and source code;

(3) from licensing, installing, supporting and servicing plaintiff's copyrighted and trade secret protected software and source code on computers owned and operated by third-parties including the United States Government;

(4) from participating in trials, demonstrations, and exercises utilizing plaintiff's copyrighted and trade secret protected software and source code;

(5) from entering into agreements with third-party resellers and distributors to copy, distribute, license, install, and support others using plaintiff's copyrighted and trade secret protected software and source code;

(6) from circumventing the technological measures that effectively control access to plaintiff's copyright and trade secret protected software;

(7) from removing plaintiff's copyright management information contained in plaintiff's copyright and trade secret protected software and source code including the plaintiff's name for the software "HAPTIC";

(8) from falsely designating the source of plaintiff's copyright and trade secret protected software;

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

(9) from attaching false or misleading copyright management information to plaintiff's copyright and trade secret protected software and source code without plaintiff's permission; and

(10)    from exposing plaintiff's confidential and trade secret protected source code on the internet and elsewhere online.

A detailed proposed findings of fact, conclusions of law, and preliminary injunction will be filed with the Court.

DATED: November 25, 2024                    Respectfully submitted,

*/s/ J. Campbell Miller*
campbell.miller@sriplaw.com
**SRIPLAW, P.A.**
231 S. Rangeline Road
Suite H
Carmel, IN 46032
561.404.4350 – Telephone
561.404.4353 – Facsimile

and

JOEL B. ROTHMAN
*(pro hac vice)*
joel.rothman@sriplaw.com

**SRIPLAW, P.A.**
21301 Powerline Road
Suite 100
Boca Raton, FL 33433
561.404.4335 – Telephone
561.404.4353 – Facsimile

and

*/s/ Philip D. Sever*
PHILIP D. SEVER
Indiana Bar No.: 25384-49
phil@landownerattorneys.com

**SEVER, STORY, WALKER**
742 South Rangeline Road
Carmel, IN 46032

31
**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

317.961.1202 – Telephone

*Counsel for Plaintiff*

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS