UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MAX MINDS, LLC, | ) |
|                 Plaintiff, | ) |
|               v. | ) No. 1:24-cv-00779-JPH-MG |
| TRIANGLE EXPERIENCE GROUP, INC., ROBERT CLARE, JEFFREY MASE, KEVIN MULLICAN, JOHN DOES 1-10, | ) |
|                 Defendants. | ) |

**ORDER ON MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Max Minds, LLC, a software-development company, brings trade secret, copyright, and trademark claims based on allegations that Triangle Experience Group ("TEG") and several of its employees misappropriated source code from one of Max's software products. TEG has filed a motion to dismiss for failure to state a claim. Dkt. [51]. For the reasons below, that motion is **DENIED**.

### I.
### Facts and Background

Because Defendants have moved for dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court accepts and recites "the well-pleaded facts in the complaint as true." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

Max Minds, LLC creates "software platforms for commercial and governmental applications." Dkt. 1 at 4. One of Max's chief products—known as Alleo for commercial users and Haptic for government users—provides a

1

real-time "collaborative workspace" that organizes people, content, and tools "in any hybrid environment." *Id.* at 4–5.  Max has copyright registrations for several Haptic versions and keeps its Alleo and Haptic source code confidential.  *Id.* at 6–7.

In February 2019, Max's CEO met representatives of TEG—which distributes software to the federal government—who invited Max to demonstrate Haptic at a federal government lab.  *Id.* at 11.  Max gave that demonstration in July 2019 and then in October provided Haptic Federal accounts to TEG executives so they could demonstrate Haptic to potential customers.  *Id.*

In January 2020, Max and TEG entered a Joint Venture Agreement ("JVA") making TEG "the exclusive distributor/reseller of the Haptic Federal product into the federal market."  *Id.* at 12.  In return, TEG had to meet certain revenue targets, manage federal-government sales relationships, and make retainer payments to Max.  *Id.* at 12–13.  Max and TEG would work together on project and program management and would equally share Haptic Federal revenue.  *Id.* at 13.  And "[a]ny Intellectual Property . . . resulting from custom software development that is paid for by TEG will be co-owned by TEG and Max."  Dkt. 1-9 at 3 (JVA).

Starting in June 2020, Max made Haptic source code available to TEG so government customers could complete security checks, with the requirement that TEG give Max chain of custody documentation for the code.  Dkt. 1 at 14.  Max also allowed TEG to access Haptic source code for "internal business

purposes" under a Source Code License Agreement that required TEG to keep the code confidential.  *Id.* at 9–11.

During 2020 and 2021, however, TEG charged customers for Haptic Federal installations without Max's authorization.  *Id.* at 17.  And in 2022 and 2023, TEG made at least $5 million in undisclosed Haptic Federal sales.  *Id.* at 16–17.  In relation to those sales, TEG "circumvented the technological [license-key copyright-protection] measures in the Haptic Federal source code" and removed the Haptic trademark from the software.  *Id.* at 16–19.  By summer 2023, TEG had failed to provide required source-code chain-of-custody documentation "on numerous occasions."  *Id.* at 14.  So, that August, Max and TEG entered a "Certification Agreement" that required TEG to keep Haptic Federal's source code confidential.  *Id.* at 14–15.  TEG still failed to protect the confidentiality of the source code, and in December 2023 stopped responding to Max's concerns.  *Id.* at 15–16.  In February 2024, Max learned that TEG had exposed Haptic Federal source code "to the public internet."  *Id.*

In May 2024, Max brought this action against TEG and several of its employees, seeking a preliminary injunction[1] and other relief.  *Id.* at 2–3; *see* dkt. 12; dkt. 104.  Relying on several federal and state statutes, Max alleges that TEG (1) misappropriated the Haptic Federal source code, which is Max's trade secret; (2) violated Max's copyright protections in the Haptic Federal

---

[1] Before Max's initial motion for preliminary injunction was ripe, TEG certified that it would not allow public access to source code while this case was pending.  Dkt. 44.  Max then amended its preliminary injunction motion in November 2024, dkt. 104, and sought an extension of time that made its reply brief due February 21, 2025, dkt. 137.

