UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MAX MINDS, LLC, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No.: 1:24-cv-00779-JPH-MG |
| | ) |
| TRIANGLE EXPERIENCE GROUP, INC., *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

## DECLARATION OF KEVIN MULLICAN

I, Kevin Mullican, declare as follows:

1. I am the Chief Technology Officer of Triangle Experience Group, Inc. ("TEG"). I am over the age of eighteen and make this Declaration on my own information, knowledge, and belief. I submit this Declaration in connection with TEG's opposition to the amended motion for preliminary injunction filed by plaintiff Max Minds, LLC ("Max").

2. I have an undergraduate degree from the Massachusetts Institute of Technology. While at MIT, I studied architecture and mechanical engineering, and I worked with neural networks and computer vision for robotics.

3. After graduating from MIT in 1993, I began a career in the Hollywood Digital Visual Effects industry where I created digital visual effects for over 100 feature films and television productions. I spent most of my career designing systems that enable large scale, real-time collaboration in high performance, high bandwidth visual compute environments across geographically disparate locations. I also founded and successfully exited several companies focusing on technology in the entertainment industry.

4. I have received multiple awards for my work, including a Craft Certificate from the Academy of Television Arts & Sciences, and I participated in and chaired several award-winning technical committees for the Academy of Motion Picture Arts & Sciences.

5. I am a published author in my field, and I have lectured extensively in distributed computing for the media and entertainment industry.

6. I have also worked outside the entertainment industry, designing, building and deploying real-time collaboration systems in spatial computing for Fortune 100 companies. I am a seasoned technical contributor, architect, and leader in distributed, real-time systems for visual collaboration.

7. Before joining TEG, I was employed by a company called Oblong Industries. I first came to know TEG in 2014, when TEG approached Oblong Industries about building the next generation collaboration tool for the military. Given my experience in the service, I was tasked with the project to create what the military has come to call a "Virtual Joint Operations Center" tool or "VJOC." I was the author of this very first version of VJOC, which worked in a client-server model with a robust network message passing interface and a fully featured web component.

8. When I joined TEG full time in 2017, I became familiar with the version of VJOC in use at that time, which was no longer the version that I had originally authored. This version of VJOC was developed by Prysm, and the underlying software was named Synthesis. This software was primarily intended to support the sales of Prysm's touch screen monitors, and it had been adapted for use in the government by Prysm under TEG's guidance.

9. Reviewing TEG's deployment and support of Synthesis, it became clear to me that the Synthesis client architecture would not be sustainable for long term use by TEG's government customers. ▇▇, ▇▇▇▇▇▇▇ ▇▇▇▇ ▇▇▇▇▇▇, ▇▇▇▇▇d ▇d ▇▇▇▇▇▇ d ▇▇▇▇ ▇l ▇b ▇▇▇▇

2

█████████h ███████This allowed TEG to add government requested capabilities that Prysm was unwilling to work with TEG to customize.

10. TEG and I also began to develop an improved ███ b ███ VJOC solution for TEG and its customers—the "next generation" VJOC by TEG. To that end, I used ██████ t ██ b 

11. In or around March/April 2018, TEG leadership and I introduced these concepts to Brandon Fischer over the course of several phone conversations and meetings in which we explored the possibility of working together with Mr. Fischer and his new company on the next generation of VJOC to be customized for TEG's federal government customers such as the Department of Defense. In these conversations, and in demonstrations, we showed Mr. Fischer our work ████████████████ b ██ d ████████████.

12. In approximately October 2019, after meeting regularly with TEG leadership, and over a year after being introduced ████████████████████ Mr. Fischer demonstrated a system to TEG ████████ d ████████████ Mr. Fischer stated that he had named this system Haptic Beta. This system was severely deficient in functionality, but the concept, as TEG had shared with Max, was headed in the right direction.

13. Thereafter, TEG continued to collaborate with Mr. Fischer and Max to define what would become Haptic Federal, and to engage in the joint development of Haptic Federal.

14. As TEG and Max continued to collaborate on the development of Haptic Federal, the functionality, structure, and design of Haptic Federal changed to such a degree that virtually none of the initial Haptic Beta appears to be present in Haptic Federal.

15. From the very beginning of our co-development relationship, Max shared many versions of source code with TEG. I am not aware of any restrictions on the use of the source code by Max that are applicable to TEG. TEG and Max were careful to ensure that the end user—TEG's government customers—returned any specific copies of the source code they were given for the specific purposes of vulnerability scanning or for installation. But source code was exchanged between TEG and Max for purposes of the joint development and customization of Haptic Federal for the TEG customer.

16. Initially, TEG had a very productive and deeply integrated software development process with Max. However, following 

17. Beginning in early 2023, Max became increasingly unresponsive. Developers stopped attending meetings. Mr. Fischer seemed to have disappeared from the project and Max inserted several new layers of management into the joint development process, effectively isolating TEG from the direct communication with Max's coders that TEG had previously enjoyed. As a result, Max's productivity dropped precipitously, and no Haptic Federal version was deployable during this time period.

18. Then, in or around August/September 2023, Max 

19. Thus, in late 2023, TEG still lacked a version of the software that worked properly. Yet TEG was confronted with customers who needed the

software to function for its intended use as the baseline virtual information sharing platform for ████████, ████████.

20. TEG still had in its possession a copy of a version of the source code that had been delivered by Max to TEG.

21. This source code was turned over to TEG's development staff in order to address the critical issues preventing TEG's customers from using the software for the purposes for which it was intended.

22. In short order, TEG was able to ██████████████████████████████████ TEG's development staff ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.



24. TEG's modifications to the software source code permitted TEG's government customers successfully to deploy and utilize the software as intended. TEG's modifications included ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ y for the software to be fully functional and useful for TEG's customers.

25. TEG made no modifications to the software source code other than what was essential to allow use of the software program by TEG's government customers for the very purpose for which the government had licensed the software. The modified software has been used in no other manner than that envisioned in the creation of the program by TEG's and Max's joint venture.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 30, 2025

*Kevin Mullican (Jan 30, 2025 18:26 PST)*
Kevin Mullican

# EXHIBIT 1

Case 1:24-cv-00779-JPH-MG   Document 151-4   Filed 02/28/25   Page 8 of 10 PageID #: 5868

Case 1:24-cv-00779-JPH-MG   Document 151-4   Filed 02/28/25   Page 9 of 10 PageID #: 5869