# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

MAX MINDS, LLC,           )
           )
       *Plaintiff,*       )
           )
       v.           )    Case No.: 1:24-cv-00779-JPH-MG
           )
TRIANGLE EXPERIENCE GROUP, INC., *et al.*, )
           )
      *Defendants*.     )

## TRIANGLE EXPERIENCE GROUP, INC.'S SEALED BRIEF IN OPPOSITION TO THE AMENDED MOTION FOR PRELIMINARY INJUNCTION

Alexander P. Orlowski, Atty. No. 30794-29
Amanda Jane Gallagher, Atty. No. 32662-79
**BARNES & THORNBURG LLP**
11 South Meridian Street
Indianapolis, IN 46204
Tel: (317) 566-1110
Fax: (317) 636-1507
alexander.orlowski@btlaw.com
amanda.gallagher@btlaw.com

Richard D. Kelley, *admitted pro hac vice*
Samuel J. Banks, *admitted pro hac vice*
Kandis M. Koustenis, *admitted pro hac vice*
**BEAN KINNEY & KORMAN, PC**
2311 Wilson Boulevard, Suite 500
Arlington, VA 22201
Tel: (703) 525-4000
Fax: (703) 525-2207
rkelley@beankinney.com
sbanks@beankinney.com
kkoustenis@beankinney.com

Heather J. Kliebenstein, *admitted pro hac vice*
**MERCHANT & GOULD**
150 South Fifth Street, Suite 2200
Minneapolis, MN 55402
Tel: (612) 332-5300
Fax: (612) 332-9081
hkliebenstein@merchantgould.com

*Counsel for Triangle Experience Group, Inc.*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................... iii

LEGAL STANDARD.................................................................................................... 1

ARGUMENT ................................................................................................................ 6

I.     The Preliminary Injunction Should be Denied Because TEG is Likely to Succeed in Dismissing Max's Copyright Infringement Claims under 28 U.S.C. Section 1498: Injunctive Relief is Precluded by Statute. ................................................................................... 6

II.    Max is Unlikely to Succeed on the Merits................................................................ 9

   A.    Max Will Not Succeed on the Merits of Any of its Claims because TEG is a Joint Owner of the Software. .................................................................................................... 10

   B.    Max Will Not Succeed on the Merits of its Trade Secrets Claims. ................................. 17

   C.    Max Will Not Succeed on the Merits of its Copyright Infringement Claim. .................. 20

     1.    TEG has an implied license to sell and distribute the software. ................................. 20

     2.    TEG's source code modifications were authorized by Section 117 of the Copyright Act. 22

   D.    Max Will Not Succeed on the Merits of its DMCA Claims. ............................................ 26

     1.    Max Fails to Plead the Infringement Nexus Required by Section 1201 of the DMCA. 26

     2.    Max Fails to Plead the Dual Scienter Required by Section 1202 of the DMCA. .......... 28

   E.    Max's Lanham Act Claim is Barred as a Matter of Law. ................................................. 29

III.   Max Has Not Made a Clear Showing of Irreparable Harm or No Adequate Remedy at Law If Preliminary Relief is Denied. .......................................................................... 31

IV.    The Balancing Phase Factors Weigh Against Preliminary Injunction............................. 34

   A.    The Balance of Harm Weighs in Favor of TEG and Against Issuance of Preliminary Injunction. ............................................................................................................ 34

   B.    The Public Interest is Not Served by the Issuance of Preliminary Injunctive Relief. ...... 35

V.     The Bond Amount Requested by Max is Inadequate. .......................................................... 36

CONCLUSION................................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992) ........................................ 5, 33

*Advanced Seal Tech., Inc. v. Perry*, 873 F. Supp. 1144 (N.D. Ill. 1995) .................................... 31

*Alion Sci. & Tech. Corp. v. United States*, 74 Fed. Cl. 372 (2006) ............................................ 36

*Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008) ........................................................ 21

*Autotech Techs., Ltd. P'ship v. AutomationDirect.com, Inc.*, No. 05 C 5488, 2007 U.S. Dist.
    LEXIS 69135 (N.D. Ill. Sep. 18, 2007) ................................................................................ 15

*Aymes v. Bonelli*, 47 F.3d 23 (2d Cir. 1995) .............................................................................. 23

*Baer v. Winter*, 555 U.S. 1119 (2009) ........................................................................................ 36

*Battelle Energy All., LLC v. Southfork Sec., Inc.*, 980 F. Supp. 2d 1211 (D. Idaho 2013) ........... 33

*Beloit Corp. v. C3 Datatec*, Case No. 93-C-447, 1995 U.S. Dist. LEXIS 16685 (E.D. Wis. Aug.
    23, 1995) ............................................................................................................................ 10

*Berryhill v. Minarik*, No. 05-810, 2006 U.S. Dist. LEXIS 14724 (D. Or. Mar. 14, 2006) ........... 15

*Bob Creeden & Assocs., Ltd. v. Infosoft, Inc.*, 326 F. Supp. 2d 876 (N.D. Ill. 2004) .................. 30

*Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821 (7th Cir. 1998) ............................ 5

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923 (7th Cir. 2003) ............................ 14

*Cf. Vernor v. Autodesk*, 621 F.3d 1102 (9th Cir. 2010) .............................................................. 23

*Chamberlain Group v. Skylink Techs., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004) .............................. 27

*Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1992) ...................................................................... 17

*ChoiceParts v. General Motors Corp.*, 203 F. Supp. 2d 905 (N.D. Ill. 2002) ............................ 35

*Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266 (1997) ........................................................ 36

*Comput. Assocs. Int'l v. Altai*, 982 F.2d 693, 701-02 (2d Cir. 1992) .......................................... 14

*Computer Assocs. Int'l. v. Quest Software, Inc.*, 333 F. Supp. 2d 688 (N.D. Ill. 2004) .............. 15

*Connell v. KLN Steel Prods. Ltd.*, No. 04 C 194, 2009 U.S. Dist. LEXIS 20576 (N.D. Ill. Mar.
    16, 2009) ........................................................................................................................... 7, 8

*Couponcabin LLC v. Savings.com, Inc.*, No. 2:14-cv-39, 2016 U.S. Dist. LEXIS 74369 (N.D.
    Ind. June 8, 2016) ............................................................................................................... 27

*D.U. v. Rhoades*, 825 F.3d 331 (7th Cir. 2016) .................................................................... 5, 31

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) ...................... 29, 30, 31

*Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346 (7th Cir. 1982) .................... 4

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ............................................................ 32

*Effects Assocs. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) ............................................................ 21

*Eng'g & Software Sys. Sols., Inc. v. Cusatis*, No. 23-cv-676, 2024, U.S. Dist. LEXIS 57751
    (N.D. Ill. Mar. 29, 2024) .................................................................................................. 7, 15

*Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994) .......................................... 10, 11

*Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012) ........................................................ 32

*Gaiman v. McFarlane*, 360 F.3d 644 (7th Cir. 2004) ........................................................... 12, 13

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ................................................................ 32

*GC2 Inc. v. Int'l Game Tech.*, 391 F. Supp. 3d 828 (N.D. Ill. 2019) ................................... 29, 32

*General Universal Sys. v. Lee*, 379 F.3d 131 (5th Cir 2004)........................................................ 30

*Graham v. Med. Mut. of Ohio*, 130 F.3d 293 (7th Cir. 1997)................................................... 4, 6

*Hartford Steam Boiler Inspection & Ins. Co. v. Campbell*, No. 4:20-cv-00117, 2021 U.S. Dist. LEXIS 62332 (S.D. Ind. Mar. 31, 2021) ......................................................... 18

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192 (D.C. Cir. 1992)....................................................... 8

*Homedica Osteonics Corp. v. DJO Glob., Inc.*, No. 1:17-cv-00938, 2018 U.S. Dist. LEXIS 227687 (S.D. Ind. Mar. 15, 2018)....................................................... 18

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, No. 1:18-cv-1560, 2008 WL 5092964 (S.D. Ind. Nov. 26, 2008) ....................................................... 37

*I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996) ........................................................ 20, 21, 28

*Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ......................................... 4, 9

*Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20-cv-3375, 2020 WL 3960451 (N.D. Ill. July 13, 2020)....................................................... 37

*Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356 (7th Cir. 2009) ......... 11, 12, 14

*Johnson Controls Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173 (9th Cir. 1989)........... 15

*Kiel v. City of Kenosha*, 236 F.3d 814 (7th Cir. 2000) ....................................................... 33

*Krause v. Titleserv, Inc.*, 402 F.3d 119 (2d Cir. 2005)............................................... 22, 23, 24, 25

*Krechmer v. Tantaros*, 747 F. App'x 6 (2d Cir. 2018) ....................................................... 29

*Larson v. United States*, 26 Cl. Ct. 365 (1992)....................................................... 8

*Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531 (7th Cir. 2021) ....................................... 5, 18, 31

*Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19 CV 7092, 2023 WL 3947610 (N.D. Ill. June 12, 2023) ....................................................... 39

*Ligtel Commc'ns, Inc. v. Baicells Techs., Inc.*, 455 F. Supp. 3d 792 (N.D. Ind. 2020)............... 20

*Lotus Dev. Corp. v. Paperback Software Int'l*, 740 F. Supp. 37 (D. Mass. 1990) ..................... 15

*Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020) ....................................................... 5, 6, 34

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)....................................................... 4

*MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928 (9th Cir. 2010)................................... 27

*Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883 (7th Cir. 2000)........................................... 37

*Micro Data Base Sys. v. Nellcor Puritan Bennett, Inc.*, 165 F.3d 1157 (7th Cir. 1999) ............. 32

*Money v. Pritzker*, 453 F. Supp. 3d 1103 (N.D. Ill. 2020)................................................... 5

*Nordstrom Consulting, Inc. v. M&S Techs., Inc.*, No. 06 C 3234, 2008 U.S. Dist. LEXIS 17259 (N.D. Ill. 2008)....................................................... 27

*Orr v. Shicker*, 953 F.3d 490 (7th Cir. 2020)....................................................... 4

*Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059 (N.D. Ill. 2020)........................ 20

*Payton v. Walsh*, 579 F. Supp. 3d 1057 (S.D. Ind. 2022) ....................................................... 4

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r*, 194 F. Supp. 3d 818 (S.D. Ind. 2016).......... 4

*Prominence Advisors, Inc. v. Dalton*, No. 17-CV-04369, 2017 U.S. Dist. LEXIS 207617 (N.D. Ill. Dec. 18, 2017) ....................................................... 20

*Qad. Inc. v. ALN Assocs.*, 770 F. Supp. 1261 (N.D. Ill. 1991) ....................................................... 14

*Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, 761 F. Supp. 2d 367 (E.D. Va. 2011) 23, 24, 33, 34

*Stevens v. Corelogic, Inc.*, 899 F.3d 666 (9th Cir. 2018)....................................................... 29

iv

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307 (Fed. Cir. 2005)............................................................................................................................ 27

*Sullivan v. Flora, Inc.*, No. 15-cv-298, 2016 U.S. Dist. LEXIS 140146 (W.D. Wis. Oct. 7, 2016) ........................................................................................................................................ 12

*Tasini v. N.Y. Times Co.*, 206 F.3d 161 (2d Cir. 2000)............................................................. 22

*Team Play, Inc. v. Boyer*, 391 F. Supp. 2d 695 (N.D. Ill. 2005) ................................................ 10

*Tully v. Okeson*, 977 F.3d 608 (7th Cir. 2020) ........................................................................... 4

*TVI Energy Corp. v. Blane*, 806 F.2d 1057 (Fed. Cir. 1986)...................................................... 7

*Ty, Inc. v. Publ'ns Int'l*, 292 F.3d 512 (7th Cir. 2002) ............................................................. 38

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32 (2d Cir. 2019). 22, 23, 24, 25

*Victor Elias Photography, LLC v. ICE Portal, Inc.*, 43 F.4th 1313 (11th Cir. 2022)................. 29

*W. A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886 (7th Cir. 1958) ................................... 5, 6

*W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757 (1983) ................................................... 37

*Weinstein v. University of Illinois*, 811 F.2d 1091 (7th Cir. 1987)............................................ 17

*Whelan Assocs., Inc. v. Jaslow Dental Lab'y, Inc.*, 797 F.2d 1222 (3d Cir. 1986) .................... 14

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) .................................................................................................................... 5, 34

*Williams v. Columbia Broad. Sys., Inc.*, 57 F. Supp. 2d 961 (C.D. Cal. 1999) ........................... 9

*World Fuel Services, Inc. v. City of Chicago*, No. 20-cv-07836, 2021 WL 1533778 (N.D. Ill. Apr. 19, 2021)...................................................................................................................... 31

*ZilYen, Inc. v. Rubber Mfrs. Ass'n*, 935 F. Supp. 2d 211 (D.D.C. 2013) .................................... 23

**Statutes**

17 U.S.C. § 101 ......................................................................................................................... 19

17 U.S.C. § 117(a)(1)......................................................................................................... 33, 37

17 U.S.C. § 502(a) .................................................................................................................... 13

18 U.S.C. § 1836(b)(2)(A)...................................................................................................... 1, 10

18 U.S.C. § 1839(5)(A)-(B) ....................................................................................................... 28

28 U.S.C. § 1498............................................................................................... 3, 13, 14, 22, 41

48 C.F.R. 27.201-1(a) ............................................................................................................... 13

Defend Trade Secrets Act ................................................................................................... 18, 27

Digital Millenium Copyright Act ..................................................................................... passim

Indiana Uniform Trade Secrets Act ....................................................................................... 27, 28

Lanham Act.............................................................................................. 18, 42, 43, 44

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................................................. 15

Fed. R. Civ. P. 65(c) ................................................................................................................. 41

Defendant Triangle Experience Group, Inc. ("TEG")[1] respectfully submits its brief in opposition to Plaintiff Max Minds, LLC's ("Max") Amended Motion for Preliminary Injunction (Max's Motion"). (Dkt. 104-106.)

In its Motion, Max asks the Court to enjoin TEG from, essentially, performing all of its duties under the JVA and for the United States government. (Dkt. 106 at 36-37.) Max's Motion should be denied, as the relief Max seeks cannot and should not be granted. First, Max's Motion cannot be granted because, in accordance with 28 U.S.C. § 1498, Max's exclusive remedy for copyright infringement involving the federal government is to file a lawsuit for monetary damages in the Court of Federal Claims. Under this statute and its well-established case law, there can be no injunctive relief available, and there can be no direct cause of action against a contractor that is accused of infringing copyright with the authorization or consent of the government.[2]

Even if the relief sought by Max was not specifically prohibited by § 1498, Max's Motion still fails because Max cannot meet the extraordinary burden for granting such mandatory injunctive relief. Max's likelihood of success is very small because, as Max well knows, TEG is a co-author and co-owner of the software in dispute. As a co-owner, TEG cannot be liable for any of the claims that Max asserts. As explained below, there are further technical defenses to each of Max's claims, and TEG is likely to succeed on the merits of its numerous defenses to Max's claims.

Moreover, Max has made no effort to demonstrate any irreparable harm that it would suffer if the injunction were not granted. And, Max's reliance on URLs that have been resolved via agreed

---

[1] TEG notes that while Max has brought claims against three individual defendants in this matter, those individual defendants filed a motion to dismiss for lack of personal jurisdiction, (Dkt 49), which is still pending before this Court. The individual defendants have taken no further part in this matter.

[2] Max knew that it was partnering with TEG to provide software to the federal government, that this software would be marketed, licensed and distributed throughout the Department of Defense, and that the federal government would heavily rely upon this software for top secret and specialized joint operation and warfare services.

1

stipulation before the Court moots any need for extraordinary relief. Finally, there is no emergency or injunctive relief necessary, as Max waited nearly five months to first seek injunctive relief, and another nine months have transpired since then.

With regard to the balancing factor, Max again makes no effort to demonstrate that the balance of the hardships tips in its favor. On the contrary, injunctive relief would be catastrophic for TEG both financially and reputationally. With regard to the public interest, granting injunctive relief would also be catastrophic to the federal government and its ability to maintain national defense and national security. Here, the considerations are truly overriding, as national security relies on the uninterrupted and smooth operation of the software infrastructure currently in place for the Department of Defense ("DoD") and its underlying agencies, which are currently served by TEG.

## FACTUAL BACKGROUND

While the story that Max tells in its Motion is entertaining, it is belied by the actual facts of this case. Max continually tries to portray TEG as a mere reseller of Max's software, but the JVA and the course of conduct between the parties demonstrates otherwise. As borne out in the Declaration of Robert Clare, (Dkt. 124-3), it was Brandon Fischer ("Fischer") who approached TEG about working together. After months of being shown and instructed on TEG's software, Fischer created Max in order to partner with TEG in a "***Joint Venture*** Agreement" to develop, market and sell software to the federal government.[3] The JVA contains numerous provisions clearly indicate the software was to be jointly developed, authored and owned.

---

[3] This, of course, is not a "reseller agreement" or a "distribution agreement"; it is a partnership that contains those elements and responsibilities but goes far beyond that and speaks to and bears out the joint development and joint ownership aspects of the parties relationship. Contrary to what Max contends, a "joint development agreement" is neither necessary nor warranted, especially in these circumstances.

Over the course of the relationship between the parties, TEG provided essential and invaluable copyrightable content and direction for the software on behalf of the joint venture. Moreover, in the years that the parties worked together, TEG paid Max over $5,000,000, including amounts for expenses, shared revenue, and engineering services, all related to the custom software development that the parties had undertaken called "Haptic Federal." (*See* Dkt. 124-2 at 2-7, Declaration of Janna Clare ¶¶ 5-42.) While the parties worked together relatively well at the outset, Max soon began to funnel TEG's developmental and financial contributions from the joint venture into Max's commercial version the software, called Alleo. This became an even larger problem when Max began to ignore its developmental duties altogether and essentially cut off TEG from any of Max's contractually obligated development services or support.[4] (*See* Dkt. 124-7 at 4-5, Declaration of Kevin Mullican ¶¶ 16-19.) Most troubling, however, was that despite Max's apparent inability to solve critical issues with the software, TEG had, on behalf of the joint venture, made strong inroads into the federal government and had ongoing licenses and contracts to service those clients.[5]

In order to keep its commitment to the federal government clients, TEG undertook developmental control and responsibility for remediating the quality issues in the jointly owned software caused by Max. (*See* Dkt. 124-7 at 5-6, Mullican Decl. ¶¶ 20-25; Dkt. 124-3 at 23-25, R. Clare Decl. ¶¶ 120-129.) Once TEG was able to fix the software for its intended purpose, TEG again resumed a productive and essential relationship with the federal government, which is of

---

[4] Because of these breaches, TEG promptly filed suit against Max on December 28, 2023. *See Triangle Experience Group, Inc. v. Max Minds, LLC*, No. 1:24-cv-00650 (S.D. Ind. Dec. 28, 2023), which is also pending in this Court.

[5] Contrary to Max's allegations, TEG never failed to pay Max for any and all amounts owed. In fact, even now, TEG still keeps an accounting of what Max would have been entitled to except for its breach of the JVA, depending on the outcome of these cases. (*See* Dkt. 124-2 at 8, J. Clare Decl. ¶¶ 44-45.)

3

critical importance to the public interest in national defense and security. (*See* Dkt. 124-1 at 1-2,

Declaration of ███████████████████████ ¶¶ 3-5.)

## **LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r*, 194 F. Supp. 3d 818, 823 (S.D. Ind. 2016). To obtain such extraordinary relief, "the party seeking the preliminary injunction carries the burden of persuasion by a clear showing." *Payton v. Walsh*, 579 F. Supp. 3d 1057, 1061 (S.D. Ind. 2022) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1349 (7th Cir. 1982)).[6]

In order to obtain a preliminary injunction, the movant must show: "(1) a reasonable likelihood of success on the merits, (2) no adequate remedy at law, and (3) irreparable harm if preliminary relief is denied." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Because "a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it," *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (cleaned up), courts require that a "movant's showing of likelihood of success on the merits must be strong." *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020) (quotation marks omitted). While this "does not mean proof by a preponderance," a movant must demonstrate how it "proposes to prove the key elements of its case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). A "better than negligible" likelihood of success is not enough. *Id.*

---

[6] Although Max styles its memorandum of law, in part, as seeking a "seizure order," it is evident that Max has dropped its previous request for an ex parte seizure order under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(2)(A). First, it goes without saying that Max's request is no longer ex parte, which is the only procedure contemplated by § 1836(b)(2)(A). Second, Max's amended preliminary injunction motion does not contend that preliminary injunctive relief, if granted, would somehow be inadequate. *See* 18 U.S.C. § 1836(b)(2)(A)(ii) (one of the several requirements for ex parte seizure is a clear showing from specific facts that a Rule 65 order or another form of equitable relief would be inadequate).

With respect to irreparable harm, "[h]arm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Id*. (citation omitted). Where "money damages could make [the movant] whole again," the standard for irreparable harm has not been met. *D.U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016).

