**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| MAX MINDS, LLC, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No.: 1:24-cv-00779-JPH-MG |
| | ) |
| TRIANGLE EXPERIENCE GROUP, INC., *et al.* | ) |
| | ) |
| *Defendants*. | ) |

### ANSWER TO COMPLAINT

Defendants Triangle Experience Group, Inc., ("TEG"), Robert Clare ("Clare"), and Jeffrey Mase ("Mase") (collectively, "Defendants") now submit, by counsel, this Answer in response to Plaintiff's Complaint. Defendants note that, for ease of reference, Plaintiff's Complaint allegations are set forth verbatim, with Defendants' responses following each allegation.

### SUMMARY OF THE ACTION

1.      This is an action for trade secrets theft and misappropriation by a prime contractor to the government in violation of the Economic Espionage Act of 1996 as amended by the Defend Trade Secrets Act of 2016; copyright infringement in violation of the Copyright Act of 1976, 17 U.S.C. § 101, et. seq.; circumvention in violation of the Digital Millenium Copyright Act, 17 U.S.C. § 1201; removal or falsification of copyright management information in violation of the Digital Millenium Copyright Act, 17 U.S.C. § 1202; and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a).

**ANSWER:**    Defendants admit that Plaintiff purports to bring this action pursuant to the statutes identified in the foregoing paragraph. Defendants deny any remaining allegations or implications contained in the foregoing paragraph.

2.      The victim, plaintiff Max Minds, LLC, seeks expedited preliminary injunctive relief and a seizure order pursuant to 18 U.S.C. § 1836(b)(2) due to the national security threat posed by the actions of defendants in exposing plaintiff's confidential, trade secret source code on the internet.

**ANSWER:**    Defendants admit that Plaintiff purports to seek expedited preliminary injunctive relief and a seizure order pursuant to 18 U.S.C. § 1836(b)(2). Defendants deny any remaining allegations or implications contained in the foregoing paragraph.

3.      The defendants' actions threaten the security of plaintiff's software which is used by federal agencies in the Department of Defense (DOD) to operate classified command and control systems. A motion for seizure order and preliminary injunction pursuant to 18 U.S.C. § 1836(b)(2) and supporting affidavits are filed separately herewith.

**ANSWER:**    Defendants admit that Plaintiff filed a motion for seizure order and preliminary injunction pursuant to 18 U.S.C. § 1836(b)(2) and supporting affidavits. Defendants deny any remaining allegations or implications contained in the foregoing paragraph.

## JURISDICTION AND VENUE

4.      This is an action arising under the Economic Espionage Act of 1996 as amended by the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b); the Copyright Act, 17 U.S.C. § 501; the Digital Millenium Copyright Act, 17 U.S.C. §§ 1201, 1202; the Lanham Act, 15 U.S.C. § 1125(a).

**ANSWER:**    Defendants admit that Plaintiff purports to bring this action pursuant to the statutes identified in the foregoing paragraph. Defendants deny any remaining allegations or implications contained in the foregoing paragraph.

5.    This Court has subject matter jurisdiction over these claims pursuant 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1338(a).

**ANSWER:**    Defendants admit that this Court has subject matter jurisdiction over the claims identified in the foregoing paragraph based on the allegations in Plaintiff's Complaint. Defendants deny any remaining allegations or implications contained in the foregoing paragraph.

6.    This Court has personal jurisdiction over Defendant TEG because TEG consented to jurisdiction and venue pursuant to the parties' agreements.

**ANSWER:**    Defendant TEG admits the Court has personal jurisdiction over TEG based on the allegations in Plaintiff's Complaint. Defendant TEG denies any remaining allegations or implications contained in the foregoing paragraph.

7.    This Court also has personal jurisdiction over TEG because, among other things (i) this case arises out of agreements made or to be performed in Indiana and (ii) TEG has derived substantial revenue from goods and/or services rendered in Indiana and from interstate commerce.

**ANSWER:**    Defendant TEG admits the Court has personal jurisdiction over TEG based on the allegations in Plaintiff's Complaint. Defendant TEG denies any remaining allegations or implications contained in the foregoing paragraph.

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(c)(2) because TEG "resides" in the Southern District of Indiana given that TEG is subject to personal jurisdiction in this District.

**ANSWER:**    Defendant TEG admits that venue is proper in this Court based on the allegations in Plaintiff's Complaint. Defendant TEG denies any remaining allegations or implications contained in the foregoing paragraph.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this judicial district.

**ANSWER:**    Defendants admit that venue is proper in this Court based on the allegations in Plaintiff's Complaint and the Court's Order dated February 24, 2025 regarding the named individual defendants (Dkt. 145). Defendants deny any remaining allegations or implications contained in the foregoing paragraph.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and 1400(a) because the events giving rise to the claims occurred in this district, Defendants engaged in infringement in this district, Defendants reside in this district, and Defendants are subject to personal jurisdiction in this district.

**ANSWER:**    Defendants admit that venue is proper in this Court based on the allegations in Plaintiff's Complaint and the Court's Order dated February 24, 2025 regarding the named individual defendants (Dkt. 145). Defendants deny any remaining allegations or implications contained in the foregoing paragraph.

## PARTIES

11.     MAX is an Indiana limited liability company, with its principal place of business of 12400 North Meridian Street, Suite 175, Carmel, Indiana 46032.

**ANSWER:**    Upon information and belief, admitted.

12.     MAX creates cutting edge software platforms for commercial and governmental applications.

**ANSWER:**    Denied.

13.    MAX's sole member is CEO Brandon Fischer ("Fischer") who is domiciled in Indiana.  Mr. Fischer is also MAX's CEO and founder.

**ANSWER:**    Upon information and belief, admitted.

14.    Triangle Experience Group, Inc. ("TEG") is a Virginia stock corporation with its principal place of business at 11182 Hopson Road, Suite A, Ashland, VA 23005.

**ANSWER:**    Admitted.

15.    Defendant Robert Clare is the President and CEO of TEG.

**ANSWER:**    Admitted.

16.    Defendant Jeffrey Mase is the Chief Operating Officer of TEG.

**ANSWER:**    Admitted.

17.    Defendant Kevin Mullican is an employee of TEG with the title Program Manager.

**ANSWER:**    Denied, except to admit that Kevin Mullican is an employee of TEG. Moreover, pursuant to the Court's February 24, 2025 Order, (Dkt. 145), the Court lacks personal jurisdiction over Kevin Mullican, and he is therefore no longer a named defendant in this case.

18.    Defendants John Does 1-10 are employees of TEG whose true names and identities are not yet known but who will be identified in discovery in this case.

**ANSWER:**    Denied. Moreover, pursuant to the Court's February 24, 2025 Order, (Dkt. 145), the Court lacks personal jurisdiction over Defendants John Does 1-10, and they are therefore no longer named "John Doe" defendants in this case.

### MAX'S SOFTWARE

19.     MAX creates highly functional software platforms for commercial and governmental applications.

**ANSWER:**    Denied.

20.     MAX's chief commercial product is currently called Alleo, and was previously known as Haptic. Alleo is an interactive content collaboration platform that allows users to customize their own easy-to-use, visual collaboration solution.

**ANSWER:**    Defendants admit that MAX puts out a product called Alleo, which MAX claims is an interactive content collaboration platform. Defendants deny all remaining allegations or implications contained in the foregoing paragraph.

21.     Alleo is a browser-based interactive digital canvas serving as the single destination for ideating and creating customizable hybrid collaboration and presentation experiences.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the foregoing paragraph and they are, therefore, denied.

22.     Alleo unifies the collaborative experience by allowing users to easily assemble the necessary people, content and tools in a way that promotes engagement and delivers collaboration equity in any hybrid environment.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the foregoing paragraph and they are, therefore, denied.

23.     Initially designed as a high-level solution for hybrid collaboration called Haptic, MAX's developers evolved the system to address the changing needs of users and their preferred work models.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the foregoing paragraph and they are, therefore, denied.

24.    The system MAX created known as Haptic was recently rebranded as Alleo for commercial users. The Haptic name remains in use for government users.

**ANSWER:**    Defendants admit that MAX puts out a product called Alleo, which MAX claims is an interactive content collaboration platform for commercial and government use. Defendants deny all remaining allegations or implications contained in the foregoing paragraph.

25.    MAX's software is used in briefing centers, experience centers, innovation centers and command and control centers. MAX's customers include Fortune 100 companies in consulting, telecommunications, IT, pharma, and manufacturing.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the foregoing paragraph and they are, therefore, denied.

