# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

MAX MINDS, LLC,

                Plaintiff,

v.

TRIANGLE EXPERIENCE GROUP, INC.,
ROBERT CLARE, JEFFREY MASE,
KEVIN MULLICAN, and JOHN DOES 1-10,

                Defendants.

CAUSE NO. 1:24-cv-00779-MPB-MKK

JURY TRIAL DEMANDED

## REDACTED REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF AMENDED MOTION FOR PRELIMINARY INJUNCTION AND IN RESPONSE TO DEFENDANTS' OPPOSITION (ECF 125)

**SRIPLAW**
California ◆ Georgia ◆ Florida ◆ Indiana ◆ Tennessee ◆ New York ◆ Texas

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT—MAX DEMONSTRATED LIKELIHOOD OF SUCCESS ON THE
MERITS ............................................................................................................ 2

    A.   TEG concedes Max's likelihood of success in proving the elements of Max's
copyright infringement claims. ..................................................................... 2

    B.   Section 1498 does not apply to this case; the Court should not consider TEG's
undisclosed §1498 defense; even if §1498(b) applies here, TEG cannot meet its burden. ..... 2

        1.   Section 1498(b) does not apply to a private defendant's liability for sales made to
the United States Government. ......................................................... 3

        2.   Max is not seeking a mandatory injunction. ........................................... 4

        3.   TEG cannot meet its burden on its § 1498 affirmative defense. ............................... 5

        4.   The previously undisclosed testimony of Navy ███████████ hould be
excluded. ....................................................................................... 7

        5.   The proffered testimony of Navy ████████ does not support any of the
elements TEG is required to prove. ...................................................... 8

    C.   TEG cannot enforce the provision of the JVA making TEG a co-owner of any IP
"resulting from custom development paid for by TEG" because TEG admits it breached the
JVA by refusing to pay Max after February 2023. ................................................. 8

    D.   TEG's "contributions" to Max's source code development were for features and bug
fixes none of which are copyrightable authorship; none of TEG's evidence of its
contributions rises to the level of copyrightable authorship. ........................................ 9

    E.   TEG's claim of joint authorship is unsupported by the facts; Max created Haptic
Federal before the start of Max's relationship with TEG. .......................................... 11

    F.   TEG fundamentally misunderstands the difference between "source code" and
"software," but the distinction is critical and determinative...**Error! Bookmark not defined.**

    G.   The essential step defense does not apply to TEG's theft of Max's source code or
TEG's development of derivative works and TEG cannot meet its burden of proof on this
affirmative defense. .................................................................................... 12

        1.   TEG's previously undisclosed defense of "essential step" under § 117 was never
disclosed and should not be considered. ............................................... 16

    H.   TEG cannot meet its burden on any of its defenses to trade secret misappropriation. 16

        1.   The Court should not consider the "implied license to sell or distribute" affirmative
defense. ....................................................................................... 19

    I.   TEG concedes circumvention in violation of § 1201 and offers no evidence in support
of any defenses to circumvention. ................................................................... 20

    J.   TEG concedes removal of Max's CMI in violation of § 1202 and offers no evidence in
support of any defenses to CMI removal. ........................................................... 21

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

K.    TEG concedes trademark infringement of Max's HAPTIC trademark and offers no evidence in support of any defenses to trademark infringement. ........................................... 22

III. ARGUMENT—MAX SUFFERED IRREPARABLE HARM; THE BALANCE OF HARDSHIPS TIP IN MAX'S FAVOR; THE PUBLIC INTEREST IS NOT HARMED BY AN INJUNCTION THAT PREVENTS FUTURE INFRINGEMENT BUT PERMITS THE GOVERNMENT'S CONTINUED USE AND SUPPORT OF HAPTIC FEDERAL ................ 22

IV. TEG'S $100M BOND IS UNSUPPORTED BY EVIDENCE; A $10,000 BOND IN THE FACE OF TEG'S THEFT IS GENEROUS.................................................................................. 25

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

**TABLE OF EXHIBITS**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 1 | Transcript of Deposition of Jeffrey Mase |
| 2 | Transcript of Deposition of Nick Ferrara |
| 3 | Stipulation |

## I.    INTRODUCTION

The Amended Motion for Preliminary Injunction (ECF 104) ("AMFPI") presented unrefuted evidence that in 2023 TEG engaged in the theft of Max's trade secret and copyrighted source code. After the theft, TEG developed derivative works from this stolen source code and licensed these derivatives to the U.S. Government.

TEG has conceded and admitted to this illegal conduct both in their opposition brief and in the record.  TEG's own executives confessed to the theft, modification, and licensing of Max's source code in their deposition testimony and declarations in opposition. (ECF 106-2 "Clare Tr." 62:10-71:4, 80:25-82:15; ECF 106-3 "Mullican Tr." 27:20-29:5, 58:6-10; Ex. 1 hereto "Mase Tr." 18:15-19:5; ECF 124-3, 124-7). The ongoing nature of TEG's trade secrets theft, copyright infringement, and other illegal activities is inflicting irreparable harm upon Max, necessitating injunctive relief.

In its opposition (ECF 125), TEG fails to counter Max's claims on their merits. Instead, TEG introduces new defenses that were not previously disclosed. These new defenses lack evidentiary support and rely solely on conclusory, self-serving statements. TEG falls short of meeting its burden of proof concerning these defenses. While TEG continues to assert co-ownership of Max's copyrights based on the language of the JVA, this claim has been overshadowed by its new defenses.

TEG's assertion that a preliminary injunction is "precluded" by 28 U.S.C. § 1498(a) (ECF 125 at 6-9) is erroneous, as the statute is inapplicable to suits against private parties. Furthermore, TEG's claim that the stolen source code constitutes a "joint work" and that TEG is a "co-author" lacks any merit.  By their own admission TEG has never written a single line of code (ECF 125 at 12). Even TEG's own expert was unable to identify any code that was written by TEG. Instead, the expert's opinion revolved around TEG's alleged contribution of unprotectable

"architectural designs and concepts" (ECF 124-8). TEG's invocation of the "essential step" defense to justify its creation of derivative works from Max's source code is also flawed. This defense is inapplicable to source code, does not protect the creation of derivative works of source code, and does not legitimize TEG's distribution of software.

Finally, TEG persists in its claim that its "contribution of funding to pay for the engineers' coding services and customization" establishes co-ownership under the JVA (ECF 125 at 13). However, this argument lacks evidentiary foundation and relies solely on self-serving statements. There is no evidence to substantiate that anyone from TEG wrote any software code.

## II.    ARGUMENT—MAX DEMONSTRATED LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  TEG concedes Max's likelihood of success in proving the elements of Max's copyright infringement claims.

TEG does not challenge the validity of Plaintiff's copyrights. TEG does not dispute that by retaining and not destroying Max's source code, and by creating derivative works of the source code[1], TEG committed copyright infringement. TEG concedes that Max never gave TEG permission to retain the source code, to create derivative works from the source code, or to distribute unauthorized derivative software versions to the Department of Defense. TEG's opposition does not challenge the merits of Max's copyright infringement claims. Instead, TEG's opposition relies on *defenses* to TEG's illegal conduct, namely § 1498, joint work, and essential step. TEG cannot meet its burden.

