# Exhibit 2

CONFIDENTIAL

Page 1

1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
2
            CASE NO.: 1:24-cv-00779-JPH-MKK
3
4

MAX MINDS, LLC,

5
        Plaintiff,

6
v.

7

TRIANGLE EXPERIENCE GROUP, INC.,
8   ROBERT EDWARD CLARE, JEFFREY MASE,
    KEVIN G. MULLICAN and JOHN DOES 1-10,

9
        Defendants.
10  _____/

11

12                  Loudoun County, Virginia  20165
                    Wednesday, 10:05 a.m. - 12:29 p.m.
13                  February 19, 2025

14

15

16

17                  CONFIDENTIAL

18

19      VIDEO CONFERENCE DEPOSITION OF NICK FERRARA

20

21      Taken on behalf of the Plaintiff before

22  SANDRA GOLDMAN FREDERICKS, Florida Professional

23  Reporter, Notary Public in and for the State of Florida

24  at Large, pursuant to Notice of Deposition of Nick

25  Ferrara in the above cause.

CONFIDENTIAL

Page 2

1   APPEARANCES VIA VIDEO CONFERENCE:
2

      J. CAMPBELL MILLER, ESQUIRE
3     JOEL B. ROTHMAN, ESQUIRE (Pro Hac Vice)
      SRIPLAW, P.A.
4     21301 Powerline Road, Suite 100
      Boca Raton, Florida  33433
5     Attorneys for Plaintiff
6     RAIGHNE C. DELANEY, ESQUIRE
      BEAN, KINNEY & KORMAN, PC
7     2311 Wilson Boulevard, Suite 500
      Arlington, Virginia  22201
8     Attorney for Defendants
9

    ALSO PRESENT:
10
11    Brandon Fischer
      Jordan Abisror
12
13
                       INDEX
14
    WITNESS                              PAGE
15
    NICK FERRARA
16
    Direct Examination by Mr. Rothman ............  4
17  Cross-Examination by Mr. Delaney ............. 91
    Certificate of Oath of Witness ............... 96
18  Letter to Witness Re: Reading ................ 98
    Witness Signature Page/Errata Sheet .......... 99
19
20
21
22
23
24
25