3

source code; and (3) passed off Max's Haptic trademark as its own. Dkt. 1 at 19–24. TEG filed a motion to dismiss for failure to state a claim. Dkt. 51.

## II.
## Rule 12(b)(6) Standard

Defendants may move under Federal Rule of Civil Procedure 12(b)(6) to dismiss claims for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim is one that allows "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, a complaint "must allege enough details about the subject-matter of the case to present a story that holds together," *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021), "but it need not supply the specifics required at the summary judgment stage." *Graham v. Bd. of Educ.*, 8 F.4th 625, 627 (7th Cir. 2021).

When ruling on a 12(b)(6) motion, the Court "accept[s] the well-pleaded facts in the complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). "It is enough to plead a plausible claim, after which a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017).

# III.
# Analysis

## A. Misappropriation of Trade Secrets (Counts I and II)

Max brings claims for misappropriation of trade secrets under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and the Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1 *et seq.*  Dkt. 1 at 19–21.  TEG argues that these claims must be dismissed because the JVA[2] allowed TEG to access and use the Haptic source code, so the code was not "misappropriated."  Dkt. 52 at 12–13.  Max responds that it has plausibly alleged misappropriation because TEG did not limit source code disclosure as it was required to do.  Dkt. 57 at 16–18.

TEG admits, at this stage, that the source code is a trade secret.  Dkt. 52 at 12 n.5.  And Max alleges that TEG disclosed that trade secret in violation of their agreements by "expos[ing] source code maps and source code to the public internet."  Dkt. 1 at 15.  That states a plausible claim, since improper disclosure does not require improper acquisition to be "misappropriation."  18 U.S.C. § 1839; Ind. Code § 24-2-3-2; *Motorola Solutions, Inc. v. Hytera Commc'ns. Corp. Ltd.*, 108 F.4th 458, 484 (7th Cir. 2024) ("Misappropriation can occur through any of three actions: (1) acquisition, (2) disclosure, or (3) use.").

Still, TEG argues that this disclosure cannot be misappropriation because it was done to comply with the JVA.  Dkt. 52 at 12–13.  But the JVA

---

[2] The Court considers the JVA because Max attached it to the complaint.  Dkt. 1-9; *see Williamson v. Curran,* 714 F.3d 432, 436 (7th Cir. 2013).

5

language that TEG relies on required only that TEG "maintain a web presence for marketing material of the Haptic Federal product."  Dkt. 1-9 at 2.  That language—with all reasonable inferences drawn in Max's favor—does not require disclosure of Haptic Federal's underlying source code or constitute Max's consent to such a disclosure.  *See Gociman v. Univ. of Chi.*, 41 F.4th 873, 885 (7th Cir. 2022) ("At the motion to dismiss stage for failure to state a claim, we test the sufficiency of the complaint, not the merits of the case" and "draw all reasonable inferences in the [non-moving party's] favor.").  Indeed, TEG cites no authority supporting dismissal of trade-secret claims based on similar disclosure allegations.  Dkt. 52 at 12–14; dkt. 69 at 6–7.

Finally, TEG briefly argues that Max has not shown that the disclosure "revealed any concrete secrets."  Dkt. 52 at 13–14.  As explained above, however, TEG admits at this stage that the source code is a trade secret and Max alleges that it was exposed to the public internet.  Dkt. 52 at 12 n.5; dkt. 1 at 15.  TEG does not elaborate why that's insufficient.

Max has therefore plausibly alleged its misappropriation of trade secret claims.  *See Motorola Solutions, Inc.*, 108 F.4th at 484 (unauthorized disclosure can support a trade-secret misappropriation claim).

### B. Copyright Infringement (Count III)

Max alleges that TEG infringed its copyright in the Haptic Federal source code by copying the source code and creating derivative works from it.  Dkt. 1 at 21–22. TEG argues that this claim must be dismissed because the JVA gave it a license to distribute and sell the software, which limits Max to contract

6

claims instead of copyright. Dkt. 52 at 14–18; dkt. 69 at 8–11. Max responds that it has plausibly pleaded infringement, including that TEG exceeded the JVA's authorizations. Dkt. 57 at 18–21.