If the moving party cannot establish these three prerequisites, the court's "inquiry is over and the injunction must be denied." *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). If, however, the movant satisfies these requirements, the court proceeds to the balancing phase, applying a "sliding scale" approach "to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017); *see Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

"Mandatory preliminary injunctions—those 'requiring an affirmative act by the defendant'—are 'ordinarily cautiously viewed and sparingly issued.'" *Mays*, 974 F.3d at 818 (quoting *Graham*, 130 F.3d at 295); *see also W. A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) (finding that "mandatory injunctions are rarely issued . . . . except upon the clearest equitable grounds"). Additionally, "a preliminary injunction that would give the movant substantially all the relief he seeks is disfavored, and courts have imposed a higher burden on a movant in such cases." *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 827 (7th Cir. 1998); *accord Money v. Pritzker*, 453 F. Supp. 3d 1103, 1117 (N.D. Ill. 2020).

Here, Max's requested relief would require TEG to take numerous affirmative acts: canceling its current contractual obligations to serve as the Department of Defense's strategic

partner in maintaining and implementing the VJOC collaborative software infrastructure adopted across nearly all strategic defense divisions; failing to follow through with numerous contractual obligations that are near the end of the arduous military procurement cycle; and refusing to provide future government customers with TEG's VJOC software, when VJOC and TEG are "critical to strategic operations" for the DoD. (*See* Dkt. 124-1 at 1-2, Nusraty Decl. ¶¶ 3-5.) TEG would effectively go out of business, thus granting Max all the relief it seeks in this Second Filed Action—and more. The Court's review of Max's preliminary injunction request should thus be "even more searching," *Mays*, 974 F.3d at 818, and granted only "upon the clearest equitable grounds." *Graham*, 130 F.3d at 295 (quoting *W.A. Mack, Inc. v. General Motors Corp.,* 260 F.2d 886, 890 (7th Cir. 1958)). Max has not met—and cannot meet—this stringent standard.

## **ARGUMENT**

### I.    **The Preliminary Injunction Should be Denied Because Injunctive Relief is Precluded by Statute.**

TEG's only customers for the VJOC software are the federal government's military and defense agencies. Each customer has engaged in a lengthy and detailed procurement process specific to its particular agency or division of the federal government and chosen TEG as its contractor of choice for its collaborative communications software. As such, the software at issue in this case is subject to statutory law barring injunctive relief and limiting Max's copyright relief to an action against the United States in the Court of Federal Claims for monetary damages alone.

According to 28 U.S.C. § 1498, "the exclusive remedy for patent or copyright infringement by or on behalf of the Government is a suit for monetary damages against the Government in the Court of Federal Claims." 48 C.F.R. 27.201-1(a). Moreover, "[t]here is no injunctive relief available, and there is no direct cause of action against a contractor that is infringing a patent or

copyright with the authorization or consent of the Government (*e.g.*, while performing a contract)."

*Id.*; *see generally* 3 Nimmer § 12.01[E][1].

Subsection (a) of the statute applies to patent infringement claims, while subsection (b) applies to copyright infringement claims: [7]

> [W]henever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, *or by a contractor, subcontractor*, or any person, firm, or corporation *acting for the Government and with the authorization or consent of the Government*, the *exclusive action* which may be brought for such infringement *shall be an action by the copyright owner against the United States in the Court of Federal Claims* for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of title 17, United States Code . . . .

28 U.S.C. § 1498(b) (emphasis added). The original purpose of § 1498 was "to stimulate contractors to furnish what was needed for the War, without fear of becoming liable themselves for infringements to inventors or the owners or assignees of patents." *Connell v. KLN Steel Prods. Ltd.*, No. 04 C 194, 2009 U.S. Dist. LEXIS 20576, at *30 (N.D. Ill. Mar. 16, 2009) (applying § 1498(a)'s similar language for patent infringement claims). Thus, the scope of §1498 is broad because Congress intended "to allow the Government to procure whatever it wished regardless of possible patent infringement." *Id.* (citing *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986)).

When, as here, a party sues a private party acting as a federal government contractor, § 1498's jurisdictional bar applies when the private party is acting for the government and with the government's authorization or consent. *See Eng'g & Software Sys. Sols., Inc. v. Cusatis*, No. 23-cv-676, 2024, U.S. Dist. LEXIS 57751, at *10-11 (N.D. Ill. Mar. 29, 2024). Government

---

[7] Section 502 of the Copyright Act makes the issuance of an injunction "subject to the provisions of section 1498 of title 28." 17 U.S.C. § 502(a).

authorization or consent for the alleged copyright infringement may be implied from certain conduct. *Cusatis*, U.S. Dist. LEXIS, at *11 (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198-99 (D.C. Cir. 1992)); *Connell*, 2009 U.S. Dist. LEXIS 20576, at *33. Implied consent or authorization is found where: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a copyright; and (3) the government had some knowledge of the infringement. *Connell*, 2009 U.S. Dist. LEXIS 20576, at *33 (citing *Larson v. United States*, 26 Cl. Ct. 365, 370 (1992)).

Here, TEG is acting with the consent or authorization of its federal government customers for the software. The evidence demonstrates that the government expressly contracted with TEG for collaborative communications software that meets certain specifications, namely, the software the government calls "VJOC," which has been and continues to be provided and serviced by TEG since at least as early as 2020. (*See* Dkt. 124-2, at 3-5, 8, J. Clare Decl. ¶¶ 14-29, 45 (describing TEG's license sales history); Dkt. 124-3 at 3-4, 14-15, 19-22, R. Clare Decl. Decl. ¶¶ 7-12, 72-80, 105-113.) Moreover, at least from Max's point of view, these VJOC specifications cannot be met without infringing Max's copyrights. Finally, the government has knowledge of the alleged infringement ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████, the federal government is aware of Max's infringement allegations against TEG but █████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████ (Dkt. 124-1 at 2, ██████████████ Consistent with the underlying purpose of § 1498, the government is entitled to procure the goods and services it wants regardless of Max's allegations of copyright infringement. ████████████████████████

███████████████████████████

███████████████████████████

███ Thus, TEG is more than likely to succeed on the merits of its affirmative defense[8] to dismiss Max's copyright infringement claims, which must be brought against the U.S. government in the Court of Federal Claims, and, in all events, cannot support a demand for injunctive relief, preliminary or final. The preliminary injunction can and should be denied on this basis alone.

## II.    Max is Unlikely to Succeed on the Merits.

Even if the Court found that it could award injunctive relief, Max is unlikely to succeed on the merits of its copyright infringement claim (and related DMCA claims requiring intent to commit or induce copyright infringement), *see infra* Parts II.A., II.C., and II.D., as well as the balance of the hardships and public interest weighing against entry of a preliminary injunction. *See infra* Parts IV. and V.

Max's complaint raises six causes of action: (1) misappropriation of trade secrets under the DTSA (Dkt. 1 ¶¶ 145-53); (2) misappropriation of trade secrets under Indiana law (*id*. ¶¶ 154-63); (3) copyright infringement (*id*. ¶¶ 164-75); (4) circumvention of copyright protection systems under the Digital Millenium Copyright Act ("DMCA") (*id*. ¶¶ 176-82); (5) removal and/or falsification of copyright management information under the DMCA (*id*. ¶¶ 183-88); and (6) false designation of origin under the Lanham Act (*id*. ¶¶ 189-98.) Max asserts that it has a "better than negligible" chance of success on the merits of each of these claims, (Dkt. 106 at 24), but a "better than negligible" likelihood of success is not enough. *Illinois Republican Party*, 973 F.3d at 762.

---

[8] When an agency of the federal government is a defendant, the statute affords a jurisdictional defense because jurisdiction lies only with the Court of Federal Claims. But when a private party like TEG is a defendant, it gives rise to an affirmative defense on which summary judgment can be granted. *Williams v. Columbia Broad. Sys., Inc.*, 57 F. Supp. 2d 961, 966 (C.D. Cal. 1999).

Max has not demonstrated the clear and strong showing that it will likely succeed on the merits of its claims.[9]

### A.     Max Will Not Succeed on the Merits of Any of its Claims because TEG is a Joint Owner of the Software.

A co-owner cannot be liable to another co-owner for copyright infringement. *Team Play, Inc. v. Boyer*, 391 F. Supp. 2d 695, 705 (N.D. Ill. 2005). Each co-owner has the right to use or license use of the work, subject to accounting to all other co-owners for any profits. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir. 1994); *Beloit Corp. v. C3 Datatec*, Case No. 93-C-447, 1995 U.S. Dist. LEXIS 16685, at *25 (E.D. Wis. Aug. 23, 1995) (holding that a joint author cannot misappropriate a jointly authored work because the work is not a trade secret "of another").

The terms of the JVA itself support TEG's status as a co-owner of the software entitled to share one-half of the undivided interests with Max and one-half of all revenue received by Max from sales or licensing of the software. The JVA states that TEG and Max "will partner together to deliver capabilities to the end user in the federal customer space" using a "[c]ollective approach to sell, deliver and sustain a collaborative capability to the US Government." (Dkt. 1-9 at 2.) Moreover, TEG and Max: co-owned any intellectual property resulting from custom software development (Dkt. 1-9 at 3); source code was to be delivered and installed on TEG's servers for testing and demo purposes with the ability to create unlimited user accounts (*id.*); should either party cease to be viable, the other party would transfer its share of the source code to the other (*id.*); TEG and Max would share 50/50 in all product and user license sales in the federal customer

---

[9] See also Dkt. 52, Dkt. 69 (TEG's briefing on its motion to dismiss these claims under Fed. R. Civ. P. 12(b)(6)).

space; (Dkt. 1-9 at 4); and in the event of a sale of the Haptic Federal product to a third party, TEG and Max would share in the proceeds of the sale. (*Id.*)

Max claims that no custom development ever took place and puts its own gloss on the JVA terms. Max's and TEG's competing interpretations of the JVA, however, do no more than highlight the contract interpretation issues at the heart of the First Filed Action. In this case, the question of intellectual property ownership is readily resolved by reviewing the conduct of the parties as they "partner[ed] together to deliver capabilities to the end user in the federal customer space." (Dkt. 1-9 at 2.) The facts show that TEG was and is much more than a mere reseller of the software but is, in fact, a co-author with Max of the software, which is a joint work under copyright law.

Section 101 of the Copyright Act defines "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. "In general, individuals are co-authors of a work where they (1) intend to create a joint work; and (2) contribute independently copyrightable material." *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 361 (7th Cir. 2009) (citing *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1071 (7th Cir. 1994)). The first element, the intent prong, "does not have to do with the collaborators' intent to recognize each other as coauthors for purposes of copyright law; the focus is on the parties' intent to work together in the creation of a single product, not on the legal consequences of that collaboration. *Janky*, 576 F.3d at 362 (citing *Erickson*, 13 F.3d at 1068-69.)