26.    MAX's software is typically licensed to customers as a software as a service (SAAS) system residing on a server on the internet (a "cloud" server) and customers access the software using an internet browser.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the foregoing paragraph and they are, therefore, denied.

27.    Government customers—especially customers in the military services sector—require more security for their systems than a SAAS software offering can provide. Therefore, Government customers typically install MAX's Haptic Federal software "on premise" on their own servers to provide users with secure access that mission critical applications require.

**ANSWER:**    Defendants admit that government customers—especially customers in the military services sector—have specific security requirements. Defendants deny all remaining allegations or implications contained in the foregoing paragraph.

28.    MAX began development of its software in or around March 2019.

**ANSWER:**    Denied.

29.    Full-time development began in May 2019.

**ANSWER:**    Denied.

30.    Alleo/Haptic is an original, creative software program written in several different programming languages.

**ANSWER:**    Denied.

31.    Alleo/Haptic is a server-based collaborative workspace that utilizes a browser interface, enabling users to collaborate in real-time. It also features screen sharing capabilities that permit users to select and share the display window of individual programs from their workstations to the Alleo/Haptic workspace. Alleo/Haptic is an infinite canvas of screen real estate that operates synchronously for all members in real-time. Alleo/Haptic is both the front-end operating system and underlying source code that is responsible for delivering these capabilities.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the foregoing paragraph and they are, therefore, denied.

32.    In June 2019, MAX demonstrated its software to industry partners and potential commercial customers at InfoComm.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the foregoing paragraphs and they are, therefore, denied.

33.     Also in July 2019, MAX conducted another demonstration of its software to industry partners and potential customers.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the foregoing paragraph and they are, therefore, denied.

34.     MAX's first customer for the government version of its software called Haptic Federal was an agency of the Department of Defense (DOD) that agreed to license Haptic Federal in August of 2019.

**ANSWER:**    Denied.

35.     The agency of DOD is still a client and user of Haptic Federal through its prime contractor Peraton. The agency of DOD continues to use Haptic Federal on premise to manage command and control processes within the agency.

**ANSWER:**    Denied.

36.     On or about October 1, 2019, MAX posted a video demonstration of its software showing a highly functional product. The video demonstration can be viewed at this URL: https://vimeo.com/363671367/409066cb0e.

**ANSWER:**    Defendants admit that a video is available for viewing on Vimeo via the link provided. Defendants deny the remaining allegations or implications contained in the foregoing paragraph.

37.     In or about November 2019, Haptic Federal was installed on-premise for the aforementioned DOD agency.

**ANSWER:**    Denied.

## MAX'S COPYRIGHT, TECHNOLOGICAL PROTECTIONS AND COPYRIGHT MANAGEMENT INFORMATION FOR ITS SOFTWARE

38.     Max's Haptic Federal software is an original creative work of authorship entitled to copyright protection.

**ANSWER:**     The allegations in Paragraph 38 are legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations of Paragraph 38.

39.     Haptic Version 1.2.21.1 was registered as an unpublished work with the Copyright Office effective April 19, 2024, Registration No. TXu 2-425-362. A true and correct copy of the registration certificate is attached hereto as **Exhibit 1**.

**ANSWER:**     Defendants admit that the Copyright Office issued a Supplementary Registration bearing Registration Number TXu 2-425-362 with Effective Date of Registration April 19, 2024 as a supplement to Registration Number TXu002416034 for the unpublished Work titled Haptic Version 1.2.21.1 completed in 2020 as a revised computer program (excluding materials from a prior computer program). Defendants deny all remaining allegations or implications contained in the foregoing paragraph.

40.     Haptic Version 1.2.125 was registered as an unpublished work with the Copyright Office effective April 2, 2024, Registration No. TXu 2-412-490. A true and correct copy of the registration certificate is attached hereto as **Exhibit 2**.

**ANSWER:**     Defendants admit that the Copyright Office issued a Registration bearing Registration Number TXu 2-421-490 with Effective Date of Registration April 02, 2024 for the unpublished Work titled Haptic Version 1.2.125 completed in 2021 as a revised computer program (excluding materials from previous registrations). Defendants deny all remaining allegations or implications contained in the foregoing paragraph.

41.    Haptic Federal Version 3.1.21.4 was registered as an unpublished work with the Copyright Office effective March 21, 2024, Registration No. TXu 2-419-714. A true and correct copy of the registration certificate is attached hereto as **Exhibit 3**.

**ANSWER:**    Defendants admit that the Copyright Office issued a Registration bearing Registration Number TXu 2-419-714 with Effective Date of Registration March 21, 2024 for the unpublished Work titled Haptic Version 3.1.21.4 completed in 2023 as a revised computer program (excluding materials from previous registrations). Defendants deny all remaining allegations or implications contained in the foregoing paragraph.

42.    Haptic Federal Version 3.1.21.8 was registered as an unpublished work with the Copyright Office effective March 21, 2024, Registration No. TXu 2-419-718. A true and correct copy of the registration certificate is attached hereto as **Exhibit 4**.

**ANSWER:**    Defendants admit that the Copyright Office issued a Registration bearing Registration Number TXu 2-419-718 with Effective Date of Registration March 21, 2024 for the unpublished Work titled Haptic Version 3.1.21.8 completed in 2023 as a revised computer program (excluding materials from previous registrations). Defendants deny all remaining allegations or implications contained in the foregoing paragraph.

43.    All Haptic Federal software is protected by technological measures that effectively control access to the software in that in the ordinary course of the software's operation, these measures require the application of information, or a process or a treatment, with the authority of MAX, to gain access to the work.

**ANSWER:**    Denied.

44.    One technological measure that MAX uses to protect Haptic Federal is a license key that is required to install the software.

**ANSWER:**    Defendants admit that at a certain point in time during Plaintiff's and TEG's course of conduct under the JVA, the Haptic Federal software included a license key required to install the software. Defendants deny the remaining allegations or implications contained in the foregoing paragraph.

45.    MAX applied copyright management information (CMI) to the Haptic Federal software.

**ANSWER:**    Denied.

46.    The copyright management information MAX applied to the Haptic Federal Software consisted of the Haptic name which is title, author and identifying information for the title and author of Haptic Federal, MAX.

**ANSWER:**    Denied.

## MAX'S TRADE SECRETS IN ITS SOFTWARE

47.    The Alleo/Haptic software source code was written in several different programming languages by MAX employees and developers under contract to MAX. All employees and developers working for MAX are contractually bound to maintain the confidentiality of the software they develop for the company.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in the foregoing paragraph and they are, therefore, denied.

48.    The source code for the Alleo/Haptic software is a compilation, program, and code, which derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its

disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**ANSWER:**    The allegations in Paragraph 48 are legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations of Paragraph 48.

49.    The Alleo/Haptic source code is never distributed to end users in source code format. Instead, the source code is compiled into executable, binary or web format executable code in such a fashion as to obscure the underlying trade secrets contained within the code.

**ANSWER:**    Defendants deny that the source code sometimes referred to as "Haptic Federal" is never distributed to end users in source code format. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations or implications contained in the foregoing paragraph and they are, therefore, denied.

## THE HAPTIC FEDERAL EULA

50.    When Haptic Federal is licensed to end users it is always pursuant to restrictions contained in an End User License Agreement (EULA) such as the EULA attached hereto as **Exhibit 5.**

**ANSWER:**    Denied, except to admit that **Exhibit 5** to the Complaint purports to be a template document titled "End User License Agreement."

51.    Pursuant to the EULA, users of the Haptic Federal software are granted a limited "non-exclusive, non-transferable, non-sublicensed" license for a limited time.

**ANSWER:**    Defendants admit that **Exhibit 5** to the Complaint purports to be a template document titled "End User License Agreement." Defendants deny any allegations in this paragraph

that are inconsistent with the language of **Exhibit 5**, and deny any remaining allegations or implications contained in the foregoing paragraph.

52.    Pursuant to the EULA, users of the Haptic Federal software agree not to "directly or indirectly (i) sell, rent out, lease, license, distribute, market, exploit the Product or any of its parts commercially, (ii) reverse engineer, decompile, disassemble, adapt, reproduce, or create derivative works of this Product," "(iii) create, use and/or distribute "auto", "trainer", "script" or "macro" computer programs or other "cheat" or "hack" programs or software applications for this Product (whether over the internet or in local area network); (iv) remove, alter, disable or circumvent any copyright and trademark indications or other authorship and origin information, notices or labels contained on or within this Product and (v) export or re-export this Product or any copy of adaptation in violation of any applicable laws or regulations."