### B.  Section 1498 does not apply to this case; the Court should not consider TEG's undisclosed  § 1498 defense; even if  § 1498(b) applies here, TEG cannot meet its burden.

In reliance on the vague and conclusory declaration of ███████████ (ECF 125 at

---

[1] TEG does not dispute that it is storing Max's code in two separate source code repositories where TEG is actively modifying and developing derivative works of the source code. (Clare Tr. 13:2-17; TEG's Second Amended Answers to Interrogatories, p. 18-19; Mullican Tr. 27:20-29:5)

8), TEG claims the government "expressly contracted with TEG for collaborative communications software that meets certain specifications," *implying* the government authorized the theft of Max's source code. (ECF 125 at 8). TEG also contradicts itself by arguing that a preliminary injunction is "precluded" by § 1498 because "TEG is acting with the consent or authorization" of the U.S. Government, while at the same time asserting based on *Williams v. Columbia Broad. Sys., Inc.*, 57 F. Supp. 2d 961, 966 (C.D. Cal. 1999), that § 1498(b) gives rise to an affirmative defense that TEG must prove. (ECF 125 at 9, n.8).

The Court should not consider TEG's § 1498 defense. TEG never disclosed the defense in preliminary injunction interrogatories. (ECF 105-22). TEG did not move to dismiss on this basis. (ECF 51, 52). TEG never disclosed ██████████ as a witness in its interrogatory answers. (ECF 105-22). But even if the Court considers TEG's § 1498 defense, § 1498 does not "preclude" a finding of liability against private parties like TEG.

### 1.    Section 1498(b) does not apply to a private defendant's liability for sales made to the United States Government.

Section 1498 is not jurisdictional; the prevailing view is that § 1498(b) is an affirmative defense[2] in cases against private parties and does not divest a district court of subject matter jurisdiction. See *Eng'g & Software Sys. Sols., Inc. v. Cusatis*, No. 23-cv-676, 2024 WL 1363578, 2024 U.S. Dist. LEXIS 57751, at *15, n.6 (N.D. Ill. Mar. 29, 2024) (collecting cases, noting the absence of Seventh Circuit authority, and concluding that subject matter jurisdiction dismissal based on § 1498 in a suit against private parties is inappropriate). Section 1498 does not preclude a lawsuit against a private party for infringement in connection with sales to the U.S. Govern-

---

[2] TEG bears the burden of proof on its affirmative defense, as well as the burden of persuasion. *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 309 (7th Cir. 2010).

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

ment. *Manville Sales Corp. v. Paramount Sys.*, 917 F.2d 544, 555 (Fed. Cir. 1990); *Sperry Gyroscopic Co. v. Arma Engineering Co.*, 271 U.S. 232 (1926) (holding the precursor statute to § 1498 to be non-jurisdictional as to private defendants). *Williams* and *Eng'g & Software* both surveyed the authorities and concluded that § 1498 is only jurisdictional as to *government* defendants not private defendants like TEG. See also *TM Patents v. IBM*, 107 F. Supp. 2d 352, 354 (S.D.N.Y. 2000) (accord with *Williams* and *Eng'g & Software*).

Max is not suing the U.S. Government. (ECF 1). The AMFPI only seeks injunctive relief against TEG and its executives Clare, Mase and Mullican. (ECF 104). Max is not seeking to enjoin the U.S. Government's current use of Max's copyrighted software. Max only seeks to enjoin future infringement.

### 2.    Max is not seeking a mandatory injunction.

TEG incorrectly claims Max is seeking a mandatory injunction and therefore must be held to a higher standard. (ECF 125 at 1, 5, 33). Max is not seeking mandatory relief. Under these circumstances, a preliminary injunction can be narrowly tailored to protect Max's interests in its intellectual property while still protecting national security interests. See e.g. *Xtec, Inc. v. Cardsmart Techs., Inc.*, No. 11-22866-CIV-ROSENBAUM, 2014 U.S. Dist. LEXIS 184607 (S.D. Fla. May 15, 2014) (finding it was in the public interest to protect the plaintiff's trade secrets by imposing a preliminary injunction prohibiting the defendants from marketing, selling, or offering to sell a software system in the future, but "to protect the Navy's interests and in furtherance of national security" permitting the defendants to maintain the system for the Navy.)

Careful review of Max's requested injunction in its motion (ECF 104) reveals that all the relief sought is forward looking and will not require the U.S. Government to stop using Haptic Federal. The status quo will be preserved under the proposed injunction. TEG will be enjoined

from *future* infringement. TEG will be enjoined from marketing, selling, or offering to sell Haptic Federal or the derivative works TEG created from the Haptic Federal source code in the future. Injunctive relief in this case can be narrowly tailored so it does not impact national security.

### 3.    TEG cannot meet its burden on its § 1498 affirmative defense.

TEG must prove it "was acting for the government and with the government's authorization or consent." *Eng'g & Software*, 2024 U.S. Dist. LEXIS 57751, at *10-11, citing *Boyle v. United States*, 200 F.3d 1369, 1373 (Fed. Cir. 2000). "[P]roof of the Government's 'authorization and consent' to the infringement (and hence the contractors defense to liability) depends on more than mere proof of purchase by the Government." *Connell v. KLN Steel Prods. Co.,* No. 04 C 0194, 2006 WL 1120514, 2006 U.S. Dist. LEXIS 29419, at *19-20 (N.D. Ill. Apr. 25, 2006). TEG, citing *Connell* and *Larson v. United States,* agrees it must show "(1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a [copyright]; and (3) the government had some knowledge of the infringement." 26 Cl. Ct. 365, 370 (Ct. Cl. 1992). TEG cannot meet its burden.

*First*, TEG failed to disclose any contracts with the Government authorizing TEG's theft in preliminary injunction discovery. This Court must therefore presume no such agreements exist. See *Neidhoefer v. Auto. Ins. Co.,* 182 F.2d 269, 271 (7th Cir. 1950)("[T]he failure to produce evidence, which under the circumstances would be expected, gives rise to a presumption against the party failing to produce it.") Nor did TEG offer any evidence besides ██████████ unfounded fears about "interruption to the access of VJOC" and TEG's self-serving statements.

*Second*, TEG obviously did not *need* to steal Max's source code to meet any Government specifications, it simply *chose* to steal.[3] The evidence offered by TEG shows that TEG believed

---

[3] TEG appears to couch its source code theft as occurring under some sort of duress, but Robert Clare's testimony

that theft was the expedient solution to its claimed problem that "in late 2023, TEG still lacked a version of the software that worked properly." (Mullican Decl. ECF 124-7 at 4). And so, as Mullican reveals, since "TEG still had in its possession a copy of a version of the source code,"[4] TEG decided to "turn[] over [the source code] to TEG's development staff" and develop derivative works of the source code. (Mullican Decl. ECF 127-7 at 5). TEG offered no evidence that but for the theft of Max's source code, national security would be compromised.