Veritext Legal Solutions

800-726-7007                                         305-376-8800

CONFIDENTIAL

Page 3

```
 1                    E X H I B I T S

 2

     PLAINTIFF'S

 3   NUMBER              DESCRIPTION                PAGE

 4

     Exhibit 1    Expert Report of Nick Ferrara        5

 5

     Exhibit 2    Systems and software engineering -

 6                Vocabulary                           5

 7   Exhibit 3    Declaration of Janna Clare          19

 8   Exhibit 4    Declaration of Robert Clare         20

 9   Exhibit 5    Declaration of Kevin Mullican       21

10   Exhibit 6    Declaration of Robert Simon         71

11   Exhibit 7    End User License Agreement          21

12   Exhibit 8    Source Code License Agreement       22

13   Exhibit 15   E-mails from Azure DevOps to

                  various recipients                  75

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

Page 4

1    Thereupon:

2                      NICK FERRARA

3    was called as a witness and, having been first duly

4    sworn and responding, "I do," was examined and testified

5    as follows:

6                    DIRECT EXAMINATION

7    BY MR. ROTHMAN:

8      Q.  Good morning, Mr. Ferrara.

9      A.  Good morning.

10     Q.  Have you ever had your deposition taken before?

11     A.  I have.

12     Q.  How many times?

13     A.  About a dozen at this point, I think.

14     Q.  Okay.  Great.

15         I'm going to be asking you some questions.

16         Since you've had your deposition taken before,

17   have you had it taken remotely like this over Zoom?

18     A.  Probably half of those times at this point, I

19   think.

20     Q.  Great.  Okay.  So you probably know how to handle

21   this.

22         Just a reminder, let's try and talk -- not over

23   each other so that the court reporter can get my

24   questions and your answers clearly.  All right?

25     A.  For sure.

CONFIDENTIAL

Page 5

1     Q.  And if there's anything you don't understand, let

2   me know, and we'll repeat it or have it read back.

3     A.  Will do.

4     Q.  Great.

5         So you have exhibits that we sent and they all

6   have numbers beginning -- in the file names beginning

7   with 001 and 002, et cetera, and I'd like to have you

8   open Exhibit 1, which is entitled "Expert Report of Nick

9   Ferrara", and Exhibit 2, which is a document called

10  "Systems and software engineering - Vocabulary".

11        (Thereupon, the above-referred to documents were

12    premarked as Plaintiff's Exhibit Numbers 1 and 2,

13    respectively, for Identification.)

14  BY MR. ROTHMAN:

15    Q.  Let me know when you have -- if you have those

16  open.

17    A.  I have them both open.

18    Q.  Great.  Thank you.

19        So Exhibit 1, is this the expert report that you

20  prepared in the case we're here on today that is dated

21  January 31st, 2025?

22    A.  I'll double-check the date for you.  Just one

23  moment.

24        Yes, although it looks like some highlighting has

25  been added on a lot of the pages.

CONFIDENTIAL

Page 6

1      Q.   Yeah.   There might have been some highlights that

2   I put in.

3           Other than the highlights, does it appear to be

4   the expert report that you submitted in this case?

5      A.   I think so.

6      Q.   Okay, great, and the signature at the bottom of

7   page 26 is yours?

8      A.   It is.

9      Q.   Okay.   It's not indicated to be submitted under

10  penalty of perjury, but is everything contained in this

11  expert report, as far as you know, the truth based on

12  your personal knowledge?

13     A.   It is.

14     Q.   So we have your CV, which is attached, I'm going

15  to skip over that, and I'd like to start by going to the

16  Executive Summary on page 8 and I want to direct you to

17  paragraph 16, and in the first sentence of paragraph 16,

18  you say, "The record indicates that TEG worked jointly

19  with Max to complete technical work involved in

20  developing the Haptic Federal software."

21          MR. ROTHMAN:   Ms. Goldman, haptic is

22     h-a-p-t-i-c.

23          THE COURT REPORTER:   Thank you.

24  BY MR. ROTHMAN:

25     Q.   Do you see that, Mr. Ferrara?

CONFIDENTIAL

Page 7

1    A.   I do.

2    Q.   Okay.  When you say "the record indicates", what

3  are you referring to?

4    A.   So the various materials that I have in my report

5  is probably the easiest way to summarize that.

6         You know, there are -- go ahead.  Sorry.

7    Q.   No.  The -- so you mean Attachment 2 where you

8  list materials that you relied upon in preparing your

9  report?

10   A.   Let me look at Attachment 2 again.

11        In general, I think that's true.

12        In other words, all of those documents,

13 that's basically, I think, all the material that were

14 produced to me that I've considered in this case.

15   Q.   Okay.  Well, so but does Attachment 2 contain a

16 list of all the materials that you considered in

17 connection with preparing your expert report?

18   A.   I need to take a look.

19        In general, I think the answer is yes.

20        It is possible certainly there is some things

21 further cited in some of the footnotes in the report

22 that might have (inaudible) my attention.

23        In general, I try and cite the salient points in

24 footnotes and have sort of a comprehensive listing in

25 Attachment 2 of it should be everything, but I mean it's

CONFIDENTIAL

Page 8

1    certainly possible there's things in the footnotes that

2    are relevant to that as well.

3        Q.   Okay.  So when we're talking about "the record" in

4    paragraph 16, you mean either documents that are listed

5    in Attachment 2 or materials that are cited in footnotes

6    to the report?

7        A.   Yeah.  I mean I guess I'll clarify that for you.

8        Q.   All right.

9        A.   You know, when I'm talking about the record, I'm

10   talking about materials that have been produced in this

11   case.

12           Obviously there are other materials such as

13   publications or industry standards that I'm citing to as

14   well, but it's not really part of the record per se.

15   I'm really referring here to materials produced in the

16   case.

17       Q.   Okay, but for clarity, all the materials that were

18   produced in the case that you looked at and relied upon,

19   right, are listed either in Attachment 2 or is referred

20   to in footnotes; correct?

21       A.   In general, I think that's true.  It's certainly

22   possible there's, you know, stuff that just didn't make

23   it into Attachment 2, but as best as I can recall, I

24   think that's what's been produced to me.

25       Q.   How did you receive the materials that are listed

CONFIDENTIAL

1   in Attachment 2; in other words, did you get sent a link

2   to download them from someone or were you given access

3   to a computer system or were you given paper copies?

4   How did you get them?

5      A.   It probably varies for the specific material.

6           You know, I think some of this probably was

7   documents that were e-mailed.  I would think some of it

8   also was probably sent via some sort of file sharing

9   site.  You know, I don't recall the specifics of the

10  exact transmission medium that was used for each of

11  these as I sit here at this moment.

12     Q.   Okay.  We -- there's been documents that have been

13  produced in the case by each side.

14          Did you get to choose which documents you would

15  look at or were they just all -- all the ones in

16  Attachment 2 were just provided to you and without your

17  ability to select which ones you wanted and which ones

18  you didn't want?

19     A.   Well, I mean I -- my general recollection is I was

20  given, you know, here's a folder of documents or here's

21  a set of documents, and I could just look at all of

22  them.

23     Q.   Got it, and who gave you those; do you remember

24  the person?

25     A.   No.

CONFIDENTIAL

Page 10

1    Q.  Was it an attorney working for the Bean Kinney

2    firm?

3    A.  I think that's right.  I couldn't tell you who

4    specifically gave me these documents from, you know, six

5    months ago.

6    Q.  All right.  Do you remember when several --

7    A.  No.

8    Q.  -- months ago is?

9    A.  No.

10   Q.  So looking back at your report, you say in the

11   second sentence, "analysis of the parties' source code

12   corroborates TEG's position that it provided key

13   architectural designs that Max used in the development

14   of the Haptic Federal software".

15       Now, if you can turn to Attachment 2, can you

16   identify for me what you're referring to on Attachment 2

17   as the parties' source code that you did analysis of?

18   A.  I'm sorry.  Attachment 2?

19   Q.  Yes, Attachment 2.

20   A.  Sorry.  I misheard Exhibit 2 for a moment there.

21       Give me a moment to scroll down.

22   Q.  Sorry.

23   A.  No, no, I -- my bad.

24       Sure.

25       So this is the source code that's listed at the

CONFIDENTIAL

1    top of page 1 on Attachment 2, the first section being

2    "TEG Source Code Repository Data", which starts with

3    repository named "aces" and goes down through depository

4    named "VJOC-Client-main" --

5        Q.    Okay.

6        A.    -- and the source code under the heading "Max

7    Source Code Repository Data", which since there's just

8    four of them, I'll just list them, ███████████████

9    ███████████  ████████████████████████████████████

10   and I think all of those listed in the section under

11   both "TEG Source Code Repository Data" and "Max Source

12   Code Repository Data", those should all be source code

13   repositories.

14       Q.    Okay.  The ones listed under "Max Source Code

15   Repository Data", the four items there that you read

16   into the record, those you reviewed on the source code

17   review computer that you examined at the offices of Bean

18   Kinney; correct?

19       A.    That's correct.

20       Q.    Okay.  With respect to the ones above that under

21   "TEG Source Code Repository Data", starting with "aces",

22   how did you go about reviewing the source code

23   repository for ACES?

24       A.    Can you be more specific?

25       Q.    Well, was it something where you were given files

CONFIDENTIAL

Page 12

1   that you downloaded and examined on your own computer or

2   did you go to a facility to review it; how did it come

3   about?

4      A.   So I was provided with copies of the repositories

5   for these files and used --

6      Q.   Okay.

7      A.   -- industry standard tools to be able to review

8   and analyze the source code.

9      Q.   Okay.  So you did all the analysis in your office,

10  not at a remote location?

11     A.   I think that's correct.

12          I think this was all provided to me fairly early

13  on before the parties sort of got into their dispute

14  over the mechanism by which the source code was going to

15  be produced.

16          So I'd have to go back and check, but that's my

17  recollection.

18     Q.   Okay.  So with respect to ACES, what format was

19  the repository in; was it in Git format or some other

20  format?

21     A.   Yeah, I'm pretty sure all of the repositories

22  listed here are Git repositories.

23          THE WITNESS:  And for the court reporter, Git

24     is G-i-t.

25  BY MR. ROTHMAN:

CONFIDENTIAL

Page 13

1    Q.  Okay.  All right, and do you recall -- now, when

2   we talk about a repository, that's actually one of the

3   definitions in Exhibit 2.

4        So is it correct that in footnotes to your report,

5   you refer in a number of places to the standard,

6   "Systems and software engineering — Vocabulary", that's

7   marked as Exhibit 2 for the definition of terms?

8    A.  So just to make sure I understand your question --

9   would you repeat it?  I think there were a

10  few (inaudible) --

11   Q.  Yeah.

12   A.  -- that I'd like a little clarity, please.

13   Q.  Is it true you refer throughout your report to

14  definitions of terms contained in "Systems and software

15  engineering — Vocabulary" marked as Exhibit 2?

16   A.  Yes, that's correct, and just to be clear, I've

17  also referred to that as ISO 24765.

18       That's referenced back to the systems ISO

19  international standard.

20   Q.  Okay.  If I refer to Exhibit 2, you'll know what I

21  mean though; right?

22   A.  Sure.

23   Q.  Great.

24       So there is a definition in Exhibit 2 of

25  repository, and it's 3.3415.

CONFIDENTIAL

Page 14

1       When you're using the term "repository", are you

2   using that term as it's defined in Exhibit 2?

3     A.  You'll have to give me a minute to review the

4   definition.

5     Q.  And there are actually bookmarks in the document I

6   sent to many of the terms.  If you open the bookmarks

7   panel, you might be able to get there a little quicker.

8     A.  Actually you providing the -- oh, yeah, that's

9   fair.  Okay.

10      I was going to say, if you just give me the line

11  item number like you did, 3.3415, that was perfectly

12  fine too, and, in fact, I might ask you to do that.

13      Repository is -- oh, no, it is listed out.

14      Okay.  Let me just review the definition.  So give

15  me a moment.

16      I mean I would say insofar as these sort of more

17  general definitions are consistent with a Git

18  repository, which is a version control management

19  program, and the technology used to store changes to

20  source code over time, I would say that's consistent.

21    Q.  Great.

22      Now, it's my understanding that Git repositories

23  will have information contained in them indicating, for

24  example, a name or e-mail address of a person who

25  submitted code into the repository.

CONFIDENTIAL

1       Is that your understanding?

2    A.  That's generally correct, yes.

3    Q.  In the course of your analysis, did you examine

4  the names or e-mail addresses of the people who were

5  submitting code into the Git repositories listed at the

6  top of Attachment 2 to your report?

7    A.  I believe I did as part of my review of the code.

8    Q.  Okay.  Did you make notes about that or keep a

9  record of those names or e-mail addresses anywhere?

10   A.  I don't think so, no.

11   Q.  Okay.  It's my understanding also that when there

12  is a submission or something called a commit to a Git

13  repository, it will also indicate a date that -- or

14  potentially multiple dates if the code is subsequently

15  revised, that the code was submitted to the repository.

16       Is that your understanding?

17   A.  That's correct.

18   Q.  Okay.  Did you take note and memorialize the dates

19  for any of the commits in the repositories listed at the

20  top of Attachment 2?

21   A.  I would say yes to that.

22   Q.  Okay, and where is that information; did you --

23  'cause I don't see -- with respect to the "aces", which

24  is the first repo (phonetic), did you keep notes as to

25  dates of commit for that one?

CONFIDENTIAL

1    A.  Give me one moment to check.  I might be able to

2    point you to a specific footnote.

3          So in general, I refer you to footnotes 18 through

4    21 in which I refer to commits from particular TEG

5    source code repositories, which are listed in quotes,

6    and I provide both specific files at particular commits

7    as well as dates for those commits.

8          So, for example, in citing to this particular item

9    in footnote 18, that's a TEG source code repository,

10   double quotes, ███████████████  ███████████ █

11   █████  ████████████  ████████████████

12   unquote, and then parenthetically, (June 12th, 2018), at

13   a particular line with a parenthetical description after

14   that describing --

15   Q.  You're reading -- yeah, you're reading from

16   footnote 18.

17   A.  I am, and the point I'm trying to make is if you

18   look, for example, midway through that first line, where

19   it says "e4d4aa", that is the first six characters of a

20   particular commit.

21         That's a typical approach for identifying commits.

22   They are listed commit and colon followed with the path,

23   the particular file in the source code repository, and

24   I've noted parenthetically the date of that particular

25   commit.

CONFIDENTIAL

Page 17

1          Now, I will also note for full context, if you
2      look further down at, for example, footnote 20, where I
3      have "TEG source code repository ████████, at --
4      you know, I'm sorry.  That's actually a bad example.
5          There may be one or two here where I've referred
6      to the commits generally because there is something that
7      is broader or might be a commit message, for example,
8      that is specific to the entire commit rather than
9      changes to a certain file.
10         So it is typically listed in my footnotes where
11     I'll just say, you know, at commit hash line and then
12     the six characters of the start of the commit hash ID,
13     and forgive me.  I don't know how technical you are.  If
14     there's a concept or term I throw in there by reflex,
15     let me know and I can explain it.
16     Q.  I definitely will, but I am pretty technical, but
17     if I have questions, I'll let you know.
18         So but let me ask you, going back to the beginning
19     of footnote 18, where you say, "see, for example, TEG
20     source code repository" okay, which item are you
21     referring to listed at the top of Attachment 2?
22     A.  The transaction-manager repository.
23     Q.  Okay.  I see.
24         So item -- the fourth bullet down, --
25     A.  Correct.

CONFIDENTIAL

Page 18

1    Q.  -- the ███████████████ ?

2    A.  Correct.

3    Q.  Okay, and whenever you refer to TEG source code

4    repository, in the footnotes that follow, are you always

5    referring to that transaction-manager item?

6    A.  No.

7    Q.  Okay.  So what is the transaction-manager; what

8    can you tell me about that repository?

9    A.  I would have to look back at each one of these to

10   give you a better summary description.

11        There are particular items I've cited to that are

12   relevant here.

13        That is, I recall, a back end component of the

14   software as provided, --

15   Q.  Yeah.

16   A.  -- and I've cited the particular file's

17   description, but I would have to go back and look at the

18   source code to give you a full explanation.

19   Q.  I got it.

20   A.  In the repositories, there are README files which

21   provide sometimes some summary indication.  Those are

22   probably the easiest way to summarize their

23   functionality, but I don't have those in front of me.

24   Q.  Okay.  Did you create a file name listing of all

25   of the files in the repositories listed at the top of

CONFIDENTIAL

1    Attachment 2?

2        A.   I don't think so.

3        Q.   Okay.  Is that something that you could do?

4        A.   As a technical matter, sure.

5        Q.   We'll come back and we'll go through some more

6    specifics about that in a moment.

7            So if we go back to middle of page 8, paragraph

8    16, you say that your analysis corroborates TEG's

9    position that it provided key architectural designs.

10           What do you mean by key architectural designs?

11       A.   So for this, I would refer you to, I'll give you

12   the exact citation, paragraphs 26 through 29 including

13   29's subcomponents.

14           These are fundamentally the organizational

15   components that are at the heart of how the source code

16   I analyzed operates.

17       Q.   Got it.  Okay.

18           So I want to ask some other questions about some

19   other documents before we go further.

20           (Thereupon, the below-referred to document

21    was premarked as Plaintiff's Exhibit Number 3 for

22    Identification.)

23   BY MR. ROTHMAN:

24       Q.   So Exhibit 3 is a document called "Declaration of

25    Janna Clare".

CONFIDENTIAL

Page 20

1      Did you review that document at all in preparation

2  for your expert report?

3      A.  I'm not sure.

4      I know I had seen some of the papers and

5  attachments that have been or some of the attachments

6  that were included as exhibits to the parties' most

7  recent motions.  I just don't recall if this is one of

8  them offhand.

9      Q.  Okay.  I'm asking specifically about the

10  declaration part that begins the exhibit, not about any

11  attachments.

12      A.  No, I understand.

13      I think this may have been an attachment to

14  something that was recently provided.  I just don't

15  recall for sure.  It looks familiar, but I'm not

16  positive.

17      (Thereupon, the below-referred to document

18   was premarked as Plaintiff's Exhibit Number 4 for

19   Identification.)

20  BY MR. ROTHMAN:

21      Q.  Okay.  What about the "Declaration of Robert

22  Clare" that begins on the second page of Exhibit 4?

23      A.  Exhibit 4, give me one moment.

24      I'm not sure.

25

CONFIDENTIAL

1        (Thereupon, the below-referred to document

2     was premarked as Plaintiff's Exhibit Number 5 for

3     Identification.)

4    BY MR. ROTHMAN:

5     Q.  Okay.  What about the "Declaration of Kevin

6    Mullican" that -- in Exhibit 5, that begins Exhibit 5?

7     A.  Give me one moment to review the document.

8        I think the answer to that is yes.

9     Q.  Okay.

10     A.  I think I was provided with this fairly recently.

11     Q.  Okay.  Did you rely on that for any of the

12    opinions you give in your report?

13     A.  No.

14        Although I think it is consistent with my

15    understanding of TEG's position, I don't think this was

16    available.  'Cause this was executed January 30th, I'm

17    not sure if I saw this prior to that, but I think it is

18    consistent with my understanding of TEG's position.

19        (Thereupon, the below-referred to document was

20     premarked as Plaintiff's Exhibit Number 7 for

21     Identification.)

22    BY MR. ROTHMAN:

23     Q.  Okay.  Exhibit 7 is an "End User License

24    Agreement".

25        Did you review that and rely on it at all in

CONFIDENTIAL

Page 22

1   connection with providing your opinions?

2     A.   So you have two questions in there, I think.

3         Could you just repeat it and maybe break that

4   apart for me?

5     Q.   Did you review this prior to providing your

6   opinions and did you rely on it?

7     A.   I am not sure if I have reviewed it.  I don't have

8   a Bates number on this document, so I can't check that

9   one way or the other offhand, and I do not believe I

10  relied on it for any of my technical analysis.

11        (Thereupon, the below-referred to document

12    was premarked as Plaintiff's Exhibit Number 8 for

13    Identification.)

14  BY MR. ROTHMAN:

15    Q.   What about the next -- same question for the next

16  document, Exhibit 8, the "Source Code License

17  Agreement".

18    A.   Just for my own clarity, the document has a

19  sticker on it that says "Exhibit 8", but the document's

20  also labeled "Exhibit 6".

21        Should I be going by the sticker and the file

22  name?

23    Q.   Just don't go with the Exhibit 6 name that's in

24  the middle of the page.  It's the same -- it's the

25  Exhibit 8.

CONFIDENTIAL

Page 23

1    A.   Okay.  So use the file name, the 00 8 as the --

2    Q.   Yes, please.

3    A.   Okay.  All right.

4         I may have seen this.  I don't recall when.

5    Obviously I believe I've seen this -- well, I certainly

6    saw this when you sent it ten minutes ago.  I don't

7    recall if I saw it before.

8         Again, this document's not Bates numbered.  So I

9    can't easily check that.

10   Q.   Okay, but you didn't rely on it at all?

11   A.   For the technical analysis, I don't think so, no.

12   Q.   Okay.  Did you rely on any agreements for your

13   analysis?

14   A.   I don't think I'm relying on any agreement.  I had

15   an understanding of certain agreements, but I think my

16   analysis was all just based straight upon analysis of

17   the source code and the other material cited in the

18   record.

19   Q.   So did you find -- in your review of the source

20   code on the review computer in the four repositories

21   listed on Attachment 2 under "Max Source Code Repository

22   Data", did you find any source code that was written by

23   anyone at TEG?

24   A.   So that particular question is difficult to

25   answer.  Both given the constraints on the review

CONFIDENTIAL

1    computer and the fact that the source code has been

2    isolated, it's difficult to do any side by side

3    comparison.

4        I know, if I recall from some of the declarations,

5    that there are references -- or maybe it was from some

6    of the testimony, there are references to pseudo code or

7    other information that was provided.  So it would be

8    hard for me to answer that without being able to do a

9    full side by side comparison.

10       Obviously that's separate from my opinion

11   regarding the architectural similarities that are

12   pointed out in my report, but in terms of actual source

13   code, I would need both sets of data on one computer to

14   do any side by side comparison.

15   Q.  Understood, but is the answer to the question --

16   considering the constraints of your review, is the

17   answer to the question that you didn't find any source

18   code authored by anyone at TEG on the review computer?

19   A.  I don't think I've offered an opinion on that.  I

20   think the constraints on that are, you know, I haven't

21   been asked to get into the weeds of where did each line

22   of code come from except insofar as that the

23   architectural similarities, as I've pointed out in my

24   report, are things that are -- well, I'll rephrase.

25       The architectural similarities in the source code

CONFIDENTIAL

1   that was on the review computer are the same as the

2   architectural elements that are present in the earlier

3   source code that I've reviewed that was provided by TEG.

4        That I would say is the same and I understand that

5   that might have some bearing on that question.

6        In terms of specific lines of code, I'm not in a

7   position to do that analysis the way the code has been

8   produced at this time.

9   Q.  Okay.  So your engagement, you were not asked to

10  determine where did the code come from; is that my

11  understanding?

12  A.  No, I wouldn't say that.

13       I would say that what I was asked to do was to

14  analyze the source code particularly as it pertains to

15  what's in the record related to what TEG developed

16  vis-à-vis the source code on the review computer.

17       So, you know, in the particular context of what

18  we're looking at here, that is architectural analysis.

19       That is distinct from the question of analyzing

20  individual lines of source code and saying, this line of

21  source code was written by this person or that person.

22  Q.  Okay.  You used the phrase a moment ago, "what TEG

23  developed"; right?

24       In other words, you were looking at, what did TEG

25  develop that was in my client's source code; right?

CONFIDENTIAL

1    A.   Well, a couple of things.

2         First and foremost, you said your client's source

3    code.

4         Are we talking about the source code on the review

5    computer?

6    Q.   Yes, Max's source code.

7    A.   Well, okay, I -- first, again, just to be clear,

8    my -- I'm happy to refer to it as the source code in the

9    review computer, but my understanding is the ownership

10   of that source code is at issue.

11        So just so the record is clear, when we're talking

12   about what you have referred to as Max's source code,

13   I'm only referring here to the source code in the review

14   computer.

15        I have no opinions on the ownership of the source

16   code.  Those are legal issues outside the scope of my

17   report just so that's clear for everything.

18   Q.   Okay.  Agreed.

19   A.   With that said, perhaps you could repeat your

20   question just to make sure I give you a complete answer

21   to it.

22   Q.   Thank you.

23        So it was not part of what the -- what you did in

24   your analysis to determine whether TEG developed any of

25   the source code on the review computer?

CONFIDENTIAL

Page 27

1    A.  Well, I think that's conflating sort of an idea

2    that we're looking at individual lines of source code

3    versus the underlying designs that are used to implement

4    the system.

5        You know, I mean you -- to the extent that the TEG

6    source code implements those designs and those designs

7    are then present later in the source code on the review

8    computer, I'd say that is part of my analysis.

9        To the extent we're talking about looking at each

10   line of code, that's not something that can easily be

11   done based on the constraints that were placed on the

12   review computer, and so, you know, the -- I think,

13   again, the architectural analysis is really what we're

14   talking about in terms of designs that were developed by

15   TEG that then get implemented in the source code on the

16   review computer.

17   Q.  Okay, and when you're talking about "designs that

18   were developed by TEG", you were referring to the detail

19   that you put into your analysis beginning at paragraph

20   21 of your report under the heading "Design"?

21   A.  In general.

22       Obviously the findings are more specific as you

23   get down into that.  That section includes some

24   methodology and some further background, but in general,

25   that is correct.

CONFIDENTIAL

Page 28

1    Q.  Okay.  So what was it that you determined TEG

2    designed?

3    A.  So there is several elements of the architecture

4    that I point to in my report and these are covered in