The JVA made TEG the "exclusive distributor/reseller of the Haptic Federal product into the federal market." Dkt. 1-9 at 3. TEG uses that language to raise the affirmative defense that it had a license to use the source code. Dkt. 52 at 15; *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). An affirmative defense like a license, however, can support dismissal only if "the face of [the] complaint compels a conclusion" that it applies. *Mosely v. Bd. of Ed. of City of Chi.*, 434 F.3d 527, 533 (7th Cir. 2006); *see Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[C]ourts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses" unless "all relevant facts are presented."). So a plaintiff facing a license defense "is *not* required to prove [or allege] that the defendant's copying was unauthorized in order to state a *prima facie* case of copyright infringement." *Muhammad–Ali v. Final Call, Inc.*, 832 F.3d 755, 761 (7th Cir. 2016). Instead, the "burden is . . . on the alleged infringer to show that the use was authorized" by the license. *Id.*

Here, Max has pleaded that TEG's use of the source code at issue was unauthorized. Dkt. 1 at 21–22; *see* dkt. 57 at 21 (arguing that TEG therefore did not have a license or exceeded its scope). And TEG cites no authority showing that its status as a "distributor/reseller" can "compel [the] conclusion" at the pleadings stage that its affirmative defense of a license applies. *Mosely*,

7

434 F.3d at 533; *see* dkt. 69 at 8–9.  For the same reason, TEG has not shown that breach-of-contract claims are the sole remedy for these allegations.  Even if an applicable license would limit Max to breach-of-contract claims, TEG has not shown on the face of the pleadings that its affirmative defense of a license forecloses Max's copyright infringement claim.  *See Edgenet, Inc. v. Home Depot U.S.A., Inc.*, 658 F.3d 662, 664 (7th Cir. 2011) (claim arose under copyright law even though defendant invoked a contract as an affirmative defense).

Last, TEG briefly argues that Max hasn't plausibly pleaded that TEG used code that's "substantially similar[ ]" to Max's protectable work.  Dkt. 52 at 17–18.  But at this stage the Court must accept Max's allegation that its code was "copied."  Dkt. 1 at 22.  And TEG does not cite authority showing that Max's source code might be unprotected or supporting its view that allegations of "unauthorized copying" are insufficient to plausibly plead infringement.  *See id.* (relying on *Doorage, Inc. v. Blue Crates, LLC*, No. 1:20-cv-421, 2023 WL 6214099 at \*3–4 (N.D. Ill. Sept. 22, 2023), a non-binding case stating, on a developed summary-judgment record, that some marketing-video "ideas and themes" may not be protectable).

Max has therefore plausibly alleged copyright infringement.  *Muhammad–Ali*, 832 F.3d at 761–62 ("Ali proved that he owned a valid copyright over the painting, and that lithographs sold by The Final Call were copies of it.  He was required to do no more than that.").

8

### C. Digital Millenium Copyright Act Claims (Counts IV and V)

Max claims that TEG violated the Digital Millenium Copyright Act ("DMCA") by circumventing copyright protection systems and removing copyright management information. Dkt. 1 at 23–24.

#### 1. Circumvention of Copyright Protection Systems

The DMCA prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected [by a valid copyright] under this title." 17 U.S.C. § 1201(a). The parties agree that this claim requires that the alleged circumvention "constitutes . . . or facilitates copyright infringement." Dkt. 57 at 22; dkt. 69 at 11; *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1203 (Fed. Cir. 2004). TEG argues that Max has not plausibly alleged that element because TEG is authorized to use the source code, and the government customers accessing Haptic Federal are licensed customers. Dkt. 52 at 20. Max responds that TEG committed infringement when it modified the source code to get around the licensing-key requirement that Max included in the code. Dkt. 57 at 21–23.