The evidence demonstrates that TEG and Max intended to work together to create a single product—the Haptic Federal Software. Moreover, evidence of a party's significant contribution to a work and some measure of control over what is included in the work has also been found sufficient to infer intent to produce a joint work. *Sullivan v. Flora, Inc.*, No. 15-cv-298, 2016 U.S.

11

Dist. LEXIS 140146, at *18 (W.D. Wis. Oct. 7, 2016). Throughout the course of TEG's and Max's joint venture relationship, TEG has routinely submitted significant contributions to the direction, design, development, and implementation of the Haptic Federal Software and exercise substantial control over the end product. (*See* Dkt. 124-8 at 8, 10-18, Ferrara Expert Report ¶¶ 16, 20-41; Dkt. 124-7 at 3-4, Mullican Decl. ¶¶ 10-16; Dkt. 124-3 at 8-17, R. Clare Decl. ¶¶ 34-94.)

The second element—contribution of independently copyrightable material—requires contributions beyond general "ideas, refinements, and suggestions." *Sullivan*, 2016 U.S. Dist. LEXIS 140146, at *28. There is no requirement that a contribution meet a rigidly defined, particular type of expression, however. To the contrary, whether each party's contributions are sufficient to create a joint work depends on the specific facts surrounding the development of that particular work. For example, contribution of "concrete expressions that were significant to the work's final product and commercial viability" may be considered independently copyrightable. *Janky*, 576 F.3d at 362-63. TEG's significant contributions to and control over the software's expression are also compelling evidence of TEG's contribution of "concrete expressions, beyond mere ideas, refinements and suggestions, and therefore independently copyrightable" under the second element of the co-authorship test. *Sullivan*, 2016 U.S. Dist. LEXIS 140146, at *28.

Even if some of TEG's contributions could be characterized as not independently copyrightable, there is "at least room to argue that without [TEG's] contributions, [Max's] work would be equally lacking." *Id.* (citing *Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004)). In *Gaiman*, the Seventh Circuit stated that a work may constitute a joint work even where neither party's contributions rise to the level of "independently copyrightable," but the finished project would not have been possible without the contributions of both parties. *Gaiman*, 360 F.3d at 659. As the Seventh Circuit explained in *Gaiman*:

12

> Two professors collaborate on an academic article. One professor has brilliant ideas but cannot write; the other is an excellent writer with commonplace ideas. Even though one of the authors is merely contributing ideas to the article, their joint intent to collaborate on the article makes them such under 17 U.S.C. §201(a).

*Gaiman*, 360 F.3d at 659. Thus, the Court cautioned, the "independently copyrightable" test should not be applied in situations where it simply does not make sense or "would be peeling the onion until it disappeared." *Id.* at 658-59. Accordingly, courts should take account of the "nature of the particular creative process that had produced it." *Id.*

Here, Max's contribution to the joint venture's software project consisted of software engineers capable of writing and managing code. TEG contributed funding to pay for the engineers' coding services and customization for the federal customer, (Dkt. 124-2 at 2-3, 5-7, J. Clare Decl. ¶¶ 5-12, 31-42), as well as TEG's decades of knowledge and experience in servicing the federal government's unique needs for national defense and software infrastructure, (Dkt. 124-3 at 2-4, 7-8, 11, 14-15, 19-20, R. Clare Decl. ¶¶ 1-12, 29-33, 54-56, 71-80, 105-108; Dkt. 124-7 at 2-3, Mullican Decl. ¶¶ 7-10), and TEG's preexisting source code and key architectural designs. (Dkt. 124-8 at 8, 10-14, Ferrara Expert Report ¶¶ 16, 20-31; Dkt. 124-7 at 2-3, Mullican Decl. ¶¶ 8-13.)

Applying the Seventh Circuit's rationale in *Gaiman*, it would simply not make sense to apply a rigid definition of "independently copyrightable expression" to nothing more than source code, as Max asserts. Taking account of the particular creative process engaged in by TEG and Max from 2018 through 2023, the evidence demonstrates that the resulting "Haptic Federal" computer program could not have been created without the contributions of both TEG and Max. Max is like the professor who is an excellent writer with commonplace ideas; TEG is like the professor who has brilliant ideas but cannot write (because TEG did not employ coders at that time).

13

Haptic Federal software could not exist without TEG's government contracting expertise and relationships with the federal government defense community customers. TEG's concrete contributions to the development of the Haptic Federal software under the joint venture were not only significant to the software's final product but also, significant—indeed crucial and indispensable—to the software's commercial viability in the federal government market space. Simply put, Max could not have created a product suited for this particular federal government customer (focused on the country's military defense and security forces) without TEG's contributions. *See Janky*, 576 F.3d at 362-63 (concrete expressions significant to the work's final product and *commercial viability* may be considered independently copyrightable) (emphasis added).

Moreover, Max is wrong in its continued assertion that the only possible protectable contribution to the software here is source code. (*See, e.g.*, Dkt. 106 at 14 ¶ 5.) Independently copyrightable contributions in the software context include more than merely writing the source code. Copyright protection extends beyond the literal code to a software program's structure, sequence and organization, for example. *Qad. Inc. v. ALN Assocs.*, 770 F. Supp. 1261, 1265 (N.D. Ill. 1991) (quoting *Whelan Assocs., Inc. v. Jaslow Dental Lab'y, Inc.*, 797 F.2d 1222, 1248 (3rd Cir. 1986)); *accord Comput. Assocs. Int'l v. Altai*, 982 F.2d 693, 701-02, 710 (2d Cir. 1992) (noting that copyright protection in a computer program extends beyond its strictly textual form to its non-literal components and explaining underlying framework and rationale).

Seventh Circuit courts regularly operate under the understanding that copyright extends beyond the purely literal components of software. *See, e.g.*, *Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 926 (7th Cir. 2003) (Posner, J.) (recognizing that copyright protection inheres in both the underlying software and the "display" of computer programs); *Autotech Techs.,*

*Ltd. P'ship v. AutomationDirect.com, Inc.*, No. 05 C 5488, 2007 U.S. Dist. LEXIS 69135, at *17 (N.D. Ill. Sep. 18, 2007) (concluding that "a cursory review of the case law fails to demonstrate that a claim for copyright infringement of a user interface necessitates a review of source codes, as opposed to a comparison of the interfaces themselves"); *Cusatis*, 2024 U.S. Dist. LEXIS 57751, at *23 ("The protected expression in the MARS Software includes both its literal elements (that is, its source code), and its non-literal elements (its structure, sequence, organization, and user interface)."); *Computer Assocs. Int'l. v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004) (similarity in techniques, fundamental rules and certain functions in plaintiff and defendant's software resulted in substantial similarity of protected expression).[10] The expert report and opinion of Nick Ferrara further explains and supports why the copyrightable expression in computer programs extends far beyond the mere writing of code. (Dkt. 124-8 at 8, 9-10, Ferrara Expert Report ¶¶ 14-15, 18-19.) And that TEG extensively contributed to the development of the Haptic Federal software. (*Id.* at 8, 10-18, Ferrara Expert Report ¶¶ 16, 20-41.)

Max argues that the SCLA, a Certification Agreement and the EULA are inconsistent with TEG's co-authorship and co-ownership of Haptic Federal. Even if the SCLA were enforceable (it is not),[11] Max's position is mistaken. The SCLA does not divest TEG's undivided ownership or

---

[10] The Seventh Circuit's view is bolstered by out-of-circuit precedent. *See, e.g.*, *Berryhill v. Minarik*, No. 05-810-AA, 2006 U.S. Dist. LEXIS 14724, at *8–9 (D. Or. Mar. 14, 2006) (discussing the provision of "the actual framework for Berryhill's code adaptation" as a distinct, copyrightable aspect of software that was potentially a "'joint work' under the Copyright Act"); *Lotus Dev. Corp. v. Paperback Software Int'l*, 740 F. Supp. 37, 55 (D. Mass. 1990) (collecting cases); *Johnson Controls Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1175 (9th Cir. 1989) (explaining that "[a] computer program is made up of several different components, including the source and object code, the structure, sequence and/or organization of the program, the user interface, and the function, or purpose, of the program," and that "[t]he user interface, also called the 'look and feel' of the program, is generally the design of the video screen and the manner in which information is presented to the user").

[11] As noted above in the Introduction, Max takes the SCLA out of context and, moreover, the SCLA is unenforceable on its face, as it is merely an agreement to agree, lacks consideration, and never came to fruition. *See also* First Filed Action, Dkt. 50 at 9-12.

authorship in the software created by the JVA and copyright laws. The SCLA is not an assignment. As explained above, the JVA and joint authorship standard in this Circuit clearly vest ownership rights in TEG. Even if the SCLA implied sole ownership, it does not assign TEG's rights away.

The SCLA is at most a restriction on a specific copy of a specific version of Haptic Federal. The SCLA distinguishes between the intellectual property in the "Software" property and copies of the "Source Code." The SCLA is a license for TEG to use Max-owned copies of the source code. The license restrictions limit TEG's use of the copy of the source code it borrowed from Max. Again, even if the SCLA were enforceable, it terminated after three months and was never performed.

Moreover, the SCLA is inconsistent with Max's sole ownership claim. *First*, Max alleges that the SCLA was drafted to allow government agencies to scan the source code. (Dkt. 106 at 9.) But SCLA license grant is limited to "*Licensee's* internal business purposes." The only Authorized Users under the SCLA are end users employed by Licensee. Security scans performed by federal government agencies do not fall within TEG's internal business purposes, nor are they performed by an Authorized User. Thus, the SCLA cannot be an intellectual property license for TEG and its customers' use, because the SCLA is a limited license for an internal use copy of the source code. The SCLA is silent regarding third party use of other copies of the source code because TEG already has the intellectual property rights to distribute and sell to end users under the JVA and copyright laws.

*Second*, under Max's sole ownership theory, TEG would be nonsensically double-paying Max for the same license. Max claims that TEG paid Max for two software licenses under the JVA for testing and demonstration purposes, (Dkt. 106 at 22), then contracted to pay Max again under the SCLA for the same internal business purposes license. That makes no sense. Further, under

Max's sole ownership theory, TEG did not exceed its license authority; it had *no authority* to do anything with the software for nearly the entirety of the parties' relationship. Effectively, Max claims that it refused to provide TEG the authority it needed to fulfill its contractual obligations under the JVA. Again, that makes no sense.

The Certification Agreement and End User License Agreement, by their own terms, do not alter TEG's joint authorship and joint ownership of Haptic Federal. The Certification Agreement does not mention authorship or ownership but is focused solely on chain of custody. (Dkt. 105-12 at 2.) The End User License Agreement similarly does not alter TEG's authorship and ownership of Haptic Federal. The EULA is for end users; TEG is not an end user of Haptic Federal. (Dkt. Dkt. 124-3 at 19, R. Clare Decl. ¶ 104; Dkt. 106-2 at 26-27 (R. Clare Dep. at 24:19-25:9).)[12] Section 2 discusses ownership but does not contend Max exclusively owns Haptic Federal. Moreover, Section 2 states that ownership vests in Max "or its licensors." TEG also has the right to license Haptic Federal, per the JVA.

As a joint author, TEG holds an undivided interest in the software, as well as other rights of authorship, *see Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir. 1992), including the right to make derivative works and distribute the original or any revision. *Weinstein v. University of Illinois*, 811 F.2d 1091, 1095 (7th Cir. 1987). TEG cannot, therefore, be liable for copyright infringement (or the related DMCA and trade secret claims discussed *infra*).

### B.    Max Will Not Succeed on the Merits of its Trade Secrets Claims.

Max alleges parallel trade secret misappropriation claims under federal and state law. Count I alleges that TEG has misappropriated Max's trade secrets in violation of the DTSA. (Dkt.

---

[12] *See also* First Filed Action, Dkt. 50 at 13, asserting that EULA was never a binding contract on TEG, as TEG is not an end user.

1 ¶¶ 145-50, 152-53.) Count II alleges the same under the Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3 ("IUTSA"). (Dkt. 1 ¶¶ 154-60, 162-63.)

"The elements of a claim under the DTSA and IUTSA are similar; key to each is the existence of a trade secret and its misappropriation." *Hartford Steam Boiler Inspection & Ins. Co. v. Campbell*, No. 4:20-cv-00117, 2021 U.S. Dist. LEXIS 62332, at *12 (S.D. Ind. Mar. 31, 2021) (analyzing together the sufficiency of a plaintiff's trade secret misappropriation claims under both the DTSA and the IUTSA). Under both the DTSA and the IUTSA, "misappropriation" is defined as either: (1) acquisition of a trade secret of another by improper means; or (2) the disclosure or use of a trade secret of another without express or implied consent. 18 U.S.C. § 1839(5)(A)-(B); Ind. Code. § 24-2-3-2; *see also Homedica Osteonics Corp. v. DJO Glob., Inc.*, No. 1:17-cv-00938-SEB-TAB, 2018 U.S. Dist. LEXIS 227687 (S.D. Ind. Mar. 15, 2018) (noting both the DTSA and the Indiana act "predicate liability on an act of misappropriation.").

Identifying the trade secret as the entirety of the source code for the "Alleo/Haptic software," (Dkt. 1 ¶¶ 47-49; Dkt. 106 at 15; Dkt. 114-1 at 2), Max claims that TEG misappropriated the trade secret by disclosing it to the public via the long-disabled URLs. (Dkt. 1 ¶¶ 103, 105; Dkt. 106 at 10, 20 ¶¶ 30-31, 30; Dkt. 114-1 at 3.) Max is unlikely to succeed on the merits of this claim. First, Max expressly consented to any "disclosure" by the URLs. The material posted by TEG on the URLs were used by TEG to comply with its agreement under the JVA to "maintain a web presence for marketing material of the Haptic Federal product." (Dkt. 1-9 at 1 ¶ 1.) As such, the disclosure was not without Max's consent.

Second, Max makes no showing whatsoever that any "source code" allegedly disclosed to the public through the URLs revealed any "concrete secrets." *See Life Spine*, 8 F.4th at 540-41 (because trade secret law focuses on concrete secrets rather than broad areas of technology, trade

18

secret protection may be preserved even where certain aspects have been publicly disclosed) (citations omitted). And finally, Max has already obtained preliminary injunctive relief from this alleged trade secret disclosure. Under the June 4, 2024 stipulated order, TEG certified "that public internet access to the software and the allegedly copyrighted and trade secret source code has been disabled/terminated and will remain disabled/terminated during the pendency of this lawsuit and/or until further order of this Court." (Dkt. 44; *see* Dkt. 106-3 at 61 (Mullican Dep. at 59:22-24) ("when we became aware of it, we put them behind a private gateway").)

Third, if these URLs inappropriately disclosed or exposed trade secrets to the public, Max itself has exposed and continues to expose its source code and, as such, has apparently destroyed its own alleged trade secret. As explained in detail in the expert report of Mr. Ferrara, Max has engaged and continues to engage in precisely the same type of "public exposure" of which Max has accused TEG. (Dkt. 124-8 at 8, 18-25, Ferrara Expert Report ¶¶ 17, 42-48.)

Finally, Max cannot demonstrate that TEG acquired the software trade secret by improper means because TEG routinely had access to the software's source code as Max's joint venture partner under the JVA. (*See* Dkt. 1 ¶¶ 96, 111; Dkt. 1-9 at 1-2; Dkt. 106 at 11, 17 ¶ 18, 18 ¶ 21.) Rather than acquiring the alleged trade secret software by improper means, TEG acquired it through the normal course of TEG and Max's business under the JVA for development and testing purposes. (*See, e.g.*, Dkt. 124-7 at 4, Mullican Decl. ¶ 15; Dkt. 124-3 at 9, 15-17, R. Clare Decl. ¶¶ 40, 82-94.) Indeed, the express terms of the JVA state that TEG was to have source code installed directly on TEG's servers for testing, demonstration, and development purposes. (Dkt. 1-9 at 3.)

Max itself notes that it transferred alleged trade secrets to TEG in September 2023. Max alleges only that TEG "retained the source code," "withheld the government scan report,"

"withheld Chain of Custody documents," and "failed to obtain signatures" from the government customers who received the source code. (Dkt. 1 ¶¶ 111-12; Dkt 106 at 19 ¶ 22.) The mere possession of trade secrets, however, is insufficient to allege misappropriation of those trade secrets. *Ligtel Commc'ns, Inc. v. Baicells Techs., Inc.*, 455 F. Supp. 3d 792, 808 (N.D. Ind. 2020) ("[H]aving had access to trade secrets and misappropriating trade secrets are two entirely different allegations.") Similarly, the failure to return lawfully acquired information does not constitute "misappropriation" of that information. *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020) (citing *Prominence Advisors, Inc. v. Dalton*, No. 17-CV-04369, 2017 U.S. Dist. LEXIS 207617, 2017 WL 6988661, at *4 (N.D. Ill. Dec. 18, 2017)).

## C.    Max Will Not Succeed on the Merits of its Copyright Infringement Claim.

Max is unlikely to succeed on the merits of its copyright infringement claim because (1) TEG is a co-author and co-owner of the software, *see supra* Part II.A.; (2) even if TEG were not a co-owner, it enjoys an implied license to access the software source code, scan and test it for validity for use by the government customer, and take measures necessary to provide the software to TEG's government customers pursuant to the JVA; and (3) because TEG is authorized to possess the source code under either theory, all of TEG's actions fall within the essential step exclusion of Section 117 of the Copyright Act.[13]

### 1.    TEG has an implied license to sell and distribute the software.

The existence of a license creates an affirmative defense to a claim of copyright infringement. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996) (citing *Effects Assocs. v.*

---

[13] Additionally, Max's "copyright infringement" claim alleges no more than breaches of contractual covenants, not conditions precedent to Max's duty to perform under the JVA or any other contract. As such, Max's allegations sound in contract, not copyright, and are redundant of Max's counterclaims for breach of contract asserted in the First Filed Action. For this separate reason, Max is unlikely to succeed on the merits of its copyright infringement or DMCA claims. *See* Dkt. 52 at 16-17; Dkt. 69 at 7-12.

*Cohen*, 908 F.2d 555, 559 (9th Cir. 1990)); *Agence Fr. Presse v. Morel*, 769 F. Supp. 2d 295, 302 (S.D.N.Y. 2011) ("It is a hallmark principle of copyright law that licensors may not sue their licensees for copyright infringement."). The JVA authorizes TEG to distribute the software to the federal government market. (Dkt. 1-9 at 2; *see* Dkt. 1 ¶¶ 84-85, 125.) Moreover, TEG made Max millions of dollars for its joint contributions to the software. The full scope of the JVA's authorization, however, is demonstrated by the parties' conduct in carrying out the day-to-day business under that joint venture, which shows, at a minimum, that TEG enjoys an implied license to use the software as necessary to serve its federal government customers.

An implied, nonexclusive license is granted when (1) a person requests the creation of a work, (2) the creator makes that particular work and delivers it to the person who requested it, and (3) the creator intends that the requestor copy and distribute his work. *I.A.E., Inc.*, 74 F.3d at 776 (citing *Effects Assocs.*, 908 F.2d at 558-59). An implied license which is supported by consideration cannot be revoked. *Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008).

Here, the JVA dictated that the parties would co-author the software, and TEG agreed to pay Max millions of dollars for its contributions. Max, as it alleges, contributed towards the software, and delivered it to TEG to distribute to the federal government market. Of course, Max knew and intended that TEG would copy and distribute the work, for that was the stated purpose of the JVA. In light of the foregoing, even if the Court were to ultimately find, at trial, that TEG was not a co-author of the software, the facts support a finding that TEG was granted an implied, nonexclusive, and irrevocable license.

Max's copyright infringement claims rest on Max's bare conclusions that TEG exceeded its authority in retaining a copy of the source code without demonstrating why or how that is so, other than to rely on side agreements meant to protect the source code from third parties outside

21

the joint venture, including the government customer. Max has not met its burden here. *See Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 40-41 (2d Cir. 2019) (where a claim turns on the scope of a license, the copyright owner bears the burden of proving defendant's use was unauthorized) (citing *Tasini v. N.Y. Times Co.*, 206 F.3d 161, 171 (2d Cir. 2000)). *See supra* Part II.A.

### 2. *TEG's source code modifications were authorized by Section 117 of the Copyright Act.*

TEG's actions are additionally protected from infringement under the "essential step" defense authorized by § 117(a) of the Copyright Act. Section 117(a) states, in relevant part:

> [I]t is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided . . . that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner.

17 U.S.C. § 117(a)(1).

TEG's modifications (i.e., adaptations) to the source code fall within this exclusion and, therefore, cannot constitute copyright infringement because the adaptations (1) were made by TEG, who was authorized to possess the copy of the computer program, (2) were "created as an essential step in the utilization of the computer program in conjunction with a machine," and (3) were "used in no other manner." *Krause v. Titleserv, Inc.*, 402 F.3d 119, 122 (2d Cir. 2005).