**ANSWER:**    Defendants admit that **Exhibit 5** to the Complaint purports to be a template document titled "End User License Agreement." Defendants deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 5**, and deny any remaining allegations or implications contained in the foregoing paragraph.

53.    Pursuant to the EULA, users of the Haptic Federal software agree that MAX retains and owns all intellectual property rights in the Haptic Federal software.

**ANSWER:**    Defendants admit that **Exhibit 5** to the Complaint purports to be a template document titled "End User License Agreement." Defendants deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 5**, and deny any remaining allegations or implications contained in the foregoing paragraph.

54.    Pursuant to the EULA, users of the Haptic Federal software agree to comply with all applicable laws, rules and regulations applicable to the software.

**ANSWER:** Defendants admit that **Exhibit 5** to the Complaint purports to be a template document titled "End User License Agreement." Defendants deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 5**, and deny any remaining allegations or implications contained in the foregoing paragraph.

55.    Pursuant to the EULA, users of the Haptic Federal software agree not to "create, use, share and/or publish by any means in relation to the Product any material (text, words, images, sounds, videos, etc.) which would breach of a duty of confidentiality, infringe any intellectual property right or an individual's right to privacy or which would incite the committing of an unlawful act (in particular, piracy, cracking or circulation of counterfeit software)."

**ANSWER:** Defendants admit that **Exhibit 5** to the Complaint purports to be a template document titled "End User License Agreement." Defendants deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 5**, and deny any remaining allegations or implications contained in the foregoing paragraph.

56.    Pursuant to the EULA, users of the Haptic Federal software agree not to "create, supply or use alternative methods of using the Products, for example server emulators."

**ANSWER:** Defendants admit that **Exhibit 5** to the Complaint purports to be a template document titled "End User License Agreement." Defendants deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 5**, and deny any remaining allegations or implications contained in the foregoing paragraph.

57.    Pursuant to the EULA, users of the Haptic Federal software agree not to "modify, distort, block, abnormally burden, disrupt, slow down and/or hinder the normal functioning of all or part of the Product, or their accessibility to other users, or the functioning of the partner networks of the Product, or attempt to do any of the above."

**ANSWER:**    Defendants admit that **Exhibit 5** to the Complaint purports to be a template document titled "End User License Agreement." Defendants deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 5**, and deny any remaining allegations or implications contained in the foregoing paragraph.

58.    Pursuant to the EULA, "the laws of the United States and the State of Indiana" apply to the EULA.

**ANSWER:**    Defendants admit that **Exhibit 5** to the Complaint purports to be a template document titled "End User License Agreement." Defendants deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 5**, and deny any remaining allegations or implications contained in the foregoing paragraph.

59.    Pursuant to the EULA, "any action at law or in equity arising under this EULA shall be finally adjudicated or determined in any court or courts of the State of Indiana, or of the United States of America, in Hamilton County, Indiana."

**ANSWER:**    Defendants admit that **Exhibit 5** to the Complaint purports to be a template document titled "End User License Agreement." Defendants deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 5**, and deny any remaining allegations or implications contained in the foregoing paragraph.

## THE HAPTIC FEDERAL SOURCE CODE LICENSE AGREEMENT

60.    The Haptic Federal source code has only been distributed in limited circumstances pursuant to significant restrictions contained in a Source Code License Agreement ("SCLA").

**ANSWER:**    Denied.

61.    The source code for MAX's software has never been distributed to users.

**ANSWER:**   Denied.

62.     One limited circumstance where MAX agreed to provide restricted access to the Haptic Federal source code was to TEG pursuant to a Source Code License Agreement dated March 30, 2021 (SCLA) attached hereto as **Exhibit 6**.

**ANSWER:**   Denied, except to admit that **Exhibit 6** to the Complaint purports to be a document titled "Source Code License Agreement." Defendants further deny that the Source Code License Agreement attached as **Exhibit 6** to the Complaint is a valid, enforceable agreement. Moreover, the SCLA is by its express terms limited to one specific copy of source code for a specific "Haptic Federal" version intended to be delivered to the federal government for a specific purpose. That specific copy of source code was never provided by Max to Defendant TEG or to the federal government. Thus, Max's obligations, conditions, and covenants under the SCLA's terms were never performed by Max. The Complaint's alleged SCLA has no legal effect on Defendant TEG, Defendant Clare, Defendant Mase, or the federal government. Defendants further deny any remaining allegations or implications contained in the foregoing paragraph.

63.     Subject to and conditioned on TEG's payment of fees owed pursuant to the SCLA and TEG's compliance with all the terms and conditions of the SCLA, MAX grated [sic] TEG "a non-exclusive, non-sublicensable, and non-transferable (except in compliance with Section 12(g) of the SCLA), a license during the SCLA's term to (i) use the Source Code for the [Haptic Federal] system for [TEG's] Internal business purposes; and (ii) use and make a reasonable number of copies of the Documentation [for the Haptic Federal software] solely for [TEG's] internal business purposes in connection with [TEG's] use of the Source Code."

**ANSWER:**   Denied, except to admit that **Exhibit 6** to the Complaint purports to be a document titled "Source Code License Agreement." Defendants further deny that the Source Code

License Agreement attached as **Exhibit 6** to the Complaint is a valid, enforceable agreement. Moreover, the SCLA is by its express terms limited to one specific copy of source code for a specific "Haptic Federal" version intended to be delivered to the federal government for a specific purpose. That specific copy of source code was never provided by Max to Defendant TEG or to the federal government. Thus, Max's obligations, conditions, and covenants under the SCLA's terms were never performed by Max. The Complaint's alleged SCLA has no legal effect on Defendant TEG, Defendant Clare, Defendant Mase, or the federal government. Defendants further deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 6**, and deny any remaining allegations or implications contained in the foregoing paragraph.

64.    The SCLA further restricted the use of the Haptic Federal source code to "Authorized Users." An "Authorized User" is defined as "an employee or other end user of [TEG] who [TEG] permits to access and use the Source Code for the software and/or Documentation pursuant to [TEG's] license."

**ANSWER:**    Denied, except to admit that **Exhibit 6** to the Complaint purports to be a document titled "Source Code License Agreement." Defendants further deny that the Source Code License Agreement attached as **Exhibit 6** to the Complaint is a valid, enforceable agreement. Moreover, the SCLA is by its express terms limited to one specific copy of source code for a specific "Haptic Federal" version intended to be delivered to the federal government for a specific purpose. That specific copy of source code was never provided by Max to Defendant TEG or to the federal government. Thus, Max's obligations, conditions, and covenants under the SCLA's terms were never performed by Max. The Complaint's alleged SCLA has no legal effect on Defendant TEG, Defendant Clare, Defendant Mase, or the federal government. Defendants further deny any

allegations in this paragraph that are inconsistent with the language of **Exhibit 6**, and deny any remaining allegations or implications contained in the foregoing paragraph.

65.    The SCLA restricted TEG's use of the Haptic Federal source code further. The section entitled "Use Restrictions" provides:

> <u>Use Restrictions</u>. Licensee shall not use the Source Code or Documentation for any purposes beyond the scope of the license granted in this Agreement. Without limiting the foregoing and except as otherwise expressly set forth in this Agreement, Licensee shall not at any time, directly or indirectly: (i) copy, modify, or create derivative works of the Source Code or the Documentation, in whole or in part, ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Source Code or the Documentation to any third party: (iii) remove any proprietary notices from the source Code or the Documentation; or (iv) use the Source Code in any manner or for any purpose that infringes, misappropriates. or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law.

**<u>ANSWER:</u>**    Denied, except to admit that **Exhibit 6** to the Complaint purports to be a document titled "Source Code License Agreement." Defendants further deny that the Source Code License Agreement attached as **Exhibit 6** to the Complaint is a valid, enforceable agreement. Moreover, the SCLA is by its express terms limited to one specific copy of source code for a specific "Haptic Federal" version intended to be delivered to the federal government for a specific purpose. That specific copy of source code was never provided by Max to Defendant TEG or to the federal government. Thus, Max's obligations, conditions, and covenants under the SCLA's terms were never performed by Max. The Complaint's alleged SCLA has no legal effect on Defendant TEG, Defendant Clare, Defendant Mase, or the federal government. Defendants further deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 6**, and deny any remaining allegations or implications contained in the foregoing paragraph.

66.    Pursuant to the SCLA, TEG "acknowledges that, as between [MAX and TEG, MAX] owns all rights. title, and interests, including all intellectual property rights in and to the Source Code and Documentation.