*Third*, none of the three factors in *Larson* can be demonstrated by TEG and therefore TEG cannot meet its burdens of proof or persuasion. Nothing in the agreements between the parties reflect that there were "certain specifications" that Max was required to deliver that Max failed to deliver.[5] Nothing in TEG's opposition demonstrates that the U.S. Government's specifications necessitated TEG furnish the government with Max's software; to the contrary, TEG claims "the government expressly contracted with TEG for collaborative communications software . . . the government calls 'VJOC'" which is the name for TEG's software, not Max's Haptic Federal software. Moreover, TEG's "evidence" of the government's "express[] contract[s]" (cited at ECF 125 at 8) is limited to the self-serving testimony of Janna Clare (ECF 124-2) and

---

shows that not to be the case.

> **Q:** "So how did [TEG's developing on the source code] happen?"
> **A:** I think the discussions were around trying to hold Max to their job and then I believe that those discussions broke down. Max was not concentrating on the development and the engineering, and there are certain little steps that took place to get that to happen on the Max side, encouragement to do their job, positive, negative reinforcement of hey, man, you are not delivering. And then it morphed into the need to fix it for them, like if you are not going to fix it, then we will.

(Clare Tr. 81:20-82:9).

[4] "TEG still had in its possession a copy of a version of the source code" because it failed to comply with the SCLA and CA and destroy the copy of the source code after the source code was security scanned and falsely certified destruction to Max. (Clare Tr. 63:25-64:5, 99:15-100:7; Mullican Tr. 27:20-29:5, 58:6-10; Mase Tr. 18:15-19:5).

[5] TEG's opposition contains the bizarre statement that "from Max's point of view, these VJOC specifications cannot be met without infringing Max's copyrights." (ECF 125 at 8). It is unclear what point TEG is making. TEG could have contracted with any other software company to fulfill TEG's requirements. TEG chose Max.

Robert Clare (ECF 124-3) who say nothing in their declarations about government requirements necessitating theft of Max's source code and attach no contracts as evidence.[6]

*Fourth*, as Max will demonstrate in its testimony at a hearing on the AMFPI, none of TEG's justifications for stealing Max's software are true. All are false.[7] In fact, examination of TEG's evidence offered in opposition shows that TEG's claims that it provided "contributions" to Haptic Federal, and TEG's justifications for stealing Max's source code, are contrived.[8]

### 4.    The previously undisclosed testimony of Navy ▇▇▇▇▇▇▇▇ should be excluded.

Max's preliminary injunction interrogatories number 2 and 3 sought identification of witnesses with knowledge concerning the motion for preliminary injunction and the substance of the witnesses' knowledge. ▇▇▇▇▇▇▇▇▇▇▇▇ was never disclosed. TEG's opposition asserts facts and arguments based on the ▇▇▇▇▇▇ testimony. According to

---

[6] Janna Clare's declaration is also notable for its use of incorrect terminology. Ms. Clare's declaration refers numerous times to payments made to Max "for engineering services relating to the joint development of the software customized for use by the federal government customer" (ECF 124-2 at 2), or "to help defray the costs of engineering services associated with the customization of the software," (ECF 124-2 at 3), or for "continued joint development of the custom federal government software," (ECF 124-2 at 6), or "to continue to develop and engineer capabilities to the government customer's needs." (ECF 124-2 at 7). Ms. Clare is obviously attempting to shoehorn her language into the provision of the JVA that says that "[a]ny Intellectual Property ("IP") resulting from custom software development that is paid for by TEG will be co-owned by TEG and MAX." The problem is that the "customization" of software Ms. Clare is talking about is different from the "custom software development" that the JVA is talking about. Max never performed "custom software development" for TEG. (ECF 105-2 ¶ 60)

[7] Relying on the declaration of Mullican, TEG argues it "made changes to the software only when faced with the inability to service TEG's DoD customers in early 2023 because Max had continually failed to provide deployable version of the software, and those changes were necessary to enable TEG's licensed customers to use the software for the purpose for which it was intended." (ECF 125 at 24). This self-serving statement is unsupported and unsupportable. This self-serving statement also contradicts Mullican's testimony at deposition that TEG stole the source code and began developing derivative works because the source code belonged to TEG. (Mullican Tr. 43:12-21, 48:4-10).

[8] For example, Robert Clare's declaration refers to a spreadsheet Max created "to track issues from TEG's and Max's testing of Haptic Federal (ECF 124-3 ¶ 53), and Clare attaches a spreadsheet with "specifications, technical requirements, valuable engineering concepts, architecture, user-interface design and even component coding." (ECF 124-3, Ex. 16, at 221). However, Clare left out the fact that at the time the parties' JVA was signed, Haptic Federal met approximately 90% of the government's requirements as determined by a third-party. (ECF 124-3 compare Ex. 11 with Ex. 16). The only requirement missing at that time was integrated chat. Max developed the source code for the integrated chat feature and then shared the software with the chat feature with TEG. Clare mentions the "Haptic Chat UI" feature as completed in July 2021 in Clare's declaration. (ECF 124-3 ¶ 53). Clare appears to take credit for the feature, but the credit belonged to Max because Max did all the coding for Haptic Federal.

documents produced in the related case, TEG has been in regular contact with █████████ █ since at least April 9, 2023, but failed to disclose him. Therefore, this Court should disregard his declaration and not accept any evidence offered by ████████████.

**5.    The proffered testimony of Navy ████████████ does not support any of the elements TEG is required to prove.**

Even if this Court considered the declaration or testimony from ████████████, nothing he says supports the government's need for TEG to steal Max's source code, the need for TEG to create unauthorized derivative works for the government, or the government's prior consent and authorization for such theft. Even if the Court were to consider the testimony of this one man, there is no indication he speaks for the entire Department of Defense or that he even has authorization to make the statements in his declaration for the Navy or any defense agency.[9]

**C.  TEG cannot enforce the provision of the JVA making TEG a co-owner of any IP "resulting from custom development paid for by TEG" because TEG admits it breached the JVA by refusing to pay Max after February 2023.**

It is well established that when one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party if that other party breaches the contract at a later date. See *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 917 (Ind. Ct. App. 2011) (purchasers were clearly the first breaching party and trial court correctly concluded that they were not entitled to enforce the agreement against the sellers); *Immense Salon & Spa, LLC v. Williams*, 139 N.E.3d 742 (Ind. Ct. App. 2019).