5    paragraph 29 and its respective subparts.

6         So one element of it is the concept of a single

7    message box or a source of information that is used to

8    distribute messages to all connected users.

9         As I point out, that serves the same function as

10   the board that is in the source code on the review

11   computer.

12        Another is the use of WebSockets as the

13   transmission technology, for lack of a better term, to

14   send and receive data to clients connected to the

15   software, and it -- further, the attachments or rather

16   the components that are used for certain types of media

17   that are stored on the boards or in the message boxes,

18   however you want to phrase it, related to chat and video

19   streaming functionality.

20        The same general organization for how those

21   components are laid out in the software, their purpose

22   and how they interoperate is the same as what's in the

23   source code on the review computer.

24   Q.  Okay.  So summarizing, one, the architectural

25   concept of a board; two, the use of WebSockets; and

CONFIDENTIAL

Page 29

1  three, the use of components for media such as chat
2  video; is that an accurate --
3     A.  I would say it's probably you've gone a little too
4  high level.
5        It's not necessarily, for example, just the
6  architectural concept of the board but how it fits into
7  the system as a whole and how it interoperates with the
8  other components.
9        I think all of how those pieces fit together is
10  centered around the board as part of the architecture as
11  well.
12     Q.  Okay.  So in the course of your review leading to
13  your opinions in your report, were you given any design
14  or architectural documents that were authored by someone
15  at TEG that laid out these three items?
16     A.  I would say this is based on my analysis of the
17  code.
18        I would also say to the extent there are README
19  files or other documentations that are included in the
20  source code, that's relevant too.  That provides some
21  overview in some of the components I seem to recall.
22        I don't know that there are other documents beyond
23  that, but my analysis is all based on the source code
24  directly and what's in those repositories.
25     Q.  Okay.  So there is an item, a vocabulary item, in

CONFIDENTIAL

Page 30

1    in Exhibit 2.  It's item 3.1164 called "detailed design

2    description".

3        Did you see anywhere in your review a detailed

4    design description authored by someone at TEG?

5    A.  I don't think so.

6        It's not necessarily something that is always

7    produced when you're developing source code, but it -- I

8    don't recall seeing one for this particular project.

9    Q.  Did you see any indication that there was ever a

10   detailed design review conducted, which is defined in

11   3.1164?

12   A.  That's something that would come typically, I

13   would say, later in the software development process.

14       You know, I think of -- for context, I've had

15   cases where, for example, in the development of software

16   for the healthcare industry, you know, oftentimes, if

17   you're using a software development lifecycle such as

18   those promulgated by the Center for Medicare Services,

19   they'll have specific phases where they say, you're

20   going to do your development, and then there will be a

21   detailed design review phase where, you know, all the

22   documents you've built, which we've required as part of

23   a particular project, are going to be examined.

24       So that happens in some projects based on the

25   specific nature of what's going on and how the

CONFIDENTIAL

1    development is being done.  That's not necessarily

2    relevant for what we're looking at here.

3        Q.   Okay.  Did you see any documentation other than

4    what you saw in the source code that laid out the design

5    requirements written by someone at TEG for the three

6    items that you identify?

7        A.   I don't know that I've seen anything in terms of

8    requirements for -- we're talking about the items in

9    paragraph 29; right?

10       Q.   Yes.

11       A.   I don't know that I've seen anything that provided

12   requirements that were written earlier on for that.

13       Certainly all of that code, if you look in the

14   repositories developed between 2017 and 2018, I don't

15   think anything I've seen dates back to that period for

16   specifically those requirements.

17       There's obviously other requirements that are, you

18   know, elsewhere in the record, but I don't think there's

19   anything for that time period.

20       Q.   Okay.  Did you come across in your review anything

21   that you would describe as a software development plan

22   that included the three items in paragraph 29 that was

23   written by someone at TEG, and the definition of

24   software development plan is at 3.3806.

25       A.   Give me one moment to take a look at that; 3.3806?

CONFIDENTIAL

Page 32

1    Q.   Uh-huh.

2    A.   One moment.  Let me take a look.

3         No, but I wouldn't expect to see something like

4    that in a software development plan.

5         Software development plans are typically processes

6    that are described for how the software is going to be

7    developed in terms of where source code will be stored,

8    who's going to work on it, who will have review

9    authority, how a particular branch of the source code

10   might get handled, things of that nature that have more

11   general purpose to how the software is developed.

12        They're not going to be specific to any one

13   particular project's requirements or designs or things

14   like that.  They're a higher level document typically.

15   Q.   Did you find anything in your review that

16   contained the three items in paragraph 29 written by

17   someone at TEG in the nature of software design

18   description, which is defined in 3.3799?

19   A.   I'll take a look at that document.

20        No.  I think it's, again, sort of consistent with

21   what I said earlier on the design documents, which are

22   the detailed design description.

23        You know, there's not much in terms of

24   documentation that sets forth sort of the abstract

25   designs.

CONFIDENTIAL

Page 33

1      You know, my analysis and assessment of the source

2  code is based on my training, experience and my

3  background as a system architect and my analysis of the

4  source code primarily.

5      I don't know that I've seen something where this

6  was broken down at the level of some of those kinds of

7  documents except insofar as that there may be

8  documentation in the source code as well.

9  Q.  Okay.  You talk about documentation in the source

10  code, right.

11      We're talking about comments or notes that are in

12  the source code itself; correct?

13  A.  Correct, and I'd include README files in that

14  description as well.

15  Q.  And README files.  Okay.

16      When you were looking at the code in the repos

17  that are listed at the top of Attachment 2 under "TEG

18  Source Code Repository Data", did you see any comments

19  or README files that were written by TEG employees or

20  contractors?

21  A.  I think that's right, but I would have to go back

22  and check the source code to see the history of those

23  files.

24      Certainly there are README files in at least some

25  of these repositories, but I would have to check and

CONFIDENTIAL

Page 34

1   see, looking at the history, who wrote them.

2       Q.  Okay, but you don't recall seeing -- sitting here

3   today, you don't recall seeing any that were written by

4   TEG employees or contractors?

5       A.  I mean I would say that's my understanding -- my

6   recollection, rather, excuse me, but I would have to go

7   and check.

8       I mean there's a hundred commits or more across

9   these repositories, each of which has its own metadata.

10  I just don't recall the specifics of each one as I sit

11  here.

12      Q.  Okay.  It's my understanding that the items, the

13  three items in paragraph 29 that you're identifying as

14  being things that TEG developed, right, it's my

15  understanding that in doing your review, that you were

16  looking at the code to determine whether someone from

17  TEG developed those items in paragraph 29, or am I

18  incorrect about that?

19      A.  I mean I think that is correct.

20      It is certainly my understanding that the source

21  code was written by TEG.  You know, if you're asking

22  more specifically beyond that, who, I would have to

23  check the repository.

24      Q.  Okay.  So is it your understanding then that the

25  first item in the source code repository list for TEG at

CONFIDENTIAL

1    the top of Attachment 2, "aces", is it your

2    understanding that the source code in ACES was written

3    by someone at TEG?

4        A.  Well, I guess I should be a little specific here

5    to be safe.

6            So my understanding in general is that the source

7    code we're talking about here in the two, three, four,

8    five, six, seven, eight, nine -- no, I'm sorry, the

9    eight bullet points at the top of Attachment 2 under

10   "TEG Source Code Repository Data" generally are all

11   components of the ACES software.

12           I've tried to refer to it broadly in my report to

13   make it a little easier, but specifically I'm referring

14   to all of those eight bullet points that are at the top

15   of Attachment 2 when I'm talking about the ACES software

16   in that section.

17       Q.  Okay.  So from "aces", which is the first bullet

18   point, down to "web-video", which is the eighth bullet

19   point, --

20       A.  Correct.

21       Q.  -- all of these are part of the ACES software?

22       A.  When I'm using that term in the report, that's

23   what I'm trying to get at, yes.

24       Q.  Okay, and is it your understanding that those

25   first eight items contain source code that was written

CONFIDENTIAL

Page 36

1    by someone at TEG?

2        A.   That's my recollection, yes.

3        Q.   Okay, and it's your recollection based on what?

4        A.   Review of the source code repository data.

5        Q.   Okay, and by review of the source code repository

6    data, you mean the person who did the commit to the

7    repo?

8        A.   Commits, plural, I think that is correct.  I'd

9    have to check and see if there is further data and

10   comments or documentation that might also support that,

11   I don't recall offhand, but at the very least, that

12   would be one source of metadata towards that point,

13   correct.

14       Q.   Okay.  Did you have some list of TEG personnel

15   that you could refer to when reviewing the commits to

16   identify, oh, this person who did this commit on this

17   date in the ACES software, which is the first one, that

18   person was a TEG employee?

19       A.   I would have to go back and check my materials to

20   see if I had a list or something provided.

21           Certainly I have an understanding as to some of

22   the people who are TEG employees, but I don't know that

23   I have a comprehensive list.  I'd have to check the

24   materials that I've been provided.

25       Q.   Well, I'm trying to understand how you knew, from

CONFIDENTIAL

Page 37

1    looking at the names or e-mail addresses of people who

2    did the commits for the first eight items, that those

3    people were working for TEG at the time.  That's what

4    I'm trying to understand, because I thought I heard you

5    say that all of the commits for those first eight items

6    were by TEG people.

7        A.   I'm sorry.

8        Q.   Did I hear that correctly?

9        A.   No, I'm not sure I said it quite like that.

10       Q.   Okay.

11       A.   I think what I said was that I believe there are

12   commits by individuals who are TEG in there.  I seem to

13   recall that.

14       Q.   Okay.

15       A.   I don't actually know if I can tell you all of

16   them are one way or another.  I'd have to look at the

17   source code repository.

18       Q.   Okay.

19       A.   I certainly have an understanding that the code

20   that TEG provided, I believe they've said that that was

21   code that they developed.

22            I would have to double-check that as well, but I

23   think that is consistent with my review of the

24   repository data, but, again, I don't have it in front of

25   me.  I would have to go back and look.

CONFIDENTIAL

Page 38

1    Q.  Okay.  So do I understand correctly then that it
2    was represented to you by whoever gave you those repos
3    that at least the first eight items at the top of
4    Attachment 2 contain code developed by people at TEG; is
5    that the representation given to you?
6    A.  I think when I was initially provided that, when
7    we were discussing what was available for my analysis, I
8    think that's right.  I think that's also consistent with
9    my review, as I recall it, looking at the commit
10    histories, and I think those -- I think that was
11    consistent, but, again, I would have to check the
12    repository data.
13    Q.  Okay, and when you say you think it was
14    consistent, for example, the metadata for these commits,
15    would they contain e-mail addresses that would indicate
16    that the person who did the commit had an e-mail address
17    @triangleexperiencegroup.com; is that what you mean?
18    A.  So when you commit to a source code repository,
19    you're going to have a name and an e-mail.
20        The name and the e-mail may or may not be at a
21    particular organization.
22        There are many times I've seen when people use
23    their -- get accounts on their local computer and they
24    forget they have their local e-mail address put on, so
25    like a Gmail or Hotmail account that -- but it will

CONFIDENTIAL

Page 39

1    still say typically their name.

2         That is the kind of metadata that's usually

3    included with the repository that we're talking about

4    here.

5    Q.   Okay.  Well, but wouldn't you then have to have

6    been given a list of all the names of the TEG developers

7    in order to match them up with the commits to know that

8    the source code in those commits was written by someone

9    who worked for TEG?

10   A.   Well, no, not necessarily.

11   Q.   Well, how else would you know?

12   A.   Well, you said, would I need to be provided a

13   list.

14        I mean the names of some of these individuals are

15   in the record.

16        Kevin Mullican, obviously I don't need to see --

17   Q.   Okay.

18   A.   -- his name on a list to know he's associated with

19   TEG.

20   Q.   Okay.  So you saw Kevin Mullican's name as being

21   one of the names of someone who committed -- who did a

22   commit to the first eight repos?

23   A.   It seems correct, but I don't recall as I sit here

24   for sure.

25   Q.   Okay.  So were there other names that you saw who

CONFIDENTIAL

1    you know from the record who committed software in the

2    first eight items?

3        A.    Again, I would have to check the repository

4    history.  I don't recall all of the entries as I sit

5    here today.

6        Q.    Okay.  What about the last three items,

7    ███████████████  ████████████  ███████████████  did you

8    examine those to determine who did the commits?

9        A.    For those, I recall looking at the history at one

10    point.  I don't recall the specifics of that right now.

11        I think what I was looking at was looking

12    particularly at the initial version to understand the

13    architecture of the software as it existed when it was

14    first checked into those repositories, so at the

15    earliest possible time available.

16        Q.    Okay, and did you -- when you looked at those

17    initial commits, did you see that there were names of

18    people committing the software who worked for TEG?

19        A.    Again, I would have to go look at the repository

20    history.  I don't have their history of their

21    repositories memorized.

22        There's hundreds of entries in these different

23    databases.

24        It's -- you know, it's the sort of thing that you

25    would typically look up looking at the repository

CONFIDENTIAL

Page 41

1    instead of trying to remember.

2       Q.   Okay.  Just to make things clear, you're not

3    sitting here offering an opinion that TEG or anyone

4    working for TEG wrote source code in any of these

5    repositories at the top of Attachment 2, right; that's

6    not one of your opinions?

7       A.   I'm not sure I would say it like that.

8            Certainly I have an understanding that, to start

9    with, I asked for what TEG's preexisting codes that they

10   have available, what was it.

11      Q.   Okay.

12      A.   So that's the starting point.

13           I would -- I seem to recall, looking at it, that

14   there are commits that are consistent with TEG employee

15   names like Kevin Mullican, I think, perhaps in these

16   repositories.  I don't recall all the specifics.

17           You know, that might be an understanding

18   assumption in some of the analysis, but I don't know

19   that I've -- I wouldn't quite phrase it the way that I

20   think you did in your question.

21      Q.   Okay.  I just want to make sure that we understand

22   the scope of your report because it seems to me that

23   there is a difference -- and correct me if you think I'm

24   wrong, Mr. Ferrara, it seems to me that there's a

25   difference between writing source code and what you say

CONFIDENTIAL

1    TEG did in paragraph 29 with those three items.

2    A.  I'm sorry.  Was that a question?

3    Q.  Yeah.

4        Is there a difference between writing source code

5    and what you say TEG did in paragraph 29 with the three

6    items that you've highlighted?

7    A.  Yeah.  I mean I would say they're both different

8    parts of the software development process.  They are --

9    you know, the design process is upstream of the code.

10   You can't write code until you've done some degree of

11   design.

12   Q.  Okay.  Thank you.

13       If we go back and take a look at, for example,

14   paragraph 22, you're saying --

15   A.  Paragraph 22 of which document, please?

16   Q.  Of your report, --

17   A.  Okay.

18   Q.  -- page 11.

19       You say, "I understand from my conversations with

20   TEG".

21       Okay.  So who did you have conversations with and

22   when did those conversations take place and how long did

23   they take?

24       Can you start first with who did you speak to?

25   A.  I don't know that I recall all the individuals.

CONFIDENTIAL

Page 43

1          Certainly Mr. Mullican was one of them.

2      Q.  Okay, and when did you speak to him; most

3  recently, when did you speak to him?

4      A.  I mean I don't recall.  It's been some months

5  since --

6      Q.  Okay.

7      A.  -- that initial conversation or conversations.

8      Q.  Okay.  Did you take notes?

9      A.  I don't think so.  If I did, it would have been --

10     Q.  Okay.

11     A.  -- in the form of sort of data that ultimately

12  gets finalized in the report as is.

13     Q.  And what do you recall him telling you?

14     A.  So my recollection is that he said, in 2017 and

15  2018, he was working on back end source code directed at

16  developing sort of the next version of the software that

17  they had been working with previously, that they were

18  moving to a web-based system, which is going to have a

19  different architecture design for the what I understand

20  was a client-based system, one you would install on a

21  computer that had been the code or the software he'd

22  been previously working with, and he had been working on

23  developing the underlying components of that new

24  software prior to the engagement of Max Minds in, I

25  think, 2019.

CONFIDENTIAL

1    Q.  Okay.  So in paragraph 24, you say that you

2    compared -- first line, "I compared the source code

3    architecture and design of source code that TEG wrote

4    for ACES, TEG's predecessor to the Haptic Federal

5    software, to both early and later versions of the Haptic

6    Federal software developed in mid-2019 and fall 2023,

7    respectively."

8         So can you identify for me the items on

9    Attachment 2 that you compared ACES to?

10   A.  Sure.

11        So that's going to be to source code in the --

12   from the review computer.

13   Q.  Oh, okay.

14        So how did you do that comparison?

15   A.  So -- excuse me one moment.

16        So I reviewed using a technique called Static Code

17   Analysis where you're actually reviewing the code as

18   opposed to running it, read through the files,

19   understood the relationships, understood how the

20   different components interconnect and the system

21   architecture fits together, and I compared that, again,

22   Static Code Analysis to review how the source code

23   worked on the read computer, how the different

24   components connect, the different relationships between

25   them and the different parts of the software that are

CONFIDENTIAL

Page 45

1    involved.

2      Q.  Okay.  Did you do the comparison simultaneously or

3    did you first review the software on the review

4    computer, the source code on the review computer, and

5    then subsequently review ACES, or did you do it in the

6    other way around, or was it at the same time; how did it

7    happen?

8      A.  I would say I reviewed ACES first and then the

9    Haptic Federal software second.

10     Q.  Okay, and what was the period of time between your

11   review of ACES and your review of the Haptic Federal

12   software?

13     A.  I mean I don't recall specifically.

14     Q.  So was it a day, a month, a year; I mean

15   approximately what period of time?

16     A.  I mean a few weeks, I suppose, since the initial

17   review.

18         I certainly went back and refreshed myself looking

19   at the source code as I was doing review, and I had my

20   own computer, you know, connected to the -- to my

21   network with access to the source code for my review as

22   I was doing that.

23         So it wasn't like, you know, I had to memorize all

24   of ACES and then go in and look at it.  I had

25   information available when I needed to do those

CONFIDENTIAL

Page 46

1    comparisons.

2       Q.   Okay.  So you had it -- when you did the review,

3    you had your own computer that had ACES on it next to

4    the computer that you did the review on so you could

5    look from one to the other?

6       A.   Yeah.  I mean it's not the best process, but it's

7    serviceable if you really have to.

8       Q.   Okay.  You didn't see any source code statements

9    that were identical though; correct?

10      A.   I don't know that I could say that one way or

11   another.

12           Again, my focus was on the architecture and the

13   analysis of how those pieces fit together.

14      Q.   Okay.

15      A.   There could always be lines that end up being

16   identical as a result of the fact that there are

17   programming constructs that will look the same when

18   you're doing any sort of development, but, you know, I

19   didn't go deeper into it from the particulars of

20   particular lines of code.

21           Again, this was an architectural analysis of the

22   parties' source code.

23      Q.   What programming language or languages were -- was

24   ACES in the first eight bullet points on Attachment 2

25   written in?

CONFIDENTIAL

Page 47

1    A.  I think it was C++, but I would have to
2    double-check if that's the only thing it's written in.
3    Q.  Okay, and what about the review computer; what
4    language was the code written in there?
5    A.  Primarily C-Sharp.  I think there's also
6    JavaScript components if I recall.
7    Q.  You say in paragraph 25 in the first line that
8    "Analysis of the parties' source code demonstrates that
9    core architectural design elements", okay, "used", you
10   go on.
11       Those are the items listed in paragraph 29, right,
12   the core architectural design elements?
13   A.  For the TEG software for the Haptic Federal
14   software, that's in 27 through 28.
15   Q.  Okay.  So the first item that you're dealing with
16   in 26 "is the architectural concept of a board".
17       Do you see that?
18   A.  I do.
19   Q.  Okay, and then at the end of that paragraph, you
20   drop a footnote 10 there at the bottom, and then you
21   begin to cite to certain lines in the Haptic Federal
22   software; right?
23   A.  I believe that's correct.
24   Q.  Okay.  Do you know who wrote the source code at
25   the lines cited in footnote 10?

CONFIDENTIAL

Page 48

1    A.   I mean not as I sit here at this moment.  I would

2    have to go and look at the repository.

3    Q.   Okay, and then it's my understanding that if we go

4    forward to paragraph 29.1, that 29.1 is the same design

5    elements that you found in TEG's software; right?

6    A.   You mean in the Haptic Federal software?

7    Q.   Right.

8         So 26 describes what you saw in the Haptic Federal

9    software and then 29.1 is your description of what -- of

10   that same element that you found in the TEG software?

11   A.   That's correct.  I think you had reversed it when

12   you said it.  So --

13   Q.   Sorry.

14   A.   No, no.  I'm just making sure I was clear on the

15   question.

16   Q.   Okay.  So you drop a footnote to 29.1 to

17   footnote 18 and you go into some detail.  It goes on to

18   the next page about different lines where you find that.

19        Do you know who it was who wrote the source code

20   that you're citing to in footnote 18?

21   A.   So, again, I would have to check in the repository

22   history, but I want to just make clear, at this point,

23   when we're talking about the source code, you know, we

24   need to distinguish here between just the actual line of

25   text and the design, the sequence, the structure, the

CONFIDENTIAL

1    organization of how this system operates that are being

2    implemented by those lines of text.

3         You know, you might be able to say look at the

4    repository and see who wrote down the actual here is the

5    text of this particular line in a particular commit, but

6    that is distinct from the question of the design

7    elements, the structure and sequence and organization

8    that's inherent in those lines.  That is a different

9    point that's not quite the same.

10   Q.  Okay.  Is it your opinion that the design

11   elements, which you're saying are different from the

12   source code, that these design elements that you found

13   in paragraph 29, the three of them, that those design

14   elements were confidential information owned by TEG?

15       MR. DELANEY:  Object to the form of the

16    question.

17       You can answer.

18       THE WITNESS:  So, yeah, I mean I would say, to

19    start, I don't think I've offered any opinions one

20    way or another on confidentiality.

21   BY MR. ROTHMAN:

22   Q.  Okay.

23   A.  I can say that the design elements between the two

24   are the same and the design elements listed in 29.1

25   through 29.3 are all developed between, I think, 2017

CONFIDENTIAL

1    and 2018.

2         I'd have to double-check the dates for the

3    earliest commits on some of those, but at least through

4    2018.  Those are the most recent commits, I think, which

5    are cited in my report.

6    Q.  Okay.

7    A.  Those predate the designs that are implemented in

8    the Haptic Federal software.

9    Q.  Okay, and in other words -- well, withdrawn.

10        Are you -- is it your testimony that TEG was the

11   first to use the concept of a board in the design of

12   software?

13   A.  No.  I think that's going further.

14        I'm talking about a board in the context of this

15   particular application and how the pieces of that puzzle

16   fit together.

17   Q.  Okay.  Are you -- is it your opinion that TEG was

18   the first to use the concept of a board in this type of

19   application; that is, no other software company had

20   previously used the concept of a board in this type of

21   software application?

22   A.  No.  Now you're going too narrow.

23        So, again, it's -- that is one component and it is

24   the core of this application as a part of the larger

25   system architecture.

CONFIDENTIAL

Page 51

1          It is the most important concept for someone to

2     understand when you're trying to figure out how these

3     components work, but it's part of this system as a whole

4     and that's what I'm looking at when I'm comparing these

5     two.

6          I'm not going -- you've gone both broader and more

7     narrow.  That's not quite what I'm saying.

8     Q.   Okay.  Is it that the combination of the concept

9     of a board, the use of WebSockets and the use of chat

10    and video streaming functionality together is something

11    that TEG was the first to use; is that what you're

12    saying?

13    A.   I don't think I have said that they are the first

14    to use it.

15    Q.   Okay.

16    A.   I said they developed a system using this

17    architecture.

18         I haven't gone further than that to say it was the

19    first time, but I think that this architecture was

20    developed by TEG for this application and its purpose,

21    and then my understanding, that is Mr. Mullican

22    testified that he then had meetings with Mr. Fischer and

23    discussed and provided that design architecture as the

24    parties started at the outset of their relationship, and

25    then what I can see in the Haptic Federal code is the

CONFIDENTIAL

Page 52