TEG does not address Max's argument that this source-code modification constituted or facilitated TEG's own infringement, except to argue that under the JVA, TEG could not have committed infringement. Dkt. 52 at 20; dkt. 69 at 11. But as explained above, Max has plausibly alleged—with all reasonable inferences drawn in its favor—that TEG committed copyright infringement and that the JVA did not authorize TEG's actions. Max's DMCA circumvention

9

claim is therefore also plausible.[3]  *See Eclipse Gaming Sys., LLC v. Antonucci*, No. 17-cv-196, 2019 WL 398687 at *3–4 (N.D. Ill. Jan. 31, 2019) (allegations that defendant reverted to a prior software version to avoid a software-license verification mechanism stated a plausible DMCA claim); *accord In re Dealer Mgmt. Sys. Antitrust Lit.*, No. 18-cv-864, 2019 WL 4166864 at *14 (N.D. Ill. Sept. 3, 2019).

### 2. Removal of Copyright Management Information

The DMCA also prohibits "intentionally remov[ing] or alter[ing] any copyright management information," which includes the name, title, and other identifying information about a work of its author.  17 U.S.C. § 1202(b), (c).  TEG argues that this claim must be dismissed because Max has not pleaded the required intent "for the same reasons that Max can allege no set of facts in which TEG or its government customers can be liable for copyright infringement." Dkt. 52 at 21–22.  Max responds that it has plausibly alleged that TEG "removed Max's name HAPTIC and renamed the software . . . in order to deceive the [Department of Defense] into believing that the software belongs to TEG."  Dkt. 57 at 24.

Because Max has plausibly pleaded copyright infringement for the reasons above, and because TEG raises no other argument for dismissal of this claim, Max has pleaded a plausible DMCA removal claim.  *See* dkt. 69 at 11–

---

[3] Since this claim plausibly alleges that TEG committed copyright infringement, the Court does not address TEG's argument that "[a]ny attempt by Max to bring allegations of copyright infringement against TEG's government customers" falls under the Court of Federal Claims's exclusive jurisdiction. Dkt. 52 at 20–21.

12; *Soos & Assocs., Inc. v. Five Guys Enters., LLC*, No. 17-cv-6577, 2020 WL 1027885 at *3 (N.D. Ill. Mar. 3, 2020) (allegations that CMI was removed "to mislead third party architects into believing Five Guys owned the copyrights in the templates" stated a plausible § 1202(b) claim); *accord Design Basics, LLC v. Van Prooyen Builders, Inc.*, No. 2:19-cv-100-PPS-SLC, 2021 WL 838348 at *3 (N.D. Ind. Mar. 5, 2021).

### D. Trademark Reverse Passing Off (Count VI)

Max alleges that TEG violated the Lanham Act, 15 U.S.C. § 1125(a), by "reverse passing off"[4] when it removed the Haptic mark from Haptic Federal software and replaced it with TEG's own identifying marks. Dkt. 1 at 24. TEG argues that this claim must be dismissed under Supreme Court precedent limiting false-origin claims related to intellectual—rather than tangible—content. Dkt. 52 at 22–24 (relying on *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2007)). Max responds that recent Seventh Circuit precedent shows that *Dastar* does not foreclose false-origin claims like this one. Dkt. 57 at 25–26.

In *Dastar*, the Supreme Court explained that 15 U.S.C. § 1125(a) "create[s] a federal remedy against a person who used in commerce . . . a false designation of origin . . . in connection with any goods or services." 539 U.S. at 29. The Court held that this "origin of goods" language "refers to the producer

---

[4] "Passing off . . . occurs when a producer misrepresents his own goods or services as someone else's. . . . 'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003).

11

of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37.  This was in part because expanding § 1125(a) to "intellectual content" like that in a book or video would "conflict with the law of copyright, which addresses that subject specifically." *Id.* at 33.

Here, Max bases its reverse-passing-off claim on the Haptic Federal software as a product that was "displayed, advertised, and marketed to TEG's clients" with the Haptic mark removed from the software's "main page."  Dkt. 1 at 18, 24.  This claim therefore relies on the Haptic Federal software as a "good" or "service," rather than the "intellectual content" within the software.  *See id. Dastar* does not clearly foreclose such a product-based claim.  *Phoenix Enter. Partners v. Rumsey*, 829 F.3d 817, 821–22 (7th Cir. 2016) (explaining that under *Dastar*, trademark law does not protect "the creative content of [a] product" but it does protect the "tangible product sold in the marketplace").  Indeed, *Dastar* recognized that the trademark claim there "would undoubtedly be sustained" if Dastar had repackaged and passed off someone else's videotapes (as opposed to creative content on videotapes) as its own.  539 U.S. at 31.