The term "owner" as used in § 117(a) [14] does not require formal title in a copy of the software at issue. *Universal Instruments*, 924 F.3d at 44 (citing *Titleserv*, 402 F.3d at 123)). Although the Seventh Circuit has not yet had occasion to analyze in detail this element of § 117(a), the Second Circuit and the Federal Circuit have both considered and rejected the notion that

---

[14] The Copyright Act distinguishes between ownership of a copyright and ownership of a copy of a copyrighted work, 17 U.S.C. § 202, but does not define the term "owner" under § 117(a).

possession of formal title to a computer program copy is necessary in order to be considered an "owner" under § 117(a). *ZilYen, Inc. v. Rubber Mfrs. Ass'n*, 935 F. Supp. 2d 211, 218-20 (D.D.C. 2013) (discussing cases). Instead, those courts look to the underlying circumstances of the transaction at issue to determine whether the software user exercised rights consistent with ownership. *Id.* (citations omitted); *see Universal Instruments*, 924 F.3d at 44 ("courts should inquire into whether the party exercised sufficient incidents of ownership over a copy of the program to be sensibly considered the owner of the copy for purposes of § 117(a)") (quoting *Titleserv*, 402 F.3d at 124)); *Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, 761 F. Supp. 2d 367, 373 (E.D. Va. 2011).[15] Likewise, here, the factual evidence discussed above demonstrating TEG's joint development and joint ownership of the Haptic Federal software further demonstrates TEG's status as an owner of a copy of the program within the meaning of § 117(a).

To receive the protection of § 117(a), TEG must also demonstrate that its modification of the software was "an essential step in the utilization of the computer program in conjunction with a machine." 17 U.S.C. § 117(a). "[T]his test is met where the adaptations at issue were 'essential to allow use of the program[s] for the very purpose for which they were purchased.'" *Softech Worldwide*, 761 F. Supp. 2d at 374 (quoting *Krause v. Titleserv*, 402 F.3d at 125).

Courts have held software modifications to fall within this essential step definition where defendants have modified software programs: to keep them up to date and to ensure compatibility with successive generations of computer systems;[16] to correct bugs;[17] to perform regular integrity

---

[15] *Cf. Vernor v. Autodesk*, 621 F.3d 1102, 1111 (9th Cir. 2010) (applying different test to find software user was a licensee rather than an owner of a copy).

[16] *See, e.g.*, *Aymes v. Bonelli*, 47 F.3d 23, 26 (2d Cir. 1995); *Titleserv*, 402 F.3d at 125-26; *Softech*, 761 F. Supp. 2d at 374.

[17] *See, e.g.*, *Titleserve*, 402 F.3d at *125*; *Softech*, 761 F. Supp. 2d at 374.

checks;[18] to improve efficiency;[19] and to add new capabilities, features, and functions to better serve the business for which they were created, even if those new features and functions were not strictly necessary to maintain the software's basic functioning.[20] So long as the modifications are designed to improve the source code's functionality in serving the business for which it was created and do not "harm the interests of the copyright proprietor," or its ability to exploit the copyrighted work, the modifications are essential under § 117(a) and cannot constitute copyright infringement. *Universal Instruments*, 924 F.3d at 46-47 (quoting *Titleserv*, 402 F.3d at 129); *see also Final Report of the National Commission on New Technological Uses of Copyrighted Works* 13 (1978) ("CONTU Report") ("[A] right to make those changes necessary to enable the use for which it was both sold and purchased should be provided. . . . [including] the right to add features to the program that were not present at the time of rightful acquisition.").

As TEG's Chief Technology Officer, Kevin Mullican explains, TEG routinely received copies of the software source code from Max during the course of the parties joint development of the Haptic Federal software. (Dkt. 124-7 at 4, Mullican Decl. ¶ 15.) TEG made changes to the software only when faced with the inability to service ███████████ in early 2023 because Max had continually failed to provide deployable version of the software, and those changes were necessary to enable TEG's licensed customers to use the software for the purpose for which it was intended. (Dkt. 124-7 at 4-6, Mullican Decl. ¶¶ 16-25.)

Max's assertion that TEG's current software is essentially identical to the software Max provided to TEG during the course of the parties' joint venture relationship[21] further supports the

---

[18] *See, e.g., Softech*, 761 F. Supp. 2d at 374.

[19] *See, e.g.*, *Universal Instruments*, 924 F.3d at 46-47.

[20] *See, e.g.*, *Titleserve*, 402 F.3d at 125-26; *Softech*, 761 F. Supp. 2d at 374.

[21] Dkt. 106 at 21.

fact TEG's modifications were made only to correct the bugs and defects preventing the government customer's use of the software. TEG did no more than improve the source code's functionality and its ability to serve the paying government customer for which it was created. As such, TEG's modifications were not and are not copyright infringement but, rather, essential steps excluded from copyright infringement. *See Universal Instruments*, 924 F.3d at 43, 46-47 (noting that plaintiff's expert witness testimony that the source codes were essentially identical except for certain modifications to the code made by defendant after delivery by plaintiff failed to support copyright infringement but instead supported the modifications as "essential steps" excluded from copyright infringement).

Moreover, TEG's adaptation of the software program so that it could fulfill its government sales under the JVA do not harm Max's interests as the allegedly sole copyright owner because Max is free to market to the government customer (and has been doing so). Max may be unhappy about the competition, but competition is not the type of harm to copyright ownership interests contemplated by CONTU, the statute, or the case law. *See Universal Instruments*, 924 F. 3d at 47 ("where the copyright owner 'enjoy[s] no less opportunity after . . . changes, than before, to use, market, or otherwise reap the fruits of the copyrighted programs that he created,' the changes may properly be considered essential under § 117(a)") (quoting *Titleserv*, 402 F.3d at 129). TEG's continued sales under the JVA on a non-exclusive basis did not and do not inhibit Max's ability to market or sell its "Alleo" software to the government market space or any other market.

Finally, to warrant the protection of § 117(a), TEG must show that the modified software was "used in no other manner," that it, that it was used only to make adaptations that were necessary to utilize the software in the same manner for which it was originally developed. *Universal Instruments*, 924 F. 3d at 47; *see Titleserv*, 402 F.3d at 130 ("What is important is that

the transaction for which the programs are used is the type of transaction for which the programs were developed.") The evidence demonstrates that TEG's modifications to the software were made solely for the purpose of making the software workable and usable for the government customer for which the software was developed. Max has come forward with no evidence to suggest that TEG's adapted software is being used for any purposes other than those originally intended for the government customer.

  **D.**  **Max Will Not Succeed on the Merits of its DMCA Claims.**

    *1.*  ***Max Fails to Plead the Infringement Nexus Required by Section 1201 of the DMCA.***

  Count IV of the Complaint alleges that TEG violated § 1201(a)(1)(A) of the DMCA when it bypassed the license key in the software. (Dkt. 1 ¶¶ 43-44, 115, 119-20, 177-78, 180-81.) Max has not—and cannot—make a clear showing of circumvention under the DMCA because there is no nexus between the circumvention and copyright infringement.

  This section of the DMCA provides: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). To make a claim under this section of the DMCA, Max must show the following: (1) ownership of a valid copyright on a work, (2) effectively controlled by a technological measure, which has been circumvented, (3) that third parties can now access (4) without authorization, in a manner that (5) infringes or facilitates infringing a right protected by the Copyright Act. *Couponcabin LLC v. Savings.com, Inc.*, No. 2:14-cv-39, 2016 U.S. Dist. LEXIS 74369, at *15 (N.D. Ind. June 8,

2016) (quoting *Chamberlain Group v. Skylink Techs., Inc.*, 381 F.3d 1178, 1203 (Fed. Cir. 2004)).[22]

The Federal Circuit's holding in *Chamberlain Group* (applying Seventh Circuit law on appeal from the Northern District of Illinois) requires a plaintiff to show that "the access resulting from the circumvention of the technological measure [was] in a manner that 'infringes or facilitates infringing a right protected by the Copyright Act.'" *Couponcabin*, 2016 U.S. Dist. LEXIS 74369, at \*\*15-16 (quoting *Nordstrom Consulting, Inc. v. M&S Techs., Inc.*, No. 06 C 3234, 2008 U.S. Dist. LEXIS 17259, at \*8 (N.D. Ill. 2008) (quoting *Chamberlain Group*, 381 F.3d at 1203)). Thus, "[a] copyright owner seeking to impose liability on an accused circumventor must demonstrate a reasonable relationship between the circumvention at issue and a use relating to a property right for which the Copyright Act permits the copyright owner to withhold authorization." *Couponcabin*, at \*16 (quoting *Chamberlain Group*, 381 F.3d at 1204). This "infringement nexus requirement" has been adopted by several courts, including district courts within this Circuit. *Id.* TEG respectfully submits that this Court should do the same.[23]

Fatally missing from Max's circumvention allegations are facts sufficient to draw a reasonable inference that TEG's alleged circumvention—the removal of the license key—constitutes copyright infringement or facilitates copyright infringement. First, as demonstrated in Parts I., II.A., and II.C. *supra*, TEG's distribution of the software to its government customers as permitted under the JVA does not constitute copyright infringement. TEG's adaptations to the

---

[22] *Couponcabin* and *Chamberlain Group* involved violations of § 1201(a)(2). In *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1318 (Fed. Cir. 2005) the Federal Circuit clarified that the same infringement nexus requirement applies as well to § 1201(a)(1) of the DMCA.

[23] The Ninth Circuit adopts the contrary view, rejecting an infringement nexus requirement. *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 948-52 (9th Cir. 2010). While at least one district court in this Circuit has applied this contrary view, the Seventh Circuit has not yet decided the issue. *See Eclipse Gaming*, 2019 U.S. Dist. LEXIS 15078, at \*\*6-9. TEG urges this Court to adopt the *Chamberlain* rule.

license key were not made with the intent to commit copyright infringement but solely to make the software workable for TEG's customers. (Dkt. 124-7 at 4-6, Mullican Decl. ¶¶ 17-25; Dkt. 106-2 at 65-66, 69-72 (R. Clare Dep. at 63:18-64:15, 67:22-70:14).)

Second, TEG is not facilitating copyright infringement. The only third parties accessing the software are TEG's government customers, who are licensed customers. As permitted users, TEG's customers cannot infringe Max's copyright rights. *See Shaver*, 74 F.3d at 775 ("the existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement"). Any attempt by Max to bring allegations of copyright infringement against TEG's government customers is also improper because the Court of Federal Claims has exclusive jurisdiction over copyright infringement claims brought against the government. 28 U.S.C. § 1498(b).

### 2. *Max Fails to Plead the Dual Scienter Required by Section 1202 of the DMCA.*

Count V of the Complaint alleges that TEG violated § 1202 of the DMCA when it allegedly removed Max's CMI[24] from the software and replaced it with a copyright notice using the terms "VJOC" and "C4MAP." (Dkt. 1 ¶¶ 45-46, 104, 129-31, 184, 186-87.) Because Max cannot make a clear showing that any of TEG's alleged conduct was committed with the requisite intent to infringe or to facilitate infringement, Max is unlikely to succeed on the merits of this DMCA claim.

Section 1202(a) of the DMCA prohibits a person from "knowingly" providing or distributing false CMI "with the intent to induce, enable, facilitate, or conceal infringement." 17 U.S.C. § 1202(a). Section 1202(b) also prohibits removing or altering CMI "intentionally" (or "knowing" that CMI has been removed or altered) "knowing, or . . . having reasonable grounds to

---

[24] Copyright Management Information or "CMI" is defined in § 1202(c). 17 U.S.C. § 1202(c).

know, that it will induce, enable, facilitate, or conceal an infringement of any right of this title." 17 U.S.C. § 1202(b). Both subsections of the statute require what courts have called the "dual scienter" or "double scienter" requirement. *See Victor Elias Photography, LLC v. ICE Portal, Inc.*, 43 F.4th 1313, 1319-21 (11th Cir. 2022) (discussing statutory basis for the double scienter requirement); *GC2 Inc. v. Int'l Game Tech.*, 391 F. Supp. 3d 828, 840 (N.D. Ill. 2019) (citing *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018) and *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674 (9th Cir. 2018)).

Max is unlikely to succeed on the merits of its DMCA claims because Max has no evidence that TEG intended to engage in copyright infringement or to induce or facilitate others to engage in copyright infringement as required by § 1202.

### E.    Max's Lanham Act Claim is Barred as a Matter of Law.

Max asserts that TEG's use of the names C4MAP or VJOC in connection with the software rather than Max's "Haptic" name constitutes reverse passing off in violation of § 43(a) of the Lanham Act. (Dkt. 1 ¶¶ 132-40, 144, 190-95, 197.) Max cannot succeed on the merits of its Lanham Act claim because it is barred as a matter of law by the Supreme Court's *Dastar* decision and its progeny. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 (2003).[25]

In *Dastar*, plaintiff Twentieth Century Fox made essentially the same allegation as Max does here: that defendant Dastar's sale of videos (copied and derived from a television series in which Fox claimed exclusive rights) "without proper credit" to the copied television series constituted "reverse passing off" in violation of § 43(a) of the Lanham Act. *Id.* The Ninth Circuit agreed with Fox, but the Supreme Court reversed, holding that a false designation of origin claim under § 43(a)(1)(A) of the Lanham Act is inapplicable where the alleged "false designation" is of

---

[25] *See also* Dkt. 52 at 22-24; Dkt. 69 at 12-14.

the creator of a creative or communicative work. *Id.* at 37-38. This is because, the Court reasoned, the word "origin" in this statutory context denotes only the producer of the physical goods and not the creator of the intellectual property embodied in those goods. *Id.*

The *Dastar* reasoning has been applied equally to claims of false affiliation or sponsorship as well as to claims of false advertising under § 43(a). *Agence Fr. Presse*, 769 F. Supp. 2d at 307-08. It has also been applied to allegations such as those made by Max here where a plaintiff alleges a defendant copied its source code and marketed it as its own. *See Bob Creeden & Assocs., Ltd. v. Infosoft, Inc.*, 326 F. Supp. 2d 876, 879-80 (N.D. Ill. 2004) (granting motion to dismiss Lanham Act claim under *Dastar* where plaintiff alleged defendant was selling software directly derived from plaintiff's software, giving the false impression to customers that the software system was defendant's own); *General Universal Sys. v. Lee*, 379 F.3d 131, 148-49 (5th Cir 2004) (affirming summary judgment grant against Lanham Act claims where plaintiff alleged defendant created derivative work of its software and marketed it as its own).

The gravamen of Max's Count VI is that TEG has violated the Lanham Act by marketing and selling software directly derived from the software source code without acknowledging Max as the creator of the software. (Dkt 1 ¶¶ 134, 138.) Max alleges that TEG misrepresented not the *origin* of its software product (for surely TEG is the origin of the allegedly unauthorized software), but rather, the *author* of the copyrighted expression embodied in the software. For example, Max alleges that TEG misrepresented the software "as TEG's own creation," (Dkt. 1 ¶ 134), and "intended to conceal the true facts concerning ownership" of the software. (Dkt. 106 at 23 ¶ 40). Max makes no showing of consumer confusion as to the source of TEG's software product. Max's only complaint is that TEG fails to give Max appropriate credit as the alleged sole author of the

source code embodied in the product.[26] Such a claim is solely the province of the copyright laws under *Dastar*. 539 U.S. at 32-34. Max cannot succeed on the merits of its Lanham Act claim.

### III.    Max Has Not Made a Clear Showing of Irreparable Harm or No Adequate Remedy at Law If Preliminary Relief is Denied.

"Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine*, 8 F.4th at 545. Thus, where "money damages could make [the movant] whole again," the standard for irreparable harm has not been met. *Rhoades*, 825 F.3d at 339.

Max, however, makes no effort to discuss what remedies at law may exist—such as recovery of monies owed under the terms of the JVA—or why they are inadequate. Max merely asserts without explanation or evidence that its "losses are unquantifiable." (Dkt. 106 at 32.) This failure alone is enough to deny the preliminary injunction. *See World Fuel Services, Inc. v. City of Chicago*, No. 20-cv-07836, 2021 WL 1533778, at *4 (N.D. Ill. Apr. 19, 2021) (the "failure to discuss the adequacy of any remedy at law, together with its unconvincing claim of irreparable harm" is enough to deny an injunction) (quoting *Advanced Seal Tech., Inc. v. Perry*, 873 F. Supp. 1144, 1150 (N.D. Ill. 1995)).

To support its alleged irreparable harm, Max asserts that TEG's conduct deprives Max of the ability to "control" its software and prevents Max from selling the software to the federal government. (Dkt. 106 at 23, 32-33.)[27] Max's vague "loss of control" arguments essentially rely

---

[26] Computer programs are not entitled to author attribution under the Copyright Act. *See* 17 U.S.C. § 106A(a)(1)(A) (Copyright Act expressly limits the right of attribution to specified "works of visual art"); *Graham*, 144 F.3d at 236 ("The generally prevailing view in this country under copyright law has been that an author who sells or licenses her work does not have an inherent right to be credited as author of the work."). ███████████████████████████████████████████████████████████████████ ███████████████████████ (Dkt. 106-2 at 87, 90-91 (R. Clare Dep. at 85:7-25, 88:19-89:12).)

[27] Max also relies on the presumption of irreparable harm restored to Lanham Act claims in 2021. (Dkt. 106 at 33). Max cannot rely on this presumption, however, because Max cannot, as a matter of law, succeed on the merits of its Lanham Act claim. *See supra* Part II.E.

on the outdated presumption of irreparable harm formerly applied to copyright claims. The law is clear, however, that no such presumption can be applied in a copyright case. *See Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012) (finding district court erred in presuming irreparable injury in connection with plaintiff's copyright claims) (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006)).[28]

Max fails to make a showing of any factual evidence of such loss. To the extent this loss of control is tied to TEG's continued sales of the software under the JVA, however, those losses (just like Max's vague allegations of lost sales) are easily quantified by the shared licensing revenue calculations under that agreement. Max has failed to explain why the calculation of monetary damages under the JVA would fail to compensate it for any injury, should it prevail in its claims against TEG. As noted, the availability of such money damages alone refutes the existence of irreparable harm here. *See Micro Data Base Sys. v. Nellcor Puritan Bennett, Inc.*, 165 F.3d 1157 (7th Cir. 1999) (affirming denial of preliminary injunction where "[o]nly money" under the parties' software contract was at issue). Harm that is purely emotional and reputational does not constitute irreparable harm. *Garcia v. Google, Inc.*, 786 F.3d 733, 745 (9th Cir. 2015).

It appears that Max is also relying on the long-disabled URLs as the sole allegation of irreparable harm supported by factual evidence. (*See* Dkt. 13 at 7-8; Dkt. 106 at 10-11, 20; Dkt. 105-1 ¶¶ 3-6, 8 (Simon Decl.); Dkt. 105-2 ¶¶ 86-91 (Fischer Decl.).) Yet Max conceded that once the threat of the source code being made available online was removed, TEG's actions would no longer "pose an imminent threat to Max's intellectual property." (Dkt. 13 at 8.) Because Max's alleged irreparable harm has already been enjoined by (stipulated) Court order, (Dkt. 44), Max can

---

[28] *Accord GC2*, 391 F. Supp. 3d at 853 (applying *eBay* and noting Seventh Circuit's disavowal of the historical presumption of irreparable harm).

no longer rely on these allegedly public URLs as evidence of irreparable harm. Max cannot also not be heard to complain about any "irreparable harm" or, indeed trade secret exposure, based on these long-disabled URLs because, as explained in detail in the expert report of Mr. Ferrara, Max has engaged and continues to engage in precisely the same type of "public exposure" of which Max accused TEG. (Dkt. 124-8 at 8, 18-25, Ferrara Expert Report ¶¶ 17, 42-48.)

Finally, Max has been aware of the core dispute between the parties since at least as early as December 2023, when the First Filed Action was commenced. Yet Max waited five months before filing this Second Filed Action and its initial preliminary injunction request. *See Battelle Energy All., LLC v. Southfork Sec., Inc.*, 980 F. Supp. 2d 1211, 1219, 1221 (D. Idaho 2013) (five month delay in seeking any form of injunctive relief seriously undermined plaintiff's claim that injunction was necessary to prevent immediate, irreparable injury); *Softech Worldwide*, 761 F. Supp. 2d at 377 (six month delay in seeking injunctive relief raised additional doubt as to the immediacy of any potential harm).

Because Max has failed to show a likelihood of success on the merits of its claims or the existence of irreparable harm that cannot be redressed through monetary damages, the Court need not move forward with the "balancing phase" of the preliminary injunction analysis. Max's motion for preliminary injunction fails at the outset based on Max's failure to meet the threshold elements alone. *See Kiel v. City of Kenosha*, 236 F.3d 814, 817 (7th Cir. 2000) (plaintiff's failure to meet the threshold elements for obtaining preliminary injunctive relief is sufficient to end the analysis); *Abbott Lab'ys*, 971 F.2d at 12 (the court's "inquiry is over and the injunction must be denied" if the moving party cannot establish the three prerequisites). The balancing phase factors nevertheless weigh heavily in TEG's favor and against the issuance of a preliminary injunction here.

33

IV.    **The Balancing Phase Factors Weigh Against Preliminary Injunction.**

During this phase of its analysis, the court considers whether the balance of harm favors the moving party or whether the harm to the other parties or the public interest sufficiently outweighs the movant's interests. *Whitaker*, 858 F.3d at 1044; *Mays*, 974 F.3d at 818.

A.    **The Balance of Harm Weighs in Favor of TEG and Against Issuance of Preliminary Injunction.**

The issuance of the mandatory preliminary injunction requested by Max would effectively put TEG out of business, forcing TEG to breach its contracts with existing government customers, ███████████████████████████. The loss of TEG's ability to fulfill its government contracts would irreparably harm its business relationships and reputation in the federal government contracting space which TEG has developed with care for over twelve years. (Dkt. 124-3 at 19-23, R. Clare Decl. ¶¶ 105-115.)

A preliminary injunction would also harm TEG's government customers who have come to rely on TEG's software services ████████████████████████████████ ██████████████████. *See Softech Worldwide*, 761 F. Supp. 2d at 377 (denying preliminary injunction where defendant's continued servicing of software for its government customer was essential for the software's functionality; injunction would harm the government customer's software infrastructure). As ██████████████████████ explains, it would be extremely difficult, if not impossible, for TEG's customers such as ██████████████████████ ███████████████████ to cease use of the software without ████████████████████ ███████████████████████ (Dkt. 124-1 at 1-2, ████████████████ Issuance of a preliminary injunction would further disrupt the ████████████████████████████ ████████████████████████████████████████████████ ████████████████████ (*Id.* at 2, ████████████████ TEG's continued servicing and sales

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

Max faces no comparable hardship if the injunction is denied. The parties will simply continue to operate under the status quo of the JVA, (Dkt. 124-3 at 23, R. Clare Decl. ¶¶ 116, 119), under which TEG continues to maintain proper accounting practices. (Dkt. 124-2 at 8, J. Clare Decl. ¶¶ 44-45.) Any potential harm to Max is thus purely financial and can be remedied through monetary damages, *see supra* Part III., thus tipping the balance of harms against injunctive relief. *See ChoiceParts v. General Motors Corp.*, 203 F. Supp. 2d 905, 924-25 (N.D. Ill. 2002) (balance of harm favored defendants who would suffer substantial disruption to business operations if the injunction were granted whereas plaintiff's alleged harm could be remedied by monetary damages). The disruptive harm to TEG's business operations ████████████████████ ████████████████████████████ customers far outweighs the speculative and compensable harm alleged by Max. The preliminary injunction should be denied.

**B.    The Public Interest is Not Served by the Issuance of Preliminary Injunctive Relief.**

Max claims that a preliminary injunction will serve the public's interest in protecting Max's copyright ownership rights and the rights of non-existent confused consumers. (Dkt. 106 at 34-35.) Max ignores, however, the specific federal government and military context at issue in this case, which requires a court to give due regard to the interest of national defense and national

---

[29] For the same reasons, the federal government, and, by extension, its authorized contractor TEG, cannot be subjected to injunctive relief, preliminary or otherwise. *See supra* Part I.

security when considering requests for injunction. *Alion Sci. & Tech. Corp. v. United States*, 74 Fed. Cl. 372, 376 (2006).

When national defense and national security interests are concerned, "[p]ublic interest militates against awarding injunctive relief." *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997) (denying injunctive relief, in part, because of national security concerns); *see also Baer v. Winter*, 555 U.S. 1119, 129 S. Ct. 948, 173 L. Ed. 2d 145 (2009) at 24 (refusing to preliminarily enjoin Navy training exercises and directing district courts to consider carefully an injunction's "adverse impact on the public interest in national defense"); *Battelle Energy All., LLC v. Southfork Sec., Inc.*, 980 F. Supp. 2d 1211, 1223 (D. Idaho 2013) (denying injunctive relief, in part, because there "is a potential national security risk in this case"). Here, national security relies on the uninterrupted and smooth operation of the software infrastructure currently in place for ▮▮▮▮ and other government customers currently serviced by TEG. (*See* Dkt. 124-1 at 1-2, ▮▮▮▮ ▮▮▮ *see infra* Part V.)

The harm to the public's interest in national security, uninterrupted government operations, and unimpeded government procurement that would result from issuance of a preliminary injunction here substantially outweighs Max's self-interest in its copyright ownership rights. The public interest in this case weighs *against* the award of injunctive relief. The preliminary injunction should be denied.

## V. The Bond Amount Requested by Max is Inadequate.

Finally, Max's Amended Motion for a Preliminary Injunction should be denied because the proposed bond is inadequate to protect TEG's interests. The party seeking a preliminary injunction must provide security sufficient "to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The bond amount must be commensurate with the harm the injunction may cause the enjoined party. *Mead Johnson & Co. v.*

36

*Abbott Labs.*, 201 F.3d 883, 887-88 (7th Cir. 2000). This is a holistic assessment, and the Court may consider lost sales and lost market share, *id.*, as well as the reputational harm to the enjoined party. *See Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20-cv-3375, 2020 WL 3960451, at *15 (N.D. Ill. July 13, 2020).

The Seventh Circuit has instructed that, "[w]hen setting the amount of security, district courts should err on the high side." *Mead Johnson & Co.*, 201 F.3d at 888. This is because an error in setting the bond amount too high is "not serious"—an enjoined party that is ultimately successful is not automatically entitled to the full amount of the bond but rather must prove damages resulting from the erroneous injunction. *Id.* In contrast, an error in the other direction is irreparable; the damages for an erroneous preliminary injunction cannot exceed the amount of the bond. *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 770 n.14 (1983) ("A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond."). Indeed, guided by such principles, it is not uncommon for bonds to far exceed $1 million. *E.g.*, *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, No. 1:18-cv-1560-DFH-DML, 2008 WL 5092964, at *1 (S.D. Ind. Nov. 26, 2008) ($2 million bond), *superseded by* 2008 WL 5216027, at *11 (S.D. Ind. Dec. 11, 2008) (ordering plaintiff to maintain the $2 million bond and post an additional bond undertaking to pay defendants $130 million for costs and damages sustained if they are found to have been wrongfully enjoined).

For the reasons described above, a preliminary injunction is not warranted in this case. But if the Court concludes otherwise, Max should be required to post a bond of no less than $100 million. TEG's existing customers are expected to renew contracts equivalent to over ███████ ██████████████████████████████████████████████████████████████ ████████████████████ (Dkt. 124-3 at 20-21, R. Clare Decl. ¶¶ 108-09.) Further, TEG has

37

issued quotes to additional ████████████████████████████████████

████████████████████████████████████████████████████

████████████████ (Dkt. 124-3 at 21-22, R. Clare Decl. ¶¶ 110-112.) Moreover, TEG is currently

working with ███████████████████████████████████████████

███████ (Dkt. 124-3 at 22, R. Clare Decl. ¶ 113.)

Having seen the success of the VJOC software in other divisions of the Department of

Defense, the United States Navy is actively testing and validating VJOC for expanded operational

use across its carrier strike groups. (Dkt. 124-1 at 2, Nusraty Decl. ¶ 4.) That testing is expected to

be completed by Q3 Government Fiscal Year of 2025, and the United States Navy intends to use

TEG's VJOC because of its essential capabilities during operations. (*Id.* at 2, Nusraty Decl. ¶ 4.)

But if access to VJOC is interrupted, the United States Navy could not use this strategic capability

and would have to start the bidding process all over. (*Id.* at 2, Nusraty Decl. ¶ 5.) Moreover, it

would be extremely difficult (if not impossible) for existing combatant commands using VJOC's

capabilities to cease use of VJOC without suffering serious disruption to their essential security

operations. (*Id.* at 1-2, Nusraty Decl. ¶¶ 3, 5; Dkt. 124-3 at 22, R. Clare Decl. ¶ 111.) Based on its

existing and developing relationships, TEG stands to suffer substantial lost sales from any

injunction—in addition to immeasurable reputational harm. (Dkt. 124-3 at 22-23, R. Clare Decl.

¶¶ 112-116.) Any bond amount must reflect that harm.

Max suggests that a $10,000 bond is adequate "[b]ecause of the strong and unequivocal

nature of Plaintiff's evidence of infringement." (Dkt. 106 at 35.) But that is not the law. "The

purpose of an injunction bond is to compensate the defendant, in the event he prevails on the

merits, for the harm that an injunction entered before the final decision caused him." *Ty, Inc. v.

Publ'ns Int'l*, 292 F.3d 512, 516 (7th Cir. 2002). Plaintiff's likelihood of success is irrelevant; the

Court must determine what amount is necessary to ensure the defendant is made whole if it prevails at trial. *See Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19 CV 7092, 2023 WL 3947610, at *2 (N.D. Ill. June 12, 2023) ("[W]hile Life Spine has demonstrated likelihood of success on the merits, equity nonetheless requires sufficient security to ensure Aegis made whole if it prevails in this case at trial.") (requiring $4 million bond). Accordingly, if the Court determines that a preliminary injunction is necessary under these circumstances, it should order Max Minds to post a bond of no less than $100 million.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Max's motion for a preliminary injunction.

Dated: January 31, 2025

Respectfully submitted,

*/s/ Richard D. Kelley*
Richard D. Kelley, *admitted pro hac vice*
Samuel J. Banks, *admitted pro hac vice*
Kandis M. Koustenis, *admitted pro hac vice*

Alexander P. Orlowski, Atty. No. 30794-29
Amanda Jane Gallagher, Atty. No. 32662-79
**BARNES & THORNBURG LLP**
11 South Meridian Street
Indianapolis, IN 46204
Tel: (317) 566-1110
Fax: (317) 636-1507
alexander.orlowski@btlaw.com
amanda.gallagher@btlaw.com

**BEAN KINNEY & KORMAN, PC**
2311 Wilson Boulevard, Suite 500
Arlington, VA 22201
Tel: (703) 525-4000
Fax: (703) 525-2207
rkelley@beankinney.com
sbanks@beankinney.com
kkoustenis@beankinney.com

Heather J. Kliebenstein, *admitted pro hac vice*
**MERCHANT & GOULD**
150 South Fifth Street, Suite 2200
Minneapolis, MN 55402
Tel: (612) 332-5300
Fax: (612) 332-9081
hkliebenstein@merchantgould.com

*Counsel for Triangle Experience Group, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2025, a copy of the foregoing document was filed electronically using the CM/ECF system, which will send notification of such filing (NEF) to counsel of record.

*/s/ Samuel J. Banks*