**ANSWER:**    Denied, except to admit that **Exhibit 6** to the Complaint purports to be a document titled "Source Code License Agreement." Defendants further deny that the Source Code License Agreement attached as **Exhibit 6** to the Complaint is a valid, enforceable agreement. Moreover, the SCLA is by its express terms limited to one specific copy of source code for a specific "Haptic Federal" version intended to be delivered to the federal government for a specific purpose. That specific copy of source code was never provided by Max to Defendant TEG or to the federal government. Thus, Max's obligations, conditions, and covenants under the SCLA's terms were never performed by Max. The Complaint's alleged SCLA has no legal effect on Defendant TEG, Defendant Clare, Defendant Mase, or the federal government. Defendants further deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 6**, and deny any remaining allegations or implications contained in the foregoing paragraph.

67.    The SCLA contains an extensive confidentiality agreement in which TEG acknowledged and agreed that the Haptic Federal Source Code and the Documentation for the Haptic Federal Source Code was "confidential intellectual property (including trade secrets)" of MAX and that TEG would maintain all Confidential Information provided to TEG by MAX as confidential and to not disclose such information.

**ANSWER:**    Denied, except to admit that **Exhibit 6** to the Complaint purports to be a document titled "Source Code License Agreement." Defendants further deny that the Source Code License Agreement attached as **Exhibit 6** to the Complaint is a valid, enforceable agreement. Moreover, the SCLA is by its express terms limited to one specific copy of source code for a specific

"Haptic Federal" version intended to be delivered to the federal government for a specific purpose. That specific copy of source code was never provided by Max to Defendant TEG or to the federal government. Thus, Max's obligations, conditions, and covenants under the SCLA's terms were never performed by Max. The Complaint's alleged SCLA has no legal effect on Defendant TEG, Defendant Clare, Defendant Mase, or the federal government. Defendants further deny any allegations in this paragraph that are inconsistent with the language of **Exhibit 6**, and deny any remaining allegations or implications contained in the foregoing paragraph.

68.    The Haptic Federal source code is a compilation, program, and code, which derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Haptic Federal source code is a trade secret of MAX.

**ANSWER:**    The allegations in Paragraph 68 are legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations of Paragraph 68.

## MAX'S RELATIONSHIP WITH TEG

69.    MAX's CEO Brandon Fischer first met representatives of TEG in 2016 when TEG was a licensed distributor of software sold by Fischer's prior employer.

**ANSWER:**    Denied.

70.    In February 2019, Fischer invited representatives of TEG to a demonstration of MAX's Haptic software. TEG's representatives declined but invited Fischer to demonstrate Haptic the next day at the U.S. Government Joint Staff Lab in Norfolk, Virginia.

**ANSWER:**    Denied.

71.    Prior to the demonstration, MAX and TEG entered into the mutual Non-Disclosure Agreement ("NDA"), attached herewith as **Exhibit 7**.

**ANSWER:**    Denied, except to admit that Plaintiff and TEG entered into the Mutual Nondisclosure Agreement attached as **Exhibit 7** to the Complaint.

72.    Fischer later discovered that the demonstration fulfilled an obligation of TEG under a pre-existing $49.5 million sole-source government contract awarded to TEG.

**ANSWER:**    Denied.

73.    On July 25, 2019, a week after the demonstration, TEG received an additional $16.6 million contract award described as "Cross Domain Solutions-Comprehensive, Collaborative, Command and Control Mission Application Platform Service (C4MAP)."

**ANSWER:**    Denied.

74.    Fischer had no prior knowledge of the C4MAP contract award.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in the foregoing paragraph and they are, therefore, denied.

75.    On October 2, 2019, Fischer provided TEG's CEO Rob Clare and COO Jeff Mase with Haptic Federal user accounts.

**ANSWER:**    Denied.

76.    Before signing-in to their user accounts, Clare and Mase agreed to the Haptic Privacy Policy, attached herewith as **Exhibit 8**.

**ANSWER:**    Denied.

77.     The user accounts permitted Clare and Mase access to and the ability to demonstrate Haptic Federal to TEG's customers.

**ANSWER:**     Denied.

78.     In order to use the Haptic Federal software, Clare and Mase agreed to the Haptic Federal EULA.

**ANSWER:**     Denied.

79.     Impressed with Haptic Federal's capabilities, Clare contacted Fischer on November 3, 2019 to discuss how TEG could become an authorized reseller of Haptic Federal to the U.S. Government.

**ANSWER:**     Denied.

80.     Fischer and Clare met in January 2020.

**ANSWER:**     Admitted.

81.     On January 23, 2020, MAX and TEG signed the Joint Venture Agreement (JVA) attached hereto as **Exhibit 9**.

**ANSWER:**     Admitted.

82.     Pursuant to the JVA, TEG agreed to create a distribution channel to license Haptic Federal to customers in the federal government.

**ANSWER:**     Defendants admit that **Exhibit 9** to the Complaint is a copy of the JVA. Defendants deny any allegations in this paragraph that are inconsistent with the language of the JVA, and deny any remaining allegations or implications contained in the foregoing paragraph.

83.    The JVA stated that MAX would "[c]reate and maintain a branch of the Haptic source code, called Haptic Federal" that would be "for exclusive use by the US government."

**ANSWER:**    Defendants admit that **Exhibit 9** to the Complaint is a copy of the JVA. Defendants deny any allegations in this paragraph that are inconsistent with the language of the JVA, and deny any remaining allegations or implications contained in the foregoing paragraph.

84.    The JVA provided that TEG would be the exclusive distributor of MAX's federal government product, Haptic Federal, so long as TEG hit certain licensing goals and shared half the revenue with MAX.

**ANSWER:**    Defendants admit that **Exhibit 9** to the Complaint is a copy of the JVA. Defendants deny any allegations in this paragraph that are inconsistent with the language of the JVA, and deny any remaining allegations or implications contained in the foregoing paragraph.

85.    The JVA granted TEG the right to be "the exclusive distributor/reseller of the Haptic Federal product into the federal market," so long as TEG hit certain "license-based revenue targets, paid to MAX[.]"

**ANSWER:**    Defendants admit that **Exhibit 9** to the Complaint is a copy of the JVA. Defendants deny any allegations in this paragraph that are inconsistent with the language of the JVA, and deny any remaining allegations or implications contained in the foregoing paragraph.

86.    Under the JVA, TEG was required to "maintain a web presence for marketing material of the Haptic Federal product [and] deliver, deploy, sustain, and develop customer requirements."

**ANSWER:**    Defendants admit that **Exhibit 9** to the Complaint is a copy of the JVA. Defendants deny any allegations in this paragraph that are inconsistent with the language of the JVA, and deny any remaining allegations or implications contained in the foregoing paragraph.

87.    Under the JVA, TEG was required to "establish and manage all federal channel sales partnerships."

**ANSWER:**    Defendants admit that **Exhibit 9** to the Complaint is a copy of the JVA. Defendants deny any allegations in this paragraph that are inconsistent with the language of the JVA, and deny any remaining allegations or implications contained in the foregoing paragraph.

88.    The JVA required "TEG and Max [ ] to establish and share an electronic files system." Specifically, "TEG and MAX agree[d] to work collaboratively on the preparation and delivery of: Proposals, Marketing materials, [and] Activity reporting to government customers[.]" "TEG and MAX agree[d] to conduct routine project and program management review discussions."

**ANSWER:**    Defendants admit that **Exhibit 9** to the Complaint is a copy of the JVA. Defendants deny any allegations in this paragraph that are inconsistent with the language of the JVA, and deny any remaining allegations or implications contained in the foregoing paragraph.

89.    The JVA provided that in the first year, TEG would make retainer payments to MAX that would be credited toward revenue targets. MAX would use the retainer payments to create and maintain Haptic Federal, install and support two installations with TEG for testing and demonstration purposes, and provide TEG with a software update at least once every three months.

**ANSWER:**    Defendants admit that **Exhibit 9** to the Complaint is a copy of the JVA. Defendants deny any allegations in this paragraph that are inconsistent with the language of the JVA, and deny any remaining allegations or implications contained in the foregoing paragraph.

90.    With respect to sales revenue, MAX and TEG agreed to equally share revenue from "total sale of Haptic Federal product and user license sales[.]". However, TEG agreed that "[a]ny channel discount will be negotiated using TEG's portion of the TEG/MAX shared revenue."

**ANSWER:**    Defendants admit that **Exhibit 9** to the Complaint is a copy of the JVA. Defendants deny any allegations in this paragraph that are inconsistent with the language of the JVA, and deny any remaining allegations or implications contained in the foregoing paragraph.

91.    Notably, the JVA does not entitle TEG to share revenue earned by MAX through sale of products other than Haptic Federal. And the JVA does not state that TEG is the exclusive distributor of all of MAX's software.

**ANSWER:**    Denied, except to admit that there is no language in the JVA stating: "TEG is the exclusive distributor of all of MAX's software."

92.    MAX and TEG also agreed to equally share revenue from "total sale in non-federal opportunities, when using co-owned [intellectual property]." However, co-owned intellectual property would only exist in the event that TEG paid MAX for "custom software development," which never occurred.

**ANSWER:**    Defendants admit that **Exhibit 9** to the Complaint is a copy of the JVA. Defendants deny any allegations in this paragraph that are inconsistent with the language of the JVA, and deny any remaining allegations or implications contained in the foregoing paragraph.

93.    Nothing in the JVA granted TEG ownership rights in the Haptic Federal software.

**ANSWER:**    Denied.

94.    The JVA applied to the Haptic Federal product only.

**ANSWER:**    Denied.

95.     After the JVA was entered into, TEG also entered into the SCLA attached as **Exhibit 6**, and the EULA attached as **Exhibit 5**.

**<u>ANSWER:</u>**     Defendants admit that in March 2021, TEG signed the SCLA attached as **Exhibit 6** to the Complaint but deny that the Source Code License Agreement is a valid, enforceable agreement. Moreover, the SCLA is by its express terms limited to one specific copy of source code for a specific "Haptic Federal" version intended to be delivered to the federal government for a specific purpose. That specific copy of source code was never provided by Max to Defendant TEG or to the federal government. Thus, Max's obligations, conditions, and covenants under the SCLA's terms were never performed by Max. The Complaint's alleged SCLA has no legal effect on Defendant TEG, Defendant Clare, Defendant Mase, or the federal government. Defendants further deny any remaining allegations or implications contained in the foregoing paragraph.

With respect to the EULA attached as **Exhibit 5** to the Complaint, Defendants deny that TEG entered into the EULA. Defendants further deny that either of the individual defendants entered into the EULA. TEG and the individual defendants are not "end users" subject to the application of the Complaint's alleged EULA but rather, were granted access to all versions of the software or its source code solely under the terms of the JVA and TEG's status as a joint venturer and joint developer, not as an "end user" to whom the software licenses were sold.

Defendants further deny any remaining allegations or implications contained in the foregoing paragraph.

### THE CERTIFICATION AGREEMENT

96.     Beginning in June 2020, MAX made the source code securely availably [sic] to TEG over a dozen times to allow their government customer(s) to scan for vulnerabilities and security issues.

**ANSWER:**    Denied, except to admit that Plaintiff provided decompiled source code to TEG to provide to the federal government to scan for vulnerabilities and security issues.

97.    TEG was required to provide MAX with a "chain of custody" document with signatures from everyone who accessed the source code stating that each person witnessed destruction of the source code after the scan.

**ANSWER:**  Denied.

98.    TEG failed to provide the required chain of custody documentation to MAX on numerous occasions.

**ANSWER:**    Denied.

99.    In the Summer of 2023, TEG failed to provide chain of custody documentation multiple times as MAX required in order to protect its trade secret source code from unauthorized disclosure.

**ANSWER:**    Denied.

100.    As a result, on August 17, 2023, MAX and TEG entered into a Certification Agreement. The agreement was intended to formalize confidentiality safeguards for Haptic Federal. The Certification Agreement is attached as **Exhibit 10**.

**ANSWER:**    Denied, except to admit that TEG signed the document titled Certification Agreement and attached as **Exhibit 10** to the Complaint. Defendants further deny any allegations in this paragraph inconsistent with **Exhibit 10**, and deny any remaining allegations or implications contained in the foregoing paragraph.

101.    The Certification Agreement recites that "the Parties wish to maintain the source code for the Haptic Federal software platform ("Source Code") confidential and to preserve its value as a trade secret, and therefore wish to limit disclosure of the Source Code."

**ANSWER:**    Denied, except to admit that TEG signed the document titled Certification Agreement and attached as **Exhibit 10** to the Complaint. Defendants further deny any allegations in this paragraph inconsistent with **Exhibit 10**, and deny any remaining allegations or implications contained in the foregoing paragraph.

102.    Pursuant to the Certification Agreement, TEG "acknowledge[d] and agree[d] that it shall be responsible for implementing procedures to ensure that:

    a.  Haptic Federal Source Code is at all times maintained as confidential, not disclosed except to customer personnel having a need to receive the Haptic Federal source code, and

    b.  Haptic Federal source code is used only by the customer to complete required security scans. TEG shall secure from the customer in each instance a chain of custody form reasonably acceptable to Max Minds (similar to the DA 4137)."

**ANSWER:**    Denied, except to admit that TEG signed the document titled Certification Agreement and attached as **Exhibit 10** to the Complaint. Defendants further deny any allegations in this paragraph inconsistent with **Exhibit 10**, and deny any remaining allegations or implications contained in the foregoing paragraph.

### TEG'S TRADE SECRET THEFT AND MISAPPROPRIATION VIOLATIONS

103.    In February 2024, MAX discovered that TEG installed Haptic Federal on internet facing servers accessible on at least six uniform resource locators (URL).

**ANSWER:**    Denied.

104.    In each instance, TEG removed the Haptic CMI from the Haptic Federal software and replaced the Haptic CMI with false CMI indicating that the software was TEG's software by using the terms "VJOC" and "C4MAP."

**ANSWER:**    Denied.

105.    At each URL the servers hosting the Haptic Federal software exposed source code maps and source code to the public internet.

**ANSWER:**    Denied.

106.    The exposure of MAX's Haptic Federal source code is a serious issue of concern for MAX since it exposes MAX's trade secrets to the public that TEG is required to maintain as secret.

**ANSWER:**    Denied.

107.    Defendants Robert Clare, Jeffrey Mase, and Kevin Mullican are aware of, know about and complicit in the exposure of MAX's Haptic Federal source code online.

**ANSWER:**    Denied.

108.    Defendants Robert Clare, Jeffrey Mase, and Kevin Mullican know that MAX's Haptic Federal source code is a trade secret of MAX.

**ANSWER:**    Denied.

109.    Pursuant to the Certification Agreement and the SCLA, TEG is under a continuing obligation to maintain the confidentiality of the Haptic Federal Software and the Haptic Federal Source Code.

**ANSWER:**    Denied.

110.    After the parties entered into the Certification Agreement, MAX discovered TEG violated the Certification Agreement in ways that infringed upon MAX's intellectual property rights numerous times.

**ANSWER:**    Denied.

111.    On September 13, 2023 and September 22, 2023, MAX engaged in source code transfers (versions 3.1.21.8 and 3.1.21.9) to TEG.

**ANSWER:**    Admitted.

112.    With respect to each transfer, TEG (1) retained the source code; (2) withheld the government scan report; (3) withheld Chain of Custody documents; and (4) failed to obtain signatures from everyone who touched the Haptic Federal source code.

**ANSWER:**    Denied.

113.    MAX asked TEG at least twenty times to remedy these issues, but TEG stalled and eventually stopped responding to MAX in December 2023.

**ANSWER:**    Denied.

114.    TEG's Certification Agreement violations willfully endangered the Haptic Federal source code, resulting in damage to MAX.

**ANSWER:**    Denied.

**TEG'S CIRCUMVENTION AND COPYRIGHT INFRINGEMENT VIOLATIONS**

115.    TEG circumvented the technological measures in the Haptic Federal source code.

**ANSWER:**    Denied.

116.    TEG made at least $5 million of undisclosed software/service sales of Haptic Federal or trials in Haptic Federal in 2022 and 2023.

**ANSWER:**    Denied.

117.    In each case of a sale, TEG required a license key to install Haptic Federal.

**ANSWER:**    Denied.

118.    MAX never provided license keys for these sales to TEG.

**ANSWER:**    Denied.

119.    Instead, to get around the licensing key requirement, TEG modified the Haptic Federal source code by stripping out or modifying the licensing logic from the source code to circumvent the licensing key technological measure.

**ANSWER:**    Denied.

120.    At no time did the defendants ever request or receive permission or authority to strip out or modify the licensing logic from the source code to circumvent the licensing key technological measure.

**ANSWER:**    Denied.

121.    In 2020-2021, MAX discovered that TEG misused software licenses by providing free extended trials.

**ANSWER:**    Denied.

122.    MAX was required to authorize each free trial of Haptic Federal software that TEG provided to a customer in advance of installation.

**ANSWER:**    Denied.

123.    In mid-2021, MAX discovered at least a dozen trials that TEG had extended to customers without MAX's authorization.

**ANSWER:** Denied.

124.   In response, TEG told MAX these were free trials. However, this was false. TEG was paid to install and support the trail [sic] installations of Haptic Federal.

**ANSWER:** Denied.

125.   TEG also provided unauthorized trials to customers by exceeding the scope of the two software licenses granted to TEG pursuant to the JVA.

**ANSWER:** Denied.

126.   TEG made unauthorized copies and distributed those unauthorized copies of Haptic Federal to third parties for live events and live exercises for which TEG received compensation.

**ANSWER:** Denied.

127.   TEG exceeded the scope of software licenses purchased from MAX by copying and distributing Haptic Federal numerous times without MAX's authorization.

**ANSWER:** Denied.

128.   On May 16, 2023, TEG admitted to back-dating computers to circumvent MAX's licensing policy for Haptic Federal.

**ANSWER:** Denied.

**TEG'S CMI REMOVAL VIOLATIONS**

129.   Without notice to MAX or permission from MAX, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "C4MAP" when it demonstrated Haptic Federal to certain government customers.

**ANSWER:** Denied.

130.    Without notice to MAX or permission from MAX, TEG removed "Haptic" from the main page of Haptic Federal and changed the name of Haptic Federal to "VJOC," an abbreviation for Virtual Joint Operations Center, to other government customers.

**ANSWER:**    Denied.

131.    TEG removed the Haptic name from the Haptic Federal software without MAX's knowledge, agreement or authorization.

**ANSWER:**    Denied.

**TEG'S LANHAM ACT VIOLATIONS**

132.    TEG engaged in a campaign of unauthorized rebranding of Haptic Federal under TEG's brand names.

**ANSWER:**    Denied.

133.    TEG rebranded the Haptic Federal software as "C4MAP 3.0" or "VJOC."

**ANSWER:**    Denied.

134.    Calling the Haptic Federal software "C4MAP 3.0" or "VJOC" allowed TEG to misrepresent Haptic Federal to industry partners and customers as TEG's own creation.

**ANSWER:**    Denied.

135.    TEG replaced product trademarks in the Haptic Federal software with TEG's own VJOC logo.

**ANSWER:**    Denied.

136.    TEG marketed Haptic Federal as C4MAP on the e-marketplace CHESS where the U.S. Army shops for commercial information technology ("IT") software and services.

**ANSWER:**    Denied.

137.    TEG marketed Haptic Federal as "C4MAP (VJOC)" on the military IT solutions website SupplyCore.

**ANSWER:**    Denied.

138.    TEG promoted C4MAP without mentioning Haptic Federal or MAX on the websites www.digitaltwinconsortium.org and www.opencommons.org.

**ANSWER:**    Denied.

139.    TEG marketed MAX's intellectual property as its own in various bid proposals submitted to the Government.

**ANSWER:**    Denied.

140.    TEG either did not disclose its bid proposals to MAX or did not disclose full and accurate versions of the proposals.

**ANSWER:**    Denied.

141.    MAX learned about TEG's actions and confronted TEG in March 2020.

**ANSWER:**    Denied.

142.    In response, TEG agreed that it would always call the product "C4MAP powered by Haptic."

**ANSWER:**    Denied.

143.    Despite TEG's agreement to the contrary, TEG later reverted to leaving out any reference to Haptic or MAX when marketing Haptic Federal.

**ANSWER:**    Denied.

144.    TEG's rebranding has deprived end customers of their ability to make informed procurement decisions and caused financial harm to both MAX and the end customers.

**ANSWER:**    Denied.

## COUNT I

### (MISAPPROPRIATION OF TRADE SECRETS - VIOLATION 18 U.S.C. § 1836(B)) AGAINST ALL DEFENDANTS

145.    MAX incorporates the allegations of paragraphs 1 through 144 of this Complaint as if fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to the allegations in Paragraphs 1 through 144 as if the same were fully set forth herein.

146.    The Haptic Federal Source Code is a trade secret of MAX consisting of scientific, technical or engineering information, including patterns, plans, compilations, program devices, formulas, designs, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing.

**ANSWER:**    The allegations in Paragraph 146 are legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations of Paragraph 146.

147.    MAX has taken reasonable measures to keep the Haptic Federal Source Code secret.

**ANSWER:**    Denied.

148.    The Haptic Federal Source Code derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

**ANSWER:**     The allegations in Paragraph 148 are legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations of Paragraph 148.

149.     Defendants disclosed MAX's trade secret Haptic Federal Source Code.

**ANSWER:**     Denied.

150.     At the time of disclosure, Defendants knew or had reason to know that the Haptic Federal Source Code was a trade secret of MAX because TEG acquired the Haptic Federal Source Code under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.

**ANSWER:**     Denied.

151.     Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN personally disclosed and/or caused, directed and authorized employees of TEG to disclose MAX's trade secret Haptic Federal Source Code without permission or authority of MAX.

**ANSWER:**     Denied.

152.     MAX has been damaged.

**ANSWER:**     Denied.

153.     The harm caused to MAX has been irreparable.

**ANSWER:**     Denied.

## COUNT II
## (MISAPPROPRIATION OF TRADE SECRETS – VIOLATION OF IC 24-2-3)
### AGAINST ALL DEFENDANTS

154.     MAX incorporates the allegations of paragraphs 1 through 144 of this Complaint as if fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to the allegations in Paragraphs 1 through 144 as if the same were fully set forth herein.

155.    The Haptic Federal Source Code is a trade secret of MAX consisting of scientific, technical or engineering information, including patterns, plans, compilations, program devices, formulas, designs, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing.

**ANSWER:**    The allegations in Paragraph 155 are legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations of Paragraph 155.

156.    MAX has taken reasonable measures to keep the Haptic Federal Source Code secret.

**ANSWER:**    Denied.

157.    The Haptic Federal Source Code derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

**ANSWER:**    The allegations in Paragraph 157 are legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations of Paragraph 157.

158.    Defendants disclosed MAX's trade secret Haptic Federal Source Code.

**ANSWER:**    Denied.

159.    At the time of disclosure, TEG knew or had reason to know that the Haptic Federal Source Code was a trade secret of MAX because TEG acquired the Haptic Federal Source Code

under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.

**ANSWER:**    Denied.

160.    The trade secrets themselves are integral to MAX's software products, namely Haptic Federal and Alleo, both of which are licensed via interstate commerce.

**ANSWER:**    Denied.

161.    Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN personally disclosed and/or caused, directed and authorized employees of TEG to disclose MAX's trade secret Haptic Federal Source Code without permission or authority of MAX.

**ANSWER:**    Denied.

162.    MAX has been damaged.

**ANSWER:**    Denied.

163.    The harm caused to MAX has been irreparable.

**ANSWER:**    Denied.

## COUNT III
## (COPYRIGHT INFRINGEMENT)
## AGAINST ALL DEFENDANTS

164.    MAX incorporates the allegations of paragraphs 1 through 144 of this Complaint as if fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to the allegations in Paragraphs 1 through 144 as if the same were fully set forth herein.

165.    MAX owns a valid copyright in the Haptic Federal source code.

**ANSWER:**    Denied.

166.    The Haptic Federal source code is a "computer program" within the meaning of 17 U.S.C. § 101 and constitutes copyrightable subject matter within the meaning of 17 U.S.C. § 102.

**ANSWER:**    The allegations in Paragraph 166 are legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations of Paragraph 166.

167.    MAX registered the Haptic Federal source code with the Register of Copyrights of the United States Copyright Office.

**ANSWER:**    Defendants admit that Max claims to have registered the Haptic Federal source code, but deny that the registrations are valid as Plaintiff knowingly neglected to name Defendant TEG as an author and a claimant for each of the registrations Max applied for. Defendants deny any remaining allegations or implications contained in the foregoing paragraph.

168.    Defendants had access to the Haptic Federal source code.

**ANSWER:**    Admitted.

169.    Defendants copied and distributed the Haptic Federal source code and created derivative works of the Haptic Federal source code without authorization of MAX.

**ANSWER:**    Denied, except to admit that as a joint author and joint owner of the intellectual property rights, including copyright, in the source code, TEG had and has the right to copy, distribute, modify, or create derivative works of the source code without seeking or receiving authorization from Max.

170.    Defendants knew their copying, distribution, and creation of derivative works was unlawful.

**ANSWER:**    Denied.

171.    Defendants unauthorized use and copying of the Haptic Federal source code, and creation of one or more derivative works therefrom, constitutes direct violations of MAX's exclusive copyright rights.

**ANSWER:**    Denied.

172.    Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN caused, directed and authorized employees of TEG to copy, distribute or make derivative works of the Haptic Federal source code without permission or authority of MAX.

**ANSWER:**    Denied.

173.    Defendants' actions were knowing and willful.

**ANSWER:**    Denied.

174.    MAX has been damaged.

**ANSWER:**    Denied.

175.    The harm caused to MAX has been irreparable.

**ANSWER:**    Denied.

## COUNT IV

### (CIRCUMVENTION OF COPYRIGHT PROTECTION SYSTEMS IN VIOLATION OF 17 U.S.C. §1201)

### AGAINST ALL DEFENDANTS

176.    MAX incorporates the allegations of paragraphs 1 through 144 of this Complaint as if fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to the allegations in Paragraphs 1 through 144 as if the same were fully set forth herein.

177.    Defendants without permission or authority of MAX or the law, modified the Haptic Federal source code and backdated computers to bypass the license key requirement.

**ANSWER:**    Denied.

178.    Defendants' actions constitute circumvention of MAX's technological measures to protect that source code and violated 17 U.S.C. §1201(a)(1)(A).

**ANSWER:**    Denied.

179.    Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN caused, directed and authorized employees of TEG to circumvent MAX's technological measures without permission or authority of MAX.

**ANSWER:**    Denied.

180.    Defendants committed these acts knowingly and intentionally.

**ANSWER:**    Denied.

181.    Plaintiff has been damaged by Defendants' actions described herein.

**ANSWER:**    Denied.

182.    The harm caused to Plaintiff has been irreparable.

**ANSWER:**    Denied.

## COUNT V

### (REMOVAL AND/OR FALSIFICATION OF COPYRIGHT MANAGEMENT INFORMATION IN VIOLATION OF 17 U.S.C. §1202)

### AGAINST ALL DEFENDANTS

183.    MAX incorporates the allegations of paragraphs 1 through 144 of this Complaint as if fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to the allegations in Paragraphs 1 through 144 as if the same were fully set forth herein.

184.    Defendants without permission or authority of MAX or the law, removed MAX's copyright management information and distributed copyright management information knowing that it was false without authority of MAX.

**ANSWER:**    Denied.

185.    Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN caused, directed and authorized employees of TEG to distribute copyright management information without permission or authority of MAX.

**ANSWER:**    Denied.

186.    Defendants committed these acts knowing or having reasonable grounds to know that they will induce, enable, facilitate or conceal infringement of the MAX's rights in the Haptic Federal Source Code protected under the Copyright Act.

**ANSWER:**    Denied.

187.    Plaintiff has been damaged by Defendants' actions described herein.

**ANSWER:**    Denied.

188.    The harm caused to Plaintiff has been irreparable.

**ANSWER:**    Denied.

## COUNT VI
### (REVERSE PASSING OFF – VIOLATION OF LANHAM ACT 15 U.S.C. § 1125)

189.    MAX incorporates the allegations of paragraphs 1 through 144 of this Complaint as if fully set forth herein.

**ANSWER:**    Defendants incorporate their responses to the allegations in Paragraphs 1 through 144 as if the same were fully set forth herein.

190.    The Haptic mark is a trademark of MAX for software.

**ANSWER:**    Denied.

191.    The Haptic mark as used for the Haptic Federal software is inherently distinctive or suggestive.

**ANSWER:**    Denied.

192.    TEG removed the Haptic mark on the Haptic Federal software and replaced it with C4MAP and JVOC [sic] when the software was displayed, advertised, and marketed to TEG's clients.

**ANSWER:**    Defendants admit that at a certain point in time, TEG ceased using the names "Haptic" or "Haptic Federal" when marketing the jointly developed software. Defendants deny, however, that the JVA requires any particular branding for the jointly developed software or that TEG has an obligation to use any particular brand name for the jointly developed software. Defendants deny any remaining allegations or implications contained in the foregoing paragraph.

193.    TEG's removal and replacement of the Haptic mark is a false designation of origin in violation of 15 U.S.C. §1125(a).

**ANSWER:**    Denied.

194.    TEG's removal and replacement of the Haptic mark was committed in interstate commerce.

**ANSWER:**    The allegations in Paragraph 194 are legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations of Paragraph 194.

195.    TEG's removal and replacement of the Haptic mark is likely to cause confusion of consumers, namely the U.S. Government, by inducing them to believe that MAX's product originates from TEG thereby diluting the goodwill MAX has in its Haptic mark.

**ANSWER:**    Denied.

196.    Defendants ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN caused, directed and authorized employees of TEG to remove the Haptic mark without permission or authority of MAX.

**ANSWER:**    Denied.

197.    Plaintiff has been damaged by Defendants' actions described herein.

**ANSWER:**    Denied.

198.    The harm caused to Plaintiff has been irreparable.

**ANSWER:**    Denied.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff Max Minds LLC respectfully requests the following relief to be entered against Defendants:

1)    Enjoin TEG, ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN, and their respective agents, employees, officers, directors, servants, attorneys, and representatives, and all others acting in concert with them, directly or indirectly, or alone or in concert with others, from using MAX's proprietary information including MAX's trade secrets, MAX's proprietary Haptic Federal software, any derivative works thereof, and any materials authored by MAX in connection with Haptic Federal, for any purpose;

2)      Direct TEG, ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN, and their respective agents, employees, and representatives to immediately destroy, and certify the destruction of, all of MAX's proprietary information and any and all copies thereof, including, among other things, the Haptic Federal software and any derivative works thereof;

3)      Order the seizure of all of MAX's proprietary information and any and all copies thereof, including, among other things, the Haptic Federal software and any derivative works thereof, in the possession of TEG, ROBERT CLARE, JEFFREY MASE, and KEVIN MULLICAN, to prevent further propagation or dissemination of MAX's trade secrets pursuant to 18 U.S.C. § 1836(b)(2);

4)      Enter temporary, preliminary, and permanent injunctions pursuant to Federal Rule of Civil Procedure 65, 15 U.S.C. § 1116, 17 U.S.C. § 502, 17 U.S.C. § 1203, and enjoin defendants, their agents, representatives, servants, employees, and all those acting in concert or participation therewith, from using the Haptic mark or any mark or design similar thereto, in connection with the same or distribution of any software; from falsely representing themselves as being connected with Plaintiff, through sponsorship or association, or engaging in any act that is likely to falsely cause members of the trade and/or of the purchasing public to believe any goods or services of defendants, are in any way endorsed by, approved by, and/or associated with Plaintiff; from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation, including words or other symbols tending to falsely describe or represent Defendants' goods as being those of Plaintiff, or in any way endorsed by Plaintiff and from offering such goods in commerce; from copying, displaying, distributing or creating derivative works of Plaintiff's copyrighted Works; from circumventing plaintiff's works; from removing or falsifying plaintiff's copyright management information.

5)      Award MAX damages, including punitive damages, in an amount to be determined at trial;

6)      Award MAX its attorneys' fees and costs; and

7)      Award MAX such other legal or equitable relief as the Court deems just and proper.

**ANSWER:**      Defendants deny any violations or wrongdoing of any kind and therefore deny that Plaintiff is entitled to any relief, in equity or at law. Defendants further deny that Plaintiff is entitled to a seizure order under 18 U.S.C. § 1836(b)(2). Plaintiff has dropped its previous request for an ex parte seizure order under the Defend Trade Secrets Act and, indeed, has not and cannot met any of the requirements for such a seizure order. Defendants further deny that Plaintiff is entitled to any relief from and against KEVIN MULLICAN. Pursuant to the Court's February 24, 2025 Order, (Dkt. 145), the Court lacks personal jurisdiction over KEVIN MULLICAN, and Mr. Mullican is no longer a named defendant in this case. Defendants deny any remaining allegations or implications contained in the foregoing paragraphs appearing under the title Demand for Relief.

Defendants respectfully request that Plaintiff take nothing by way of its Complaint, that judgment be entered in Defendants' favor and against Plaintiff, that Defendants be awarded costs and expenses in defending this action, including attorneys' fees, and that Defendants be awarded all other just and appropriate relief.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

**ANSWER:**      Defendants admit that Plaintiff has requested a jury trial in this action. However, Defendants object to a jury determination of any equitable issues in this action or any other issues not triable by a jury. Defendants reserve the right to have all equitable matters decided by the Court.

Defendants deny each and every allegation contained in the Complaint that is not otherwise addressed herein.

## **AFFIRMATIVE AND OTHER DEFENSES**

Subject to a reasonable opportunity for further investigation and discovery, Defendants assert the following defenses:

### First Affirmative Defense

1.      Defendants incorporate the allegations of Paragraphs 1 through 94 of TEG's First Amended Complaint, (Dkt. 90), in *Triangle Experience Group, Inc. v. Max Minds, LLC*, No. 1:24-cv-00650 (S.D. Ind. Dec. 28, 2023) (the "First Filed Action") as if fully set forth herein.

2.      Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

3.      Plaintiff's claims are barred, in whole or in part, because recovery, while not warranted under the facts or law of this case, would be offset by sums owed by Plaintiff to TEG in the First Filed Action.

### Second Affirmative Defense

4.      Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

5.      Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations.

### Third Affirmative Defense

6.      Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

7.      For at least five years, Plaintiff has been aware of TEG's position, that TEG is a co-author of the software (and underlying source code) at issue in this case and, therefore, that TEG is a joint owner of the intellectual property rights in the software (and underlying source code).

8.      Yet Plaintiff failed to bring any intellectual property claims against TEG until nearly six months after TEG filed its breach of contract claims in the First Filed Action.

9.      Plaintiff's claims are therefore barred, in whole or in part, by the doctrines of laches, waiver, estoppel, acquiescence, and/or unclean hands.

<u>Fourth Affirmative Defense</u>

10.     Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

11.     Plaintiff's claims are barred, in whole or in part, because Plaintiff committed the first material breach(es) of the Joint Venture Agreement.

<u>Fifth Affirmative Defense</u>

12.     Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

13.     Plaintiff's claims are barred, in whole or in part, because TEG is a joint author and joint owner of the software and source code at issue in this case.

14.     The terms of the JVA itself support TEG's status as a co-owner of the software and source code entitled to share one-half of the undivided intellectual property interests in the software and source code with Max.

15.     Moreover, the software and source code is a joint work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole. Here, TEG and Max intended to create the joint work referred to as "Haptic Federal" because TEG and Max intended to work together in the creation of a single

product—the Haptic Federal computer program. In addition, TEG and Max each contributed independently copyrightable material contributions beyond mere ideas, refinements, and suggestions. TEG in particular contributed concrete expressions and contributions that were significant to the final product and its viability with the government military customer.

16.     The "Haptic Federal" computer program could not have been created without TEG's contributions and, therefore, TEG is a joint author and joint owner of that software and source code and any derivatives thereof.

<u>Sixth Affirmative Defense</u>

17.     Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

18.     Plaintiff's claims are barred, in whole or in part, by 28 U.S.C. § 1498(b), which provides that the exclusive remedy for patent or copyright infringement by or on behalf of the Government is a suit for monetary damages against the Government in the Court of Federal Claims. There is no injunctive relief available, and there is no direct cause of action against a contractor that is infringing a patent or copyright with the authorization or consent of the Government, while performing a government contract, for example.

19.     Here, TEG is acting as a contractor with the authorization or consent of the government. TEG's only customers for the software are the federal government's military and defense agencies. Each customer has engaged in a lengthy and detailed procurement process specific to its particular agency or division and has chosen TEG as its contractor of choice for collaborative communications software. As such, the software at issue in this case is subject to statutory law barring injunctive relief and limiting Max's copyright relief to an action against the United States in the Court of Federal Claims for monetary damages alone.

<u>Seventh Affirmative Defense</u>

20.    Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

21.    Alternatively, Plaintiff's claims are barred, in whole or in part, because TEG has (1) an express license to sell and distribute the software under the terms of the JVA or (2) an implied license to do so, each of which is a defense to copyright infringement.

22.    Here, TEG requested assistance from Max to create an improved virtual collaboration software program suitable for the military defense space. TEG paid Max large sums of money to help create the program. Max did assist in creating the program and delivered it to TEG with the intent that TEG would copy and distribute the program (including its underlying source code as required by government customers).

23.    Because TEG paid consideration for Max's assistance in the creation of the work, the implied license to TEG cannot be revoked.

24.    As such, Max's post-litigation attempts to revoke any prior licenses granted to TEG are void and unenforceable. An implied license supported by consideration is irrevocable.

<u>Eighth Affirmative Defense</u>

25.    Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

26.    Plaintiff's claims are barred, in whole or in part, because Plaintiff's "copyright infringement" claim alleges no more than breaches of contractual covenants, not conditions precedent to Plaintiff's duty to perform under the JVA. As such Plaintiff's allegations sound in contract, not copyright, and are redundant of Max's counterclaims for breach of contract in the First Filed Action.

<u>Ninth Affirmative Defense</u>

27.     Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

28.     Plaintiff's claims are barred, in whole or in part, because TEG's source code modifications did not and do not constitute copyright infringement under the "essential step" defense authorized by 17 U.S.C. § 117(a)(1).

29.     TEG's modifications (i.e., adaptations) to the source code at issue here fall within this exclusion and do not constitute copyright infringement because the adaptations (1) were made by TEG, who was authorized to possess the copy of the computer program's source code, (2) were created as an essential step in the utilization of the computer program  in conjunction with a machine, and (3) were used in no other manner. In other words, the adaptations were essential to allow the use of the program for the very purpose for which they were purchased or licensed.

30.     TEG's modifications were designed to improve the source code's functionality in serving the business for which it was created (the federal government). TEG's modifications do not harm Max's ability to exploit the copyrighted work under its "Alleo" brand. Accordingly, TEG's modifications are essential under §117(a) and do not constitute copyright infringement.

<u>Tenth Affirmative Defense</u>

31.     Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

32.     Plaintiff's claims are barred, in whole or in part, because Plaintiff enjoys no consumer recognition or goodwill in the HAPTIC mark.

33.     Plaintiff has no valid or exclusive rights in the mark HAPTIC. On information and belief, Plaintiff abandoned the HAPTIC mark at least as early as February 2, 2022.

<u>Eleventh Affirmative Defense</u>

34.    Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

35.    Plaintiff's claims are barred, in whole or in part, because computer programs are not entitled to author attribution under the Copyright Act. *See* 17 U.S.C. § 106A(a)(1)(A).

<u>Twelfth Affirmative Defense</u>

36.    Defendants incorporate the allegations in response to the preceding paragraphs 1 through 198 in this Answer and its Affirmative and Other Defenses as if fully set forth herein.

37.    Plaintiff's claims are barred, in whole or in part, because Plaintiff's trade secret allegations based on the source code being made available online are now moot and have been adequately satisfied by the voluntary, stipulated preliminary injunction issued by Court Order on June 4, 2024. (Dkt. 44.)

## **RESERVATION OF RIGHTS**

To the extent that discovery reveals facts that support additional affirmative or avoidance defenses, Defendants reserve the right to add such defenses at a later date.

WHEREFORE, Defendants respectfully request that Plaintiff take nothing by way of its Complaint, that judgment be entered in Defendants' favor and against Plaintiff, that Defendants be awarded costs and expenses in defending this action, including attorneys' fees, and that Defendants be awarded all other just and appropriate relief.

Dated:  March 10, 2025                    Respectfully submitted,

                                         */s/ Richard D. Kelley*

Alexander P. Orlowski, Atty. No. 30794-29    Richard D. Kelley, *admitted pro hac vice*
Amanda Jane Gallagher, Atty. No. 32662-79    Kandis M. Koustenis, *admitted pro hac vice*
**BARNES & THORNBURG LLP**                   Samuel J. Banks, *admitted pro hac vice*
11 South Meridian Street                     **BEAN KINNEY & KORMAN, PC**

Indianapolis, IN 46204
Tel: (317) 566-1110
Fax: (317) 636-1507
alexander.orlowski@btlaw.com
amanda.gallagher@btlaw.com

2311 Wilson Boulevard, Suite 500
Arlington, VA 22201
Tel: (703) 525-4000
Fax: (703) 525-2207
rkelley@beankinney.com
kkoustenis@beankinney.com
sbanks@beankinney.com

Heather J. Kliebenstein, *admitted pro hac vice*
**MERCHANT & GOULD**
150 South Fifth Street, Suite 2200
Minneapolis, MN 55402
Tel: (612) 332-5300
Fax: (612) 332-9081
hkliebenstein@merchantgould.com

*Counsel for Triangle Experience Group, Inc.,
Robert Clare and Jeffrey Mase*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2025, a copy of the foregoing document was filed electronically using the CM/ECF system, which will send notification of such filing (NEF) to counsel of record.

*/s/ Richard D. Kelley*