---

[9] It is hard to believe that ████████████ swore out his declaration after being fully informed of TEG's actions. If that were the case then TEG would have this Court believe that this Naval officer sanctioned source code and trade secret theft. If ████████████ was fully informed then he made his declaration after being advised of TEG's negligent public exposure of MAX's source code discovered in March 2024 detailed in the declaration of Robert Simon. (ECF 14-1). It is far more likely that the ████████████ was not fully informed by TEG and that ██ believes—incorrectly—that TEG was the original creator of the software. As a result, ████████ may not fully grasp the risks associated with the U.S. Government using TEG's unauthorized derivative works of Max's software. ████████████ may not know that TEG made modifications to Max's software without Max's oversight or approval, and therefore, without the rigorous testing and security validation required for mission-critical systems. These questions and others will need to be put to the ████████ at a hearing on the AMFPI if TEG intends to attempt to meet its burdens on its defenses.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

Janna Clare admits that TEG breached the JVA by not paying Max monies due and owing to Max—and instead merely "accounting" for those monies—after TEG's last payment in February of 2023. (ECF 124-2). TEG's theft of Max's source code did not occur until later, in or around September of 2023 when Max made source code transfers to TEG of versions 3.1.21.8 and 3.1.21.9, and TEG withheld government scans, withheld chain of custody documents, and retained the code. (ECF 105-2 at 16; Clare Tr. 63:25-64:5, 99:15-100:7; Mullican Tr. 27:20-29:5, 58:6-10; Mase Tr. 18:15-19:5). TEG was the first party to breach the JVA. As a result, the provision that TEG claims makes it a co-owner of intellectual property is not enforceable by TEG against Max, and TEG cannot rely on its co-ownership of a copyright to defeat Max's infringement claim.

### D. TEG's "contributions" to Max's source code development were for features and bug fixes none of which are copyrightable authorship; none of TEG's evidence of its contributions rises to the level of copyrightable authorship.

The copyrighted source code at issue in this case is identified in a table in the AMFPI (ECF 105 at 8) and in four certificates of copyright attached as exhibits to the motion. (ECF 105-3, 105-4, 105-5, 105-6). TEG failed to challenge the validity of Max's copyrights in its source code, except to argue that TEG is a "co-author with Max of the software, which is a joint work under copyright law."[10] (ECF 125 at 11). Haptic Federal does not qualify as a joint work.

A "joint work" is prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole. *Erickson v. Trinity*

---

[10] There are four separate copyrights for four separate versions of Max's source code at issue. However, TEG never discloses anywhere in opposition what version or versions TEG claims is or are the "joint works." If TEG was truly a joint author it would do better than simply claim in a conclusory fashion that it contributed original expression that could stand on its own as copyrightable. If TEG was a joint author, TEG could specifically identify the original expression it contributed to a specific version of Max's copyrighted source code. TEG's inability to do so proves the point. TEG's expert reviewed Max's source code, but TEG's expert could not find any original expression TEG employees contributed to the source code of any version of Haptic Federal. The reason is that TEG contributed no copyrightable expression whatsoever and there is no joint work here.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

*Theatre, Inc.*, 13 F.3d 1061, 1063 (7th Cir. 1994). TEG must show that (1) the contribution of each joint author is copyrightable (i.e., each contribution must represent "original expression that could stand on its own as the subject matter of copyright"); and (2) "the parties must have intended to be joint authors at the time the work was created." *Id.* The burden of proof is on TEG. *Gaylord v. United States,* 595 F.3d 1364, 1377 (Fed. Cir. 2010).

TEG failed to meet its burden. The declaration of Robert Clare appears to be offered to suggest that TEG contributed to the development of Haptic Federal. However, upon closer examination that declaration is nothing more than self-serving conclusory statements claiming TEG employees gave Max unprotectible ideas for different features to add to Haptic Federal, and then Max did the copyrightable work of actually writing the protectible source code to make those features a reality. Nothing in Robert Clare's declaration demonstrates that TEG wrote copyrightable source code for any of the registered versions of Haptic Federal at issue.[11]

If TEG wrote source code, the evidence would be found in the report of its expert Mr. Ferrara who performed a source code review and who looked for TEG code in Max's Haptic Federal source code.[12] Ultimately, Mr. Ferrara found nothing in his review of Max's source code to indicate that anyone at TEG or at any other company besides Max wrote Max's Haptic Federal

---

[11] TEG claims that Max's "*source code* was to be delivered and installed on TEG's servers for testing and demo purposes with the ability to create unlimited user accounts" citing the Complaint page 9 (ECF 125 at 10), but the Complaint says no such thing about *source code.* The Complaint says source code "has only been distributed in limited circumstances pursuant to significant restrictions" in the SCLA, that source code "has never been distributed to users," and in the "one limited circumstance where MAX agreed to provide restricted access to the Haptic Federal source code" that was pursuant to the SCLA. (ECF 1 at 9). Max's source code was highly restricted and only disclosed for security testing purposes pursuant to the SCLA and CA. (ECF 105-2 at 9-13).

[12] Mr. Ferrara filed a declaration earlier in the case claiming he needed access to all versions of Max's source code to determine whether TEG "provided Plaintiff with initial ideas and design as to how the software at issue in this case should be designed and operated." (ECF 83-2 Decl. Ferrara ¶ 10). In opposition to Mr. Ferrara's claimed need for all Max's source code, Max's CEO Brandon Fischer swore under oath that "[n]o one working for TEG ever wrote any of the Haptic Federal source code." (ECF 89-1, Fischer Decl. ¶ 14). Mr. Ferrara also claimed he needed to "stand[] up the software" in order to determine whether Max is entitled to a preliminary injunction so he could determine whether TEG contributed any "copyrightable essence." In the end, Mr. Ferrara found TEG contributed nothing more than uncopyrightable ideas.

source code. The closest Mr. Ferrara comes is a conclusion he reached based on Ferrara's review

of unspecified versions and lines of code and upon "conversations with TEG that TEG takes the

position that it provided key architectural designs and concepts to Max at the outset of the par-

ties' work together on the Haptic Federal software." (ECF 124-8 at 12). Based upon Mr. Fer-

rara's review and his conversations he concludes that his analysis "corroborates TEG's positions,

indicating that TEG provided key designs underlying the Haptic Federal software." (ECF 124-8

at 12). Mr. Ferrara's opinions are limited to TEG's "joint authorship" contributions being "fea-

tures" and "architectural concepts," not actual code written by TEG employees.[13]

     As a matter of law, submitting ideas for features and architectural concepts is not contrib-

uting independently copyrightable authorship; features and architectural concepts are ideas. The

Copyright Act expressly provides that "[i]n no case does copyright protection for an original

work of authorship extend to any idea, procedure, process, system, method of operation, concept,

principle, or discovery, regardless of the form in which it is described, explained, illustrated, or

embodied in such work." 17 U.S.C. § 102(b). Copyrightable authorship requires fixation of origi-

nal, creative expression in a tangible medium of expression. 17 U.S.C. § 102(a). TEG's expert

found no TEG authored creative expression in Max's source code.

### E. TEG's claim of joint authorship is unsupported by the facts; Max created Haptic Federal before the start of Max's relationship with TEG.

     TEG's own meeting notes from Fischer's 2019 demonstration of Haptic Beta (ECF 124-3

at Ex. 11) prove that Max created the software first. The meeting notes identify features already

---

[13] Mr. Ferrara specifically calls out two types of "features" and "architectural concepts" TEG contributed. One is "the architectural concept of a 'board' . . . where multiple users can connect to view and manage a shared user inter-face." And another is the use of a "third-party Microsoft library ('SignalR') implementing the 'WebSockets' com-munications protocol." (ECF 124-8 at 12-13). These are ideas for features, not copyrightable contributions.

in Haptic Federal before any relationship between Max and TEG. (ECF 124-3 ¶ 27). TEG's expert, Nick Ferrara, claims he found a "board" feature, WebSockets, and chat and video streaming functionality in the source code for "ACES"[14] (Ferrara Decl. ¶ 29), and therefore Ferrara concluded that because these features were in ACES, TEG must have "provided Max [these] architectural design elements ultimately used in the Haptic Federal software." (Ferrara Decl. ¶ 25). However, in deposition, Ferrara admitted that he did no independent analysis but instead was simply told by executives at TEG (including Mullican) that TEG created these "architectural design elements" and shared them with Max. (**Ex. 2** hereto, "Ferrara Tr." at 35:1-36:2; 53:8-54:23). In fact, the "unprotectible "architectural design elements" Ferrara says TEG created were not "ultimately used in the Haptic Federal software" but were already present. TEG's joint authorship argument based on its contributing "key architectural design elements" fails.[15]

### F.   The essential step defense does not apply to TEG's theft of Max's source code or TEG's development of derivative works and TEG cannot meet its burden of proof on this affirmative defense.

TEG argues that its "modifications (i.e., adaptations) to the *source code*" are not infringing because 17 U.S.C. § 117(a) says that under certain circumstances "it is not an infringement for the owner of a copy of a *computer program* to make or authorize the making of another copy or adaptation of that computer program." (ECF 125 at 22). Section 117 does not apply by its terms to *source code*. Ownership of a copy of a program is distinct from copyright ownership. 17 U.S.C. § 202 ("Ownership of a copyright, or of any of the exclusive rights under a copyright, is

---

[14] "Aces" was the name of source code for software that Hadron accused TEG of stealing from Hadron. (*Hadron Industries, Inc., et al. v. Triangle Experience Group, Inc. et. al.*, 1:19-cv-00035-LO-MSN (E.D. Va. January 9, 2019) (found at ECF 76-1).

[15] TEG has been spinning a false narrative since filing the earliest pleading in the parties' disputes. TEG's first complaint falsely claimed that in 2019 Max "used the confidential information provided to him by TEG and worked with TEG's employees to create a BETA version" of Haptic Federal. See 1:24-cv-00650, Docket No. 1 at ¶ 24-28. The truth finally caught up to TEG with the admission in Robert Clare's declaration that the Haptic Federal BETA version already contained the features TEG previously claimed Max's Fischer stole from TEG. TEG has not produced documents showing that it shared any of the alleged architectural designs with Fischer in 2018 or 2019.

distinct from ownership of any material object in which the work is embodied."). For § 117(a) to apply, the copy must be created solely as an essential step in using the program with a computer (such as loading a copy of the program into memory). Section 117(a) only applies to owners of "a copy of a computer program," who "make or authorize the making of another copy or adaptation of that computer program," and who do not use the copy for any other purpose beyond what is necessary for program utilization. TEG's reliance on this defense is misplaced.

The defense does not apply to TEG's actions here because TEG made derivative works of Max's computer *source code*[16] and then distributed *software*[17] made from the derivative works of *source code*. TEG conflates these two fundamentally distinct terms[18] as part of their 17 USC §117(a) "essential step" affirmative defense.  The "essential step" defense only provides protection for certain types of infringement that may occur in the use of software.  It does not provide any protections for infringement of *source code*.

The critical nature of this distinction becomes evident when considering TEG's reliance on the § 117(a) defense against infringement claims. TEG contends that their modifications to the source code do not constitute infringement because, under certain circumstances, this statute

---

[16] Source code refers to the human-readable text of a computer program written in a specific programming language. This text is subsequently compiled or assembled into a format that a computer can directly execute. See "Source code" https://en.wikipedia.org/wiki/Source_code.

[17] "Software" is computer programs that instruct the execution of a computer. See "Software" https://en.wikipedia.org/wiki/Software. Source code becomes executable as software or a computer program when it is run through a compiler which converts it into the binary 1s and 0s of object, or executable, program code. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 438-39 (2d Cir. 2001).

[18] TEG gets the terms "software" and "source code" consistently wrong. During preliminary injunction discovery, TEG created so much confusion about the terms "Software" and "Source Code" that Max forced TEG to enter into a Stipulation (**Ex. 3 hereto**) defining the terms "Software" and "Source Code" so TEG would produce discovery and Max could avoid moving to compel compliance with the Court's order and produce the documents and information Max requested. The parties agreed "software" means the "Haptic Federal On-Premise Version, Expected Release Date: April 6, 2021" referenced in the SCLA, including all software MAX registered a copyright in and all Derivative Works of the Software. (Ex. 3). The parties also agreed that "'Source Code' means the source code for the Software, any and all information and materials concerning the source code that Max delivered or disclosed to TEG, and all updates and Derivative Works of the Source Code, including all Derivative Works created by or on behalf of TEG." (Ex. 3).

allows the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that program.

TEG's argument misinterprets the scope of the statute's protections. By its plain language Section 117 does not provide protections for manipulations of source code. TEG modified Max's source code to create derivative works and then distributed the software generated from that modified source code. These actions fall outside the scope of protection provided by 17 U.S.C. § 117(a). TEG's actions do not align with the activities protected by the statute.

TEG claims the "SCLA is a license for TEG to *use* Max-owned copies of the *source code*," that TEG "*borrowed* from Max." (ECF 125 at 16). That's not what the SCLA says; TEG agreed in the SCLA that it,

> shall not at any time, directly or indirectly: (i) copy, modify, or create derivative works of the Source Code or the Documentation, in whole or in part; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer. or otherwise make available the Source Code or the Documentation to any third party: (iii) remove any proprietary notices from the Source Code or the Documentation; or (iv) use the Source Code in any manner or for any purpose that infringes, misappropriates. or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law.

(ECF 105-2 at 11-12; 105-11). TEG also "acknowledge[d]" in the SCLA that Max owns all rights, title, and interests, including all intellectual property rights, in and to the Software, Source Code and Documentation." (ECF 105-2 at 12; 105-11). After Max and TEG signed the SCLA, they entered into the more specific Certification Agreement (CA) "to enable TEG, and/or government customers, to conduct security scans on the Source Code." (ECF 105-2 at 12; 105-12). The CA makes even clearer that the SCLA is not a license to "use" or "borrow" Max's source code. The CA mandates destruction of Max's source code within 24 hours, written certification of destruction, and documentation of chain of custody.  (ECF 105-2 at 13-14; 105-12).

TEG cites *Krause v. Titleserv, Inc.,* 402 F.3d 119 (2d Cir. 2005). The facts of *Krause*

14

were very different. Titleserv (the owner of the program) and Krause (the developer of the source code) had no written agreements. Titleserv paid Krause to develop the software exclusively for Titleserv. Krause quit before the parties could negotiate an assignment of Krause's copyright to Titleserv. The court noted that:

> Krause told Titleserv that it was free to continue using the executable code as it existed on the day Krause left, but asserted that Titleserv had no right to modify the source code. Inability to modify the source code would have severely limited the value of those programs to Titleserv. Many routine functions such as the addition of a new customer or a change of a customer address could be performed only by changing the source code. In addition, changes were required to fix bugs from time to time to keep the system from crashing.

*Id.* at 121. This case is not *Krause*. Max and TEG had *written agreements*: the EULA, SCLA, CA, and the JVA. The EULA provides that licensees like TEG may not "reverse engineer, decompile, disassemble, adapt, reproduce, or create derivative works" of Haptic Federal. (ECF 105-2 at ¶ 30, 105-7). The SCLA provides that TEG "may not at any time, directly or indirectly: (i) copy, modify, or create derivative works of the Source Code or the Documentation, in whole or in part; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer. or otherwise make available the Source Code or the Documentation to any third party: (iii) remove any proprietary notices from the Source Code or the Documentation; or (iv) use the Source Code in any manner or for any purpose that infringes, misappropriates. or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law." (ECF 105-2 at ¶ 68, 105-11). The CA mandates destruction of Max's source code transferred to TEG for security scanning within 24 hours, requires TEG to provide written certification of destruction, and documentation of chain of custody by TEG. (ECF 105-2 at 13-14; 105-12). The JVA provides that "MAX [not TEG] will develop and engineer capabilities to support the customer needs." (ECF 105-10). The parties' agreements are simply incompatible with TEG's assertion of the essential

step defense. See *Vernor v. Autodesk, Inc.,* 621 F.3d 1102, 1114 (9th Cir. 2010) (rejecting the application of § 117 in situations where, as here, the parties had written agreements that restricted the use and transfer of software, and distinguishing *Krause* because "defendant-employer had paid the plaintiff-employee significant consideration to develop the programs for its sole benefit, and the plaintiff had agreed to allow the defendant to use the programs 'forever,' regardless of whether the parties' relationship terminated.")

*Krause* is also inapplicable because Krause was paid for his contribution and left copies of the software on Titleserv's servers. That was enough to qualify Titleserv as an owner of copies of software. See *4DD Holdings, LLC v. United States*, 159 Fed. Cl. 337, 355 (Ct. Cl. 2022) (distinguishing *Krause*). In addition, and importantly, Titleserv and Krause were not competitors like TEG and Max; TEG stole Max's software to compete with Max in the federal contracting space; TEG cannot use § 117 to shield its infringement to compete with Max. See *Automated Mgmt. Sys. v. Rosenthal,* No. 1:16-CV-04762-LTS-KNF, 2022 WL 991755, 2022 U.S. Dist. LEXIS 61328, at *35 (S.D.N.Y. Mar. 31, 2022) (§ 117 cannot be used to excuse the appropriation of a program's features for incorporation into the program of a competitor).

1.    **TEG's previously undisclosed defense of "essential step" under § 117 was never disclosed and should not be considered.**

*Krause* recognized that § 117 is an affirmative defense and TEG's burden to prove. But TEG never disclosed it would rely on the "essential step" defense under 17 U.S.C. § 117 in preliminary injunction interrogatories. (ECF 105-22). TEG did not move to dismiss on this basis. (ECF 51, 52). Therefore, TEG should not be permitted to rely upon this defense at this point. Max was prejudiced and unable to question TEG's witnesses at deposition on this defense.

G.  **TEG cannot meet its burden on any of its defenses to trade secret misappropriation.**

TEG's opposition does not dispute that the source code for Haptic Federal is a trade secret, and that by its theft TEG willfully misappropriated Max's trade secret source code. TEG's

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

opposition does not dispute that TEG acquired Max's trade secret source code by improper means and used Max's trade secret source code without express or implied consent of Max. Instead, TEG opposes the motion first by incorrectly asserting that "Max claims that TEG misappropriated the trade secret by disclosing it to the public via the long-disabled URLs." (ECF 125 at 18). However, Max claims more than just disclosing the source code online.[19] The AMFPI also claimed defendants are "using Max's trade secret source code without consent from Max and know that it was acquired under circumstances giving rise to a duty to maintain it as secret." (ECF 106 at 24). TEG failed to respond to this claim and conceded Max's likelihood of success. Furthermore, all of TEG's witnesses acknowledged that TEG stole Max's trade secret source code and created derivative works of that code.

TEG next argues that Max made "no showing whatsoever" that TEG's public disclosure of Max's source code "revealed any 'concrete secrets'" citing *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) for the proposition that "limited disclosure" does not destroy trade secret protection because "trade secret law focuses on concrete secrets rather than broad areas of technology." (ECF 125 at 18). But this is not a limited public disclosure case. Robert Simon's declaration (ECF 14) demonstrates that TEG exposed source code maps online and in so doing exposed the majority of Max's trade secret source code on the internet. That is not a limited public disclosure. Moreover, TEG's argument ignores the fact that TEG is admittedly *using* Max's source code in violation of the DTSA without Max's consent.

---

[19] When Max filed its complaint on May 7, 2024, Max did not know that TEG was using Max's stolen source code to develop derivative works and distribute software from those derivative works to the government. All Max knew at the time was that TEG exposed Max's source code online, and that TEG failed to comply with the SCLA and the CA when after Max made source code transfers, TEG "(1) retained the source code; (2) withheld the government scan report; (3) withheld Chain of Custody documents; and (4) failed to obtain signatures from everyone who touched the Haptic Federal source code." (ECF 1 at 16). If Max knew then what Max learned in discovery then Max's complaint would have said so. Max will amend the complaint at the appropriate time.

Third, TEG tries to justify its own misappropriation by claiming "Max has engaged and continues to engage in precisely the same type of 'public exposure' of which Max has accused TEG" citing Ferrara's expert report discussing the use of "minified javascript." (ECF 125 at 19). However, at his deposition Ferrara could not say that the use of "minified javascript" exposed Max's confidential trade secrets and created a security threat like the exposure of source code maps did as explained by Robert Simon in his declaration. (Compare Simon Decl. at ECF 14 with Ferrara Tr. at 79:24-91:18).

Citing the self-serving conclusory statements of Mullican and Clare in their declarations, TEG falsely claims it "routinely had access to the software's *source code* as Max's joint venture partner under the JVA" and therefore TEG's possession of the *source code* was authorized. (ECF 125 at 19-20). TEG is confusing "software" with "source code" again. The SCLA and CA provide that TEG's possession of *source code* for purposes other than facilitating the government's security scanning is prohibited and requires destruction of the source code immediately after scanning. Any possession by TEG of Max's source code for purposes other than security scanning was unauthorized. TEG's admission it failed to comply with the SCLA and CA and destroy the copy of the source code after the source code was security scanned and falsely certified destruction to Max also admits Max's likelihood of success in demonstrating TEG's liability for trade secret misappropriation. (Clare Tr. 99:15-100:7)

Finally, TEG claims that it has an "implied license to sell and distribute," Max's Haptic Federal software. (ECF 125 at 20 to 22). It is TEG's burden to prove "the existence of a license, exclusive or nonexclusive, [which] creates an affirmative defense to a claim of copyright infringement." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). Citing *Shaver* and *Effects Associates, Inc. v. Cohen,* 908 F.2d 555 (9th Cir. 1990), TEG argues that a non-exclusive license

may be implied where (1) a person requests the creation of a work, (2) the creator makes that particular work and delivers it to the person who requested it, and (3) the creator intends that the requestor copy and distribute his work. (ECF 125 at 20-21). However, in both of those cases, and in the prototypical implied license case, the putative licensee commissioned the work from the licensor specifically for the licensee's intended use and the parties failed to memorialize their agreement. *Shaver*, 74 F.3d at 772 (noting that in *Effects* the plaintiff "'created a work at defendant's request and handed it over, intending that defendant copy and distribute it,' in exchange for $ 56,000," and similarly "Mr. Shaver created, for a fee of $ 10,000, designs for the Airport's air cargo building and handed them over to Joint Venture and the Airport.")

This is not a case where TEG commissioned Max to create a work just for TEG. Max's source code was a preexisting work that Max licensed to many users pursuant to written agreements. This is not a case where the parties lack agreements; one need not imply a license where, as here, the parties already have numerous express licenses including the EULA for the software program, the JVA for TEG's distributorship, and the SCLA and CA to safeguard the source code in connection with security scans. None of the parties' agreements permitted TEG to steal Max's source code, develop derivative works of the source code, compile the source code and then copy and distribute the software to anyone TEG chose. Implied license does not apply.

1.    **The Court should not consider the "implied license to sell or distribute" affirmative defense.**

TEG's interrogatory answers never mentioned anything about TEG possessing an implied license to sell or distribute Max's software.[20] The Court should not consider this late disclosed affirmative defense as a result.

---

[20] TEG's answers to interrogatories mentioned at the end of its "joint owner" defense that if TEG was not a joint owner, "[a]t the very least, TEG is an authorized licensee of the software and source code" (ECF 105-22 at 14), but no other disclosure was provided.

**H.  TEG concedes circumvention in violation of § 1201 and offers no evidence in support of any defenses to circumvention.**

TEG's opposition concedes that TEG made "adaptations to the license key" logic in the source code for Haptic Federal. Relying on self-serving conclusory statements of Mullican and Clare, TEG claims those "adaptations" were justified because they "were not made with the intent to commit copyright infringement but solely to make the software workable for TEG's customers." (ECF 125 at 27-28). However, there is no "justification" defense to § 1201(a), which provides simply that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a). TEG admitted to modifying Max's Haptic Federal source code to circumvent the license logic in the code. (ECF 106-5, Mullican Tr. at 56-59). TEG cannot avoid liability.

TEG also argues it "is not facilitating copyright infringement" because "[t]he only third parties accessing the software are TEG's government customers, who are licensed customers." (ECF 125 at 28). TEG's government customers do not have valid licenses. TEG violated the JVA, the EULA, the SCLA, and the CA. TEG stole Max's source code. TEG has no authority to grant licenses to software it created from source code that TEG stole from Max. As a result, no licenses granted by TEG are valid. TEG is also not a "permitted user" and neither is the U.S. Government. The U.S. Government has no valid license for the software distributed by TEG that was made from stolen source code.[21] TEG's circumvention of the license logic in Haptic Federal undoubtedly facilitated TEG's ability to distribute and unlock copies of Haptic Federal distributed by TEG compiled from stolen source code.

---

[21] Max is not currently asserting copyright infringement claims in this or any other case against the U.S. Government. Max is not seeking to enjoin the continued use of existing copies of Haptic Federal that the government is currently using. Max understands that any future claim for copyright infringement against the U.S. Government must be brought in the Court of Federal Claims pursuant to § 1498(b). But no such claims are asserted here.

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

**I.   TEG concedes removal of Max's CMI in violation of § 1202 and offers no evidence in support of any defenses to CMI removal.**

TEG offers no evidence and therefore concedes that without notice to or permission from Max, TEG removed the name HAPTIC from Max's software, and changed the name to VJOC. (ECF 105-2 at 18). However, TEG argues that "Max cannot make a clear showing that any of TEG's alleged conduct was committed with the requisite intent to infringe or to facilitate infringement." (ECF 125 at 28). TEG asserts that "Max has no evidence that TEG intended to engage in copyright infringement or to induce or facilitate others to engage in copyright infringement." (ECF 125 at 29). However, TEG's conclusory assertions of no evidence are contradicted by TEG's specific admissions. TEG's Mullican admitted that because "TEG still had in its possession a copy of a version of the source code," that version was turned over "to TEG's development staff" to develop derivative works of the source code. (Mullican Decl. ECF 127-7 at 5). Robert Clare admitted in his deposition testimony to the theft of Max's source code by TEG and TEG's creation of derivative works. (Clare Tr. 80:12-82:15).

TEG also ignores the circumstantial evidence of TEG's intent to infringe by changing the name of the software from Haptic Federal to VJOC since the change would conceal the fact that the software was not created by TEG but was instead stolen from Max.[22] Circumstantial evidence is relevant to proving violations of § 1202. See *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1189 (9th Cir. 2016) (Approving of the use of circumstantial evidence of specific wrongful intent to commit violations of § 1202 because direct proof is rarely available for state

---

[22] TEG also forgets that in copyright law "willful blindness is knowledge." *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003). TEG's willful blindness to the consequences of changing the name of Haptic Federal to VJOC is just as probative as direct evidence of TEG's knowledge that it was concealing its theft of Max's source code by changing the name from Haptic Federal to VJOC.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

of mind). The rule in the Seventh Circuit is the same: a defendant's wrongful intent may be logically inferred from circumstantial evidence by the finder of fact. See generally *Matter of Sheridan*, 57 F.3d 627 (7th Cir. 1995).

**J. TEG concedes trademark infringement of Max's HAPTIC trademark and offers no evidence in support of any defenses to trademark infringement.**

TEG, relying on *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) argues that Max's Lanham Act claim is precluded; TEG describes Max's claim as one where TEG is accused of marketing and selling "software directly derived from the software source code without acknowledging Max as the creator of the software," and TEG argues that this is a claim that *Dastar* says does not give rise to a Lanham Act violation. (ECF 125 at 30)

TEG misreads *Dastar,* Max's AMFPI, and Max's complaint. Max alleges that TEG "removed the Haptic mark on the Haptic Federal software and replaced it with C4MAP and JVOC when the software was displayed, advertised, and marketed to TEG's clients." (ECF 105 at 24). That is not what happened in *Dastar.* In *Dastar*, the defendant "took a creative work in the public domain--the Crusade television series--copied it, made modifications (arguably minor), and produced its very own series of videotapes." *Dastar*, 539 U.S. at 31. TEG did not take a work in the public domain, copy it and repackage it as TEG's own work. Instead, TEG stole Max's source code, created derivative works from the source code, and passed off the software TEG made from the source code as TEG's own C4MAP and VJOC products.[23]

**III.    ARGUMENT—MAX SUFFERED IRREPARABLE HARM; THE BALANCE OF HARDSHIPS TIP IN MAX'S FAVOR; THE PUBLIC INTEREST IS NOT HARMED BY**

---

[23] Max's claim against TEG is analogous to the claim in *Dastar* that the Supreme Court said "would undoubtedly be sustained if Dastar had bought some of New Line's Crusade videotapes and merely repackaged them as its own." *Dastar,* 539 U.S. at 31. (Noting also that "Dastar's alleged wrongdoing, however, is vastly different: it took a creative work in the public domain--the Crusade television series--copied it, made modifications (arguably minor), and produced its very own series of videotapes.")

**AN INJUNCTION THAT PREVENTS FUTURE INFRINGEMENT BUT PERMITS THE GOVERNMENT'S CONTINUED USE AND SUPPORT OF HAPTIC FEDERAL**

Balancing the harms requires a comparison of the harm to Max from the wrongful denial of a preliminary injunction with any harm that TEG may suffer that would not be cured by prevailing on the merits and Federal Rule of Civil Procedure 65(c)'s injunction bond. *A. J. Canfield Co. v. Vess Bevs., Inc.*, 796 F.2d 903, 908 (7th Cir. 1986). Strong policy considerations favoring protections for commercial trade secrets tip the balance in Max's favor. See *My Fav Elecs., Inc. v. Currie*, No. 24 C 1959, 2024 U.S.P.Q.2D (BNA) 1833, 2024 WL 4528330, 2024 U.S. Dist. LEXIS 189428, at *56 (N.D. Ill. Oct. 18, 2024).

There is a presumption of irreparable harm in cases of trade secret misappropriation. *Inventus Power, Inc. v. Shenzhen Ace Battery Co*., No. 20-cv-3375, 2020 U.S. Dist. LEXIS 122347, at *41 (N.D. Ill. July 13, 2020). In copyright infringement, where, as here, the plaintiff invested "substantial time, effort and money into creating the [copyright protected work]" and he likely will not realize a return on that "investment due to [Defendants'] infringement of the copyright," irreparable harm is found. *Aidong Zou v. Entities,* No. 23 C 16600, 2024 WL 1013976, 2024 U.S. Dist. LEXIS 40565, at *9 (N.D. Ill. Mar. 8, 2024). Irreparable harm is also found where plaintiff showed "potential harm to goodwill, reputation, brand confidence, [and] potential lost market share." *Antsy Labs, LLC v. Individuals Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Ass'n Identified on Schedule A Hereto*, 2022 U.S. Dist. LEXIS 212406, 2022 WL 17176498, at *3 (N.D. Ill. Nov. 23, 2022).

Max's inability to control its source code is conceded by TEG. TEG's development of unauthorized derivative works and distribution of those works is conceded. TEG's trade secret theft of Max's source code is conceded. TEG's circumvention is conceded. TEG's trademark violations and CMI removal are conceded. Yet TEG continues to request this Court maintain "the

status quo of the JVA." Apart from the fact that TEG breached the JVA first, the facts that TEG stole Max's source code, developed derivative works of Max's source code, and distributed new versions of Haptic Federal, indicates TEG will continue to harm Max irreparably unless enjoined. TEG pleads for equitable consideration but is entitled to none.

TEG's claim that a preliminary injunction "would irreparably harm its business relationships and reputation" (ECF 125 at 34) ignores the fact that the harm to TEG is not relevant because it "would be a consequence of [its] own conduct.'" *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1146 (N.D. Ill. 2019)). TEG cites to *Softech Worldwide, LLC v. Internet Tech. Broad. Corp.*, but the software at issue in that case was not for sale on the open market and there "was no risk of its cheapening through dissemination." 761 F. Supp. 2d 367, 377 (E.D. Va. 2011). However, Max licenses its software on the open market and is used in briefing centers, experience centers, innovation centers, and command and control centers by the government and Fortune 100 companies.[24] (ECF 105-2 at ¶ 6).

TEG's vague national security concerns about "disrupt[ion of] the nearly completed testing and validation of VJOC" do not create a public interest that outweighs the issuance of a preliminary injunction. Max's harms "including the loss of significant trade secrets and confidential information, reputation damage, and the wrongful loss of numerous customers" outweigh TEG's unsupported complaints about potential harm. *CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1064 (S.D. Ind. 2010) (balancing the harms in favor of the issuance of an injunction and refusing to order security because the plaintiff was a corporation in good standing and has made a strong showing that it is likely to succeed on the merits). Furthermore, a preliminary injunction

---

[24] Unlike the software in *Softech*, the potential application of Max's software is limitless, unlike the software in *Softech* which could only be used by one customer. (*See* ECF 124-3 at ¶¶ 107-114). Furthermore, unlike the plaintiff in *Softech* who waited six months before filing for a preliminary injunction, Max filed this case and sought an injunction as soon as it discovered that TEG exposed Max's source code online. (*See* ECF 15 at ¶ 82).

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ INDIANA ◆ TENNESSEE ◆ NEW YORK ◆ TEXAS

prohibiting future infringement will not cause disruption as the Court can enter an injunction that takes into account the need to protect national security while still protecting Max's interests.

## IV.     TEG'S $100M BOND IS UNSUPPORTED BY EVIDENCE; A $10,000 BOND IN THE FACE OF TEG'S THEFT IS GENEROUS

Despite its seemingly mandatory language, Rule 65(c) grants the court discretion to enter a preliminary injunction without requiring a bond under appropriate circumstances. *Wayne Chemical, Inc. v. Columbus Agency Service Corp.*, 567 F.2d 692, 701 (7th Cir. 1977). Likelihood of success on the merits is a basis for granting an injunction without a bond. *Trost v. Dixon Unit Sch. Dist. 170*, No. 21 C 50255, 2021 U.S. Dist. LEXIS 155790, at *15 (N.D. Ill. Aug. 18, 2021); *Huntington Learning Centers, Inc. v. BMW Education, LLC*, No. 10-cv-79, 2010 U.S. Dist. LEXIS 24769, 2010 WL 1006545, * 1 (E.D. Wis. March 15, 2010). A bond may be waived where the court is satisfied that there is no danger that the "opposing party will incur damages from the injunction." *Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). Courts have also reduced the requested bond amounts because it exceeded the movant's ability to pay, and courts balanced "the relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction that he may need desperately." *Id.* (collecting cases).

TEG has no basis to ask for a bond as security from its blatant theft. A low bond or no bond is appropriate here in view of Max's strong likelihood of success and TEG's lack of defenses for its conduct. See *Monroe Cty. Bd. of Comm'rs v. United States Forest Serv.,* No. 4:23-cv-00012-TWP-KMB, 2023 U.S. Dist. LEXIS 53620, at *27-28 (S.D. Ind. Mar. 29, 2023).

DATED: February 21, 2025                    Respectfully submitted,

*/s/ J. Campbell Miller*_____
campbell.miller@sriplaw.com
**SRIPLAW, P.A.**
231 S. Rangeline Road

Suite H
Carmel, IN 46032
561.404.4350 – Telephone
561.404.4353 – Facsimile

and

JOEL B. ROTHMAN
*(pro hac vice)*
joel.rothman@sriplaw.com

**SRIPLAW, P.A.**
21301 Powerline Road
Suite 100
Boca Raton, FL 33433
561.404.4335 – Telephone
561.404.4353 – Facsimile

and

*/s/ Philip D. Sever*
PHILIP D. SEVER
Indiana Bar No.:  25384-49
phil@landownerattorneys.com

**SEVER, STORY, WALKER**
742 South Rangeline Road
Carmel, IN 46032
317.961.1202 – Telephone

*Counsel for Plaintiff*