```
1    same architectural elements are present in the designs

2    that are inherent in TEG's source code.

3      Q.  Okay.  Great.

4          MR. ROTHMAN:  Do you want to take a break now

5    or -- for five minutes --

6          THE WITNESS:  That's fine.

7          MR. ROTHMAN:  -- and then we can come back.

8          It's 20 after 11.  I have some more to ask, but

9    just to offer it to you.

10         THE WITNESS:  Sure.  I'd love to get a bottle

11   of water actually.

12         MR. ROTHMAN:  Okay.  Great.  Me too.

13         All right.  Let's take five minutes.

14         Thanks.

15         (Thereupon, a recess was taken at 11:21 a.m.,

16   after which time the deposition resumed at

17   11:27 a.m.)

18   BY MR. ROTHMAN:

19     Q.  Okay.  So let's look at paragraph 27.

20         Paragraph 27, you talk about "implementing the

21   WebSockets communications protocol"; correct?

22     A.  Correct.

23     Q.  Okay.  In your footnote 12, you refer to the

24   protocol "Comments 6455" from the Internet Engineering

25   Task Force.  It's dated December 2011.
```

CONFIDENTIAL

Page 53

1       Do you see that?

2    A.  I do.

3    Q.  Okay.  So you're not saying that it was TEG's idea

4    to use WebSockets as a design element for a computer

5    program initially or originally; correct?

6    A.  Can you repeat that?  I'm not quite sure that it's

7    right the way you phrased it.

8    Q.  You're not saying that it was TEG the first to use

9    WebSockets as a design element for a computer program?

10   A.  For any computer program ever?

11   Q.  Right.

12   A.  Correct.  That's further than I'm going.

13       It's the choice of this particular technology for

14   this particular architecture is what we're talking about

15   here.

16   Q.  Okay, and it's -- you're basing your opinion on

17   the fact that you saw the use of WebSockets in ACES, you

18   were told that ACES was created by TEG, and then you saw

19   the use of WebSockets in the haptic review computer;

20   correct?

21   A.  I mean I --

22       MR. DELANEY:  Object to the form.

23       THE WITNESS:  I would say you have perhaps

24   oversimplified that.

25       It's not just the use of WebSockets, the use of

CONFIDENTIAL

Page 54

1    WebSockets as part of the architecture as a whole.

2    It's not just, oh, here's WebSockets in one.  Here's

3    WebSockets in another.

4        It's how those components are connected to

5    implement the functionality of the two systems as a

6    whole.

7    BY MR. ROTHMAN:

8    Q.  Okay.  I only have three elements that you've

9    called out in paragraph 29, right; the board, WebSockets

10   and chat and streaming -- chat and video streaming.  I

11   just have those three.

12       Are you saying that there are more design elements

13   that TEG contributed besides those?

14   A.  I'm saying that while I have summarized those

15   elements to high levels, specific connections and the

16   specific implementations that build those up for these

17   purposes are part of that as well.

18       You can't just reduce it just to that level.  It's

19   a little bit broader than that.  In fact, that's some of

20   what I have cited in the footnotes where I'm pointing to

21   specific conscience to be able to say, this is where

22   some of that functionality is implemented that links

23   these things together.

24   Q.  And do I understand correctly that there is no

25   design document anywhere that specifies the use of these

CONFIDENTIAL

Page 55

1  three design elements in how they're linked together as

2  you've described?

3      A.  I would say I don't know that I have seen one

4  that's like a document that was written in advance of

5  programming.  It's not necessarily atypical, especially

6  if you have a small team or individuals working on code.

7  They don't necessarily write down a design document, but

8  I mean I don't know that I have seen one so far, --

9      Q.  Okay.

10     A.  -- again, with the caveat of my earlier testimony

11  being except insofar that there's documentation in the

12  source code itself on README files and other materials

13  as well.

14     Q.  Okay.  The documentation in the source code that

15  you saw, the README files and the comments, did you see

16  any README files or comments where, when you read them,

17  it indicated to you that the three elements that you

18  call out in paragraph 29 made up some larger design

19  concept that TEG was going for, or did it just talk

20  about, in this piece of code, we use WebSockets, or in

21  this piece of code, we implement chat and video

22  streaming?

23     A.  I would have to --

24     Q.  Do you understand my question?

25     A.  I understand your question.  I just don't recall

CONFIDENTIAL

1    as I sit here.  I would have to go back and look at the

2    code to answer it specifically.

3       Q.  Okay.  So I'm trying to understand whether it's

4    your opinion that it's these three items in paragraph 29

5    used together that constitutes what TEG contributed or

6    whether TEG's contribution consists of three separate

7    features functionality from a design standpoint that are

8    disconnected from each other.

9         Do you understand my question?

10      A.  No, I don't think I do.

11      Q.  Okay.  By combining these three items into

12   paragraph 29, you seem to be suggesting that these three

13   items are somehow connected.

14        In other words, the use of WebSockets with a board

15   and chat and video streaming is TEG's design concept.

16        Is that what you're saying?

17      A.  I think in that they are sort of the core of the

18   architecture that was being implemented, I think that is

19   correct, --

20      Q.  Okay.

21      A.  -- and there's other parts of the system as well

22   obviously which, again, I'd have to refer back to the

23   source code for, but I think in general terms, that's

24   correct.

25      Q.  Okay, but you never saw anywhere where it said you

CONFIDENTIAL

1    have to use WebSockets and a board and chat and video

2    streaming functionality together; you never saw anything

3    like that?

4       A.   I mean except for the source code itself perhaps,

5    which is where those designs are implemented.

6       Q.   Right.

7       A.   I mean it's in the pudding on something like that.

8    That's what they ultimately built, --

9       Q.   Okay.

10      A.   -- just source code.

11      Q.   Got it.

12           So beginning in paragraph 32, you go through

13    testing.

14           What is it that you're saying that TEG contributed

15    in terms of testing?

16      A.   So refer you to, for example, 33 and 34.

17           In 33, I say, "Evidence in the record demonstrates

18    that TEG performed system testing on the Haptic Federal

19    software", and in 34, I refer to "regression testing",

20    which is a form of testing that is similar to system

21    testing, but it's for the specific purpose of

22    demonstrating that defects that may have already been

23    resolved have not recurred after functionality that has

24    been changed and being further modified or extended,

25    basically making sure that if you change something to

CONFIDENTIAL

1   fix a problem, when you make further changes, you didn't

2   break it again.

3      Q.  Okay.

4      A.  Let me -- if I may, let me just finish reading --

5      Q.  Sure.

6      A.  -- to make sure there's nothing further I wanted

7   to add to that.

8         Yeah, I mean I guess, in general, this whole

9   section involves sort of the testing after its -- we can

10  go through in more detail.

11        There's evidence that I point out in 36 that there

12  is testing going on and defects that are being

13  remediated and identified by the parties jointly.

14        I've identified various defects that appear to

15  have been identified by TEG personnel in 38.  That's

16  also covered in Attachment 3 to my report, you know, and

17  obviously I talk about some changes that seem to have

18  been implemented in the source code, you know, looking

19  through the materials in terms of the records that were

20  identified by TEG as a problem that ultimately were then

21  changed by Max sort of at the direction of TEG to

22  resolve the issue.

23     Q.  Okay.  So TEG was not making changes to the source

24  code as a result of testing; it was all done by someone

25  at Max?

CONFIDENTIAL

Page 59

1    A.  I would have to look at -- in general, that might

2    be right.

3        There may be things like system configurations or

4    other things that would have been changed by TEG on the

5    corey (phonetic) version of the source code, for

6    example, that they might have identified and fixed.

7        I would have to go back and look and see if

8    there's anything indicative of that particularly, but

9    that is one possibility when you're doing this kind of

10   system testing in software.

11   Q.  Okay.  One possibility but not something that you

12   observed?

13   A.  I'm not sure if there was anything that was

14   referenced in some of the conference call videos I saw.

15   So I'd have to go back and check through some of those

16   again.

17       I know they did talk about some things that they

18   were changing, configurations and other materials, but I

19   don't know that I could give an affirmative answer one

20   way or another or not without checking those materials

21   again.

22   Q.  Okay.  So did you see in the course of your review

23   any sort of test design documents or specifications?

24   A.  I seem to recall there were -- there's references

25   in the record to testing and test plans, but I would

CONFIDENTIAL

Page 60

1   have to go back and check the materials that I saw those

2   in to refresh my recollection.

3       Q.  Okay.  Did you see any test documents that were

4   written by TEG; other words, a test specification that

5   TEG -- someone at TEG wrote?

6       A.  I don't -- nothing like that comes readily to

7   mind.

8           I know there were four to five reports, I believe

9   I've seen, that included programatically detected

10  security vulnerabilities and things like that.

11          In terms of like a plan for how testing is to be

12  done, I don't know that I've seen something like that,

13  although that again is like -- just like with the

14  software design documents, you know, your mileage will

15  vary on the extent to which parties actually create

16  those upfront.  Some do.  Some don't.

17      Q.  You talk about regression testing in paragraph 34.

18          There's a definition of regression testing in

19  3.3371.

20      A.  You're talking of the ISO standard?

21      Q.  Yeah.

22      A.  Uh-huh.

23      Q.  When you talk about regression testing, are you

24  saying that TEG did regression testing?

25      A.  So for that, I mean that's my understanding of

CONFIDENTIAL

Page 61

1    what we're talking about here in, for example, the

2    April 25th, 2023, conference call that's listed in -- or

3    I should say that's transcribed in paragraph 33 where

4    Mr. Herren and Mr. Sinnk talk about running regression

5    parallel together, or I should rephrase, where it

6    says -- where Mr. Herren says, "We can run through

7    regression testing, right?  In parallel."

8    Q.  Okay.  You say in the last sentence of paragraph

9    34, "Regression testing is typically a technical test

10   carried out by the software's developer"; right?

11   A.  I do.

12   Q.  Are you saying that it cannot be done by the

13   software user or the software distributor?

14   A.  Typically, no.  Typically when you're doing

15   regression testing, it's part of the development cycle

16   where you're working on developing software for a

17   particular purpose.

18       So, you know, there are various kinds of technical

19   tests that will be done as part of the software's

20   development in order to ensure that it works right.

21       Regression -- and those are all very technical in

22   nature.  You know, that's not something a user would

23   typically do.

24       Regression testing is one of those tests.  That's

25   the sort of thing a developer would do as part of its

CONFIDENTIAL

1    system testing to make sure fun -- a particular area of

2    functionality is stable.

3        Q.  Well, but the -- one of -- several of the

4    definitions for "regression testing" in Exhibit 2, for

5    example, definition 2, "testing required to determine

6    that a change to a system component has not adversely

7    affected functionality, reliability or performance and

8    has not introduced additional defects", do you see that?

9        A.  I do.

10       Q.  It seems like something that a user could do;

11   right?

12       A.  I mean as a like could somebody go and press a

13   button to regression test, theoretically, that is

14   possible.  In practice, that's not what is done.

15       Q.  Well, but your transcript here, assuming that

16   there were changes made to the software by Max, to the

17   source code by Max, okay, are you with me?

18       A.  Uh-huh.

19       Q.  And then there was a need to make sure that those

20   changes have not adversely affected functionality,

21   reliability or performance and didn't introduce

22   additional defects, then how is what's described in

23   paragraph 33 inconsistent with that?

24       A.  Because a user is not typically the party in a

25   software development project who's executing those

CONFIDENTIAL

Page 63

1    technical tasks.

2        In a typical software development project, the

3    vendor, the manufacturer of the software, is the one

4    who's going to do all of the initial work to make sure

5    that the quality issues have been addressed before

6    providing it to the customer.

7        That's not what we're talking about here.

8        What we're talking about here says running through

9    regression testing in parallel, together.

10   Q.  Is it your assumption that TEG is the customer?

11   A.  No.

12   Q.  'Cause that's what you said.

13       MR. DELANEY:  Objection; mischaracterizes the

14   testimony.

15   BY MR. ROTHMAN:

16   Q.  What I understood you to say is that what's

17   described in paragraph 33 is not something that a

18   customer would do, and that indicates to me that from

19   your point of view, TEG is a customer for this software.

20   A.  No.

21   Q.  Am I wrong?

22   A.  I think you've misunderstood my testimony.

23   Q.  Okay.  So if TEG -- you do not think TEG was a

24   customer for the software?

25   A.  No.  I would say, based on what I've seen in the

CONFIDENTIAL

1    record, they were jointly developing and creating and

2    testing the software.

3           In this particular paragraph, we're talking about

4    testing now.

5    Q.   Okay, and when you say "jointly developing", the

6    word development, okay, what is your definition of

7    development or if -- or better, what is your definition

8    of joint development?

9    A.   So I would say, in a joint development project,

10   parties typically share responsibilities for creating a

11   software product for whoever their customers ultimately

12   would be.

13          That's going to include shared technical tasks

14   typically, things like design, code construction,

15   testing, implementation, sort of the key phases of the

16   software development lifecycle, and I've set that all

17   out in section, I think it's VII A of my report.

18          Those are the kinds of typical activities where,

19   when a vendor is doing a project, they're going to be

20   executing these very technical steps of this process.

21          When the parties are collaborating on those steps,

22   that's indication that joint development is going on.

23   Q.   Okay, but the definition of -- your definition of

24   development, it sounds like, includes more activity than

25   just the authoring of source code.

CONFIDENTIAL

Page 65

1    A.   Correct.

2         I mean it's the same way in building a house.

3         Building a house isn't just putting up girders and

4    hanging drywall.

5         There's steps that have to be done when you say to

6    someone, I want you to build me a house; designing it,

7    making sure it's safe to live in through testing it, as

8    well as putting up those steps, and that's my point

9    here.

10        Software development is the same way.  It's not

11   just I write source code on a page.  You have to design

12   what you're going to write.  You have to write it.  You

13   have to test it.  You have to make sure it's actually

14   going to work.

15        Those are all typical and necessary steps of what

16   is called the software development lifecycle or a

17   software development lifecycle.

18        There's obviously different ways you can implement

19   those processes and all of that's covered in section A

20   of my report.

21    Q.  Take a look at the definition of source code in

22   Exhibit 2 at 3.3882.

23    A.  I'm sorry.  3 --

24    Q.  .882.

25    A.  Okay.

CONFIDENTIAL

Page 66

1    Q.  It says, "computer instructions and data

2    definitions expressed in a form suitable for input to an

3    assembler, compiler, or other translator."

4         Do you see that?

5    A.  I do.

6    Q.  Okay.  With respect to the software that you

7    reviewed on the review computer, did you find any source

8    code, using that definition, authored by TEG?

9    A.  Well, so, again, as I pointed out earlier, there

10   is a distinction between individual lines of text and

11   the designs being implemented by those lines of text.

12        You can't just say, you know, oh, they -- this

13   person wrote the pen to the paper.

14        If they're using designs jointly created or

15   created by another party, that's where we get into the

16   distinction of what's going on and the facts specific to

17   this case.

18   Q.  I understand that distinction.

19        The question was a simple yes or no.

20        MR. ROTHMAN:  Can you read back the question,

21   Madam Reporter?

22        THE COURT REPORTER:  Just a second, please.

23        (Thereupon, the question referred to was read back

24   by the court reporter as above recorded.)

25        THE WITNESS:  Yeah.  I mean I think my answer

CONFIDENTIAL

Page 67

1     is ultimately the same.

2         I think inclusive in the way that question is

3     asked is a conclusion that if somebody wrote this

4     line of code, therefore, it is authored by that

5     person.

6         It is more complicated than that because there

7     are the other steps of the software development

8     process that lead to the conclusion of how those

9     lines of code are being chosen to be read.

10        That is where you get into the specific facts

11    that we're looking at in this case with the

12    similarities in the design that I've pointed out.

13    BY MR. ROTHMAN:

14    Q.   Okay.   The designs are similar; right?

15    A.   Correct.

16    Q.   Okay.   Is the source code for the software you

17    reviewed on the review computer source code that was

18    written as in the definition of source code, "expressed

19    in a form suitable for input to an assembler, compiler

20    or other translator", written by anyone at TEG?

21    A.   Well, again, I think I've answered that as well.

22        I think I have seen references in the record where

23    there's testimony that things like pseudo code and

24    whatnot were provided at various points to Max in the

25    development of the Haptic Federal software.

CONFIDENTIAL

Page 68

1    I haven't gone further to try and look for those

2    given the restraints of the review computer at this

3    time.

4    It doesn't mean that they're not there or there

5    might be substantial similarities to things that are

6    there.

7    That's something I would have to check further

8    for.  So I don't know that I can answer that at this

9    moment without doing further review.

10    Q.  Okay.  Turning to your item capital C beginning on

11    page 18 at paragraph 42, --

12    A.  All right.  Give me one moment to scroll.

13    Okay.

14    Q.  -- can you just summarize what your opinion is in

15    this section?

16    A.  Sure.

17    So I understand that there are -- one of the

18    things at issue is the source code having been made

19    publicly available by -- that -- I should rephrase.

20    I understand one thing at issue is that TEG made

21    source code available for Haptic Federal software at

22    some point in time.  You know, I forget the exact time

23    frame, 2021, 2022, '23, probably '23, '24, I forget the

24    exact date.

25    You know, as that may pertain to potentially

CONFIDENTIAL

Page 69

1    issues of confidentiality, which I understand trade

2    secrets are one thing that's at issue in this case, you

3    know, what I'm pointing out in this opinion is that the

4    functionality of the source code that composes the front

5    end of the Haptic Federal software, you know, was being

6    made available, or a portion thereof that are consistent

7    with what's in the Alleo software were being made

8    available publicly in the form of what is called a

9    minified JavaScript file, and I get into detail in my

10   report obviously about minification and how minification

11   is fundamentally a technique that does not obfuscate the

12   source code in a manner that changes its functionality

13   and how it can be what is called beautified to create

14   that -- to create something that is easier to read and

15   that will show the functionality in less compacted terms

16   in a minified file, and that's sort of everything that's

17   covered in section C in terms of how that code is being

18   made available, what is actually listed in terms of, you

19   know, the time period I found and all of that sort of

20   detail.

21       Q.  I understood you to be saying basically that what

22   TEG did with respect to the allegations of making the

23   source code maps available was the same thing as what

24   Max does with respect to making minified JavaScript

25   available online.

CONFIDENTIAL

Page 70

1     A.   That's not quite what I said.

2     Q.   Okay.  So is what TEG did, which is making source

3   code maps available online, the same as making minified

4   JavaScript available online?

5     A.   I would say there's overlap.

6          Both approaches make the functionality of the

7   software publicly available, or at least I guess in the

8   context of this, where the code can be directly

9   accessed, but when you have a JavaScript-based front

10  end, the JavaScript files composing the front end have

11  to be downloaded to the client's computer that's running

12  it.  It's just a feature of how that's worked.  They are

13  interpreted by the client's side of the computer in

14  order to render the front end.

15         So in order for those files to work, the logic

16  that implements the actual functionality of the front

17  end is included in what's downloaded.

18         If those servers are publicly available, anyone

19  who downloads those files will have the underlying

20  functionality in the file they're downloading.  That's

21  the point I'm trying to make.

22    Q.   Okay.  JavaScript has to be downloaded if you need

23  JavaScript in order to utilize the functionality, and so

24  you are -- by choosing to use JavaScript, you're going

25  to make some information available to the end user;

CONFIDENTIAL

Page 71

1    correct?

2        A.  To the end user, that is correct.

3        Q.  Okay.  Is that the same as in terms of the

4    functionality and information you make available to the

5    end user when you make source code maps available?

6        A.  In terms of functionality, it is.  Ultimately, the

7    functionality is still the same.

8        Q.  Okay, but in terms of other concerns such as

9    information security or confidentiality?

10       A.  What about -- I'm sorry.  Could you clarify the

11   question?

12       Q.  Yeah.

13           Is it the same in your view, in terms of

14   confidentiality or information security concerns, making

15   minified JavaScript available versus making source code

16   maps available?

17       A.  Sure, absolutely.

18       Q.  Okay.  So the implication -- withdrawn.

19           (Thereupon, the below-referred to document

20       was premarked as Plaintiff's Exhibit Number 6 for

21       Identification.)

22   BY MR. ROTHMAN:

23       Q.  Did you review the Exhibit Number 6, the

24   Declaration of Robert Simon and the memo that's attached

25   to it, at any point before rendering your opinion?

CONFIDENTIAL

Page 72

1    A.   Yes, I did.

2    Q.   Okay.  So did you ever attempt to go through the

3    exercise that Mr. Simon goes through in the memo

4    attached to his declaration?

5    A.   Let me just take a look through the memo.

6         I mean certainly in terms of downloading all of

7    the website resources, I think I point out in my report

8    that the approach I used to download the minified files

9    is just to document that these things are available,

10   used this "Save All Resources" Chrome plug-in that he

11   used as well.

12   Q.   Okay, but my question was, did you go through this

13   exercise that he sets forth in his memo; did you

14   actually do this?

15   A.   Well, my point is there are multiple exercises in

16   his memo.

17   Q.   I know.

18        Again, my question is, did you do what -- step by

19   step what Mr. Simon documents in his memo?

20   A.   I mean are you talking about every piece of this

21   memo; is that what you're asking?

22   Q.   So in other words, beginning on the memo, if

23   you're looking at page 4 of the memo, it says, "Below

24   please find step-by-step directions for how to find,

25   review, and capture the Max Minds applications and

CONFIDENTIAL

Page 73

1   associated source code as being served publicly on the

2   internet by TEG", and then there are steps under to

3   identify source code map files and then to view source

4   code.

5        Do you see that?

6   A.  I do.

7   Q.  Okay.  Did you follow these steps in an effort to

8   recreate what Mr. Simon lays out here?

9   A.  I don't remember if I did this for TEG or if I did

10  this at one point for Max Minds.  I do seem to recall

11  investigating this issue, but this was right at the

12  outset of work on this matter.  I don't recall the

13  specifics of which set of code I did this on.

14  Q.  So you did follow these directions?

15  A.  I mean I seem to recall certainly reviewing this

16  and looking into it.  I just -- I don't recall the

17  specifics as I sit here right now.

18  Q.  If you did do it, did you keep notes or records of

19  what you did?

20  A.  I don't think so.  I think when we were testing

21  this out, we were sort of on a time constraint of some

22  sort.

23       I don't recall saving anything from just sort of

24  initial investigation right at the outset of the work in

25  this.

CONFIDENTIAL

Page 74

1    Q.  Were you at all involved in the process of

2  recommending or advising TEG what to do about the issue

3  that's raised in Mr. Simon's declaration?

4    A.  That's all discussions with counsel potentially?

5    Q.  Yeah, it would, absolutely.

6        MR. DELANEY:  Well, if it involves discussions

7    of counsel about advice on how to handle an action

8    rather than opposed to an expert opinion, we may

9    have to claim privilege on that.

10        So --

11        MR. ROTHMAN:  Okay.

12        MR. DELANEY:  -- I would instruct him not to

13    answer, just to the extent --

14        MR. ROTHMAN:  So --

15        MR. DELANEY:  -- that he knows.

16        MR. ROTHMAN:  So you're -- okay.  So you're

17    invoking work product privilege as to any advice he

18    may have given to TEG through counsel?

19        MR. DELANEY:  If that's what you seem to be

20    asking about and he has identified that as an issue

21    in which he has -- which would involve him providing

22    advice, and sitting here right now, I don't know the

23    parameters of that, but based upon your question and

24    his reaction, I think we'll have to assert privilege

25    and work product doctrine at this point for that

CONFIDENTIAL

Page 75

1    line of inquiry.

2         MR. ROTHMAN:  Okay.

3         (Thereupon, the below-referred to document

4    was premarked as Plaintiff's Exhibit Number 15 for

5    Identification.)

6    BY MR. ROTHMAN:

7    Q.  So with respect to the source code map issue, take

8    a look at Exhibit 15.

9         I just want to ask you a few questions about

10   Exhibit 15.

11   A.  Okay.

12   Q.  Have you seen in the course of your review -- I

13   didn't see these.

14        These are a collection of "Azure DevOps" messages

15   for the Azure source code management system?

16        I didn't see these listed in your items reviewed

17   in Attachment 2.

18   A.  I'm sorry.  What was the question there?

19   Q.  The question is, did you see any documents that

20   look like what's in Exhibit 15 in the course of your

21   review?

22   A.  I would say I've seen them because they were, I

23   think, attached to the most recent motions.  I don't

24   know -- I don't recall seeing them prior to that, but

25   I'd have to check my records.

CONFIDENTIAL

1    Q.  Okay.  Well, I don't know that they were, but

2    anyway, looking at the first page, do you know anything

3    about the first page where it says, "Add licensing info

4    to codebases"; do you have any knowledge of what was

5    being done here?

6    A.  Not without additional context.

7    Q.  Okay.  In the course of your review, did you --

8    were you asked to look at anything concerning licensing

9    issues with the software?

10    A.  Sure.

11    Q.  Okay, and what did you find?

12    A.  So I think that is covered.  I'll just point it to

13    you in my report.

14        I think this is covered in general in paragraph

15    40.

16        There is documents in the record that I reviewed,

17    for example, what's cited at footnote 29, regarding

18    licensing issues that the parties were trying to address

19    during their development, you know, and the fact that

20    there was a license expired banner in software that was

21    being displayed on the Haptic Federal software that was

22    causing a problem for the government customers who were

23    trying to use the software, and I know I've seen e-mails

24    such as the one that's cited there from around this time

25    period that get into that issue, and ultimately, that

CONFIDENTIAL

Page 77

1    was something Max removed in the source code in 2023 as

2    pointed out at the end of paragraph 40 and cited in

3    footnote 30.

4        Q.  Right, but the time frame that you're talking

5    about in paragraph 40 is different from this message,

6    which is from 5/9/2024.

7        Do you know anything about licensing issues around

8    May 9th, 2024?

9        A.  That doesn't ring any bells as I'm sitting here.

10   I don't know that I've included anything of that for the

11   opinions I've offered for this report.

12       Q.  All right.  You know that there's an allegation in

13   this case about TEG removing the licensing logic in

14   Max's software; right?

15       A.  I think that's consistent with what I've seen in

16   various documents.

17       Q.  Okay.  Did you see any -- where in looking at the

18   code, did you see any indication that TEG removed

19   licensing logic in the software --

20       A.  I don't think I've offered --

21       Q.  -- and then changed it?

22       A.  I don't think I've offered any opinions on that in

23   the analysis, just what's in the report.

24       Q.  Okay, but did you see it?

25       A.  I mean as I pointed out, I think, in my report,

CONFIDENTIAL

1    and I'll show you or I'll point you to the exact

2    section --

3        Q.   No.  I -- is it the one we were just talking

4    about?

5        A.   No.

6             One moment.  I'll give you the specifics.

7             As I pointed out, the comparison I did was between

8    TEG's earlier software from 2017/2018 --

9        Q.   Oh, okay.

10       A.   -- to Max's software from -- well, and I'm sorry,

11   I shouldn't say Max's, I should say the software that

12   was produced by Max, on the review computers in mid 2019

13   and fall of 2023.

14       Q.   Okay.  Take a look at the fourth page of this

15   exhibit, please.  It's --

16       A.   I'm sorry.  Of which exhibit?

17       Q.   The one we were talking about, 15.

18       A.   Okay.

19       Q.   5/10/2024, the "Subject: User Story 233 - Strip

20   Code on build from front-end".

21       A.   Okay.

22       Q.   So have you seen this before?

23       A.   And, I'm sorry, this referring specifically to?

24       Q.   This document.

25       A.   I mean, again, I think I've seen it in preparing

CONFIDENTIAL

1    for deposition in review of the materials provided to me

2    by --

3        Q.  Take a look for a second at the description at the

4    bottom of that page.

5        A.  Okay.

6        Q.  Do you understand this description here on this

7    document, what it's talking about?

8            MR. DELANEY:  Objection.

9            You can answer if you can.

10           THE WITNESS:  I mean they're talking about

11       creating a script, but that typically refers to

12       creating source code.

13           You know, I really only have what's here for

14       context.  I don't have all their information.  I

15       don't even know if this is the full work item.

16           There's obviously a link in this e-mail that

17       says "View work item".

18           So I'm not sure if there's more information

19       beyond what's here and on the next page, but I mean

20       I only really can tell you what it says in this

21       Description section.

22    BY MR. ROTHMAN:

23       Q.  Right.

24           My question is, from reading this Description

25    section, does it -- is it your view that what's being

CONFIDENTIAL

Page 80

1    described here, to remove or strip code from the source

2    maps, to remove source from the source's content keys,

3    from the map files, is that in your view the same as the

4    issue that you raised with use of minified JavaScript;

5    in other words, that minified JavaScript being shown on

6    the front end would create the same security concerns

7    that the source map files being on front end create?

8        A.   I'm not entirely sure I understand the question.

9             I would say that at the end of the day, the

10   functionality that's in the source map is the same as

11   what's being included in minified JavaScript files.

12       Q.   The functionality is the same; did I understand

13   that correctly?

14       A.   Correct.

15       Q.   The functionality that's shown in the source code

16   map is the same as the minified JavaScript; correct?

17       A.   I'd have to look at the source map files.

18            Certainly the application is going to have to

19   have -- whatever JavaScript's functionality is present

20   in those files in some manner is going to have to be

21   transferred to the client computer in order to run.

22       Q.   You wouldn't need to transfer the source code map

23   or the source code files to the client computer, would

24   you?

25       A.   I'd have to look at the front end of the code to

CONFIDENTIAL

Page 81

1    answer that.

2       Q.  Okay.  Is your opinion in your report an opinion

3    about whether exposing source code map files creates a

4    security issue or a confidentiality issue, is that your

5    opinion, or is it just about the minified JavaScript?

6       A.  Let me just refer back to my report to make sure

7    it is accurately stated.

8          I would say that -- let me just take a look to be

9    specific.

10         I would say my opinion is specific really to the

11   minification --

12      Q.  Okay.

13      A.  -- and to its use of the -- potential uses of

14   technique to the extent that might be claimed with

15   respect to confidential information.

16         That's what's in 45 and 46, and as I point out in

17   footnotes, for example, in footnote 34, the use of the

18   security through obscurity type approach where it's just

19   not clear what you're looking at is not enough and is

20   recognized in the industry as not enough to protect

21   confidential information.  More stringent measures are

22   typically required.

23      Q.  Okay.  It's not your opinion, I want to make sure,

24   you're not rendering an opinion about whether exposing

25   minified JavaScript and exposing source code map

CONFIDENTIAL

Page 82

1    information, that those two things both expose the same

2    file types, the same file names or the same directory

3    structures, is it?

4    A.  I don't know that I've gone that far.

5        I think the point I've raised here is simply the

6    functionality with that.  I think that is what I have

7    said although I'd have to check for the citation on

8    that.

9    Q.  Okay.  Going back to you mentioned pseudo code

10   earlier.

11       If you look at Exhibit 2, at 3.3228 --

12   A.  I'm sorry.  Give me that one more time, the

13   number.

14   Q.  3.3228.

15   A.  Okay.

16   Q.  Okay.  Is the definition there consistent with how

17   you use the term pseudo code in your report or in your

18   testimony?

19   A.  Let me just review it to be sure.

20       Yeah, I think that's general enough to adequately

21   summarize my understanding of how that term is typically

22   used.

23   Q.  Okay, and there's an example given after the

24   definition that says, "IF the data arrives faster than

25   expected, THEN reject every third input ELSE process all

CONFIDENTIAL

Page 83

1    data received ENDIF."

2        Do you see that?

3    A.  I do, and just for clarity in the record, the

4    words "IF", "THEN", "ELSE" and "ENDIF" are all in all

5    caps.

6    Q.  So when you're talking about pseudo code, you're

7    talking about somebody at TEG giving a statement like

8    that in the example to Max?

9    A.  So it could be like that.  That is one example.

10   Q.  Okay.

11   A.  This is more consistent with definitions 2 and 3

12   in this --

13   Q.  Okay.

14   A.  -- particular verbiage, but let me finish my

15   response.

16   Q.  Sorry.

17   A.  In the first definition, the pseudo code can be

18   and in many cases is more programming language specific.

19       It might not be totally grammatically correct in

20   the context of the particular programming language, but

21   it might be written in something that's much closer

22   than, you know, "IF ELSE" with written description in

23   English of what should be going on.

24       That would be sort of a -- you know, the example

25   that's listed here is more sort of a high level

CONFIDENTIAL

Page 84

1   structural element of a particular algorithm that you

2   might have, but you can have pseudo code that is more

3   detailed even if it's not specific.  It depends on the

4   nature of pseudo code.  By its very nature, it's pretty

5   general as to how you can use that term.

6      Q.  Okay.  In any event though, it would be necessary

7   for someone who was using the pseudo code to take the

8   point being made in the pseudo code and turn it into

9   source code in the correct language in the application

10  for it to work; it couldn't just be copied and pasted

11  into the code?

12     A.  Not literally, but you could still use the sort of

13  design of that particular function and that could be the

14  thing that's in the message, and it could be that there

15  might be specific lines that could be verbatim the same

16  with the missing bit being whatever hasn't been

17  developed that you're saying in pseudo code, well, this

18  is what would have to be further fleshed out.

19         It varies based on the pseudo code you're using.

20  You can do it at any level of generality.

21     Q.  Do you know the difference between JavaScript and

22  TypeScript?

23     A.  I would say so.

24     Q.  Okay.  What's the difference?

25     A.  So JavaScript is typically less structured in

CONFIDENTIAL

Page 85

1    terms of the variable definitions and the particular

2    types of variable using.

3         TypeScript provides sort of a more stringent set

4    of definitions than you're using when you're working

5    with JavaScript code.

6         So, for example, in JavaScript, you can create a

7    variable just saying it's a variable and the specific

8    type could vary based on the data that's stored inside

9    that.

10        TypeScript, if I recall correctly, refines that to

11   say you have to be more specific as to what type of data

12   is in that variable so that somebody using the program

13   can look at it and say, okay, this is an integer or a

14   string or some other particular type of data.

15   Q.   Okay.  Do you know what an angular template is?

16   A.   Sure.  I think so.

17   Q.   Go ahead.  Tell me what you -- what it is.

18   A.   So angular is a JavaScript framework for creating

19   front end applications.

20        A template in this context is typically a set of

21   screen display elements that are going to provide some

22   redefined structure.

23        In this context, I would say an angular template

24   is a -- I don't -- I hate to make this sort of circular,

25   but it's a template for a JavaScript front end that is

CONFIDENTIAL

Page 86

1    built using the angular frame.

2    Q.  Okay.  If we go back to the issue of the exposure

3    of the source code maps, you said TypeScript is going to

4    be more specific than JavaScript; right?

5    A.  I think that's correct, yes.

6    Q.  Okay.  So if the information in TypeScript files

7    was specific in a way that would create security

8    concerns for the exposure of those TypeScript files, you

9    with me so far?

10   A.  I'm not sure I am, but why don't you finish the

11   question and then I'll ask for clarification.

12   Q.  Okay.  Would -- in your view, would the security

13   concerns be the same for the exposure of JavaScript

14   files?

15   A.  I think the answer, if I understand your

16   question -- let me make sure I understand the question.

17      Is the question, when I'm providing minified

18   JavaScript, are the security concerns the same as if I'm

19   providing minified TypeScript?

20   Q.  Not minified TypeScript but actually exposing the

21   TypeScript files themselves, the TypeScript files which

22   are used using the angular templates to create the

23   JavaScript.

24   A.  I think the answer is yes in that the

25   functionality still has to be expressed one way or the

CONFIDENTIAL

Page 87

1    other.

2        You're getting functionality in both that's going

3    to describe the operation of the software, which could

4    potentially be investigated and attacked like from a

5    security perspective.  That's what we're talking about

6    here.

7        There is functionality is what you're going to

8    have that's ultimately going to be the primary attack

9    factor.

10        You're going to say, how does this thing work so

11    that somebody could then say, well, where do I pull it

12    apart to make it work the way I want it to, to

13    compromise whatever that would be.

14        I think the answer is yes because the

15    functionality is the thing that's ultimately going to

16    matter.

17    Q.  So in both cases, you're saying cases exposing

18    minified JavaScript versus the case of exposing the

19    original TypeScript files, the security concerns as to

20    functionality are identical in your view?

21    A.  I think in that the functionality is being

22    exposed, yeah, that's what somebody's going to have to

23    look at.  They're going to have to look at this code and

24    say, how does it work, in order to try and determine if

25    there is an attack factor.

CONFIDENTIAL

1    Q.   Okay.  So a web browser, which is going to be what

2    is used to view or run the code, can a web browser

3    natively process original TypeScript files or angular

4    templates?

5    A.   I'd have to look into that.  Offhand, I'm not

6    totally sure.  That gets into a TypeScript building

7    question that I'd have to go and check.

8    Q.   Okay.  Let's assume for a second that a web

9    browser cannot process and run TypeScript files or

10   angular templates just for the sake of argument.

11       So it couldn't use the original TypeScript or

12   angular templates to render a web page or create an

13   application.  Okay.  Let's assume that for the purposes

14   of this.

15   A.   Okay.

16   Q.   All right.

17       Would it then still be your view that exposing

18   minified JavaScript is the same in terms of security

19   concerns as exposing the original TypeScript or angular

20   templates?

21   A.   I mean if ultimately you're going to use the

22   angular or TypeScript templates -- excuse me -- the

23   TypeScript or the angular templates in order to generate

24   JavaScript code, either way, what you're going to need

25   to have in some form is JavaScript that can be run

CONFIDENTIAL

Page 89

1    natively on a web browser.

2        That's ultimately what's going to be publicly

3    available to somebody who's going to need -- if they're

4    going to try and attack the code, that's what they're

5    going to have -- work -- ultimately, if you're upstream

6    of that and then somebody can generate the code from

7    that versus having the JavaScript code, you still have

8    the same problem.

9        If functionality is being exposed, you're creating

10   a potential attack.

11   Q.   So I understand that statement as being indication

12   that you could take a minified JavaScript file and

13   reverse engineer or de-compile it to get back into the

14   underlying logic that was in the TypeScript or in the

15   angular templates.

16       Do I -- did I understand that correctly?

17   A.   No.  I don't -- the way you phrased that, I don't

18   think that's quite correct.

19   Q.   Okay.  So the TypeScript files, they have things

20   that are not in the minified JavaScript, right, like

21   they have metadata, annotations, comments and other

22   logic that a developer could read that doesn't exist in

23   minified JavaScript; right?

24   A.   I think as you phrase that, the answer is still I

25   don't think that's right.

CONFIDENTIAL

Page 90

1    Q.  No?

2        You think that the TypeScript file wouldn't

3    contain things that would also not be contained in

4    JavaScript or vice versa?

5    A.  No.  I mean I -- that's not what I said.

6        I think the way you phrased the previous question,

7    I think there was a problem with how you phrased it that

8    made it incorrect.

9    Q.  Okay.  Well, but my point is, the TypeScript

10   files, they're going to have information in it that

11   wouldn't end up in the minified JavaScript files;

12   correct?

13   A.  That is possible, but it's not a -- you said

14   "going to".  I don't think that's strictly speaking

15   right.

16   Q.  Assuming there was information in the TypeScript

17   files in the nature of metadata, annotations, comments,

18   things like that, assuming there was that stuff in

19   there, right, that would not necessarily end up in the

20   minified JavaScript; right?

21   A.  That I believe I agree with --

22   Q.  Okay.

23   A.  -- to an extent.

24       I mean I will clarify at least to say that I would

25   have to check and make sure there are no elements of

CONFIDENTIAL

Page 91

1   what you just said that would be structurally required

2   elements to the JavaScript program that would need to be

3   present as part of the translated minified code.

4      Q.  Okay, but if my statement is correct then and if

5   those additional things, the metadata, the annotations,

6   the comments, if those things were of a confidential

7   nature, then it would be different to expose the

8   TypeScript files than it would be to just expose

9   minified JavaScript?

10     A.  I -- confidential, I mean I guess I'm lacking some

11  context in terms of how you sort of set up the

12  hypothetical here.

13     Q.  Understood.

14        The context would have been, I think, in the files

15  that were exposed that are -- that was discussed in

16  Mr. Simon's declaration and the attachment, but I can't

17  ask you about those 'cause counsel has raised a

18  privilege objection.

19        MR. ROTHMAN:  So I have no further questions.

20        MR. DELANEY:  All right.  I just want to

21     clarify the record on one thing.

22                    CROSS-EXAMINATION

23  BY MR. DELANEY:

24     Q.  Thank you, Mr. Ferrara, for your testimony.

25        You had discussed at several points that there

CONFIDENTIAL

Page 92

1    were constraints on your review of the source code and I

2    don't know if you and Mr. Rothman ever stated what those

3    were.

4         So my question to you would be, what were the

5    constraints imposed upon your review of the Haptic

6    Federal source code as we're calling it?

7    A.   So I would say there are two primary constraints.

8         First, not all of the source code that I -- based

9    on documents provided by Mr. Simon necessarily may

10   compose the Haptic Federal source code have been

11   produced.

12        There are a number of repositories that were

13   identified in one of his exhibits, one of his

14   declarations, that list something like, I think it's 91

15   source code repositories.

16        There is -- there are a number of repositories on

17   that list that reference haptic in some form or another.

18        Of that list, only four repositories have been

19   produced.

20        Again, these are the ones listed in Attachment 2

21   to my report.

22        I obviously don't know what I don't know about

23   those particular repositories, which, you know, I know

24   we have requested information about even just basic

25   metadata such as get logs that would provide some

CONFIDENTIAL

Page 93

1    clarity into what is in those repositories, and that is

2    one of the two constraints.

3         The other constraint is that the code is produced

4    in a review computer in the first place that's isolated

5    from any other code produced and is effectively air

6    gapped, for lack of a better term, meaning you can't

7    connect it to any other systems, you can't put anything

8    else on there.

9         Now, obviously we've prearranged for necessary

10   tools to be put on there, but, you know, when you're

11   working on a case where you need to compare source code

12   in particular ways, the typical approach would be to

13   have both sets of source code on a computer that could

14   be then reviewed so that you can do side by side

15   comparisons so that you can search for line by line

16   similarities.

17        That's not possible because this thing is on an

18   air gap computer system; so those both constraints on my

19   analysis in terms of what I could do.

20        I think also one other thing, thinking about it,

21   that I pointed out in one of my declarations, if I had

22   running -- I'm sorry -- if I had the repositories in the

23   system that I could potentially control that was not air

24   gapped, I could have stood up the software.

25        We could have actually done things like functional

CONFIDENTIAL

1    testing to show specific elements of how the code are

2    used, what conditions they're used in, things like that.

3         That's not really possible in an air gap system.

4    It's not practical to be able to stand up a development

5    environment that typically would be connected to the

6    internet to be able to then build source code that's

7    being produced in the federal repositories.

8         It's just I've done that on other cases, it

9    doesn't work well, and those are all things that

10   provided bounds on what I could fully explore in this

11   particular matter for purposes of this report.

12   Q.  These constraints that you mentioned, they weren't

13   imposed actually by my client, TEG, were they?

14   A.  No, definitely not.

15        MR. DELANEY:  All right.  I have no further

16   questions.

17        MR. ROTHMAN:  Thank you for your time,

18   Mr. Ferrara.

19        THE WITNESS:  Thank you.

20        MR. DELANEY:  All right.  Have a good day,

21   Joel.

22        MR. ROTHMAN:  Yes.

23        I assume he's going to read.

24        MR. DELANEY:  Yeah, we'll read.

25        MR. ROTHMAN:  And could I get also a phone

CONFIDENTIAL

Page 95

1      number for you, Ms. Goldman?

2          THE COURT REPORER:  It's (305) --

3          MR. ROTHMAN:  Uh-huh.

4          THE COURT REPORTER:  -- 439-1509.

5          MR. ROTHMAN:  1509.

6          Okay.  We're going to let you know about the

7      transcript and how quickly we need it, but I don't

8      have an answer for you right now.

9          THE COURT REPORTER:  Okay, and do you want a

10     copy, Mr. Delaney?

11         MR. DELANEY:  Yes.

12         THE COURT REPORTER:  Okay.  So it's ordered,

13     but you're --

14         MR. ROTHMAN:  Right now, for right now, it's a

15     regular order, but -- you know, regular delivery,

16     but I need a few minutes to think about how quickly

17     I need it and get back to you.

18         THE COURT REPORTER:  Okay.  No problem.

19         MR. ROTHMAN:  Okay?

20         THE COURT REPORTER:  Yes.

21         MR. ROTHMAN:  Thanks very much.

22         THE COURT REPORTER:  Thank you.

23         MR. DELANEY:  All right.  Thank you, everybody.

24         (Thereupon, the video conference deposition was

25     concluded at 12:29 p.m.)

CONFIDENTIAL

Page 96

5              CERTIFICATE OF OATH OF WITNESS

STATE OF FLORIDA        )
                        )  SS:
COUNTY OF BROWARD        )

9       I, SANDRA GOLDMAN FREDERICKS, Court Reporter
10   and Notary Public in and for the State of Florida at
11   Large, certify that the witness, NICK FERRARA, remotely
12   appeared before me on February 19, 2025, and was duly
13   sworn by me.
14        WITNESS my hand and official seal this 20th
15   day of February, 2025.

        SANDRA GOLDMAN FREDERICKS, FPR,
        Court Reporter and Notary Public,
        State of Florida at Large.

Notary #HH076143

My commission expires:  4/9/25

CONFIDENTIAL

Page 97

1          REPORTER'S VIDEO CONFERENCE DEPOSITION CERTIFICATE

2

3          I, SANDRA GOLDMAN FREDERICKS, Florida

4    Professional Reporter, certify that I was authorized to

5    and did stenographically report the video conference

6    deposition of NICK FERRARA, the witness herein; that a

7    review of the transcript was requested; that the

8    foregoing pages numbered from 4 to 95 inclusive is a

9    true and complete record of my stenographic notes of the

10   video conference deposition by said witness; and that

11   this computer-assisted transcript was prepared under my

12   supervision.

13          I further certify that I am not a relative,

14   employee, attorney or counsel of any of the parties,

15   nor am I a relative or employee of any of the

16   parties' attorney or counsel connected with the

17   action.

18          DATED this 20th day of February, 2025.

19

20

21

22                    Sandra Goldman

                SANDRA GOLDMAN FREDERICKS,

23              Florida Professional Reporter

24

25

CONFIDENTIAL

Page 98

1    Raighne C. Delaney, Esquire
     rdelaney@beankinney.com

2

                                    February 20, 2025

3

4    RE: Max Minds vs. Triangle Enterprise Group, et al.
         February 19, 2025 - Nick Ferrara - 7182553

5

6       The above-referenced transcript is available for

7    review.

8       The witness should read the testimony to verify its

9    accuracy.  If there are any changes, the witness should

10   note those with the reason on the attached Errata Sheet.

11      The witness should, please, date and sign the Errata

12   Sheet and email to the deposing attorney as well as to

13   Veritext at Transcripts-fl@veritext.com and copies will

14   be emailed to all ordering parties.

15      It is suggested that the completed errata be returned

16   30 days from receipt of testimony, as considered

17   reasonable under Federal rules*, however, there is no

18   Florida statute to this regard.

19      If the witness fails to do so, the transcript may be

20   used as if signed.

21                        Yours,

22                        Veritext Legal Solutions

23   *Federal Civil Procedure Rule 30(e)/Florida Civil

24   Procedure Rule 1.310(e)

25

CONFIDENTIAL

Page 99

1    Max Minds vs. Triangle Enterprise Group, et al.
     February 19, 2025 – Nick Ferrara – 7182553
2
3              E R R A T A   S H E E T
4
     PAGE_____LINE_____CHANGE_____
5    _____
     REASON_____
6    PAGE_____LINE_____CHANGE_____
7    _____
     REASON_____
     PAGE_____LINE_____CHANGE_____
8    _____
     REASON_____
9    PAGE_____LINE_____CHANGE_____
10   _____
     REASON_____
     PAGE_____LINE_____CHANGE_____
11   _____
     REASON_____
12   PAGE_____LINE_____CHANGE_____
13   _____
     REASON_____
     PAGE_____LINE_____CHANGE_____
14   _____
     REASON_____
15   PAGE_____LINE_____CHANGE_____
16   _____
     REASON_____
     PAGE_____LINE_____CHANGE_____
17   _____
     REASON_____
18   PAGE_____LINE_____CHANGE_____
19   _____
     REASON_____
20
21
     Under penalties of perjury, I declare that I have read
22   the foregoing document and that the facts stated in it
     are true.
23
24
25   _____    _____
     NICK FERRARA                                DATE

Veritext Legal Solutions

CONFIDENTIAL

**[& - 38]**                                                    Page 100

| & |
| --- |
| **&**   2:6 |

| 0 |
| --- |
| **00**   23:1 |
| **001**   5:7 |
| **002**   5:7 |
| **00779**   1:2 |

| 1 |
| --- |
| **1**   3:4 5:8,12,19 11:1 |
| **1-10**   1:8 |
| **1.310**   98:24 |
| **10**   47:20,25 |
| **100**   2:4 |
| **10:05**   1:12 |
| **11**   42:18 52:8 |
| **11:21**   52:15 |
| **11:27**   52:17 |
| **12**   52:23 |
| **12:29**   1:12 95:25 |
| **12th**   16:12 |
| **13150**   96:19 97:22 |
| **15**   3:13 75:4,8 75:10,20 78:17 |
| **1509**   95:5 |
| **16**   6:17,17 8:4 19:8 |
| **18**   16:3,9,16 17:19 48:17,20 68:11 |

**19**   1:13 3:7 96:12 98:4 99:1
**1:24**   1:2

| 2 |
| --- |
| **2**   3:5 5:9,12 7:7 7:10,15,25 8:5 8:19,23 9:1,16 10:15,16,18,19 10:20 11:1 13:3 13:7,15,20,24 14:2 15:6,20 17:21 19:1 23:21 30:1 33:17 35:1,9,15 38:4 41:5 44:9 46:24 62:4,5 65:22 75:17 82:11 83:11 92:20 |
| **20**   3:8 17:2 52:8 98:2 |
| **2011**   52:25 |
| **20165**   1:12 |
| **2017**   31:14 43:14 49:25 |
| **2017/2018**   78:8 |
| **2018**   16:12 31:14 43:15 50:1,4 |
| **2019**   43:25 44:6 78:12 |
| **2021**   68:23 |

**2022**   68:23
**2023**   44:6 61:2 77:1 78:13
**2024**   77:8
**2025**   1:13 5:21 96:12,15 97:18 98:2,4 99:1
**20th**   96:14 97:18
**21**   3:9,11 16:4 27:20
**21301**   2:4
**22**   3:12 42:14,15
**22201**   2:7
**23**   68:23,23
**2311**   2:7
**233**   78:19
**24**   44:1 68:23
**24765**   13:17
**25**   47:7
**25th**   61:2
**26**   6:7 19:12 47:16 48:8
**27**   47:14 52:19 52:20
**28**   47:14
**29**   19:12 28:5 31:9,22 32:16 34:13,17 42:1,5 47:11 49:13 54:9 55:18 56:4 56:12 76:17
**29's**   19:13

**29.1**   48:4,4,9,16 49:24
**29.3**   49:25

| 3 |
| --- |
| **3**   3:7 19:21,24 58:16 65:23 83:11 |
| **3.1164**   30:1,11 |
| **3.3228**   82:11 |
| **3.3228.**   82:14 |
| **3.3371.**   60:19 |
| **3.3415**   14:11 |
| **3.3415.**   13:25 |
| **3.3799**   32:18 |
| **3.3806**   31:25 |
| **3.3806.**   31:24 |
| **3.3882.**   65:22 |
| **30**   77:3 98:16,23 |
| **305**   95:2 |
| **30th**   21:16 |
| **31st**   5:21 |
| **32**   57:12 |
| **33**   57:16,17 61:3 62:23 63:17 |
| **33433**   2:4 |
| **34**   57:16,19 60:17 61:9 81:17 |
| **36**   58:11 |
| **38**   58:15 |

Veritext Legal Solutions

CONFIDENTIAL

**[4 - analysis]**                                                           Page 101

| 4 | 9 |
|---|---|

**4**   2:16 3:8 20:18
  20:22,23 72:23
  97:8
**4/9/25**   96:23
**40**   76:15 77:2,5
**42**   68:11
**439-1509**   95:4
**45**   81:16
**46**   81:16

| 5 |
|---|

**5**   3:4,6,9 21:2,6
  21:6
**5/10/2024**   78:19
**5/9/2024**   77:6
**500**   2:7

| 6 |
|---|

**6**   3:10 22:20,23
  71:20,23
**6455**   52:24

| 7 |
|---|

**7**   3:11 21:20,23
**71**   3:10
**7182553**   98:4
  99:1
**75**   3:13

| 8 |
|---|

**8**   3:12 6:16 19:7
  22:12,16,19,25
  23:1
**882**   65:24

**91**   2:17 92:14
**95**   97:8
**96**   2:17
**98**   2:18
**99**   2:18
**9th**   77:8

| a |
|---|

**a.m.**   1:12 52:15
  52:17
**ability**   9:17
**abisror**   2:11
**able**   12:7 14:7
  16:1 24:8 49:3
  54:21 94:4,6
**above**   1:25 5:11
  11:20 66:24
  98:6
**absolutely**
  71:17 74:5
**abstract**   32:24
**access**   9:2 45:21
**accessed**   70:9
**account**   38:25
**accounts**   38:23
**accuracy**   98:9
**accurate**   29:2
**accurately**   81:7
**aces**   11:3,21,23
  12:18 15:23
  35:1,2,11,15,17
  35:21 36:17
  44:4,9 45:5,8,11

45:24 46:3,24
  53:17,18
**action**   74:7
  97:17
**activities**   64:18
**activity**   64:24
**actual**   24:12
  48:24 49:4
  70:16
**actually**   13:2
  14:5,8 17:4
  37:15 44:17
  52:11 60:15
  65:13 69:18
  72:14 86:20
  93:25 94:13
**add**   58:7 76:3
**added**   5:25
**additional**   62:8
  62:22 76:6 91:5
**address**   14:24
  38:16,24 76:18
**addressed**   63:5
**addresses**   15:4
  15:9 37:1 38:15
**adequately**
  82:20
**admin**   11:9
**advance**   55:4
**adversely**   62:6
  62:20
**advice**   74:7,17
  74:22

**advising**   74:2
**affected**   62:7,20
**affirmative**
  59:19
**ago**   10:5,8 23:6
  25:22
**agree**   90:21
**agreed**   26:18
**agreement**   3:11
  3:12 21:24
  22:17 23:14
**agreements**
  23:12,15
**ahead**   7:6 85:17
**air**   93:5,18,23
  94:3
**al**   98:4 99:1
**algorithm**   84:1
**allegation**   77:12
**allegations**
  69:22
**alleo**   69:7
**analysis**   10:11
  10:17 12:9 15:3
  19:8 22:10
  23:11,13,16,16
  25:7,18 26:24
  27:8,13,19
  29:16,23 33:1,3
  38:7 41:18
  44:17,22 46:13
  46:21 47:8
  77:23 93:19

CONFIDENTIAL

analyze  12:8
25:14
analyzed  19:16
analyzing  25:19
angular  85:15
85:18,23 86:1
86:22 88:3,10
88:12,19,22,23
89:15
annotations
89:21 90:17
91:5
answer  7:19
21:8 23:25 24:8
24:15,17 26:20
49:17 56:2
59:19 66:25
68:8 74:13 79:9
81:1 86:15,24
87:14 89:24
95:8
answered  67:21
answers  4:24
anyway  76:2
apart  22:4
87:12
appear  6:3
58:14
appearances  2:1
appeared  96:12
application
50:15,19,21,24
51:20 80:18
84:9 88:13

applications
72:25 85:19
approach  16:21
72:8 81:18
93:12
approaches
70:6
approximately
45:15
april  61:2
architect  33:3
architectural
10:13 19:9,10
24:11,23,25
25:2,18 27:13
28:24 29:6,14
46:21 47:9,12
47:16 52:1
architecture
28:3 29:10
40:13 43:19
44:3,21 46:12
50:25 51:17,19
51:23 53:14
54:1 56:18
area  62:1
argument  88:10
arlington  2:7
arrives  82:24
asked  24:21
25:9,13 41:9
67:3 76:8
asking  4:15 20:9
34:21 72:21

74:20
assembler  66:3
67:19
assert  74:24
assessment  33:1
assisted  97:11
associated
39:18 73:1
assume  88:8,13
94:23
assuming  62:15
90:16,18
assumption
41:18 63:10
attached  6:14
71:24 72:4
75:23 98:10
attachment  7:7
7:10,15,25 8:5
8:19,23 9:1,16
10:15,16,18,19
11:1 15:6,20
17:21 19:1
20:13 23:21
33:17 35:1,9,15
38:4 41:5 44:9
46:24 58:16
75:17 91:16
92:20
attachments
20:5,5,11 28:15
attack  87:8,25
89:4,10

attacked  87:4
attempt  72:2
attention  7:22
attorney  2:8
10:1 97:14,16
98:12
attorneys  2:5
atypical  55:5
authored  24:18
29:14 30:4 66:8
67:4
authoring  64:25
authority  32:9
authorized  97:4
available  21:16
38:7 40:15
41:10 45:25
68:19,21 69:6,8
69:18,23,25
70:3,4,7,18,25
71:4,5,15,16
72:9 89:3 98:6
azure  3:13
75:14,15

**b**

b  2:3 3:1
back  5:2 10:10
12:16 13:18
17:18 18:9,13
18:17 19:5,7
31:15 33:21
36:19 37:25
42:13 43:15

CONFIDENTIAL

**[back - change]**                                                    Page 103

45:18 52:7 56:1
56:22 59:7,15
60:1 66:20,23
81:6 82:9 86:2
89:13 95:17
**backend**   11:9
40:7,7
**background**
27:24 33:3
**bad**   10:23 17:4
**banner**   76:20
**based**   6:11
23:16 27:11
29:16,23 30:24
33:2 36:3 43:18
43:20 63:25
70:9 74:23
84:19 85:8 92:8
**basic**   92:24
**basically**   7:13
57:25 69:21
**basing**   53:16
**bates**   22:8 23:8
**bean**   2:6 10:1
11:17
**beankinney.c...**
98:1
**bearing**   25:5
**beautified**   69:13
**beginning**   5:6,6
17:18 27:19
57:12 68:10
72:22

**begins**   20:10,22
21:6
**behalf**   1:21
**believe**   15:7
22:9 23:5 37:11
37:20 47:23
60:8 90:21
**bells**   77:9
**best**   8:23 46:6
**better**   18:10
28:13 64:7 93:6
**beyond**   29:22
34:22 79:19
**bit**   54:19 84:16
**board**   28:10,25
29:6,10 47:16
50:11,14,18,20
51:9 54:9 56:14
57:1
**boards**   28:17
**boca**   2:4
**bookmarks**   14:5
14:6
**bottle**   52:10
**bottom**   6:6
47:20 79:4
**boulevard**   2:7
**bounds**   94:10
**box**   28:7
**boxes**   28:17
**branch**   32:9
**brandon**   2:11
**break**   22:3 52:4
58:2

**broader**   17:7
51:6 54:19
**broadly**   35:12
**broken**   33:6
**broward**   96:7
**browser**   88:1,2
88:9 89:1
**build**   54:16 65:6
78:20 94:6
**building**   65:2,3
88:6
**built**   30:22 57:8
86:1
**bullet**   17:24
35:9,14,17,18
46:24
**button**   62:13

**c**

**c**   2:6 6:22 47:1,5
68:10 69:17
98:1
**call**   55:18 59:14
61:2
**called**   4:3 5:9
15:12 19:24
30:1 44:16 54:9
65:16 69:8,13
**calling**   92:6
**campbell**   2:2
**capital**   68:10
**caps**   83:5
**capture**   72:25

**carried**   61:10
**case**   1:2 5:20
6:4 7:14 8:11,16
8:18 9:13 66:17
67:11 69:2
77:13 87:18
93:11
**cases**   30:15
83:18 87:17,17
94:8
**cause**   1:25
15:23 21:16
63:12 91:17
**causing**   76:22
**caveat**   55:10
**center**   30:18
**centered**   29:10
**certain**   17:9
23:15 28:16
47:21
**certainly**   7:20
8:1,21 23:5
31:13 33:24
34:20 36:21
37:19 41:8 43:1
45:18 72:6
73:15 80:18
**certificate**   2:17
96:5 97:1
**certify**   96:11
97:4,13
**cetera**   5:7
**change**   57:25
62:6 99:4,6,7,9

CONFIDENTIAL

99:10,12,13,15
99:16,18
**changed**  57:24
58:21 59:4
77:21
**changes**  14:19
17:9 58:1,17,23
62:16,20 69:12
98:9
**changing**  59:18
**characters**
16:19 17:12
**charlie**  17:3
**chat**  28:18 29:1
51:9 54:10,10
55:21 56:15
57:1
**check**  5:22
12:16 16:1 22:8
23:9 33:22,25
34:7,23 36:9,19
36:23 37:22
38:11 40:3 47:2
48:21 50:2
59:15 60:1 68:7
75:25 82:7 88:7
90:25
**checked**  40:14
**checking**  59:20
**choice**  53:13
**choose**  9:14
**choosing**  70:24
**chosen**  67:9

**chrome**  72:10
**circular**  85:24
**citation**  19:12
82:7
**cite**  7:23 47:21
**cited**  7:21 8:5
18:11,16 23:17
47:25 50:5
54:20 76:17,24
77:2
**citing**  8:13 16:8
48:20
**civil**  98:23,23
**claim**  74:9
**claimed**  81:14
**clare**  1:8 3:7,8
19:25 20:22
**clarification**
86:11
**clarify**  8:7 71:10
90:24 91:21
**clarity**  8:17
13:12 22:18
83:3 93:1
**clear**  13:16 26:7
26:11,17 41:2
48:14,22 81:19
**clearly**  4:24
**client**  11:4,9
40:7 43:20
80:21,23 94:13
**client's**  25:25
26:2 70:11,13

**clients**  28:14
**closer**  83:21
**code**  3:12 10:11
10:17,25 11:2,6
11:7,11,12,12
11:14,16,21,22
12:8,14 14:20
14:25 15:5,7,14
15:15 16:5,9,23
17:3,20 18:3,18
19:15 22:16
23:17,20,21,22
24:1,6,13,18,22
24:25 25:3,6,7
25:10,14,16,20
25:21,25 26:3,4
26:6,8,10,12,13
26:16,25 27:2,6
27:7,10,15
28:10,23 29:17
29:20,23 30:7
31:4,13 32:7,9
33:2,4,8,10,12
33:16,18,22
34:16,21,25
35:2,7,10,25
36:4,5 37:17,19
37:21 38:4,18
39:8 41:4,25
42:4,9,10 43:15
43:21 44:2,3,11
44:16,17,22,22
45:4,19,21 46:8
46:20,22 47:4,8

47:24 48:19,23
49:12 51:25
52:2 55:6,12,14
55:20,21 56:2
56:23 57:4,10
58:18,24 59:5
62:17 64:14,25
65:11,21 66:8
67:4,9,16,17,18
67:23 68:18,21
69:4,12,17,23
70:3,8 71:5,15
73:1,3,4,13 75:7
75:15 77:1,18
78:20 79:12
80:1,15,22,23
80:25 81:3,25
82:9,17 83:6,17
84:2,4,7,8,9,11
84:17,19 85:5
86:3 87:23 88:2
88:24 89:4,6,7
91:3 92:1,6,8,10
92:15 93:3,5,11
93:13 94:1,6
**codebases**  76:4
**codes**  41:9
**collaborating**
64:21
**collection**  75:14
**colon**  16:22
**combination**
51:8

CONFIDENTIAL

**combining** 56:11
**come** 12:2 19:5 24:22 25:10 30:12 31:20 52:7
**comes** 60:6
**comments** 33:11 33:18 36:10 52:24 55:15,16 89:21 90:17 91:6
**commission** 96:23
**commit** 15:12 15:25 16:20,22 16:25 17:7,8,11 17:12 36:6,16 38:9,16,18 39:22 49:5
**commits** 15:19 16:4,6,7,21 17:6 34:8 36:8,15 37:2,5,12 38:14 39:7,8 40:8,17 41:14 50:3,4
**committed** 39:21 40:1
**committing** 40:18
**communicatio...** 52:21
**compacted** 69:15

**company** 50:19
**compare** 93:11
**compared** 44:2 44:2,9,21
**comparing** 51:4
**comparison** 24:3,9,14 44:14 45:2 78:7
**comparisons** 46:1 93:15
**compile** 89:13
**compiler** 66:3 67:19
**complete** 6:19 26:20 97:9
**completed** 98:15
**complicated** 67:6
**component** 18:13 50:23 62:6
**components** 19:15 28:16,21 29:1,8,21 35:11 43:23 44:20,24 47:6 51:3 54:4
**compose** 92:10
**composes** 69:4
**composing** 70:10
**comprehensive** 7:24 36:23

**compromise** 87:13
**computer** 9:3 11:17 12:1 23:20 24:1,13 24:18 25:1,16 26:5,9,14,25 27:8,12,16 28:11,23 38:23 43:21 44:12,23 45:4,4,20 46:3,4 47:3 53:4,9,10 53:19 66:1,7 67:17 68:2 70:11,13 80:21 80:23 93:4,13 93:18 97:11
**computers** 78:12
**concept** 17:14 28:6,25 29:6 47:16 50:11,18 50:20 51:1,8 55:19 56:15
**concerning** 76:8
**concerns** 71:8 71:14 80:6 86:8 86:13,18 87:19 88:19
**concluded** 95:25
**conclusion** 67:3 67:8

**conditions** 94:2
**conducted** 30:10
**conference** 1:19 2:1 59:14 61:2 95:24 97:1,5,10
**confidential** 1:17 49:14 81:15,21 91:6 91:10
**confidentiality** 49:20 69:1 71:9 71:14 81:4
**configurations** 59:3,18
**conflating** 27:1
**connect** 44:24 93:7
**connected** 28:8 28:14 45:20 54:4 56:13 94:5 97:16
**connection** 7:17 22:1
**connections** 54:15
**conscience** 54:21
**considered** 7:14 7:16 98:16
**considering** 24:16
**consistent** 14:17 14:20 21:14,18

CONFIDENTIAL

32:20 37:23
38:8,11,14
41:14 69:6
77:15 82:16
83:11
**consists** 56:6
**constitutes** 56:5
**constraint**
73:21 93:3
**constraints**
23:25 24:16,20
27:11 92:1,5,7
93:2,18 94:12
**construction**
64:14
**constructs**
46:17
**contain** 7:15
35:25 38:4,15
90:3
**contained** 6:10
13:14 14:23
32:16 90:3
**content** 80:2
**context** 17:1
25:17 30:14
50:14 70:8 76:6
79:14 83:20
85:20,23 91:11
91:14
**contractors**
33:20 34:4
**contributed**
54:13 56:5

57:14
**contribution**
56:6
**control** 14:18
93:23
**conversation**
43:7
**conversations**
42:19,21,22
43:7
**copied** 84:10
**copies** 9:3 12:4
98:13
**copy** 95:10
**core** 47:9,12
50:24 56:17
**corey** 59:5
**correct** 8:20
11:18,19 12:11
13:4,16 15:2,17
17:25 18:2
27:25 33:12,13
34:19 35:20
36:8,13 39:23
41:23 46:9
47:23 48:11
52:21,22 53:5
53:12,20 56:19
56:24 65:1
67:15 71:1,2
80:14,16 83:19
84:9 86:5 89:18
90:12 91:4

**correctly** 37:8
38:1 54:24
80:13 85:10
89:16
**corroborates**
10:12 19:8
**counsel** 74:4,7
74:18 91:17
97:14,16
**county** 1:12
96:7
**couple** 26:1
**course** 15:3
29:12 59:22
75:12,20 76:7
**court** 1:1 4:23
6:23 12:23
66:22,24 95:2,4
95:9,12,18,20
95:22 96:9,20
**covered** 28:4
58:16 65:19
69:17 76:12,14
**create** 18:24
60:15 69:13,14
80:6,7 85:6 86:7
86:22 88:12
**created** 53:18
66:14,15
**creates** 81:3
**creating** 64:1,10
79:11,12 85:18
89:9

**cross** 2:17 91:22
**customer** 63:6
63:10,18,19,24
**customers** 64:11
76:22
**cv** 1:2 6:14
**cycle** 61:15

**d**

**data** 11:2,7,11
11:12,15,21
23:22 24:13
28:14 33:18
35:10 36:4,6,9
37:24 38:12
43:11 66:1
82:24 83:1 85:8
85:11,14
**databases** 40:23
**date** 5:22 15:13
16:24 36:17
68:24 98:11
99:25
**dated** 5:20
52:25 97:18
**dates** 15:14,18
15:25 16:7
31:15 50:2
**day** 45:14 80:9
94:20 96:15
97:18
**days** 98:16
**de** 89:13

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **dealing** 47:15 | **delaney** 2:6,17 | **design** 27:20 | **determined** |
| **december** 52:25 | 49:15 53:22 | 29:13 30:1,4,10 | 28:1 |
| **declaration** 3:7 | 63:13 74:6,12 | 30:21 31:4 | **develop** 25:25 |
| 3:8,9,10 19:24 | 74:15,19 79:8 | 32:17,21,22 | **developed** 25:15 |
| 20:10,21 21:5 | 91:20,23 94:15 | 42:9,11 43:19 | 25:23 26:24 |
| 71:24 72:4 74:3 | 94:20,24 95:10 | 44:3 47:9,12 | 27:14,18 31:14 |
| 91:16 | 95:11,23 98:1 | 48:4,25 49:6,10 | 32:7,11 34:14 |
| **declarations** | **delivery** 95:15 | 49:12,13,23,24 | 34:17 37:21 |
| 24:4 92:14 | **demo** 11:8 | 50:11 51:23 | 38:4 44:6 49:25 |
| 93:21 | **demonstrates** | 53:4,9 54:12,25 | 51:16,20 84:17 |
| **declare** 99:21 | 47:8 57:17 | 55:1,7,18 56:7 | **developer** 61:10 |
| **deeper** 46:19 | **demonstrating** | 56:15 59:23 | 61:25 89:22 |
| **defects** 57:22 | 57:22 | 60:14 64:14 | **developers** 39:6 |
| 58:12,14 62:8 | **depends** 84:3 | 65:11 67:12 | **developing** 6:20 |
| 62:22 | **deposing** 98:12 | 84:13 | 30:7 43:16,23 |
| **defendants** 1:9 | **deposition** 1:19 | **designed** 28:2 | 61:16 64:1,5 |
| 2:8 | 1:24 4:10,16 | **designing** 65:6 | **development** |
| **defined** 14:2 | 52:16 79:1 | **designs** 10:13 | 10:13 30:13,15 |
| 30:10 32:18 | 95:24 97:1,6,10 | 19:9,10 27:3,6,6 | 30:17,20 31:1 |
| **definitely** 17:16 | **depository** 11:3 | 27:14,17 32:13 | 31:21,24 32:4,5 |
| 94:14 | **describe** 31:21 | 32:25 50:7 52:1 | 42:8 46:18 |
| **definition** 13:7 | 87:3 | 57:5 66:11,14 | 61:15,20 62:25 |
| 13:24 14:4,14 | **described** 32:6 | 67:14 | 63:2 64:6,7,8,9 |
| 31:23 60:18 | 55:2 62:22 | **detail** 27:18 | 64:16,22,24 |
| 62:5 64:6,7,23 | 63:17 80:1 | 48:17 58:10 | 65:10,16,17 |
| 64:23 65:21 | **describes** 48:8 | 69:9,20 | 67:7,25 76:19 |
| 66:8 67:18 | **describing** | **detailed** 30:1,3 | 94:4 |
| 82:16,24 83:17 | 16:14 | 30:10,21 32:22 | **devops** 3:13 |
| **definitions** 13:3 | **description** 3:3 | 84:3 | 75:14 |
| 13:14 14:17 | 16:13 18:10,17 | **detected** 60:9 | **difference** 41:23 |
| 62:4 66:2 83:11 | 30:2,4 32:18,22 | **determine** 25:10 | 41:25 42:4 |
| 85:1,4 | 33:14 48:9 79:3 | 26:24 34:16 | 84:21,24 |
| **degree** 42:10 | 79:6,21,24 | 40:8 62:5 87:24 | **different** 40:22 |
| | 83:22 | | 42:7 43:19 |

CONFIDENTIAL

**[different - employees]**                                      Page 108

44:20,23,24,25
48:18 49:8,11
65:18 77:5 91:7
**difficult**  23:24
24:2
**direct**  2:16 4:6
6:16
**directed**  43:15
**direction**  58:21
**directions**  72:24
73:14
**directly**  29:24
70:8
**directory**  82:2
**disconnected**
56:8
**discussed**  51:23
91:15,25
**discussing**  38:7
**discussions**  74:4
74:6
**display**  85:21
**displayed**  76:21
**dispute**  12:13
**distinct**  25:19
49:6
**distinction**
66:10,16,18
**distinguish**
48:24
**distribute**  28:8
**distributor**
61:13

**district**  1:1,1
**doctrine**  74:25
**document**  5:9
14:5 19:20,24
20:1,17 21:1,7
21:19 22:8,11
22:16,18 32:14
32:19 42:15
54:25 55:4,7
71:19 72:9 75:3
78:24 79:7
99:22
**document's**
22:19 23:8
**documentation**
31:3 32:24 33:8
33:9 36:10
55:11,14
**documentations**
29:19
**documents**  5:11
7:12 8:4 9:7,12
9:14,20,21 10:4
19:19 29:14,22
30:22 32:21
33:7 59:23 60:3
60:14 72:19
75:19 76:16
77:16 92:9
**doing**  34:15
45:19,22 46:18
59:9 61:14
64:19 68:9

**double**  5:22
16:10,10,11
37:22 47:2 50:2
**download**  9:2
72:8
**downloaded**
12:1 70:11,17
70:22
**downloading**
70:20 72:6
**downloads**
70:19
**dozen**  4:13
**drop**  47:20
48:16
**drywall**  65:4
**duly**  4:3 96:12

**e**

**e**  3:1,13 9:7
14:24 15:4,9
37:1 38:15,16
38:19,20,24
76:23 79:16
98:23,24 99:3,3
99:3
**e4d4aa**  16:11,19
**earlier**  25:2
31:12 32:21
55:10 66:9 78:8
82:10
**earliest**  40:15
50:3

**early**  12:12 44:5
**easier**  35:13
69:14
**easiest**  7:5 18:22
**easily**  23:9
27:10
**echo**  17:3
**edward**  1:8
**effectively**  93:5
**effort**  73:7
**eight**  35:8,9,14
35:25 37:2,5
38:3 39:22 40:2
46:24
**eighth**  35:18
**either**  8:4,19
88:24
**element**  28:6
48:10 53:4,9
84:1
**elements**  25:2
28:3 47:9,12
48:5 49:7,11,12
49:14,23,24
52:1 54:8,12,15
55:1,17 85:21
90:25 91:2 94:1
**email**  98:12
**emailed**  98:14
**employee**  36:18
41:14 97:14,15
**employees**
33:19 34:4
36:22

CONFIDENTIAL

endif  83:1,4
engagement
  25:9 43:24
engineer  89:13
engineering  3:5
  5:10 13:6,15
  52:24
english  83:23
ensure  61:20
enterprise  98:4
  99:1
entire  17:8
entirely  80:8
entitled  5:8
entries  40:4,22
environment
  94:5
errata  2:18
  98:10,11,15
especially  55:5
esquire  2:2,3,6
  98:1
et  5:7 98:4 99:1
event  84:6
everybody
  95:23
evidence  57:17
  58:11
exact  9:10 19:12
  68:22,24 78:1
examination
  2:16,17 4:6
  91:22

examine  15:3
  40:8
examined  4:4
  11:17 12:1
  30:23
example  14:24
  16:8,18 17:2,4,7
  17:19 29:5
  30:15 38:14
  42:13 57:16
  59:6 61:1 62:5
  76:17 81:17
  82:23 83:8,9,24
  85:6
except  24:22
  33:7 55:11 57:4
excuse  34:6
  44:15 88:22
executed  21:16
executing  62:25
  64:20
executive  6:16
exercise  72:3,13
exercises  72:15
exhibit  3:4,5,7,8
  3:9,10,11,12,13
  5:8,9,12,19
  10:20 13:3,7,15
  13:20,24 14:2
  19:21,24 20:10
  20:18,22,23
  21:2,6,6,20,23
  22:12,16,19,20
  22:23,25 30:1

62:4 65:22
  71:20,23 75:4,8
  75:10,20 78:15
  78:16 82:11
exhibits  5:5
  20:6 92:13
exist  89:22
existed  40:13
expect  32:3
expected  82:25
experience  1:7
  33:2
expert  3:4 5:8
  5:19 6:4,11 7:17
  20:2 74:8
expired  76:20
expires  96:23
explain  17:15
explanation
  18:18
explore  94:10
expose  82:1
  91:7,8
exposed  87:22
  89:9 91:15
exposing  81:3
  81:24,25 86:20
  87:17,18 88:17
  88:19
exposure  86:2,8
  86:13
expressed  66:2
  67:18 86:25

extended  57:24
extent  27:5,9
  29:18 60:15
  74:13 81:14
  90:23

f

facility  12:2
fact  14:12 24:1
  46:16 53:17
  54:19 76:19
factor  87:9,25
facts  66:16
  67:10 99:22
fails  98:19
fair  14:9
fairly  12:12
  21:10
fall  44:6 78:13
familiar  20:15
far  6:11 55:8
  82:4 86:9
faster  82:24
feature  70:12
features  56:7
february  1:13
  96:12,15 97:18
  98:2,4 99:1
federal  6:20
  10:14 44:4,6
  45:9,11 47:13
  47:21 48:6,8
  50:8 51:25
  57:18 67:25

CONFIDENTIAL

**[federal - functionality]**                                    Page 110

68:21 69:5
76:21 92:6,10
94:7 98:17,23
**ferrara** 1:19,25
2:15 3:4 4:2,8
5:9 6:25 41:24
91:24 94:18
96:11 97:6 98:4
99:1,25
**figure** 51:2
**file** 5:6 9:8
16:11,23 17:9
18:24 22:21
23:1 69:9,16
70:20 82:2,2
89:12 90:2
**file's** 18:16
**files** 11:25 12:5
16:6 18:20,25
29:19 33:13,15
33:19,23,24
44:18 55:12,15
55:16 70:10,15
70:19 72:8 73:3
80:3,7,11,17,20
80:23 81:3 86:6
86:8,14,21,21
87:19 88:3,9
89:19 90:10,11
90:17 91:8,14
**finalized** 43:12
**find** 23:19,22
24:17 32:15
48:18 66:7

72:24,24 76:11
**findings** 27:22
**fine** 14:12 52:6
**finish** 58:4
83:14 86:10
**firm** 10:2
**first** 4:3 6:17
11:1 15:24
16:18,19 26:2,7
34:25 35:17,25
36:17 37:2,5
38:3 39:22 40:2
40:14 42:24
44:2 45:3,8
46:24 47:7,15
50:11,18 51:11
51:13,19 53:8
76:2,3 83:17
92:8 93:4
**fischer** 2:11
51:22
**fit** 29:9 46:13
50:16
**fits** 29:6 44:21
**five** 35:8 52:5
52:13 60:8
**fix** 58:1
**fixed** 59:6
**fl** 98:13
**fleshed** 84:18
**florida** 1:1,22
1:23 2:4 96:6,10
96:20 97:3,23
98:18,23

**focus** 46:12
**folder** 9:20
**follow** 18:4 73:7
73:14
**followed** 16:22
**follows** 4:5
**footnote** 16:2,9
16:16 17:2,19
47:20,25 48:16
48:17,20 52:23
76:17 77:3
81:17
**footnotes** 7:21
7:24 8:1,5,20
13:4 16:3 17:10
18:4 54:20
81:17
**force** 52:25
**foregoing** 97:8
99:22
**foremost** 26:2
**forget** 38:24
68:22,23
**forgive** 17:13
**form** 43:11
49:15 53:22
57:20 66:2
67:19 69:8
88:25 92:17
**format** 12:18,19
12:20
**forth** 32:24
72:13

**forward** 48:4
**found** 48:5,10
49:12 69:19
**four** 11:8,15
23:20 35:7 60:8
92:18
**fourth** 17:24
78:14
**fpr** 96:19
**frame** 68:23
77:4 86:1
**framework**
85:18
**fredericks** 1:22
96:9,19 97:3,22
**front** 18:23
37:24 69:4 70:9
70:10,14,16
78:20 80:6,7,25
85:19,25
**full** 17:1 18:18
24:9 79:15
**fully** 94:10
**fun** 62:1
**function** 28:9
84:13
**functional**
93:25
**functionality**
18:23 28:19
51:10 54:5,22
56:7 57:2,23
62:2,7,20 69:4
69:12,15 70:6

CONFIDENTIAL

[functionality - healthcare]                                                Page 111

70:16,20,23
71:4,6,7 80:10
80:12,15,19
82:6 86:25 87:2
87:7,15,20,21
89:9
**fundamentally**
19:14 69:11
**further**  7:21
17:2 19:19
27:24 28:15
36:9 50:13
51:18 53:12
57:24 58:1,6
68:1,7,9 84:18
91:19 94:15
97:13

**g**

**g**  1:8 12:24
**gap**  93:18 94:3
**gapped**  93:6,24
**general**  7:11,19
7:23 8:21 9:19
14:17 16:3
27:21,24 28:20
32:11 35:6
56:23 58:8 59:1
76:14 82:20
84:5
**generality**  84:20
**generally**  15:2
17:6 35:10

**generate**  88:23
89:6
**getting**  87:2
**girders**  65:3
**git**  12:19,22,23
14:17,22 15:5
15:12
**give**  10:21 14:3
14:10,14 16:1
18:10,18 19:11
20:23 21:7,12
26:20 31:25
59:19 68:12
78:6 82:12
**given**  9:2,3,20
11:25 23:25
29:13 38:5 39:6
68:2 74:18
82:23
**giving**  83:7
**gmail**  38:25
**go**  7:6 11:22
12:2,16 18:17
19:5,7,19 22:23
33:21 34:6
36:19 37:25
40:19 42:13
45:24 46:19
47:10 48:2,3,17
56:1 57:12
58:10 59:7,15
60:1 62:12 72:2
72:12 85:17
86:2 88:7

**goes**  11:3 48:17
72:3
**going**  4:15 6:14
6:15 12:14
14:10 17:18
22:21 30:20,23
30:25 32:6,8,12
38:19 43:18
44:11 50:13,22
51:6 53:12
55:19 58:12
63:4 64:13,19
64:22 65:12,14
66:16 70:24
80:18,20 82:9
83:23 85:21
86:3 87:2,7,8,10
87:15,22,23
88:1,21,24 89:2
89:3,4,5 90:10
90:14 94:23
95:6
**goldman**  1:22
6:21 95:1 96:9
96:19 97:3,22
**good**  4:8,9
94:20
**government**
76:22
**grammatically**
83:19
**great**  4:14,20
5:4,18 6:6 13:23
14:21 52:3,12

**group**  1:7 98:4
99:1
**guess**  8:7 35:4
58:8 70:7 91:10

**h**

**h**  3:1 6:22 99:3
**hac**  2:3
**half**  4:18
**hand**  96:14
**handle**  4:20
74:7
**handled**  32:10
**hanging**  65:4
**happen**  45:7
**happens**  30:24
**happy**  26:8
**haptic**  6:20,21
10:14 11:8,9,9,9
40:7 44:4,5 45:9
45:11 47:13,21
48:6,8 50:8
51:25 53:19
57:18 67:25
68:21 69:5
76:21 92:5,10
92:17
**hard**  24:8
**hash**  17:11,12
**hate**  85:24
**heading**  11:6
27:20
**healthcare**
30:16

CONFIDENTIAL

| | | | |
|---|---|---|---|
| hear  37:8 | 75:5 | include  33:13 | industry  8:13 |
| heard  37:4 | identified  58:13 | 64:13 | 12:7 30:16 |
| heart  19:15 | 58:14,15,20 | included  20:6 | 81:20 |
| herren  61:4,6 | 59:6 74:20 | 29:19 31:22 | info  76:3 |
| hh076143  96:22 | 92:13 | 39:3 60:9 70:17 | information |
| high  29:4 54:15 | identify  10:16 | 77:10 80:11 | 14:23 15:22 |
| 83:25 | 31:6 36:16 44:8 | includes  27:23 | 24:7 28:7 45:25 |
| higher  32:14 | 73:3 | 64:24 | 49:14 70:25 |
| highlighted | identifying | including  19:12 | 71:4,9,14 79:14 |
| 42:6 | 16:21 34:13 | inclusive  67:2 | 79:18 81:15,21 |
| highlighting | implement  27:3 | 97:8 | 82:1 86:6 90:10 |
| 5:24 | 54:5 55:21 | inconsistent | 90:16 92:24 |
| highlights  6:1,3 | 65:18 | 62:23 | inherent  49:8 |
| histories  38:10 | implementation | incorrect  34:18 | 52:2 |
| history  33:22 | 64:15 | 90:8 | initial  40:12,17 |
| 34:1 40:4,9,20 | implementatio... | index  2:13 | 43:7 45:16 63:4 |
| 40:20 48:22 | 54:16 | indicate  15:13 | 73:24 |
| hotmail  38:25 | implemented | 38:15 | initially  38:6 |
| house  65:2,3,6 | 27:15 49:2 50:7 | indicated  6:9 | 53:5 |
| huh  32:1 60:22 | 54:22 56:18 | 55:17 | input  66:2 67:19 |
| 62:18 95:3 | 57:5 58:18 | indicates  6:18 | 82:25 |
| hundred  34:8 | 66:11 | 7:2 63:18 | inquiry  75:1 |
| hundreds  40:22 | implementing | indicating  14:23 | inside  85:8 |
| hypothetical | 52:20 | indication  18:21 | insofar  14:16 |
| 91:12 | implements | 30:9 64:22 | 24:22 33:7 |
| | 27:6 70:16 | 77:18 89:11 | 55:11 |
| **i** | implication | indicative  59:8 | install  43:20 |
| | 71:18 | individual | instruct  74:12 |
| idea  27:1 53:3 | important  51:1 | 25:20 27:2 | instructions |
| identical  46:9 | imposed  92:5 | 66:10 | 66:1 |
| 46:16 87:20 | 94:13 | individuals | integer  85:13 |
| identification | inaudible  7:22 | 37:12 39:14 | interconnect |
| 5:13 19:22 | 13:10 | 42:25 55:6 | 44:20 |
| 20:19 21:3,21 | | | |
| 22:13 71:21 | | | |

Veritext Legal Solutions

CONFIDENTIAL

**international**
  13:19
**internet**  52:24
  73:2 94:6
**interoperate**
  28:22
**interoperates**
  29:7
**interpreted**
  70:13
**introduce**  62:21
**introduced**  62:8
**investigated**
  87:4
**investigating**
  73:11
**investigation**
  73:24
**invoking**  74:17
**involve**  74:21
**involved**  6:19
  45:1 74:1
**involves**  58:9
  74:6
**iso**  13:17,18
  60:20
**isolated**  24:2
  93:4
**issue**  26:10
  58:22 68:18,20
  69:2 73:11 74:2
  74:20 75:7
  76:25 80:4 81:4
  81:4 86:2

**issues**  26:16
  63:5 69:1 76:9
  76:18 77:7
**item**  14:11 16:8
  17:20,24 18:5
  29:25,25 30:1
  34:25 47:15
  68:10 79:15,17
**items**  11:15
  18:11 29:15
  31:6,8,22 32:16
  34:12,13,17
  35:25 37:2,5
  38:3 40:2,6 42:1
  42:6 44:8 47:11
  56:4,11,13
  75:16

**j**

**j**  2:2
**janna**  3:7 19:25
**january**  5:21
  21:16
**javascript**  47:6
  69:9,24 70:4,9
  70:10,22,23,24
  71:15 80:4,5,11
  80:16 81:5,25
  84:21,25 85:5,6
  85:18,25 86:4
  86:13,18,23
  87:18 88:18,24
  88:25 89:7,12
  89:20,23 90:4

  90:11,20 91:2,9
**javascript's**
  80:19
**jeffrey**  1:8
**joel**  2:3 94:21
**john**  1:8
**joint**  64:8,9,22
**jointly**  6:18
  58:13 64:1,5
  66:14
**jordan**  2:11
**jph**  1:2
**june**  16:12

**k**

**keep**  15:8,24
  73:18
**kevin**  1:8 3:9
  21:5 39:16,20
  41:15
**key**  10:12 19:9
  19:10 64:15
**keys**  80:2
**kind**  39:2 59:9
**kinds**  33:6
  61:18 64:18
**kinney**  2:6 10:1
  11:18
**knew**  36:25
**know**  4:20 5:2
  5:15 6:11 7:6
  8:9,22 9:6,9,20
  10:4 13:20 17:4
  17:11,13,15,17

  20:4 24:4,20
  25:17 27:5,12
  29:22 30:14,16
  30:21 31:7,11
  31:18 32:23
  33:1,5 34:21
  36:22 37:15
  39:7,11,18 40:1
  40:24 41:17,18
  42:9,25 45:20
  45:23 46:10,18
  47:24 48:19,23
  49:3 55:3,8
  58:16,18 59:17
  59:19 60:8,12
  60:14 61:18,22
  66:12 68:8,22
  68:25 69:3,5,19
  72:17 74:22
  75:24 76:1,2,19
  76:23 77:7,10
  77:12 79:13,15
  82:4 83:22,24
  84:21 85:15
  92:2,22,22,23
  92:23 93:10
  95:6,15
**knowledge**  6:12
  76:4
**knows**  74:15
**korman**  2:6

CONFIDENTIAL

| **l** | **line** 14:10 16:13 | **literally** 84:12 | 40:9,11,11,25 |
|---|---|---|---|

**l**

**labeled** 22:20
**lack** 28:13 93:6
**lacking** 91:10
**laid** 28:21 29:15
  31:4
**language** 46:23
  47:4 83:18,20
  84:9
**languages** 46:23
**large** 1:24 96:11
  96:20
**larger** 50:24
  55:18
**lays** 73:8
**lead** 67:8
**leading** 29:12
**legal** 26:16
  98:22
**letter** 2:18
**level** 29:4 32:14
  33:6 54:18
  83:25 84:20
**levels** 54:15
**license** 3:11,12
  21:23 22:16
  76:20
**licensing** 76:3,8
  76:18 77:7,13
  77:19
**lifecycle** 30:17
  64:16 65:16,17

**line** 14:10 16:13
  16:18 17:11
  24:21 25:20
  27:10 44:2 47:7
  48:24 49:5 67:4
  75:1 93:15,15
  99:4,6,7,9,10,12
  99:13,15,16,18
**lines** 25:6,20
  27:2 46:15,20
  47:21,25 48:18
  49:2,8 66:10,11
  67:9 84:15
**link** 9:1 79:16
**linked** 55:1
**links** 54:22
**list** 7:8,16 11:8
  34:25 36:14,20
  36:23 39:6,13
  39:18 92:14,17
  92:18
**listed** 8:4,19,25
  10:25 11:10,14
  12:22 14:13
  15:5,19 16:5,22
  17:10,21 18:25
  23:21 33:17
  47:11 49:24
  61:2 69:18
  75:16 83:25
  92:20
**listing** 7:24
  18:24

**literally** 84:12
**little** 13:12 14:7
  29:3 35:4,13
  54:19
**live** 65:7
**llc** 1:4
**local** 38:23,24
**location** 12:10
**logic** 70:15
  77:13,19 89:14
  89:22
**logs** 92:25
**long** 42:22
**look** 7:10,18
  9:15,21 16:18
  17:2 18:9,17
  31:13,25 32:2
  32:19 37:16,25
  40:19,25 42:13
  45:24 46:5,17
  48:2 49:3 52:19
  56:1 59:1,7
  65:21 68:1 72:5
  75:8,20 76:8
  78:14 79:3
  80:17,25 81:8
  82:11 85:13
  87:23,23 88:5
**looked** 8:18
  40:16
**looking** 10:10
  25:18,24 27:2,9
  31:2 33:16 34:1
  34:16 37:1 38:9

40:9,11,11,25
  41:13 45:18
  51:4 58:18
  67:11 72:23
  73:16 76:2
  77:17 81:19
**looks** 5:24 20:15
**lot** 5:25
**loudoun** 1:12
**love** 52:10

**m**

**madam** 66:21
**made** 55:18
  62:16 68:18,20
  69:6,7,18 84:8
  90:8
**mail** 14:24 15:4
  15:9 37:1 38:15
  38:16,19,20,24
  79:16
**mailed** 9:7
**mails** 3:13 76:23
**main** 11:4
**make** 8:22 13:8
  15:8 16:17
  26:20 35:13
  41:2,21 48:22
  58:1,6 62:1,19
  63:4 65:13 70:6
  70:21,25 71:4,5
  81:6,23 85:24
  86:16 87:12
  90:25

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **making**  48:14 | 11:14 23:21 | **meetings**  51:22 | **minification** |
| 57:25 58:23 | 43:24 58:21,25 | **memo**  71:24 | 69:10,10 81:11 |
| 65:7 69:22,24 | 62:16,17 67:24 | 72:3,5,13,16,19 | **minified**  69:9,16 |
| 70:2,3 71:14,15 | 69:24 72:25 | 72:21,22,23 | 69:24 70:3 |
| **management** | 73:10 77:1 | **memorialize** | 71:15 72:8 80:4 |
| 14:18 75:15 | 78:12 83:8 98:4 | 15:18 | 80:5,11,16 81:5 |
| **manager**  17:22 | 99:1 | **memorize**  45:23 | 81:25 86:17,19 |
| 18:1,5,7 | **max's**  26:6,12 | **memorized** | 86:20 87:18 |
| **manner**  69:12 | 77:14 78:10,11 | 40:21 | 88:18 89:12,20 |
| 80:20 | **mean**  7:7,25 8:4 | **mentioned**  82:9 | 89:23 90:11,20 |
| **manufacturer** | 8:7 9:19 13:21 | 94:12 | 91:3,9 |
| 63:3 | 14:16 19:10 | **message**  17:7 | **minute**  14:3 |
| **map**  73:3 75:7 | 27:5 34:5,8,19 | 28:7,17 77:5 | **minutes**  23:6 |
| 80:3,7,10,16,17 | 36:6 38:17 | 84:14 | 52:5,13 95:16 |
| 80:22 81:3,25 | 39:14 42:7 43:4 | **messages**  28:8 | **mischaracteri...** |
| **maps**  69:23 70:3 | 45:13,14,16 | 75:14 | 63:13 |
| 71:5,16 80:2 | 46:6 48:1,6 | **metadata**  34:9 | **misheard**  10:20 |
| 86:3 | 49:18 53:21 | 36:12 38:14 | **missing**  84:16 |
| **marked**  13:7,15 | 55:8 57:4,7 58:8 | 39:2 89:21 | **misunderstood** |
| **mase**  1:8 | 60:25 62:12 | 90:17 91:5 | 63:22 |
| **match**  39:7 | 65:2 66:25 68:4 | 92:25 | **mkk**  1:2 |
| **material**  7:13 | 72:6,20 73:15 | **methodology** | **modified**  57:24 |
| 9:5 23:17 | 77:25 78:25 | 27:24 | **moment**  5:23 |
| **materials**  7:4,8 | 79:10,19 88:21 | **mid**  44:6 78:12 | 9:11 10:20,21 |
| 7:16 8:5,10,12 | 90:5,24 91:10 | **middle**  19:7 | 14:15 16:1 19:6 |
| 8:15,17,25 | **meaning**  93:6 | 22:24 | 20:23 21:7 |
| 36:19,24 55:12 | **measures**  81:21 | **midway**  16:18 | 25:22 31:25 |
| 58:19 59:18,20 | **mechanism** | **mileage**  60:14 | 32:2 44:15 48:1 |
| 60:1 79:1 | 12:14 | **miller**  2:2 | 68:9,12 78:6 |
| **matter**  19:4 | **media**  28:16 | **mind**  60:7 | **month**  45:14 |
| 73:12 87:16 | 29:1 | **minds**  1:4 43:24 | **months**  10:5,8 |
| 94:11 | **medicare**  30:18 | 72:25 73:10 | 43:4 |
| **max**  1:4 6:19 | **medium**  9:10 | 98:4 99:1 | **morning**  4:8,9 |
| 10:13 11:6,11 | | | |

CONFIDENTIAL

motions  20:7
  75:23
moving  43:18
mullican  1:8 3:9
  21:6 39:16
  41:15 43:1
  51:21
mullican's
  39:20
multiple  15:14
  72:15

**n**

name  14:24
  18:24 22:22,23
  23:1 38:19,20
  39:1,18,20
named  11:3,4
names  5:6 15:4
  15:9 37:1 39:6
  39:14,21,25
  40:17 41:15
  82:2
narrow  50:22
  51:7
natively  88:3
  89:1
nature  30:25
  32:10,17 61:22
  84:4,4 90:17
  91:7
necessarily  29:5
  30:6 31:1 39:10
  55:5,7 90:19

92:9
necessary  65:15
  84:6 93:9
need  7:18 24:13
  39:12,16 48:24
  62:19 70:22
  80:22 88:24
  89:3 91:2 93:11
  95:7,16,17
needed  45:25
network  45:21
never  56:25
  57:2
new  43:23
nick  1:19,24
  2:15 3:4 4:2 5:8
  96:11 97:6 98:4
  99:1,25
nine  35:8
notary  1:23
  96:10,20,22
note  15:18 17:1
  98:10
noted  16:24
notes  15:8,24
  33:11 43:8
  73:18 97:9
notice  1:24
number  3:3
  13:5 14:11
  19:21 20:18
  21:2,20 22:8,12
  71:20,23 75:4
  82:13 92:12,16

95:1
numbered  23:8
  97:8
numbers  5:6,12

**o**

oath  2:17 96:5
obfuscate  69:11
object  49:15
  53:22
objection  63:13
  79:8 91:18
obscurity  81:18
observed  59:12
obviously  8:12
  23:5 24:10
  27:22 31:17
  39:16 56:22
  58:17 65:18
  69:10 79:16
  92:22 93:9
offer  52:9
offered  24:19
  49:19 77:11,20
  77:22
offering  41:3
offhand  20:8
  22:9 36:11 88:5
office  12:9
offices  11:17
official  96:14
oftentimes
  30:16

oh  14:8,13
  36:16 44:13
  54:2 66:12 78:9
okay  4:14,20
  6:6,9 7:2,15 8:3
  8:17 9:12 11:5
  11:14,20 12:6,9
  12:18 13:1,20
  14:9,14 15:8,11
  15:18,22 17:20
  17:23 18:3,7,24
  19:3,17 20:9,21
  21:5,9,11,23
  23:1,3,10,12
  25:9,22 26:7,18
  27:17 28:1,24
  29:12,25 31:3
  31:20 33:9,15
  34:2,12,24
  35:17,24 36:3,5
  36:14 37:10,14
  37:18 38:1,13
  39:5,17,20,25
  40:6,16 41:2,11
  41:21 42:12,17
  42:21 43:2,6,8
  43:10 44:1,13
  45:2,10 46:2,8
  46:14 47:3,9,15
  47:19,24 48:3
  48:16 49:10,22
  50:6,9,17 51:8
  51:15 52:3,12
  52:19,23 53:3

CONFIDENTIAL

53:16 54:8 55:9
55:14 56:3,11
56:20,25 57:9
58:3,23 59:11
59:22 60:3 61:8
62:17 63:23
64:5,6,23 65:25
66:6 67:14,16
68:10,13 70:2
70:22 71:3,8,18
72:2,12 73:7
74:11,16 75:2
75:11 76:1,7,11
77:17,24 78:9
78:14,18,21
79:5 81:2,12,23
82:9,15,16,23
83:10,13 84:6
84:24 85:13,15
86:2,6,12 88:1,8
88:13,15 89:19
90:9,22 91:4
95:6,9,12,18,19
**ones** 9:15,17,17
11:14,20 92:20
**online** 69:25
70:3,4
**open** 5:8,16,17
14:6
**operates** 19:16
49:1
**operation** 87:3
**opinion** 24:10
24:19 41:3

49:10 50:17
53:16 56:4
68:14 69:3
71:25 74:8 81:2
81:2,5,10,23,24
**opinions** 21:12
22:1,6 26:15
29:13 41:6
49:19 77:11,22
**opposed** 44:18
74:8
**order** 39:7
61:20 70:14,15
70:23 80:21
87:24 88:23
95:15
**ordered** 95:12
**ordering** 98:14
**organization**
28:20 38:21
49:1,7
**organizational**
19:14
**original** 87:19
88:3,11,19
**originally** 53:5
**outset** 51:24
73:12,24
**outside** 26:16
**overlap** 70:5
**oversimplified**
53:24
**overview** 29:21

**own** 12:1 22:18
34:9 45:20 46:3
**owned** 49:14
**ownership** 26:9
26:15

**p**

**p** 6:22
**p.a.** 2:3
**p.m.** 1:12 95:25
**page** 2:14,18 3:3
6:7,16 11:1 19:7
20:22 22:24
42:18 48:18
65:11 68:11
72:23 76:2,3
78:14 79:4,19
88:12 99:4,6,7,9
99:10,12,13,15
99:16,18
**pages** 5:25 97:8
**panel** 14:7
**paper** 9:3 66:13
**papers** 20:4
**paragraph** 6:17
6:17 8:4 19:7
27:19 28:5 31:9
31:22 32:16
34:13,17 42:1,5
42:14,15 44:1
47:7,11,19 48:4
49:13 52:19,20
54:9 55:18 56:4
56:12 57:12

60:17 61:3,8
62:23 63:17
64:3 68:11
76:14 77:2,5
**paragraphs**
19:12
**parallel** 61:5,7
63:9
**parameters**
74:23
**parenthetical**
16:13
**parenthetically**
16:12,24
**part** 8:14 15:7
20:10 26:23
27:8 29:10
30:22 35:21
50:24 51:3 54:1
54:17 61:15,19
61:25 91:3
**particular** 16:4
16:6,8,13,20,23
16:24 18:11,16
23:24 25:17
30:8,23 32:9,13
38:21 46:20
49:5,5 50:15
53:13,14 61:17
62:1 64:3 83:14
83:20 84:1,13
85:1,14 92:23
93:12 94:11

CONFIDENTIAL

**[particularly - prepared]**                                    Page 118

| | | | |
|---|---|---|---|
| **particularly** 25:14 40:12 59:8 | **perjury** 6:10 99:21 | **plaintiff's** 3:2 5:12 19:21 20:18 21:2,20 22:12 71:20 75:4 | 67:24 91:25 |
| **particulars** 46:19 | **person** 9:24 14:24 25:21,21 36:6,16,18 38:16 66:13 67:5 | | **portion** 69:6 |
| **parties** 10:17 12:13 20:6 46:22 51:24 58:13 60:15 64:10,21 76:18 97:14,16 98:14 | | **plan** 31:21,24 32:4 60:11 | **position** 10:12 19:9 21:15,18 25:7 |
| | **personal** 6:12 | **plans** 32:5 59:25 | **positive** 20:16 |
| | **personnel** 36:14 58:15 | **please** 13:12 23:2 42:15 66:22 72:24 78:15 98:11 | **possibility** 59:9 59:11 |
| **parties'** 10:11 47:8 | **perspective** 87:5 | | **possible** 7:20 8:1,22 40:15 62:14 90:13 93:17 94:3 |
| **parts** 42:8 44:25 56:21 | **pertain** 68:25 | **plug** 72:10 | |
| | **pertains** 25:14 | **plural** 36:8 | |
| **party** 62:24 66:15 | **phase** 30:21 | **point** 4:13,18 16:2,17 28:4,9 35:18,19 36:12 40:10 41:12 48:22 49:9 58:11 63:19 65:8 68:22 70:21 71:25 72:7,15 73:10 74:25 76:12 78:1 81:16 82:5 84:8 90:9 | **potential** 81:13 89:10 |
| | **phases** 30:19 64:15 | | **potentially** 15:14 68:25 74:4 87:4 93:23 |
| **pasted** 84:10 | **phone** 94:25 | | |
| **path** 16:22 | **phonetic** 15:24 59:5 | | **powerline** 2:4 |
| **pc** 2:6 | | | **practical** 94:4 |
| **pen** 66:13 | **phrase** 25:22 28:18 41:19 89:24 | | **practice** 62:14 |
| **penalties** 99:21 | | | **prearranged** 93:9 |
| **penalty** 6:10 | **phrased** 53:7 89:17 90:6,7 | **pointed** 24:12 24:23 66:9 67:12 77:2,25 78:7 93:21 | **predate** 50:7 |
| **people** 15:4 36:22 37:1,3,6 38:4,22 40:18 | | | **predecessor** 44:4 |
| | **piece** 55:20,21 72:20 | | **preexisting** 41:9 |
| **perfectly** 14:11 | **pieces** 29:9 46:13 50:15 | **pointing** 54:20 69:3 | **premarked** 5:12 19:21 20:18 21:2,20 22:12 71:20 75:4 |
| **performance** 62:7,21 | **place** 42:22 93:4 | | |
| **performed** 57:18 | **placed** 27:11 | **points** 7:23 35:9 35:14 46:24 | **preparation** 20:1 |
| **period** 31:15,19 45:10,15 69:19 76:25 | **places** 13:5 | | **prepared** 5:20 97:11 |
| | **plaintiff** 1:5,21 2:5 | | |

CONFIDENTIAL

**preparing** 7:8 7:17 78:25
**present** 2:9 25:2 27:7 52:1 80:19 91:3
**press** 62:12
**pretty** 12:21 17:16 84:4
**previous** 90:6
**previously** 43:17,22 50:20
**primarily** 33:4 47:5
**primary** 87:8 92:7
**prior** 21:17 22:5 43:24 75:24
**privilege** 74:9 74:17,24 91:18
**pro** 2:3
**probably** 4:18 4:20 7:5 9:5,6,8 18:22 29:3 68:23
**problem** 58:1 58:20 76:22 89:8 90:7 95:18
**procedure** 98:23,24
**process** 30:13 42:8,9 46:6 64:20 67:8 74:1 82:25 88:3,9

**processes** 32:5 65:19
**produced** 7:14 8:10,15,18,24 9:13 12:15 25:8 30:7 78:12 92:11,19 93:3,5 94:7
**product** 64:11 74:17,25
**professional** 1:22 97:4,23
**program** 14:19 53:5,9,10 85:12 91:2
**programatically** 60:9
**programming** 46:17,23 55:5 83:18,20
**project** 30:8,23 62:25 63:2 64:9 64:19
**project's** 32:13
**projects** 30:24
**promulgated** 30:18
**protect** 81:20
**protocol** 52:21 52:24
**provide** 16:6 18:21 85:21 92:25

**provided** 9:16 10:12 12:4,12 18:14 19:9 20:14 21:10 24:7 25:3 31:11 36:20,24 37:20 38:6 39:12 51:23 67:24 79:1 92:9 94:10
**provides** 29:20 85:3
**providing** 14:8 22:1,5 63:6 74:21 86:17,19
**pseudo** 24:6 67:23 82:9,17 83:6,17 84:2,4,7 84:8,17,19
**public** 1:23 96:10,20
**publications** 8:13
**publicly** 68:19 69:8 70:7,18 73:1 89:2
**pudding** 57:7
**pull** 87:11
**purpose** 28:21 32:11 51:20 57:21 61:17
**purposes** 54:17 88:13 94:11
**pursuant** 1:24

**put** 6:2 27:19 38:24 93:7,10
**putting** 65:3,8
**puzzle** 50:15

**q**

**quality** 63:5
**question** 13:8 22:15 23:24 24:15,17 25:5 25:19 26:20 41:20 42:2 48:15 49:6,16 55:24,25 56:9 66:19,20,23 67:2 71:11 72:12,18 74:23 75:18,19 79:24 80:8 86:11,16 86:16,17 88:7 90:6 92:4
**questions** 4:15 4:24 17:17 19:18 22:2 75:9 91:19 94:16
**quicker** 14:7
**quickly** 95:7,16
**quite** 37:9 41:19 49:9 51:7 53:6 70:1 89:18
**quote** 16:10,11
**quotes** 16:5,10

CONFIDENTIAL

**[r - relevant]**                                                            Page 120

| r | reasonable | record 6:18 7:2 | 71:19 75:3 |
|---|---|---|---|
| **r** 99:3,3 | 98:17 | 8:3,9,14 11:16 | **referring** 7:3 |
| **raighne** 2:6 98:1 | **recall** 8:23 9:9 | 15:9 23:18 | 8:15 10:16 |
| **raised** 74:3 80:4 | 13:1 18:13 20:7 | 25:15 26:11 | 17:21 18:5 |
| 82:5 91:17 | 20:15 23:4,7 | 31:18 39:15 | 26:13 27:18 |
| **rather** 17:8 | 24:4 29:21 30:8 | 40:1 57:17 | 35:13 78:23 |
| 28:15 34:6 74:8 | 34:2,3,10 36:11 | 59:25 64:1 | **refers** 79:11 |
| **raton** 2:4 | 37:13 38:9 | 67:22 76:16 | **refines** 85:10 |
| **rdelaney** 98:1 | 39:23 40:4,9,10 | 83:3 91:21 97:9 | **reflex** 17:14 |
| **reaction** 74:24 | 41:13,16 42:25 | **recorded** 66:24 | **refresh** 60:2 |
| **read** 5:2 11:15 | 43:4,13 45:13 | **records** 58:19 | **refreshed** 45:18 |
| 44:18,23 55:16 | 47:6 55:25 | 73:18 75:25 | **regard** 98:18 |
| 66:20,23 67:9 | 59:24 73:10,12 | **recreate** 73:8 | **regarding** 24:11 |
| 69:14 89:22 | 73:15,16,23 | **recurred** 57:23 | 76:17 |
| 94:23,24 98:8 | 75:24 85:10 | **redefined** 85:22 | **regression** |
| 99:21 | **receipt** 98:16 | **reduce** 54:18 | 57:19 60:17,18 |
| **readily** 60:6 | **receive** 8:25 | **refer** 13:5,13,20 | 60:23,24 61:4,7 |
| **reading** 2:18 | 28:14 | 16:3,4 18:3 | 61:9,15,21,24 |
| 16:15,15 58:4 | **received** 83:1 | 19:11 26:8 | 62:4,13 63:9 |
| 79:24 | **recent** 20:7 50:4 | 35:12 36:15 | **regular** 95:15 |
| **readme** 18:20 | 75:23 | 52:23 56:22 | 95:15 |
| 29:18 33:13,15 | **recently** 20:14 | 57:16,19 81:6 | **reject** 82:25 |
| 33:19,24 55:12 | 21:10 43:3 | **reference** 92:17 | **related** 25:15 |
| 55:15,16 | **recess** 52:15 | **referenced** | 28:18 |
| **really** 8:14,15 | **recipients** 3:13 | 13:18 59:14 | **relationship** |
| 27:13 46:7 | **recognized** | 98:6 | 51:24 |
| 79:13,20 81:10 | 81:20 | **references** 24:5 | **relationships** |
| 94:3 | **recollection** | 24:6 59:24 | 44:19,24 |
| **reason** 98:10 | 9:19 12:17 34:6 | 67:22 | **relative** 97:13 |
| 99:5,7,8,10,11 | 36:2,3 43:14 | **referred** 5:11 | 97:15 |
| 99:13,14,16,17 | 60:2 | 8:19 13:17 17:5 | **relative** 97:13 |
| 99:19 | **recommending** | 19:20 20:17 | **relevant** 8:2 |
| | 74:2 | 21:1,19 22:11 | 18:12 29:20 |
| | | 26:12 66:23 | 31:2 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **reliability**  62:7 | 24:12,24 26:17 | **repository**  11:2 | **respective**  28:5 |
| 62:21 | 27:20 28:4 | 11:3,7,11,12,15 | **respectively** |
| **relied**  7:8 8:18 | 29:13 35:12,22 | 11:21,23 12:19 | 5:13 44:7 |
| 22:10 | 41:22 42:16 | 13:2,25 14:1,13 | **responding**  4:4 |
| **rely**  21:11,25 | 43:12 50:5 | 14:18,25 15:13 | **response**  83:15 |
| 22:6 23:10,12 | 58:16 64:17 | 15:15 16:9,23 | **responsibilities** |
| **relying**  23:14 | 65:20 69:10 | 17:3,20,22 18:4 | 64:10 |
| **remediated** | 72:7 76:13 | 18:8 23:21 | **restraints**  68:2 |
| 58:13 | 77:11,23,25 | 33:18 34:23,25 | **result**  46:16 |
| **remember**  9:23 | 81:2,6 82:17 | 35:10 36:4,5 | 58:24 |
| 10:6 41:1 73:9 | 92:21 94:11 | 37:17,24 38:12 | **resumed**  52:16 |
| **reminder**  4:22 | 97:5 | 38:18 39:3 40:3 | **returned**  98:15 |
| **remote**  12:10 | **reporter**  1:23 | 40:19,25 48:2 | **reverse**  89:13 |
| **remotely**  4:17 | 4:23 6:23 12:23 | 48:21 49:4 | **reversed**  48:11 |
| 96:11 | 66:21,22,24 | **representation** | **review**  11:17 |
| **remove**  80:1,2 | 95:4,9,12,18,20 | 38:5 | 12:2,7 14:3,14 |
| **removed**  77:1 | 95:22 96:9,20 | **represented** | 15:7 20:1 21:7 |
| 77:18 | 97:4,23 | 38:2 | 21:25 22:5 |
| **removing**  77:13 | **reporter's**  97:1 | **requested**  92:24 | 23:19,20,25 |
| **render**  70:14 | **reports**  60:8 | 97:7 | 24:16,18 25:1 |
| 88:12 | **repos**  33:16 | **required**  30:22 | 25:16 26:4,9,13 |
| **rendering**  71:25 | 38:2 39:22 | 62:5 81:22 91:1 | 26:25 27:7,12 |
| 81:24 | **repositories** | **requirements** | 27:16 28:10,23 |
| **repeat**  5:2 13:9 | 11:13 12:4,21 | 31:5,8,12,16,17 | 29:12 30:3,10 |
| 22:3 26:19 53:6 | 12:22 14:22 | 32:13 | 30:21 31:20 |
| **rephrase**  24:24 | 15:5,19 16:5 | **resolve**  58:22 | 32:8,15 34:15 |
| 61:5 68:19 | 18:20,25 23:20 | **resolved**  57:23 | 36:4,5 37:23 |
| **repo**  15:24 36:7 | 29:24 31:14 | **resources**  72:7 | 38:9 44:12,22 |
| **reporer**  95:2 | 33:25 34:9 | 72:10 | 45:3,3,4,5,11,11 |
| **report**  3:4 5:8 | 40:14,21 41:5 | **respect**  11:20 | 45:17,19,21 |
| 5:19 6:4,11 7:4 | 41:16 92:12,15 | 12:18 15:23 | 46:2,4 47:3 |
| 7:9,17,21 8:6 | 92:16,18,23 | 66:6 69:22,24 | 53:19 59:22 |
| 10:10 13:4,13 | 93:1,22 94:7 | 75:7 81:15 | 66:7 67:17 68:2 |
| 15:6 20:2 21:12 | | | 68:9 71:23 |

CONFIDENTIAL

**[review - seems]**                                                    Page 122

72:25 75:12,21
76:7 78:12 79:1
82:19 92:1,5
93:4 97:7 98:7
**reviewed**  11:16
22:7 25:3 44:16
45:8 66:7 67:17
75:16 76:16
93:14
**reviewing**  11:22
36:15 44:17
73:15
**revised**  15:15
**right**  4:24 8:8
8:19 10:3,6 13:1
13:21 23:3
25:23,25 31:9
33:10,21 34:14
38:8 40:10 41:5
47:11,22 48:5,7
52:13 53:7,11
54:9 57:6 59:2
61:7,10,20
62:11 67:14
68:12 73:11,17
73:24 74:22
77:4,12,14
79:23 86:4
88:16 89:20,23
89:25 90:15,19
90:20 91:20
94:15,20 95:8
95:14,14,23

**ring**  77:9
**road**  2:4
**robert**  1:8 3:8
3:10 20:21
71:24
**rothman**  2:3,16
4:7 5:14 6:21,24
12:25 19:23
20:20 21:4,22
22:14 49:21
52:4,7,12,18
54:7 63:15
66:20 67:13
71:22 74:11,14
74:16 75:2,6
79:22 91:19
92:2 94:17,22
94:25 95:3,5,14
95:19,21
**rule**  98:23,24
**rules**  98:17
**run**  61:6 80:21
88:2,9,25
**running**  44:18
61:4 63:8 70:11
93:22

**s**

**s**  3:1 99:3
**safe**  35:5 65:7
**sake**  88:10
**salient**  7:23
**sandra**  1:22
96:9,19 97:3,22

**save**  72:10
**saving**  73:23
**saw**  21:17 23:6
23:7 31:4 39:20
39:25 48:8
53:17,18 55:15
56:25 57:2
59:14 60:1
**saying**  25:20
42:14 49:11
51:7,12 53:3,8
54:12,14 56:16
57:14 60:24
61:12 69:21
84:17 85:7
87:17
**says**  16:19 22:19
61:6,6 63:8 66:1
72:23 76:3
79:17,20 82:24
**scope**  26:16
41:22
**screen**  85:21
**script**  79:11
**scroll**  10:21
68:12
**se**  8:14
**seal**  96:14
**search**  93:15
**second**  10:11
20:22 45:9
66:22 79:3 88:8
**secrets**  69:2

**section**  11:1,10
27:23 35:16
58:9 64:17
65:19 68:15
69:17 78:2
79:21,25
**security**  60:10
71:9,14 80:6
81:4,18 86:7,12
86:18 87:5,19
88:18
**see**  6:25 15:23
17:19,23 30:3,9
31:3 32:3 33:18
33:22 34:1 36:9
36:20 39:16
40:17 46:8
47:17 49:4
51:25 53:1
55:15 59:7,22
60:3 62:8 66:4
73:5 75:13,16
75:19 77:17,18
77:24 83:2
**seeing**  30:8 34:2
34:3 75:24
**seem**  29:21
37:12 41:13
56:12 58:17
59:24 73:10,15
74:19
**seems**  39:23
41:22,24 62:10

Veritext Legal Solutions

CONFIDENTIAL

**[seen - source]**                                                Page 123

**seen**   20:4 23:4,5
    31:7,11,15 33:5
    38:22 55:3,8
    60:9,12 63:25
    67:22 75:12,22
    76:23 77:15
    78:22,25
**select**   9:17
**send**   28:14
**sent**   5:5 9:1,8
    14:6 23:6
**sentence**   6:17
    10:11 61:8
**separate**   24:10
    56:6
**sequence**   48:25
    49:7
**served**   73:1
**servers**   70:18
**serves**   28:9
**serviceable**   46:7
**services**   30:18
**set**   9:21 64:16
    73:13 85:3,20
    91:11
**sets**   24:13 32:24
    72:13 93:13
**seven**   35:8
**several**   10:6
    28:3 62:3 91:25
**share**   64:10
**shared**   64:13
**sharing**   9:8

**sharp**   47:5
**sheet**   2:18 98:10
    98:12
**show**   69:15 78:1
    94:1
**shown**   80:5,15
**side**   9:13 24:2,2
    24:9,9,14,14
    70:13 93:14,14
**sign**   98:11
**signature**   2:18
    6:6 96:19 97:22
**signed**   98:20
**similar**   57:20
    67:14
**similarities**
    24:11,23,25
    67:12 68:5
    93:16
**simon**   3:10
    71:24 72:3,19
    73:8 92:9
**simon's**   74:3
    91:16
**simple**   66:19
**simply**   82:5
**simultaneously**
    45:2
**single**   28:6
**sinnk**   61:4
**sit**   9:11 34:10
    39:23 40:4 48:1
    56:1 73:17

**site**   9:9
**sitting**   34:2 41:3
    74:22 77:9
**six**   10:4 16:19
    17:12 35:8
**skip**   6:15
**small**   55:6
**software**   3:5
    5:10 6:20 10:14
    13:6,14 18:14
    28:15,21 30:13
    30:15,17 31:21
    31:24 32:4,5,6
    32:11,17 35:11
    35:15,21 36:17
    40:1,13,18 42:8
    43:16,21,24
    44:5,6,25 45:3,9
    45:12 47:13,14
    47:22 48:5,6,9
    48:10 50:8,12
    50:19,21 57:19
    59:10 60:14
    61:13,13,16
    62:16,25 63:2,3
    63:19,24 64:2
    64:11,16 65:10
    65:16,17 66:6
    67:7,16,25
    68:21 69:5,7
    70:7 76:9,20,21
    76:23 77:14,19
    78:8,10,11 87:3
    93:24

**software's**
    61:19
**software's**
    61:10
**solutions**   98:22
**somebody**   62:12
    67:3 83:7 85:12
    87:11 89:3,6
**somebody's**
    87:22
**sorry**   7:6 10:18
    10:20,22 17:4
    35:8 37:7 42:2
    48:13 65:23
    71:10 75:18
    78:10,16,23
    82:12 83:16
    93:22
**sort**   7:24 9:8
    12:13 14:16
    27:1 32:20,24
    40:24 43:11,16
    46:18 56:17
    58:9,21 59:23
    61:25 64:15
    69:16,19 73:21
    73:22,23 83:24
    83:25 84:12
    85:3,24 91:11
**sounds**   64:24
**source**   3:12
    10:11,17,25
    11:2,6,7,11,11
    11:12,14,16,21

CONFIDENTIAL

[source - submission]                                    Page 124

| | | | |
|---|---|---|---|
| 11:22 12:8,14 | 79:12 80:1,2,7 | **specifies** 54:25 | **steps** 64:20,21 |
| 14:20 16:5,9,23 | 80:10,15,17,22 | **src** 16:11 | 65:5,8,15 67:7 |
| 17:3,20 18:3,18 | 80:23 81:3,25 | **sriplaw** 2:3 | 73:2,7 |
| 19:15 22:16 | 84:9 86:3 92:1,6 | **ss** 96:7 | **sticker** 22:19,21 |
| 23:17,19,21,22 | 92:8,10,15 | **stable** 62:2 | **stood** 93:24 |
| 24:1,12,17,25 | 93:11,13 94:6 | **stand** 94:4 | **store** 14:19 |
| 25:3,14,16,20 | **source's** 80:2 | **standard** 12:7 | **stored** 28:17 |
| 25:21,25 26:2,4 | **southern** 1:1 | 13:5,19 60:20 | 32:7 85:8 |
| 26:6,8,10,12,13 | **speak** 42:24 | **standards** 8:13 | **story** 78:19 |
| 26:15,25 27:2,6 | 43:2,3 | **standpoint** 56:7 | **straight** 23:16 |
| 27:7,15 28:7,10 | **speaking** 90:14 | **start** 6:15 17:12 | **streaming** 28:19 |
| 28:23 29:20,23 | **specific** 9:5 | 41:8 42:24 | 51:10 54:10,10 |
| 30:7 31:4 32:7,9 | 11:24 16:2,6 | 49:19 | 55:22 56:15 |
| 33:1,4,8,9,12,18 | 17:8 25:6 27:22 | **started** 51:24 | 57:2 |
| 33:22 34:20,25 | 30:19,25 32:12 | **starting** 11:21 | **strictly** 90:14 |
| 35:2,6,10,25 | 35:4 54:15,16 | 41:12 | **string** 85:14 |
| 36:4,5,12 37:17 | 54:21 57:21 | **starts** 11:2 | **stringent** 81:21 |
| 38:18 39:8 41:4 | 66:16 67:10 | **state** 1:23 96:6 | 85:3 |
| 41:25 42:4 | 81:9,10 83:18 | 96:10,20 | **strip** 78:19 80:1 |
| 43:15 44:2,3,11 | 84:3,15 85:7,11 | **stated** 81:7 92:2 | **structural** 84:1 |
| 44:22 45:4,19 | 86:4,7 94:1 | 99:22 | **structurally** |
| 45:21 46:8,22 | **specifically** 10:4 | **statement** 83:7 | 91:1 |
| 47:8,24 48:19 | 20:9 31:16 | 89:11 91:4 | **structure** 48:25 |
| 48:23 49:12 | 34:22 35:13 | **statements** 46:8 | 49:7 85:22 |
| 52:2 55:12,14 | 45:13 56:2 | **states** 1:1 | **structured** |
| 56:23 57:4,10 | 78:23 | **static** 44:16,22 | 84:25 |
| 58:18,23 59:5 | **specification** | **statute** 98:18 | **structures** 82:3 |
| 62:17 64:25 | 60:4 | **stenographic** | **stuff** 8:22 90:18 |
| 65:11,21 66:7 | **specifications** | 97:9 | **subcomponents** |
| 67:16,17,18 | 59:23 | **stenographica...** | 19:13 |
| 68:18,21 69:4 | **specifics** 9:9 | 97:5 | **subject** 78:19 |
| 69:12,23 70:2 | 19:6 34:10 | **step** 72:18,19,24 | **submission** |
| 71:5,15 73:1,3,3 | 40:10 41:16 | 72:24 | 15:12 |
| 75:7,15 77:1 | 73:13,17 78:6 | | |

CONFIDENTIAL

**[submitted - teg's]**                                                    Page 125

| | | | |
|---|---|---|---|
| **submitted** 6:4,9 | 57:25 58:5,6 | 84:7 89:12 | 17:3,19 18:3 |
| 14:25 15:15 | 59:13 62:1,19 | **taken** 1:21 4:10 | 23:23 24:18 |
| **submitting** 15:5 | 63:4 65:7,13 | 4:16,17 52:15 | 25:3,15,22,24 |
| **subparts** 28:5 | 68:16 71:17 | **talk** 4:22 13:2 | 26:24 27:5,15 |
| **subsequently** | 76:10 79:18 | 33:9 52:20 | 27:18 28:1 |
| 15:14 45:5 | 80:8 81:6,23 | 55:19 58:17 | 29:15 30:4 31:5 |
| **substantial** 68:5 | 82:19 85:16 | 59:17 60:17,23 | 31:23 32:17 |
| **suggested** 98:15 | 86:10,16 88:6 | 61:4 | 33:17,19 34:4 |
| **suggesting** | 90:25 | **talking** 8:3,9,10 | 34:14,17,21,25 |
| 56:12 | **switchboard.c...** | 26:4,11 27:9,14 | 35:3,10 36:1,14 |
| **suitable** 66:2 | 16:11 | 27:17 31:8 | 36:18,22 37:3,6 |
| 67:19 | **sworn** 4:4 96:13 | 33:11 35:7,15 | 37:12,20 38:4 |
| **suite** 2:4,7 | **system** 9:3 27:4 | 39:3 48:23 | 39:6,9,19 40:18 |
| **summarize** 7:5 | 29:7 33:3 43:18 | 50:14 53:14 | 41:3,4,14 42:1,5 |
| 18:22 68:14 | 43:20 44:20 | 60:20 61:1 63:7 | 42:20 44:3 |
| 82:21 | 49:1 50:25 51:3 | 63:8 64:3 72:20 | 47:13 48:10 |
| **summarized** | 51:16 56:21 | 77:4 78:3,17 | 49:14 50:10,17 |
| 54:14 | 57:18,20 59:3 | 79:7,10 83:6,7 | 51:11,20 53:8 |
| **summarizing** | 59:10 62:1,6 | 87:5 | 53:18 54:13 |
| 28:24 | 75:15 93:18,23 | **task** 52:25 | 55:19 56:5 |
| **summary** 6:16 | 94:3 | **tasks** 63:1 64:13 | 57:14,18 58:15 |
| 18:10,21 | **systems** 3:5 5:10 | **team** 55:6 | 58:20,21,23 |
| **supervision** | 13:6,14,18 54:5 | **technical** 6:19 | 59:4 60:4,5,5,24 |
| 97:12 | 93:7 | 17:13,16 19:4 | 63:10,19,23,23 |
| **support** 36:10 | | 22:10 23:11 | 66:8 67:20 |
| **suppose** 45:16 | **t** | 61:9,18,21 63:1 | 68:20 69:22 |
| **sure** 4:25 10:24 | | 64:13,20 | 70:2 73:2,9 74:2 |
| 12:21 13:8,22 | **t** 3:1 6:22 12:24 | **technique** 44:16 | 74:18 77:13,18 |
| 19:4 20:3,15,24 | 99:3,3 | 69:11 81:14 | 83:7 94:13 |
| 21:17 22:7 | **take** 7:18 15:18 | **technology** | **teg's** 19:8 21:15 |
| 26:20 37:9 | 31:25 32:2,19 | 14:19 28:13 | 21:18 41:9 48:5 |
| 39:24 41:7,21 | 42:13,22,23 | 53:13 | 52:2 53:3 56:6 |
| 44:10 48:14 | 43:8 52:4,13 | **teg** 6:18 11:2,11 | 56:15 78:8 |
| 52:10 53:6 | 65:21 72:5 75:7 | 11:21 16:4,9 | |
| | 78:14 79:3 81:8 | | |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **teg's**  10:12 44:4 | 98:8,16 | 82:1 89:19 90:3 | 86:24 87:14,21 |
| **tell**  10:3 18:8 | **testing**  57:13,15 | 90:18 91:5,6 | 89:18,24,25 |
| 37:15 79:20 | 57:18,19,20,21 | 93:25 94:2,9 | 90:2,6,7,14 |
| 85:17 | 58:9,12,24 | **think**  4:13,19 | 91:14 92:14 |
| **telling**  43:13 | 59:10,25 60:11 | 6:5 7:11,13,19 | 93:20 95:16 |
| **template**  85:15 | 60:17,18,23,24 | 8:21,24 9:6,7 | **thinking**  93:20 |
| 85:20,23,25 | 61:7,9,15,24 | 10:3 11:10 | **third**  82:25 |
| **templates**  86:22 | 62:1,4,5 63:9 | 12:11,12 13:9 | **thought**  37:4 |
| 88:4,10,12,20 | 64:2,4,15 65:7 | 15:10 19:2 | **three**  29:1,15 |
| 88:22,23 89:15 | 73:20 94:1 | 20:13 21:8,10 | 31:5,22 32:16 |
| **ten**  23:6 | **tests**  61:19,24 | 21:14,15,17 | 34:13 35:7 40:6 |
| **term**  14:1,2 | **text**  48:25 49:2 | 22:2 23:11,14 | 42:1,5 49:13 |
| 17:14 28:13 | 49:5 66:10,11 | 23:15 24:19,20 | 54:8,11 55:1,17 |
| 35:22 82:17,21 | **thank**  5:18 6:23 | 27:1,12 29:9 | 56:4,6,11,12 |
| 84:5 93:6 | 26:22 42:12 | 30:5,14 31:15 | **throw**  17:14 |
| **terms**  13:7,14 | 91:24 94:17,19 | 31:18 32:20 | **time**  14:20 25:8 |
| 14:6 24:12 25:6 | 95:22,23 | 33:21 34:19 | 31:19 37:3 |
| 27:14 31:7 32:7 | **thanks**  52:14 | 36:8 37:11,23 | 40:15 45:6,10 |
| 32:23 56:23 | 95:21 | 38:6,8,8,10,10 | 45:15 51:19 |
| 57:15 58:19 | **theoretically** | 38:13 40:11 | 52:16 68:3,22 |
| 60:11 69:15,17 | 62:13 | 41:15,20,23 | 68:22 69:19 |
| 69:18 71:3,6,8 | **thereof**  69:6 | 43:9,25 47:1,5 | 73:21 76:24 |
| 71:13 72:6 85:1 | **thing**  40:24 47:2 | 48:11 49:19,25 | 77:4 82:12 |
| 88:18 91:11 | 61:25 68:20 | 50:4,13 51:13 | 94:17 |
| 93:19 | 69:2,23 84:14 | 51:19 56:10,17 | **times**  4:12,18 |
| **test**  59:23,25 | 87:10,15 91:21 | 56:18,23 63:22 | 38:22 |
| 60:3,4 61:9 | 93:17,20 | 63:23 64:17 | **today**  5:20 34:3 |
| 62:13 65:13 | **things**  7:20 8:1 | 66:25 67:2,21 | 40:5 |
| **testified**  4:4 | 24:24 26:1 | 67:22 72:7 | **together**  29:9 |
| 51:22 | 32:10,13 34:14 | 73:20,20 74:24 | 44:21 46:13 |
| **testimony**  24:6 | 41:2 54:23 59:3 | 75:23 76:12,14 | 50:16 51:10 |
| 50:10 55:10 | 59:4,17 60:10 | 77:15,20,22,25 | 54:23 55:1 56:5 |
| 63:14,22 67:23 | 64:14 67:23 | 78:25 82:5,6,20 | 57:2 61:5 63:9 |
| 82:18 91:24 | 68:5,18 72:9 | 85:16 86:5,15 | |

CONFIDENTIAL

**told** 53:18
**tools** 12:7 93:10
**top** 11:1 15:6,20
  17:21 18:25
  33:17 35:1,9,14
  38:3 41:5
**totally** 83:19
  88:6
**towards** 36:12
**trade** 69:1
**training** 33:2
**transaction**
  17:22 18:1,5,7
**transaction.m...**
  16:10
**transcribed**
  61:3
**transcript** 62:15
  95:7 97:7,11
  98:6,19
**transcripts**
  98:13
**transfer** 80:22
**transferred**
  80:21
**translated** 91:3
**translator** 66:3
  67:20
**transmission**
  9:10 28:13
**triangle** 1:7
  98:4 99:1
**triangleexperi...**
  38:17

**tried** 35:12
**true** 7:11 8:21
  13:13 97:9
  99:22
**truth** 6:11
**try** 4:22 7:23
  68:1 87:24 89:4
**trying** 16:17
  35:23 36:25
  37:4 41:1 51:2
  56:3 70:21
  76:18,23
**turn** 10:15 84:8
**turning** 68:10
**two** 17:5 22:2
  28:25 35:7
  49:23 51:5 54:5
  82:1 92:7 93:2
**type** 50:18,20
  81:18 85:8,11
  85:14
**types** 28:16 82:2
  85:2
**typescript** 84:22
  85:3,10 86:3,6,8
  86:19,20,21,21
  87:19 88:3,6,9
  88:11,19,22,23
  89:14,19 90:2,9
  90:16 91:8
**typical** 16:21
  63:2 64:18
  65:15 93:12

**typically** 17:10
  30:12 32:5,14
  39:1 40:25 61:9
  61:14,14,23
  62:24 64:10,14
  79:11 81:22
  82:21 84:25
  85:20 94:5

**u**

**uh** 32:1 60:22
  62:18 95:3
**ultimately** 43:11
  57:8 58:20
  64:11 67:1 71:6
  76:25 87:8,15
  88:21 89:2,5
**under** 6:9 11:6
  11:10,14,20
  23:21 27:20
  33:17 35:9 73:2
  97:11 98:17
  99:21
**underlying** 27:3
  43:23 70:19
  89:14
**understand** 5:1
  13:8 20:12 25:4
  36:25 37:4 38:1
  40:12 41:21
  42:19 43:19
  51:2 54:24
  55:24,25 56:3,9
  66:18 68:17,20

69:1 79:6 80:8
  80:12 86:15,16
  89:11,16
**understanding**
  14:22 15:1,11
  15:16 21:15,18
  23:15 25:11
  26:9 34:5,12,15
  34:20,24 35:2,6
  35:24 36:21
  37:19 41:8,17
  48:3 51:21
  60:25 82:21
**understood**
  24:15 44:19,19
  63:16 69:21
  91:13
**united** 1:1
**unquote** 16:12
**upfront** 60:16
**upstream** 42:9
  89:5
**use** 23:1 28:12
  28:25 29:1
  38:22 50:11,18
  51:9,9,11,14
  53:4,8,17,19,25
  53:25 54:25
  55:20 56:14
  57:1 70:24
  76:23 80:4
  81:13,17 82:17
  84:5,12 88:11
  88:21

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **used**  9:10 10:13 | **verbatim**  84:15 | **vocabulary**  3:6 | **websockets** |
| 12:5 14:19 | **verbiage**  83:14 | 5:10 13:6,15 | 28:12,25 51:9 |
| 25:22 27:3 28:7 | **verify**  98:8 | 29:25 | 52:21 53:4,9,17 |
| 28:16 47:9 | **veritext**  98:13 | **vs**  98:4 99:1 | 53:19,25 54:1,2 |
| 50:20 56:5 72:8 | 98:22 | **vulnerabilities** | 54:3,9 55:20 |
| 72:10,11 82:22 | **veritext.com** | 60:10 | 56:14 57:1 |
| 86:22 88:2 94:2 | 98:13 | | **wednesday**  1:12 |
| 94:2 98:20 | **versa**  90:4 | **w** | **weeds**  24:21 |
| **user**  3:11 21:23 | **version**  14:18 | **want**  6:16 9:18 | **weeks**  45:16 |
| 61:13,22 62:10 | 40:12 43:16 | 19:18 28:18 | **went**  45:18 |
| 62:24 70:25 | 59:5 | 41:21 48:22 | **whatnot**  67:24 |
| 71:2,5 78:19 | **versions**  44:5 | 52:4 65:6 75:9 | **wilson**  2:7 |
| **users**  28:8 | **versus**  27:3 | 81:23 87:12 | **withdrawn**  50:9 |
| **uses**  81:13 | 71:15 87:18 | 91:20 95:9 | 71:18 |
| **using**  14:1,2 | 89:7 | **wanted**  9:17 | **witness**  2:14,17 |
| 30:17 35:22 | **vice**  2:3 90:4 | 58:6 | 2:18,18 4:3 |
| 44:16 51:16 | **video**  1:19 2:1 | **water**  52:11 | 12:23 49:18 |
| 66:8,14 84:7,19 | 28:18 29:2 | **way**  7:5 18:22 | 52:6,10 53:23 |
| 85:2,4,12 86:1 | 35:18 51:10 | 22:9 25:7 37:16 | 66:25 79:10 |
| 86:22 | 54:10 55:21 | 41:19 45:6 | 94:19 96:5,11 |
| **usually**  39:2 | 56:15 57:1 | 46:10 49:20 | 96:14 97:6,10 |
| **utilize**  70:23 | 95:24 97:1,5,10 | 53:7 59:20 65:2 | 98:8,9,11,19 |
| | **videos**  59:14 | 65:10 67:2 86:7 | **word**  64:6 |
| **v** | **view**  63:19 | 86:25 87:12 | **words**  7:12 9:1 |
| **v**  1:6 | 71:13 73:3 | 88:24 89:17 | 25:24 50:9 |
| **variable**  85:1,2 | 79:17,25 80:3 | 90:6 | 56:14 60:4 |
| 85:7,7,12 | 86:12 87:20 | **ways**  65:18 | 72:22 80:5 83:4 |
| **varies**  9:5 84:19 | 88:2,17 | 93:12 | **work**  6:19 32:8 |
| **various**  3:13 7:4 | **vii**  64:17 | **we've**  30:22 | 51:3 63:4 65:14 |
| 58:14 61:18 | **virginia**  1:12 | 93:9 | 70:15 73:12,24 |
| 67:24 77:16 | 2:7 | **web**  35:18 43:18 | 74:17,25 79:15 |
| **vary**  60:15 85:8 | **vis**  25:16,16 | 88:1,2,8,12 89:1 | 79:17 84:10 |
| **vendor**  63:3 | **vjoc**  11:4 40:7,7 | **website**  72:7 | 87:10,12,24 |
| 64:19 | | | 89:5 94:9 |

CONFIDENTIAL

**worked**  6:18
  39:9 40:18
  44:23 70:12
**working**  10:1
  37:3 41:4 43:15
  43:17,22,22
  55:6 61:16 85:4
  93:11
**works**  61:20
**write**  42:10 55:7
  65:11,12,12
**writing**  41:25
  42:4
**written**  23:22
  25:21 31:5,12
  31:23 32:16
  33:19 34:3,21
  35:2,25 39:8
  46:25 47:2,4
  55:4 60:4 67:18
  67:20 83:21,22
**wrong**  41:24
  63:21
**wrote**  34:1 41:4
  44:3 47:24
  48:19 49:4 60:5
  66:13 67:3

|  x  |
| --- |
| **x**  3:1 |

|  y  |
| --- |
| **yeah**  6:1 8:7 |

**yeah**  6:1 8:7
  12:21 13:11
  14:8 16:15
  18:15 42:3,7
  46:6 49:18 58:8
  60:21 66:25
  71:12 74:5
  82:20 87:22
  94:24
**year**  45:14

|  z  |
| --- |
| **zoom**  4:17 |

|  à  |
| --- |
| **à**  25:16 |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.