Perhaps further development of Max's claims and the factual record will show that copyright law provides the only protection here.  *See Rumsey*, 829 F.3d at 824–25.  But at this pleadings stage, "[n]othing in *Dastar* forecloses" Max's § 1125(a) claim.  *Gensler v. Strabala*, 764 F.3d 735, 737 (7th Cir. 2014)

(reversing a dismissal for failure to state a claim regarding the origin of architectural designs).

### E. Further proceedings

TEG argues that this case should be stayed because Max should have raised its claims as counterclaims in an earlier-filed case brought by TEG, 1:24-cv-650-JPH-MG. Dkt. 52 at 25–29. That request violates Local Rule 7-1(a)'s requirement that "[m]otions must be filed separately," and therefore is **denied without prejudice**. *See Keeylen v. Talbot*, No. 1:18-cv-2395-JPH-DLP, 2019 WL 5551910 at *3 (S.D. Ind. Oct. 25, 2019) ("Local Rule 7-1(a) requires motions to be filed separately, meaning multiple requests may not be contained in a single motion."). After the pleadings have closed, the parties may address with Magistrate Judge Garcia whether a stay or consolidation is appropriate.

TEG also argues that Max's initial motion for preliminary injunction is "effectively moot" because the parties have agreed to remove public internet access to Max's source code. Dkt. 52 at 29–31. Max subsequently filed an amended motion for preliminary injunction, dkt. 104, so Max's initial motion is **denied without prejudice as moot**, dkt. [12].[5]

Finally, Max has filed a motion for the referral of its amended motion for preliminary injunction to Magistrate Judge Garcia for a report and recommendation. Dkt. 128. Max argues that preliminary relief is urgent

---

[5] TEG also argues that the John Doe defendants should be dismissed because the Seventh Circuit does not allow the naming of placeholder defendants. Dkt. 52 at 24–25. The Court does not address this argument because it has granted Defendants' motion to dismiss the John Doe defendants for lack of personal jurisdiction.

13

because "TEG is literally starving Max to death by withholding funds." Dkt. 129 at 3–4. And even though its amended motion for preliminary injunction was not yet ripe, Max contended that "this Court's overcrowded docket forces Max to wait and wait for preliminary injunctive relief that is intended to be exigent but, because of court delays, is no closer to fruition than when this case was filed." *Id.* TEG opposes the motion, arguing that Max is responsible for any delay. Dkt. 131.

Max initially sought a preliminary injunction in May 2024, dkt. 12, then in June 2024, TEG certified that it would not allow public access to source code while this case was pending, dkt. 44. Magistrate Judge Garcia then approved Max's proposed schedule that would have preliminary-injunction briefing complete by late September 2024. Dkt. 47. That schedule was later extended without objection to accommodate the parties' discovery, with briefing to be complete by January 24, 2025. *See* dkt. 68; dkt. 101. But after Max filed an amended motion, dkt. 104, and TEG filed its response brief, dkt. 125, Max sought an additional two weeks to file its reply brief, dkt. 132. In fact, Max sought that extension *after* it alleged that "court delays" were preventing it from receiving relief that is "intended to be exigent." Dkt. 129 at 3–4.

Max's conduct in this case therefore belies the urgency it now claims. Moreover, a report and recommendation would be unlikely to expedite preliminary-injunction proceedings because the parties would have the right to "file written objections to such proposed findings and recommendations," which require *de novo* review. 28 U.S.C. § 636(b)(1)(C). Max's motion for reference of

14

preliminary-injunction proceedings for a report and recommendation is therefore **denied**.  Dkt. [128].

## IV.
## Conclusion

TEG's motion to dismiss for failure to state a claim is **DENIED**.  Dkt. [51].  Max's initial motion for preliminary injunction is **DENIED without prejudice as moot**.  Dkt. [12].  Max's motion for reference of preliminary-injunction proceedings for a report and recommendation is **DENIED**.  Dkt. [128].

**SO ORDERED.**

Date: 2/24/2025

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel